## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) Case No. 15-11934 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DECLARATION OF PHILIP COOK IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Philip Cook, hereby declare under penalty of perjury:

1. I am an Executive Vice President and the Chief Financial Officer of Samson Resources Corporation, a corporation organized under the laws of Delaware and one of the above-captioned debtors and debtors in possession.

### Introduction

2. Oil and gas companies across the United States and around the world are feeling the pressure from the downward spiral in commodity prices, and the fate of many of these companies is yet to be determined. Access to capital is the lifeblood of exploration and production companies. With increasing leverage because of a constant need for capital, together with the recent rising cost of capital in the industry, operating in the current environment has been—and likely will remain—challenging. In addition to being capital intensive, there are several requirements associated with maintaining an oil and gas business, including an inventory of economic wells to drill, a consistent drilling program to offset the natural declines in

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227). The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is: Two West Second Street, Tulsa, Oklahoma 74103.

production that occur almost immediately, and a relatively consistent outlook for commodity prices. Some companies will attempt to wait out the current conditions, hoping for a rebound in commodity pricing and increased access to low-cost capital; others will succumb to market pressures and be forced to sell at depressed prices or otherwise permanently halt operations. Other companies will take a proactive approach and work to reshape their operations and balance sheet in a manner that will allow them to weather the macroeconomic environment in all circumstances.

3. Samson is an independent oil and gas company focused on the exploration, development, and production of natural gas and oil through its ownership interests in approximately 1.6 million net acres located in some of the most prolific and long-lived basins in the United States. Samson produced approximately 530 million cubic feet equivalents ("MMcfe/d") of gas and oil per day in 2014 from its producing wells, but has temporarily suspended exploration and drilling operations in light of its current financial distress and the recent industry turmoil.

4. A number of unexpected and unprecedented challenges have crippled Samson's ability both to sustain its leveraged capital structure and to commit the capital necessary for exploration and production. The continuation of dramatically low natural gas prices, a steep drop in the price of oil, and general market uncertainty have created an incredibly challenging operational environment for all exploration and production companies. In just the last 12 months, the price of oil dropped by more than 50 percent—from approximately $92 a barrel as of September 15, 2014 to below $50 a barrel as of September 15, 2015. With the price of natural gas at historic lows, the commodity price decline has created a perfect storm necessitating immediate action to restore the health of the company.

5.      Samson has aggressively attacked these challenges.   Following internal cost cutting (including recent suspension of drilling activity in February 2015) and performance improvement initiatives, together with isolated asset sales following an in-depth strategic review of a significant portion of its assets and operations, Samson concluded that it would need to rationalize its portfolio and add new assets with a better economic profile.   Notwithstanding these initiatives, it became clear in December 2014 that Samson's current capital structure prevented it from rationalizing its portfolio through sales and acquisitions.   In response, Samson retained restructuring professionals, including Kirkland & Ellis LLP and Blackstone Advisory Partners,[2] to help chart a path forward.

6.      With the help of its advisors, Samson considered and debated at length whether it was appropriate to make a $110 million interest payment on its senior unsecured notes in February 2015, or instead preserve liquidity and immediately commence a chapter 11 proceeding.   Ultimately, Samson made the interest payment, thereby—together with a March 2015 amendment to Samson's revolving credit facility—affording it a runway to negotiate a restructuring and recapitalization in a coordinated manner that would best maximize value and avoid the filing of a chapter 11 case without a developed restructuring framework in hand. These decisions proved to be critically important:  Samson was afforded nearly six months to engage in in-depth negotiations with both its second lien lenders and unsecured noteholders, all leading to what Samson believes will be a brief stay in chapter 11 to effectuate a complete restructuring and recapitalization that will set it on the path to profitability.

7.      Samson publicly reported significant value deterioration in its asset base in its 2014 annual report on Form 10-K filed on March 31, 2015 and Year-End 2014 Conference Call

---

[2]     Effective October 1, 2015, Blackstone Advisory Partners L.P. will be spun off from The Blackstone Group L.P. and combined with PJT Partners L.P.

presentation.  More specifically, Samson reported that the pre-tax "PV-10"—a commonly used methodology in the energy industry to derive the present value of estimated future oil and gas revenues, net of estimated direct expenses, and discounted at an annual rate of 10 percent—of its existing proved reserves was approximately $1.4 billion (including hedges).[3]  The PV-10 suggested that value did not extend beyond Samson's $1 billion second lien term loan.

8.       To facilitate a restructuring, Samson organized its major constituents and engaged in negotiations.  At Samson's request, the second lien agent under Samson's second lien term loan (at the direction of certain second lien lenders holding more than a majority in principal amount of the second lien loans), engaged legal counsel, who, in turn, engaged a financial advisor.  Likewise, a group holding more than a majority of Samson's $2.25 billion in unsecured notes engaged legal counsel and a financial advisor (notably, certain of the noteholders previously submitted a restructuring proposal to Samson in January 2015).  The engagement of both sets of advisors and the deliberate dual-path approach was constructed by Samson to create competitive tension.  This, in turn, would force each constituency to put its best foot forward and promote the development and negotiation of value-maximizing solutions for consideration by Samson and its board of directors.

9.       Significant diligence was followed by several months of negotiations, with both groups advancing actionable proposals.  The two potential paths forward, however, contemplated very different outcomes for Samson.

10.      The noteholders' proposal was designed to extend Samson's runway for the benefit of the bottom half of the capital structure through an out-of-court exchange offer and new money investment to be led by the participating noteholders.  Through the use of existing

---

[3]     Value of reserves calculated using NYMEX strip oil and natural gas prices.  "NYMEX" means the New York Mercantile Exchange.

indebtedness and lien baskets and a refinancing or amendment of the existing $950 million first lien credit facility, the potential transaction would have resulted in a "layering" of approximately $650 million in fresh capital from the noteholders, together with exchanged unsecured indebtedness (at a discount), ahead of the existing second lien term loan and directly behind the refinanced or amended first lien credit facility.  None of the new money or exchanged indebtedness was proposed to come in on a junior basis; instead, in all iterations of the noteholders' proposal, both the new money and exchanged obligations would have primed the exiting second lien debt.  The theory behind the noteholder proposal was that an extension of the company's runway for a few years would allow the company to benefit from a potential commodity price recovery and successful development of its acreage.  This proposal would have effectively created an option for stakeholders that were otherwise "out of the money."  Importantly, the noteholders' proposals consistently included "customary" mutual releases of claims and causes of action between the equity owners and the noteholders.

11.     On the other hand, the proposal from the group of second lien lenders contemplated a deleveraging of more than $3 billion, together with the infusion of $450 million in fresh capital that would permit the company to restart drilling operations and sustain the reorganized business through a potentially prolonged period of depressed oil and gas prices.  The second lien lenders maintained that an unsecured exchange that sought to layer the existing second lien term loan facility would violate the second lien intercreditor agreement and other loan documents, and informed the Debtors that they would aggressively challenge any attempt to effectuate such a transaction.  The second lien lenders recognized that their proposal would need to be implemented in chapter 11 because of the contemplated equitization or cancellation of existing claims and interests.

12.     After months of diligence, negotiations, debate, and deliberation, Samson determined to proceed with the second-lien transaction, which will reduce the first lien indebtedness and cancel the outstanding second lien indebtedness, unsecured indebtedness, the preferred equity, and the equity interests of Samson's owners—including those whose representatives also serve on Samson's board of directors.  Even though the noteholder-led alternative would have preserved an option for existing equity to potentially recover if commodity prices significantly rebounded, the unsecured exchange alternative simply was not feasible.  Thus, notwithstanding threats of litigation from the noteholders if Samson did not agree to effectuate the noteholder-led proposal, Samson, with the support of certain of its existing equity owners who stood to lose their entire $4.1 billion investment in any alternative other than the noteholder-led proposal, made the decision that was in the best interest of the enterprise.

13.     The noteholders' proposal necessitated satisfaction of several significant contingencies.  These included, among others:  obtaining consent to the exchange from holders of at least 95 percent of the unsecured notes (the proposing group held only approximately 56 percent); reaching an agreement with the existing first lien lenders or a replacement lender to allow for the contemplated layering under Samson's existing credit documents; ensuring that any arrangement fit squarely within the existing intercreditor arrangement in place with the second lien lenders; and securing an agreement with members of the Schusterman family, the original founders of Samson (together with certain related parties, the "Schustermans") in their capacities as holders of preferred shares in Samson.  Furthermore, proceeding with the noteholders' proposal was subject to risk and delay given the second lien lenders' contentions that the transaction violated terms of the second lien term loan facility documents and intercreditor agreement.

14.     Samson believed it needed to clear each of these hurdles before launching an exchange offer on August 17, 2015, which was the last day to launch and keep the exchange open for the requisite number of days before expiration of the 30-day grace period for the interest payment on the unsecured notes.  In the face of these contingencies, commodity prices continued to decline during the course of negotiations.  And, the attendant softening of the credit markets was front and center in the negotiations.  During negotiations in June and July, the interest rate on the $650 million new money investment proposed by the noteholder group (which would have primed the existing second lien loan) went from 9 percent cash-pay (and three percent payment-in-kind) to 16.5 percent cash-pay.  Meanwhile, various potential secured financing sources indicated to Samson that an amended, restated, or replacement first lien facility would have been difficult, if not impossible, to procure under these circumstances.  The totality of these factors (and significant contingencies) led Samson, in the exercise of the business judgment of its board of directors and management, to dedicate all efforts to the second-lien transaction beginning in late July.

15.     On August 14, 2015, Samson entered into a restructuring support agreement with its owners and a group of second lien lenders holding approximately 45.5 percent of second lien loan claims.  Over the last 30 days, Samson has successfully worked to document this transaction, resulting in today's filing of a chapter 11 plan and related disclosure statement that contemplates the implementation of a debt-for-equity conversion and a $450 to $485 million fully back-stopped rights offering.  The restructuring is now supported by more than 68 percent of second lien lenders.  The proposed restructuring will deleverage the company by more than $3 billion and reduce debt service by more than $250 million.  With approximately $250 million

of projected cash on hand at emergence, Samson will be able to restart drilling operations and implement its portfolio optimization program.

16.    Time is of the essence.  Samson's restructuring support agreement requires it to move quickly through chapter 11 and seek confirmation of the proposed plan by December 1, 2015.  In this dynamic operating environment with historically low commodity prices, Samson has secured access to much needed capital so that it can avoid the fate of many similarly situated companies that have, or likely will be forced to, cease operations.  All of which comes on the heels of a six-month dual track negotiation with the second lien lenders and noteholders designed to secure the best transaction for Samson.  The need to move quickly to implement the rights offering and access the new money commitment cannot be overstated.  Although noteholder claims and existing equity will be cancelled as part of this transaction, it would be unfortunate if unnecessary litigation delays the implementation of what was a fair and truly arms' length dual-track process that resulted in only one viable restructuring alternative in an extremely challenging environment.

17.    To effectuate this restructuring, on September 16, 2015 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the Court.  To minimize the adverse effects on their businesses, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Motions").  The First Day Motions seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession.  I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element in achieving a

successful reorganization of the Debtors, and best serves the Debtors' estates and creditors' interests.  The facts set forth in each First Day Motion are incorporated herein by reference.

18.    I am generally familiar with Samson's day-to-day operations, business and financial affairs, and books and records and have served as Samson's Chief Financial Officer since April 2012.  Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge of Samson's employees and operations and finances, information learned from my review of relevant documents, information supplied to me by other members of Samson's management and its advisors, or my opinion based on my experience, knowledge, and information concerning Samson's operations and financial condition.  I am authorized to submit this declaration on behalf of Samson, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

19.    This declaration has been organized into four sections.  The *first* provides background information on Samson, the oil and gas industry in which it operates, and the events leading to the filing of these chapter 11 cases.  The *second* offers detailed information on Samson's operations and capital structure.[4]  The *third* describes Samson's prepetition restructuring efforts and recent negotiations that led to agreement on the prearranged chapter 11 plan.  The *fourth* section and **Exhibit A** summarize the relief requested in, and the legal and factual basis supporting, the First Day Motions.

## I.    Samson's Businesses

20.    Samson is an onshore oil and gas exploration and production ("E&P") company with interests in various oil and gas leases primarily located in Colorado, Louisiana, North Dakota,

---

[4]    Many of the financial figures presented in this declaration are unaudited and potentially subject to change, but reflect Samson's most recent review of its businesses.  Samson reserves all rights to revise and supplement the figures presented herein.

KE 37606813

Oklahoma, Texas, and Wyoming.   Headquartered in Tulsa, Oklahoma, Samson employs approximately 600 individuals and generates most of its revenue through three operating companies: Samson Resources Company, Samson Contour Energy E&P, LLC ("Contour"), and Samson Lone Star, LLC ("Lone Star," and together with Samson Resources Company and Contour, the "Operating Companies").   The Operating Companies operate, or have royalty or working interests in, approximately 8,700 oil and gas production sites.

### A.      Oil and Gas Background

21.     Oil and gas business activity in the United States dates to the middle of the 19th century and has grown into one of the most important and influential industries in the country (and the world).   Today, the industry is typically divided into three major sectors: "upstream," "midstream," and "downstream."   E&P businesses like Samson's—that extract oil, gas, and other hydrocarbons from the ground—comprise the upstream sector.   The midstream sector includes companies engaged in gathering, transporting, and storing the (unrefined) hydrocarbons.   The downstream sector is comprised of refiners, distributors, and marketers of (refined) hydrocarbon products.

22.     The "upstream" E&P process is complex and usually involves five stages: identifying the target; drilling exploration wells; drilling appraisal wells; developing the field; and extending the life of the field.

23.     The first step—identifying the appropriate drilling target—requires E&P companies to determine where oil and gas is likely to be found in a basin below the Earth's surface.   A petroleum or hydrocarbon basin is a depression in the crust of the Earth caused by tectonic activity where certain hydrocarbon-rich sediments accumulate.   There are approximately 30 significant basins in the United States.

24.      Pinpointing the right location to extract oil and gas from a basin can be difficult and often involves specialized techniques and technology.  Seismic imaging, for instance, involves the use of sound waves to create three-dimensional images of underground rock structures.  Because oil reflects sound waves differently than water and other substances, a seismic survey is able to reveal possible oil- and natural-gas-bearing foundations.  Despite the sophisticated nature of this technology (and others like it) predictions are often inexact.  Identifying promising drilling targets requires the knowledge and training of experienced geologists, engineers, and other oil and gas personnel.

25.      After a company identifies an appropriate target, it usually drills an exploration well to determine whether its initial analysis was accurate and to calculate the probability of discovering an active hydrocarbon system.  Wells are usually drilled in stages, "casing" and cementing the hole at each stage to prevent collapse and fluid migration as the drill bit descends deeper underground.

26.      Once an exploration well is drilled, the company must conduct various analyses to determine whether—and how much—oil and gas can be extracted from the well.  This analysis is complicated, depends on the type of extraction process required to access oil and gas reserves, and can include techniques such as rock cutting, mud analysis, coring, and logging or measuring various electrical, nuclear, and acoustic properties of the rocks.  Each of these techniques has its own advantages, but the only way to definitively determine whether oil and gas production is economically tenable is a well test.  A well test allows the company to measure flow rates, properties of fluid or gas produced, and surface pressures, all of which can provide an E&P company with information necessary to more accurately predict the potential of each well.

27.     The next stage of the process usually requires drilling appraisal wells used to determine the geographic span and productivity of a given petroleum reservoir.  Finally, the field can be fully developed.  Gas, once extracted, is transported through pipeline into a central processing plant where natural gas liquids are extracted.  Once extracted, both the gas and natural gas liquids can be marketed.  Oil, on the other hand, is gathered by pipeline or trucks and is ultimately transported to a refinery for processing prior to marketing the end products.

28.     As oil and gas are extracted from a field, the pressure in a given reservoir decreases, potentially making the extraction process slower and more difficult and ultimately impossible.  To counteract this effect and extend the useful life of a field, companies often employ artificial lifting techniques to recover the gas and associated fluids.

29.     Each of the above steps depends on sophisticated technology and highly skilled personnel and each carries a different level of uncertainty and risk.  At each step, an E&P company must make complicated decisions regarding the viability—both technological and economic—of any given well or reservoir.

**B.      Samson's History**

**1.      Founding and Early Operations and Growth**

30.     Samson was founded by Charles Schusterman in 1971 when it assumed operations of certain properties in California and began an active acquisition and drilling program focused on low-risk investments.  Samson grew in the 1970s and 1980s, shifting its focus from oil to gas to avoid fluctuating oil prices and to capitalize on the growing spread between supply and demand in the natural gas market.  The end of the 1980s marked Samson's first international investment in Alberta, Canada; it eventually expanded its international portfolio to include assets in Russia, Venezuela, and the North Sea.

## 2.    Focus on Growing Domestic Production

31.    In 2005, the oil and gas business began to experience significant technological breakthroughs, including advances to hydraulic fracturing—or "fracking."  Specifically, the application of horizontal drilling combined with fracturing technology in tighter reservoirs and shales caused a breakthrough in opportunity that drove U.S. exploration and production for the next 10 years.

32.    Fracking refers to the use of fluids injected at pressures exceeding the natural stresses on the rock to cause the rock to crack.  Once cracked or fractured, the fissures are propped open with sand or ceramics.  The sand and ceramics allow for oil and gas to be more easily extracted through the cracks in the rock formation.  The diagram below illustrates the fracking process.



33.    Improved technology (including fracking technology advancements coupled with horizontal drilling) led to wide-spread development in natural gas and oil production—especially from shale rock.  In the early 2000s, Samson divested all of its international assets to concentrate on domestic acquisitions and exploration projects.  Additionally, to take advantage of technology

related to the extraction of gas from coal beds, on January 13, 2005, Samson completed its largest acquisition, in the San Juan Basin, and entered into several emerging shale and tight sand developments.

34.     Samson also later entered into JV agreements with other leading E&P companies to pursue opportunities in the Bakken and Powder River Basin regions.  Samson's domestic natural gas and oil production increased significantly as a result of these acquisitions.

35.     Wells developed using the fracking process, though expensive, allow for a high percentage of reserves to be recovered quickly, usually in their first two years.  While wells developed using conventional technology experience more gradual annual declines in yield, thereby assuring more consistent production over the long term, wells developed using fracking experience significant production declines during the first few years, often as high as 70 percent, and then flatten out over time.  The steep initial decline of fracked wells requires constant capital investment—at much higher drilling costs than for vertical wells—in new drilling projects to maintain stable production levels.

36.     By the third quarter of 2009, the increased supply caused by the significant technological improvements for oil and gas extraction through fracking, and the reduced demand resulting from the financial crisis and recession, caused the price of natural gas to decline to historic lows, dropping by over 75 percent from its most recent peak in 2008.  As the chart below illustrates, prices have remained low—even declining further—since.[5]

---

[5]     Chart data sourced from Bloomberg.



Monthly Henry Hub Natural Gas Prices ($/bbl)

### 3.    Private Acquisition

37.    On November 23, 2011, following a competitive marketing process and competing proposals, Kohlberg Kravis Roberts & Co. L.P. (together with its affiliates, "KKR") and a group of investors, including Crestview Partners ("Crestview," and together with KKR, the "Sponsors"), ITOCHU Corporation, and Natural Gas Partners agreed to acquire Samson Investment Company from the Schustermans for approximately $7.2 billion, excluding fees and expenses.  The investor group provided approximately $4.1 billion in equity investments as part of the purchase price.  The transaction, which resulted in the acquisition of substantially all of Samson's onshore domestic assets, closed in December 2011.  The only assets not included in the 2011 acquisition were the onshore Gulf Coast and deep-water Gulf of Mexico assets, which assets remain under the ownership of the Schustermans.  The Schustermans also received approximately $180 million in preferred stock in Samson in connection with the acquisition.

38.    At the time of the 2011 acquisition, Samson had nearly 1,200 employees and owned interests in over 10,000 wells in the United States (operating 4,000 of them), including

15

rights to resources in various basins throughout the Rockies, Mid-Continent, Permian,[6] and North Louisiana/East Texas areas.

39.    The investor group's strategy in acquiring Samson was to develop the liquids-heavy assets and reposition the company from a natural gas-focused company to one focused on oil and natural gas liquids (NGL) production.  At the time of acquisition, Samson had substantial producing assets (80-percent natural gas, 20-percent oil and natural gas liquids), as well as substantial undeveloped acreage.  When the investor group was negotiating the transaction in the fall of 2011, forward prices for natural gas were between $4.00 per MMBtu and $7.50 per MMBtu on long-dated natural gas.

### B.    Commodity Price Decline

40.    On the heels of the closing of the sale, by April 2012 the NYMEX prompt contract natural gas prices had declined significantly—approximately 40 percent since the buyout—and long-dated NYMEX futures continued to decline.  These declines materially reduced the cash flows Samson had to meet its interest payment burden and invest in developing its oil and natural gas liquids assets.  At the same time, overall oil and gas drilling activity in North America continued to rise, putting pressure on service costs because of demand for oilfield services.

41.    Samson also faced its own difficulties.  Challenges with then-existing management necessitated the replacement of the entire senior executive team starting in 2012. Moreover, certain of Samson's assets proved to be less productive than originally anticipated, and the company's drilling program failed to deliver the expected results.

---

[6]    Samson sold substantially all of its oil and gas properties in the Permian Basin prior to the 2011 buyout and subsequent to the transaction but continues to own some mineral rights.

42.    With natural gas prices remaining low, oil prices likewise began a steep descent beginning in mid-2014.   Worsening the decline, in November 2014 the Organization of Petroleum Exporting Countries ("OPEC")—after years of tempering significant fluctuations in oil prices through the control of supply—announced that it would not reduce production quotas in the face of the significant decrease in the price of oil.  OPEC's announcement drove the price of oil below $54 a barrel by the end of 2014, a total drop of more 50 percent from the beginning of the year.   In addition to decreasing revenue, lower commodity prices resulted in reduced borrowing capacity under Samson's revolving credit facility (and a lack of viable financing from other potential sources).  Samson's commodity hedges partially offset the impact of these price changes, but nonetheless the struggles to meet its interest burden and invest in the growth of the business continued.[7]

<u>XOP US Equity Price January 2014-August 2015</u>



_____

[7]    Chart data sourced from Bloomberg.

KE 37606813

43.     In early 2014, Samson developed a plan to improve performance and profitability by selling certain non-core assets, limiting capital to the most repeatable economic drilling opportunities, and looking for opportunities to add new assets.  Management considered creating a spin-off master limited partnership with a portion of Samson's assets and also considered creating a publicly traded growth platform with Samson's growth assets.  Samson aggressively pursued its non-core asset sale plan until the most recent commodity price declines made clear it was not feasible for Samson to execute on the strategy.  Although Samson was able to sell its Arkoma Basin properties in Oklahoma for approximately $48 million in March 2015, the commodity price drops hampered its ability to sell any other assets to help alleviate liquidity problems.

### C.     Wide-Ranging Industry Distress

44.     The difficulties faced by Samson are consistent with problems faced industry-wide.  E&P companies and others have been challenged by low natural gas prices for years—and prices remain below $3.00 MMBtu today.  The scale of the oil price decline cannot be understated.  On August 24, 2015, the price of oil hit a six-year low, dipping below $39 per barrel, and currently remains below $50.[8]

45.     These market conditions have affected oil and gas companies at every level of the industry around the world.  All companies in the oil and gas industry (not just E&P companies) have felt these effects.[9]  Even the "supermajor" multinational integrated oil and gas companies—including ExxonMobil Corporation and Chevron Corporation—have been hit by the current

---

[8]     Source:  Bloomberg.

[9]     *See* Press Release, Standard & Poor's, Oil & Gas Cos. Account for a Fourth of 2015 Corp Defaults (Aug. 21, 2015).

market conditions.[10]  Current equity (and debt) trading prices in the sector reflect the scale of the current financial distress.[11]

46.     Independent E&P companies have been especially hard-hit, as their revenues are generated from the sale of unrefined oil and gas.  Several companies, including American Eagle Energy Corporation, Quicksilver Resources Inc., Saratoga Resources Inc., and Sabine Oil & Gas Corporation have filed for chapter 11 during the first three quarters of 2015.  Numerous other E&P companies have defaulted on their debt obligations, negotiated amendments or covenant relief with creditors to avoid defaulting, or have effectuated out-of-court restructurings.  The current volatility in the commodity markets has made it especially difficult for some companies to identify and execute on any viable restructuring alternatives.

### D.     Samson's Current Assets, Operations, and Capital Structure

### 1.     Assets and Operations

47.     Samson operates throughout the United States and holds interests in various oil and gas leases in Colorado, Louisiana, Montana, New Mexico, North Dakota, Oklahoma, Texas, and Wyoming, which collectively generated approximately $290 million of commodity revenue in the first half of 2015.  Samson organizes its operations into an East Division and a West Division.

- The East Division comprises approximately 6,900 wells, a net acreage of 811,000, and proved reserves totaling 1,048 billions of cubic feet equivalent ("Bcfe").  The 2014 net production in the East Division was approximately 343 MMcfe/d.

---

[10]     *See* Joe Carroll, *Oil-Stock Plunge Erases $17 Billion as Exxon Hits Four-Year Low*, Bloomberg Business, Aug. 24, 2015, http://www.bloomberg.com/news/articles/2015-08-24/oil-explorers-tumble-as-commodities-bloodbath-sinks-markets; Clifford Krauss, *Exxon and Chevron Report Worst Quarterly Results of Current Decade*, N.Y. Times, July 31, 2015, http://www.nytimes.com/2015/08/01/business/energy-environment/exxon-mobil-chevron-q2-earnings-oil-prices.html.

[11]     Chart below indicates the equity value of the S&P Oil & Gas Exploration & Production Select Industry Index (the "XOP US Equity").  Chart data sourced from Bloomberg.

- The West Division comprises approximately 1,600 wells, a net acreage of 656,000, and proved reserves totaling 443 Bcfe.  The 2014 net production in the West Division was approximately 185 MMcfe/d.



(1)  *Includes a small "Other" business unit that reflects our interest in certain non-core assets located throughout the continental United States.*

48.     In response to current commodity prices and its leveraged balance sheet, Samson has suspended drilling and is not currently drilling new wells.

49.     As of the Petition Date, Samson has approximately 600 full-time employees. None of its employees are represented by a collective bargaining unit.  A corporate organizational chart is attached hereto as **Exhibit B**.

## 2.     Capital Structure

50.     As of the Petition Date, Samson reported approximately $4.9 billion in total liabilities.  As described in greater detail below, as of the Petition Date, Samson's significant funded debt obligations include:

- approximately $942 million of obligations under Samson's first lien revolving credit facility;

KE 37606813

- approximately $1.0 billion in principal amount of obligations under Samson's second lien term loan; and

- approximately $2.25 billion in principal amount of senior unsecured notes.

### a.    First Lien Revolving Credit Facility

51.    Samson maintains a reserve-based revolving credit facility with a borrowing base of approximately $942 million under the Credit Agreement dated December 21, 2011 (as amended, the "First Lien Credit Agreement"), with JP Morgan Chase Bank, N.A. serving as agent, and the lenders party thereto.  The First Lien Credit Agreement is subject to a borrowing base that may be adjusted by the agent and lenders based on the value of Samson's oil and gas reserves.

52.    The First Lien Credit Agreement has been amended five times, including most recently on March 18, 2015.  As of the Petition Date, the borrowing base under the first lien credit facility is approximately $942 million, and the facility is approximately fully drawn.  The first lien credit facility bears interest at a floating rate; for the six months ended June 30, 2015, the weighted average interest rate was 3.5 percent.  The first lien credit facility matures in 2016.

53.    The first lien credit facility is guaranteed by each of the Debtors and is secured by a first priority lien and security interests on substantially all assets and capital stock of Samson Investment Company and all wholly-owned domestic restricted subsidiaries, including a security interest in Samson's approximately $129.5 million in cash on hand and real property mortgages on at least 95 percent of the Debtors' oil and gas properties.

54.    The First Lien Credit Agreement is also affected by Samson's hedging program. Samson routinely enters into hedging arrangements with certain counterparties to provide partial protection against declines in oil and natural gas prices.  Samson's hedging strategy is based on a view of existing and forecasted production volumes, budgeted drilling projections, and current

and future market conditions and takes the form of oil and natural gas price collars and swap agreements.  Certain of the counterparties under the hedging agreement are also lenders under the First Lien Credit Agreement.  As of the Petition Date, the hedges currently stand in Samson's favor in an aggregate amount of approximately $105 million.  Pursuant to the proposed cash collateral order Samson negotiated before the commencement of these chapter 11 cases, certain of these hedges will remain in place in chapter 11 as long as Samson continues to pursue its prearranged plan (and certain other termination triggers do not occur).  Samson believes (based on analysis and advice leading up to the filing of these chapter 11 cases) that it is entitled to access significant cash through the settlement amount of any terminated hedge.

### b.    Second Lien Term Loan

55.    As Samson sought to maximize the value of its operations after the 2011 buyout, it considered various options to stimulate its production and growth.  In September of 2012, Samson determined to obtain additional financing to take advantage of market conditions to convert its short-term revolver debt to longer duration second lien term debt.

56.    On September 25, 2012, Samson entered into the Second Lien Term Loan Credit Agreement dated September 25, 2012 (as amended, modified, or supplemented from time to time, the "Second Lien Term Loan Credit Agreement") by and among Debtor Samson Investment Company, as borrower, Deutsche Bank Trust Company Americas, as successor administrative and collateral agent, and the lenders party thereto.  The principal amount of term loans under the Second Lien Credit Agreement is $1.0 billion and matures in 2018.  The second lien loan bears interest at a floating rate; for the six months ended March 31, 2015, the weighted average interest rate was 5.0 percent.  In 2014, Samson explored refinancing its Second Lien Term Loan.

57.     Obligations under the Second Lien Credit Agreement are guaranteed by all of the Debtors and secured by a second priority lien and security interests on substantially all assets and capital stock of Samson Investment Company and all wholly-owned domestic restricted subsidiaries, including real property mortgages on at least 95 percent of the Debtors' oil and gas properties.   A second lien intercreditor agreement among Samson Investment Company, the guarantors, the first lien agent, and the second lien agent, governs the relative rights of the first lien lenders and second lien lenders, and provides other protections for the benefit of such parties.

### c.     Unencumbered Assets

58.     The prepetition secured parties do not have security interests in all of Samson's assets.   In connection with the March 2015 amendment of Samson's first lien credit facility, the first lien lenders' minimum collateral coverage of mortgaged properties increased from 80 to 95 percent of the company's PV-9 total proved reserves.[12]   As a result, less than five percent of Samson's proved reserves is unencumbered as is certain real and personal property.   Samson's unencumbered real property is scattered throughout the United States and includes reserves, undeveloped acreage, mineral rights, and real estate.   Samson's unencumbered personal property includes certain limited equipment, machinery, vehicles, and office furniture.   Based on its review of the unencumbered assets, Samson believes that the unencumbered assets are not concentrated or readily marketable in their entirety, which dilutes the overall value of these assets.

---

[12]   "PV-9" is a commonly used methodology in the energy industry to derive the present value of estimated future oil and gas revenues, net of estimated direct expenses, and discounted at an annual rate of 9 percent.

23

### d.     Senior Unsecured Notes

59.     On February 8, 2012, Samson issued $2.25 billion in principal amount of 9.75% senior unsecured notes under the Indenture dated February 8, 2012 (the "Senior Notes Indenture") by and among Samson Investment Company, as issuer, the other Debtors, as guarantors, and Wells Fargo Bank, National Association, as trustee.  Proceeds from the issuance of senior unsecured notes were used to repay borrowings under a bridge facility associated with the 2011 buyout.

60.     The interest rate under the Senior Notes Indenture and the senior unsecured notes is 9.75% per annum, payable semi-annually in February and August, subject to a 30-day grace period.  The notes are guaranteed by all of the Debtors.  Samson did not make the approximately $110 million interest payment on the notes due on August 17, 2015.

## II.     Events Leading Up to the Restructuring

61.     Given its significant debt obligations and the state of the pricing environment for hydrocarbons at the end of 2014, Samson faced immediate challenges.  With liquidity under severe pressure from lower pricing and revenues, Samson faced an interest payment of approximately $110 million under its senior unsecured notes due on February 17, 2015. Additionally, a redetermination of the borrowing base under its first lien credit facility was scheduled for April 1, 2015 (which likely would reduce (significantly) availability given the decline in oil and gas prices).

62.     Samson took aggressive and proactive steps—from significant cost-cutting measures (including the suspension of all drilling activity, a significant reduction in work force, and a shut-in well project to increase cash flow) and performance improvement initiatives to select asset sales and an in-depth strategic review of all assets and operations—to address these challenges immediately.  In addition, in December 2014, Samson hired K&E and Blackstone to

begin exploring restructuring alternatives.  In February 2015, Samson also retained Alvarez & Marsal North America, LLC.

63.     With the help of these advisors, Samson began working in earnest to consider restructuring alternatives to ensure that its businesses were best positioned to compete in the E&P industry going forward.  To achieve an orderly restructuring and maximize the value of Samson's business, the Debtors and their advisors took a series of steps in a coordinated manner leading up to the filing of these chapter 11 cases.

A.     **Strategic Review of Assets**

64.     Starting as early as 2014, in anticipation of the issues it faces today, Samson began evaluating its asset base to determine which assets are "core" (i.e., capable of supporting long-term and sustainable drilling programs with acceptable returns) and which assets are "non-core" (i.e., assets that do not integrate well with the rest of the asset profile).  Samson also identified "upside assets," which have reasonable resource potential, but require further exploration and development.

65.     Samson has continued this analysis throughout the first three quarters of 2015 and intends to retain core assets and pursue divestitures of non-core assets to support its capital program and increase available funds for acquisition of complimentary oil and gas properties.

B.     **January Revolver Draw**

66.     Given the significant disruptions and uncertainty in the oil and gas industry and a need to bolster liquidity to maximize flexibility as it considered potential restructuring options, Samson determined that fully drawing its first lien credit facility was necessary to best position Samson in the short and longer term.  Consequently, Samson drew the remainder of available capacity under the first lien credit facility on January 16, 2015.

### C.    Noteholder Initial Proposal

67.    On January 30, 2015, Samson received a debt exchange and financing proposal from Oaktree Capital Management, L.P. and GSO Capital Partners LP.   The proposal contemplated an exchange at 60 percent of the aggregate outstanding amount of the existing unsecured senior notes held by Oaktree and GSO into 12 percent "1.5" lien notes.  The new "1.5" lien notes would constitute "First Priority Debt" under the company's Second Lien Credit Agreement, have the benefit of the existing intercreditor agreement between the first lien lenders and second lien lenders, and be subject to a new intercreditor agreement between the agent under the company's first lien credit agreement and the trustee under the indenture for the new notes. In connection with the exchange, Oaktree and GSO would provide $200 million ($100 million each) of new "last out" loans, bearing interest at 8 percent per annum, which would rank *pari passu* in right of payment with Samson's first lien revolving credit facility.

68.    After reviewing the proposal and asking Blackstone to discuss a few clarifying questions with Oaktree and GSO, Samson determined that this initial proposal was not actionable.  Among other issues, the proposal did not take into account the deterioration in the the company's asset base or the company's current valuation, both of which were to be reflected in Samson's upcoming financial disclosures.   As a result, and because Samson was just beginning discussions with its revolving lenders regarding the March borrowing base redetermination, Samson explained to the noteholders that it would be in a better position to engage in discussions beginning in March or April, once all relevant financial information was publicly disclosed.

### D.    Suspension of Drilling and Workforce Reduction

69.    Beginning in February 2015, in an effort to decrease costs, streamline operations, and preserve necessary liquidity, Samson suspended all drilling and limited capital spending.  It

also announced a plan to reduce its workforce by approximately 35 percent (approximately 375 employees) in March 2015.  The workforce reduction affected management, technical, back office, and field operations.  Samson closed small offices in the Woodlands, TX, Oklahoma City, OK, and Bossier City, LA, reduced its vehicle fleet by approximately 100, and consolidated technical software applications.  These cuts resulted in approximately $60 million of annualized savings.

### E.    February 17 Interest Payment

70.    Considering its tenuous liquidity position, Samson critically analyzed and considered the implications of making a $110 million interest payment due on February 17, 2015 under its senior notes indenture.  While making the payment would significantly reduce available cash, failing to make the payment would have necessitated a chapter 11 filing in the short term, without time to engage in negotiations that could either avoid a restructuring proceeding or otherwise minimize the duration of any such proceeding.  Samson's board of directors carefully weighed these issues, and ultimately determined to make the payment.  The board made this decision based on its determination that negotiating a consensual restructuring was reasonably achievable and that the benefits of avoiding an unplanned and potentially protracted chapter 11 process outweighed the short-term benefit of missing the payment.

### F.    March 2015 Amendment of the Revolving Credit Agreement

71.    At the same time that it was implementing the foregoing measures and considering whether to make the February coupon payment, Samson was negotiating with JPMorgan Chase & Co. ("JPM") and its other lenders regarding modifications to the financial covenants in the First Lien Credit Agreement.  On March 18, 2015, Samson and JPM reached an agreement to amend the First Lien Credit Agreement.  The March 2015 amendment provided Samson with extended relief from various covenants under the First Lien Credit Agreement

through the third quarter of 2015 and provided a waiver for any potential defaults resulting from a qualifier in Samson's 2014 financial statements regarding "substantial" doubts about its ability to continue operating as a going concern.  The March 2015 amendment also reduced the borrowing base under the First Lien Credit Agreement to $950 million (from $1 billion), increased the interest rate on borrowings by 50 basis points, increased the lenders' minimum collateral coverage from 80 to 95 percent of the PV-9 of the company's proved reserves, and imposed a requirement of $150 million minimum pro-forma liquidity after making any payment on account of junior indebtedness subsequent to July 1, 2015.  These changes provided Samson with additional time to negotiate with its key creditors in pursuit of a comprehensive financial restructuring of its businesses.

### G.    Restructuring Discussions

72.    Following the March 2015 amendment, Samson kicked off discussions with advisors to the agent under the Second Lien Term Loan Credit Agreement and advisors to certain holders of its senior unsecured notes.  The primary objective was to find a solution that satisfied the following main parameters:

- deleveraging Samson's debt obligations and reducing its debt-service expenses to a level more manageable under expected operating cash flow;

- facilitating the availability of new capital to restart drilling and support operations as the challenges facing the E&P industry continue;

- providing sufficient runway should pricing improvements not materialize in the short term; and

- maximizing enterprise value.

73.    Samson and its advisors held initial meetings with advisors to the second lien agent on April 14 and advisors to a group of noteholders on April 17.  Following those meetings,

Samson and its advisors quickly provided extensive diligence materials including detailed information on the company's operations and financials.

74.     As potential transaction discussions progressed with the advisors, in early June 2015 the Debtors negotiated confidentiality agreements with the second lien lenders and noteholders themselves (Centerbridge, Franklin, GSO, Oaktree, and Pentwater) so principals could engage in direct negotiations and diligence.   After entering into these confidentiality agreements, Samson engaged in extensive discussions with each of the two groups.   These discussions led to the negotiation of draft term sheets with each of the groups for two potential transactions.

### H.     Noteholder Negotiations

75.     The discussions with the group of noteholders focused on a potential out-of-court exchange and recapitalization transaction.   More specifically, the noteholder-led transaction contemplated an exchange, at a discount, of all of Samson's senior unsecured notes for new secured notes and a new-money investment of $650 million.   In all of the noteholder-led proposals, both the exchanged existing notes and new money investment would be invested on a priming basis ahead of the $1 billion second lien term loan obligations.   And whereas the original noteholder proposal contemplated an exchange at 60 percent of the aggregate outstanding notes, the final proposal contemplated an exchange at 20 percent of the aggregate outstanding notes.   While the noteholder-led restructuring would have resulted in deleveraging through the exchange of existing notes at a significant discount, the transaction would have left Samson with approximately $3 billion of indebtedness.

76.     For the noteholder-led transaction to be successful, broad noteholder support was required to actually delever the company.   The noteholder group itself held approximately 50 percent of the outstanding notes, and the term sheet contemplated achieving 95 percent

support from all noteholders.  The noteholder-led transaction included the risk of holdouts and the associated leverage.  In addition, Samson and the noteholders needed to reach an agreement on a refinancing or amendment of the existing first lien credit facility with JPMorgan or secure alternate financing.  None of the potential financing sources that Samson approached indicated a willingness to finance this transaction.  Further, Samson would need to reach an agreement with its existing preferred stockholders.  In addition, because of the upcoming coupon payment due under the indenture on August 17, 2015, the exchange would need to be launched and closed before the expiration of the grace period on September 16, 2015.  These contingencies needed to be resolved in that timeframe.

77.    A number of factors contributed to the inability to reach an agreement on a noteholder-led transaction, including:

- From early June through the end of July 2015, oil prices, which at one point had rebounded to approximately $60 per barrel, again dropped precipitously.  Because of this and other factors, including fears regarding China's economic growth, the credit markets softened significantly for E&P companies and made it difficult to agree on the terms of the new money investment.  In fact, during the course of negotiations, the interest on the new money investment proposed by the noteholder group increased from nine percent cash and three percent payment-in-kind to 16 percent cash.

- Samson's ability to obtain a new or amended first lien credit facility to accommodate the "layered" new money investment and exchanged debt was doubtful.  Samson needed to refinance or amend the first lien revolving credit facility in connection with the transaction (in unfavorable market conditions), which created an additional material execution risk and could have heightened the impact the credit market restrictions would have had on Samson post-transaction.

- The second lien lenders fervently opposed, and indicated that they would challenge the legality of, an exchange transaction.  This potential litigation with the second lien lenders was concerning to potential first lien financing sources.

- The noteholder group insisted that Samson's equity owners invest incremental capital as part of recapitalization.  The equity owners, however, were not prepared to make an additional investment in light of the current commodity price environment (among other things).

78.     For these reasons, among others, Samson and the group of noteholders were unable to reach an agreement regarding the terms of a transaction and Samson terminated negotiations in late July 2015.  This decision was made notwithstanding threats of litigation in any corresponding bankruptcy proceeding if Samson did not capitulate to the noteholder-led proposal.

## I.     Second Lien Lender Negotiations

79.     At the same time as the noteholder negotiations, Samson continued to discuss and negotiate a potential restructuring and recapitalization led by certain of its second lien lenders. Samson employed a dual-path approach to foster competition between the two constituencies and negotiate the best overall solution for all stakeholders.  Moreover, Samson believed it was prudent to ensure that if a noteholder-led restructuring was not workable or otherwise could not come together, it was critical to have a restructuring arrangement with the second lien lenders negotiated in advance to avoid a long, protracted restructuring where access to liquidity could lead to an entirely undesirable outcome.  After ceasing discussions with the group of noteholders, Samson focused 100 percent of its efforts on negotiating a viable, consensual transaction with its second lien lenders.

## J.     The Restructuring Support Agreement

80.     On August 14, 2015, Samson, a group of second lien lenders holding approximately 45.5 percent of outstanding second lien debt, and the Sponsors entered into a restructuring support agreement (the "Restructuring Support Agreement").[13]  In connection with entering into the Restructuring Support Agreement, Samson elected to forgo its unsecured notes

---

[13]     A copy of the Restructuring Support Agreement is attached hereto as **Exhibit C**.

KE 37606813

interest payment on August 17, 2015, and utilize the corresponding 30-day grace period to fully document the restructuring transaction.

81.    Since signing the Restructuring Support Agreement, Samson has in fact documented the terms of the prearranged restructuring, including the chapter 11 plan of reorganization filed with this declaration.  At the time of execution, the Restructuring Support Agreement had support from holders of approximately 45.5 percent of the outstanding second lien obligations.  As of the Petition Date, second lien lenders, including additional second lien lenders who subsequently executed the Restructuring Support Agreement, represent holdings over 68 percent of the outstanding loans and obligations under the Second Lien Credit Agreement.  As a result of this level of support from the class of second lien claims, Samson and the requisite second lien lenders have waived compliance with all sale-related milestones in the Restructuring Support Agreement. The plan effectuates a debt-for-equity conversion and rights offering, which will significantly reduce long-term debt and annual interest payments and result in a stronger balance sheet for Samson.  The key terms of the plan include the following:

- *New Money Investment.*  A new money investment of a minimum of $450 million, consisting of a minimum amount of $325 million in new common equity in the reorganized company and a maximum of $125 million of new second lien debt of the reorganized company, to be raised through a rights offering available to all second lien lenders.  If the company's projected liquidity is projected to be less than $350 million as of the effective date, an accordion provides for an additional investment of new common equity and new second lien debt of $35 million by the second lien lenders who elect to participate in the rights offering.  The aggregate new money investment (i.e., $450 or $485 million) under the rights offering will be backstopped by certain of the second lien lenders.

- *Exit First Lien Credit Facility.*  The exit first lien revolving credit facility will be a reserve-based revolving credit facility with a borrowing base of at least $750 million on the Effective Date, and such other terms reasonably acceptable to the Samson and the required backstop parties, which may either be an amended and restated First Lien Credit Agreement or a new facility.

- *Recovery to Second Lien Lenders.*  The second lien lenders will receive all of the new common equity in the reorganized company, less the new common equity issued to the

rights offering participants, the backstop parties, and the holders of allowed general unsecured claims (subject to dilution by new common equity issued in connection with the management incentive plan).

- **_Recovery to Holders of Unsecured Claims._**   Holders of allowed general unsecured claims (including claims under the senior unsecured notes) will receive 1.0 percent of the reorganized common equity if they vote for the plan and 0.5 percent if they do not (subject to dilution on account of the management incentive program).

- **_Releases._**   The plan includes certain releases that are consistent with the releases contained in the Restructuring Support Agreement.   The releases in the Restructuring Support Agreement provide, in consideration for the Sponsors' agreement to support the plan and restructuring (including by cooperating to preserve the debtor's valuable tax attributes) a mutual release between the second lien lenders that signed the agreement and the Sponsors (in each case including certain related parties as well) and a release of the Sponsors by Samson (again including certain related parties).

- **_Preservation of Tax Attributes._**   The plan will preserve Samson's valuable tax attributes to defray cancellation of debt income and for future offsets against income tax obligations.   More specifically, the Sponsors have agreed, in consideration of the releases included in the plan, not to

> pledge, encumber, assign, sell or otherwise transfer, including by the utilization of a worthless stock deduction, offer or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, any portion of its right, title, or interests in any of its shares, stock, or other interests in [Samson] to the extent it will impair any of [Samson's] tax attributes.

Importantly, if the Sponsors validly terminate the Restructuring Support Agreement, the parties have agreed that they maintain the immediate right to move for relief to take any of the actions otherwise proscribed by the Restructuring Support Agreement (with all parties reserving rights to oppose any such relief).

82.   Preserving Samson's valuable tax attributes—specifically, approximately $1.4 billion of net operating losses ("NOLs") as of December 31, 2014 and certain other tax attributes that can offset current and future gains or operating income if the plan is structured as a taxable sale of assets or tax-free reorganization—is critical to any restructuring and was a component of the discussions with the second lien lenders.   Before the Petition Date, certain direct and indirect holders of common stock approached Samson and the Sponsors seeking to have their interests repurchased so that these holders could take a worthless stock deduction in

33

2015.  These transactions were carefully considered and ultimately approved and executed in a manner that avoided triggering an ownership change.  Any additional transfer or redemption of common stock by the Sponsors, however, likely would impair substantially the value of, or otherwise restrict Samson's use of, the NOLs.  Like other equity owners, the Sponsors have indicated their desire to obtain the benefits associated with a worthless stock deduction in 2015.

83.     To ensure that the valuable NOLs are preserved and can be utilized by Samson, the second lien transaction was structured to include certain agreements with the Sponsors.  More specifically, and in return for mutual releases between the parties, the Sponsors agreed subject to the terms of the Restructuring Support Agreement not to sell or transfer any of their equity interests in Samson (including by utilization of a worthless stock deduction) to the extent it would impair any of Samson's tax attributes.  I have been advised that the releases granted pursuant to the Restructuring Support Agreement are consistent with the findings of an in-depth review and analysis of potential claims that Samson might possess against third parties, including the existing sponsors and any claims arising out of the 2011 leveraged buyout and the 2012 second lien loan as against the sponsors.  This investigation was commenced in anticipation of any potential in or out-of-court restructuring and is being conducted by Samson's counsel, K&E.  The investigation also includes all potential claims and causes of action associated with the 2011 leveraged buyout against other parties that are reserved under the plan.  I understand that K&E has collected and reviewed thousands of potentially relevant documents from Samson and the Sponsors in the course of its investigation.  I also understand that K&E interviewed a number of personnel of Samson and the Sponsors regarding the 2011 leveraged buyout, second lien term loan facility, and other matters.  Based on consultation with counsel, Samson concluded that it was in its best interests to provide releases in connection with an agreed-upon consensual

restructuring.  Most notably, the Sponsors together with the other equity owners collectively invested approximately $4.1 billion of equity to purchase Samson from the Schustermans.  As part of the 2011 buyout and related equity investment, the Sponsors, KKR and Crestview, received certain fees of approximately $68.1 million and $9.3 million, respectively.  Since the 2011 acquisition, the owners invested significant time and energy in Samson.  Pursuant to the terms of the Consulting Agreement dated as of December 21, 2011, which contract was entered into as part of the 2011 sale transaction, KKR and Crestview have received advisory fees totaling approximately $33.5 million and $4.9 million, respectively, through the end of 2014.  Following the significant decline in the price of oil in late 2014, combined with the deterioration in Samson's asset base as reported in early 2015, Samson and the Sponsors executed the Consent to Extension dated March 30, 2015, pursuant to which advisory fees due in 2015 were temporarily deferred.

84.    While the Sponsors could have pursued the noteholder-led transaction to preserve their 85 percent equity interests and hope for a turnaround, the Sponsors instead determined to support the transaction that was achievable and in the best interests of Samson.  This will result in the cancellation of all existing equity interests.  In addition, the Sponsors are willing to forgo an immediate worthless stock deduction (that could have been taken in the weeks leading up to the filing of these chapter 11 cases) in return for the releases and other terms included in the Restructuring Support Agreement and the chapter 11 plan.

85.    It is important to note that Samson maintains a broad "fiduciary out" under the Restructuring Support Agreement.  Specifically, section 29 of the Restructuring Support Agreement provides, in part, that nothing will prevent Samson from "taking or refraining from taking any action (including, without limitation, terminating this Agreement under

35

Section 9(b)(iii)) that it determines it is obligated to take (or to refrain from taking) on behalf of itself or its subsidiaries in the discharge of any fiduciary or similar duty."

86.     In light of the release provisions included in the Restructuring Support Agreement and the plan, as well as the possibility of the receipt of alternative restructuring proposals, Samson has appointed an independent director to each of the Debtors' authorizing bodies.  On September 16, 2015, Samson appointed Alan B. Miller to the authorizing body of each of the Debtors.  Mr. Miller was a senior partner (and later senior counsel) in the Business Finance & Restructuring Department of Weil Gotshal & Manges LLP for nearly 40 years.  Since 2007, Mr. Miller has served as a director to more than 20 companies, including in connection with the chapter 11 cases involving Mervyns Holdings, LLC, Catalyst Paper Company, Meridian Automotive Supply, and Colt Defense LLC.  Mr. Miller, through Samson, has engaged the law firm of Skadden, Arps, Slate, Meagher & Flom LLP to assist in his review of the investigation and determining the appropriateness of the releases included in the plan.

## III.     **First Day Motions**

87.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize Samson's business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring of Samson's balance sheet.  I have reviewed each of the First Day Motions.  I believe that the relief requested in the First Day Motions is necessary to allow the Debtors to operate with minimal disruption during the pendency of these chapter 11 cases.  A description of the relief requested and the facts supporting each of the First Day Motions is detailed in **Exhibit A**.

KE 37606813

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: September 16, 2015

_____
Philip W. Cook
Executive Vice President and
Chief Financial Officer