**<u>EXHIBIT A</u>**

**Evidentiary Support for First Day Motions**

<u>**EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS**</u>[1]

A.      **Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases ("<u>Joint Administration Motion</u>")**

1.      Pursuant to the Joint Administration Motion, the Debtors request entry of an order (a) directing procedural consolidation and joint administration of these chapter 11 cases and (b) granting related relief, including the ability to add later filed cases to these chapter 11 cases. Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.

2.      Many of the motions, hearings, and orders in these chapter 11 cases will affect each and every Debtor entity.  For example, virtually all of the relief sought by the Debtors in the First Day Motions is sought on behalf of all of the Debtors.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration of these chapter 11 cases, for procedural purposes only, under a single docket, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of nine independent chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

---

[1]     Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the applicable First Day Motion.

**B.    Debtors' Motion for Interim and Final Orders (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to Prepetition Lenders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 507, Bankruptcy Rules 2002, 4001, and 9014, and Local Bankruptcy Rule 4001-2, and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b) ("Cash Collateral Motion")**

3.    I believe that the Debtors have an immediate need to use Cash Collateral, without which the Debtors cannot maintain the value of their estates during these chapter 11 cases. The Debtors lack sufficient available sources of working capital and financing, however, to operate their businesses. The Debtors require access to Cash Collateral to procure goods and services from vendors, pay their employees, and satisfy other working capital needs. Such access is critical to the Debtors' ability to operate their businesses as going concerns and to finance the costs of administering these chapter 11 cases. As a result, I believe that immediate and irreparable harm will occur absent access to Cash Collateral. I believe that the Debtors' ability to use Cash Collateral is vital to preserving the Debtors' estates and avoiding the devastating consequences that any disruption to their businesses would have.

4.    In light of the Debtors' need to access liquidity, the Debtors entered into discussions with the First Lien Agent, Second Lien Agent, and certain second lien lenders. After weeks of good-faith, arm's-length negotiations, the Debtors, the First Lien Agent on behalf of the First Lien Secured Parties, and the Second Lien Agent on behalf of the Second Lien Secured Parties, reached an agreement regarding the consensual use of Cash Collateral. In addition, certain of the Hedge Bank counterparties to the debtors' hedging agreements have agreed to allow the Debtors' prepetition hedging agreements to remain in place, preserving significant value during the chapter 11 cases.

5.    The Debtors' agreement with the First Lien Agent and Second Lien Agent regarding Cash Collateral is subject to certain conditions, including the provision of adequate

3

protection to the Prepetition Secured Parties.  The Debtors will also operate in accordance with the Interim Budget during the interim period.

6.      The Debtors propose to provide the Prepetition Secured Parties with the following adequate protection package:

- superpriority administrative claims pursuant to section 507(b) of the Bankruptcy Code, which claims shall have priority over all unsecured claims and administrative expense claims against the Debtors, subject and subordinate only to the Carve Out;

- adequate protection liens, including first priority liens on Unencumbered Property, junior priority liens on certain existing liens, and certain priming liens on the Prepetition Collateral, to the First Lien Agent for the benefit of the First Lien Secured Parties to the extent of any diminution in value of their interests in the Prepetition Collateral, including Cash Collateral, subject to the Carve Out;

- adequate protection payments on the last business day of each calendar month after the entry of the Interim Order in an amount equal to all accrued and unpaid prepetition or postpetition interest, fees and costs due and payable under the First Lien Credit Agreement, such payments to be calculated (i) based on the ABR plus the Applicable Margin for ABR Loans and (ii) based on the relevant LIBOR Rate plus the Applicable Margin for LIBOR Loans (as set forth in the First Lien Credit Agreement);

- the reasonable and documented fees and expenses incurred by the First Lien Agent and certain Hedge Banks (subject to the Hedge Bank Fee Cap), including the reasonable professional fees, expenses, and disbursements (of counsel and other third-party consultants) incurred by the First Lien Agent under the First Lien Credit Agreement;

- maintained cash management arrangements in a manner consistent with that described in the Cash Management Motion (as defined herein);

- consultation with the First Lien Agent, subject to certain exceptions outlined in the Interim Order, prior to any use, sale, or lease of any material assets outside the ordinary course of business;

- compliance with the financial reporting requirements set forth in the First Lien Credit Agreement and provide certain additional financial reporting, as further described in the Interim Order;

- certain information regarding authorizations for expenditures and consult with the First Lien Agent regarding the Debtors' response, as further described in the Interim Order;

- compliance with restrictions set forth in the Interim Order related to sales and dispositions of Prepetition Collateral and Adequate Protection Collateral;

- compliance with the Interim Budget, subject to certain variances set forth in the Interim Order; and

- certain inspection and examination rights.

7.      The Debtors also propose to provide the Second Lien Secured Parties with the following adequate protection package:

- superpriority administrative claims pursuant to section 507(b) of the Bankruptcy Code, which claims shall have priority over all unsecured claims and administrative expense claims against the Debtors, subject and subordinate to the Carve Out and the First Lien Secured Parties' allowed superpriority administrative claims;

- adequate protection liens to the Second Lien Secured Parties to the extent of any diminution in value of their interests in the Adequate Protection Collateral, subject to the Carve Out, the adequate protection liens granted to the First Lien Secured Parties, the prepetition liens securing the First Lien Indebtedness, and the Intercreditor Agreement;

- reasonable and documented fees and expenses incurred by the Second Lien Agent, including the reasonable professional fees, expenses, and disbursements (of counsel and other third-party consultants) incurred by the Second Lien Agent under the Second Lien Credit Agreement;

- maintained cash management arrangements in a manner consistent with that described in the Cash Management Motion (as defined herein);

- compliance with the financial reporting requirements set forth in the Second Lien Credit Agreement and provide certain additional financial reporting, as further described in the Interim Order;

- certain information regarding authorizations for expenditures and consult with the Second Lien Agent regarding the Debtors' response, as further described in the Interim Order;

- compliance with restrictions set forth in the Interim Order related to sales and dispositions of Prepetition Collateral and Adequate Protection Collateral;

- compliance with the Interim Budget, subject to certain variances set forth in the Interim Order; and

- certain inspection and examination rights.

KE 37723069

8.      Additionally, the Debtors have stipulated, subject to the Challenge Period, to (a) the amount of the claims of the Prepetition Agents and Prepetition Secured Parties as of the Petition Date, (b) the validity and priority of the liens and security interests securing the First Lien Indebtedness and Second Lien Indebtedness, (c) the lack of a basis to challenge or avoid the validity, enforceability, priority, or perfection of the liens and security interests securing the First Lien Indebtedness and Second Lien Indebtedness, (d) the relative priority of the liens securing the First Lien Indebtedness and Second Lien Indebtedness as to each other, pursuant to the Intercreditor Agreement, and (e) the fact that all cash proceeds, subject to certain exceptions set forth in the Interim Order, are Cash Collateral of the Prepetition Secured Parties.

9.      I understand that courts in this jurisdiction have approved similar requests for relief in other, recent chapter 11 cases.  Accordingly, I believe that the Debtors' consensual use of Cash Collateral and agreed-upon adequate protection package is fair and appropriate under the circumstances of these chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Collateral Motion should be approved.

**C.      Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, (II) Continue Non-Insider Incentive Plans, and (III) Continue Employee Benefits Programs ("Wages Motion")**

10.      Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to (a) pay prepetition wages, salaries, other compensation, reimbursable expenses, director obligations, and severance obligations, (b) pursuant to the Debtors' proposed final order, continue existing non-insider incentive plans, and (c) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto.

11.    As of the Petition Date, the Debtors employ approximately 600 individuals on a full-time basis.  Approximately 245 Full-Time Employees are paid on an hourly basis, and approximately 355 receive a salary.  In addition, the Debtors also retain approximately 40 Independent Contractors and 20 Temporary Staff.  The Independent Contractors and Temporary Staff are a critical supplement to the efforts of the Debtors' Employees.

12.    The Employees, Contractors, and Temporary Staff perform a wide variety of functions critical to the administration of these chapter 11 cases and the Debtors' successful reorganization.  Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency.  In many instances, the Employees, Contractors, and Temporary Staff include highly trained personnel who are not easily replaced.  Without the continued, uninterrupted services of the Employees, Contractors, and Temporary Staff, I believe the Debtors' reorganization efforts will be hindered.

13.    The vast majority of Employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families, and will be exposed to significant financial constraints if the Debtors are not permitted to continue paying compensation, provide employee benefits, and maintain existing programs.

14.    The Debtors seek to minimize the personal hardship the Employees would suffer if employee obligations are not paid when due or as expected.  The Debtors are seeking authority to pay and honor certain prepetition claims relating to, among other things, wages, salaries, incentive programs, expense reimbursements, director obligations, severance obligations, and other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, taxes, and 401(k) contributions), health insurance, retirement benefits, workers' compensation benefits, paid time

off, parental leave, other paid leave, unpaid leave, life and accidental death and dismemberment insurance, short- and long-term disability coverage, education assistance, emergency assistance, employee assistance, relocation reimbursements, and other benefits that the Debtors have historically directly or indirectly provided to the Employees in the ordinary course of business and as further described in the Wages Motion.  In addition, the Debtors seek authority to pay all costs incident to the Employee Compensation and Benefits.

15.    I believe that the Employees provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that absent the payment of the Employee Compensation and Benefits owed to the Employees, the Debtors may experience Employee turnover and instability at this critical time in these chapter 11 cases.  I believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships these Employees may face.  Such Employees may then elect to seek alternative employment opportunities.  Additionally, I understand that a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases.  Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario.  I therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases.

16.    I also believe that continuing to maintain the Non-Insider Employee Incentive Programs for non-Insiders is a sound exercise of business judgment and in the best interests of

the estates.   Importantly, the Non-Insider Employee Incentive Programs are a long-standing component of the Debtors' overall Employee Compensation and Benefits package and are intended to incentivize the Employees.   The payments under the Non-Insider Employee Incentive Programs are only made if the applicable Employees attain the required operational and/or personal performance goals.  I believe that continuing to incentivize performance goals is beneficial for the Debtors' business and creditors, as it will help maximize the value of the Debtors' estates.   I therefore believe that it is necessary to continue these programs for non-Insiders on a postpetition basis to ensure that the non-Insider Employees are not exposed to significant financial constraints due to these chapter 11 cases.

      **D.**    **Debtors' Motion for Entry of an Order Authorizing the Debtors to (I) Continue to Operate the Cash Management System, (II) Honor Certain Prepetition Obligations Related Thereto, (III) Maintain Existing Business Forms, and (IV) Continue to Perform Intercompany Transactions ("Cash Management Motion")**

      17.    Pursuant to the Cash Management Motion, the Debtors seek entry of an order authorizing the Debtors to (a) continue to operate their Cash Management System, (b) honor certain prepetition obligations related thereto, (c) maintain existing business forms in the ordinary course of business, and (d) continue to perform intercompany transactions consistent with historical practice.

      18.    The Debtors maintain a Cash Management System which comprises a total of fifteen (15) Bank Accounts.  Thirteen of the Bank Accounts reside at JPMorgan Chase & Co. ("Chase"), one account resides at Wells Fargo Bank, N.A. ("Wells Fargo"), and one account resides at Bank of Oklahoma (collectively, the "Cash Management Banks").

      19.    The Debtors' operate their business and generate most of their revenues through three operating companies: Samson Resources Company, Samson Contour Energy E&P, LLC, and Samson Lone Star, LLC.  Each of the operating companies maintains a master account,

which collects revenue from sales of oil and natural gas, and two disbursement accounts which fund expenditures associated with the Operating Companies' general operating expenses, capital expenses, and royalty and joint interest payments. Samson Resources Company's master account serves as the Debtors' centralized main operating account and makes disbursements throughout the Cash Management System, as necessary. This account is funded by the key funding account.

20.    The Debtors also maintain a payroll account, one land and lease account, a tax-free-contribution-plan account, and an employee credit-card and expense-reimbursement account.

21.    The Cash Management System is comparable to the centralized cash management systems used by similarly situated companies to manage the cash of operating units in a cost-effective, efficient manner. The Debtors use the Cash Management System in the ordinary course of their business to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting. The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds, including in connection with intercompany transactions. Additionally, the Debtors' corporate accounting department regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.

22.    The Debtors pay their Cash Management Banks approximately $50,000 per month in the aggregate, monthly or quarterly, on account of fees incurred in connection with the Bank Accounts. The Debtors estimate that they owe Chase, Wells Fargo, and Bank of Oklahoma approximately $150,000 as of the Petition Date, the entirety of which will become due and payable within 21 days of the Petition Date.

23.     The Debtors maintain business relationships with each other resulting in intercompany receivables, and payables in the ordinary course of business.  Intercompany transactions are frequently conducted among the Debtors pursuant to prepetition shared services and informal intercompany trade arrangements, among others.  Intercompany transactions are made, through direct deposits and checks either to (a) reimburse certain Debtors for various expenditures associated with their business, (b) fund certain Debtors' accounts in anticipation of such expenditures, as needed, or (c) transfer funds up to the Company's main operating account when such excess revenue is available.

24.     I believe that the continuation of the Debtors' Cash Management System is essential to the Debtors' business and any disruption in the Debtors' use of the Cash Management System would severely disrupt, if not cripple, the Debtors' business.  I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

E.      **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of (A) Operating Expenses, (B) Joint Interest Billings, (C) Marketing Expenses, (D) Shipping and Warehousing Claims, and (E) 503(b)(9) Claims, and (II) Confirming Administrative Expense Priority of Outstanding Orders ("<u>Lien Claimants Motion</u>")**

25.     Pursuant to the Lien Claimants Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to pay in the ordinary course of business, (i) Operating Expenses, (ii) Joint Interest Billings, (iii) Marketing Expenses, (iv) Shipping and Warehousing Claims, and (v) 503(b)(9) Claims, and (b) confirming the administrative expense priority status of the Debtors' undisputed obligations for the postpetition delivery of goods and services and authorizing payment of such obligations in the ordinary course of business.  I believe that the

relief requested in the Lien Claimants Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in the ordinary course without disruption.

26.    Where the Debtors serve as an Operator, the Debtors generally will pay all of the Operating Expenses on account of their Working Interests and the Non-Op Working Interests. The Debtors will subsequently bill the holders of Non-Op Working Interests for their pro rata share of Operating Expenses.

27.    At the end of every calendar month, the Debtors generate a Joint Interest Billing for each holder of a Non-Op Working Interest in an oil and gas property operated by the Debtors. The invoices are mailed to, and published on a website accessible by, Non-Op Working Interest holders to provide actual notice of their respective Joint Interest Billings by the tenth day of the month following the month in which the Operating Expenses are incurred by the Debtors in their capacity as Operator.  The timing of JIB payments from Non-Op Working Interest holders can vary depending on the specific payment arrangement in place, but Non-Op Working Interest holders typically remit payment to the Debtors within 45-90 days of receiving their Joint Interest Billings.  In the twelve months preceding the Petition Date, the Debtors paid approximately $650.7 million in Operating Expenses.  Non-Op Working Interest holders reimbursed the Debtors approximately $182.3 million on account of Joint Interest Billings.

28.    As of the Petition Date, the Debtors estimate that they have approximately $25.6 million of Operating Expenses outstanding, for which they will be reimbursed approximately $7.2 million by holders of Non-Op Working Interests.

29.    I understand that failure to pay the Operating Expenses when due could result in the Operator's removal as Operator under a JOA or the perfection and/or enforcement of liens on

the Debtors' assets.  Specifically, state law in jurisdictions in which the Debtors operate protect the rights of mineral contractors by granting them statutory liens to secure payment for their services.  Pursuant to section 363(b)(3) of the Bankruptcy Code, the act of perfecting statutory liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.  If the Lien Claimant were able to assert liens against the Debtors for failure to pay the Operating Expenses when due, the results would be detrimental to the Debtors and their creditors.  Lien Claimants may be able to place liens on, among other things, the wells, the production and proceeds therefrom, and fixtures and equipment associated with the oil and gas properties.  As such, the Debtors revenues could be placed in jeopardy absent the relief requested.  Accordingly, the Debtors request approval to pay up to $13.2 million of the prepetition Operating Expenses on an interim basis, up to $25.6 million upon entry of the Final Order, and to continue paying Operating Expenses in the ordinary course of business on a postpetition basis.

30.     The Debtors also hold Non-Op Working Interests in many oil and gas properties. In such circumstances, a third party acts as Operator and is charged with the Daily Operations and the Operating Expenses associated therewith.  The Debtors' primary responsibility with respect to their Non-Op Working Interests is to timely pay the Operators for their pro rata share of Operating Expenses through the Joint Interest Billing Process.

31.     In the twelve months preceding the Petition Date, the Debtors paid approximately $67.7 million in Joint Interest Billings.  As of the Petition Date, the Debtors estimate that they have approximately $17.2 of prepetition Joint Interest Billings outstanding.

32.     I understand that the Operator of an oil and gas property commonly is granted a contractual and/or statutory lien on Non-Op Working Interest holders' interests in the oil and gas

property to secure the payment of obligations owed to the Operator.  Specifically, similar to Lien Claimants, applicable state law often grants Operators statutory liens to secure obligations owed to the Operator on account of the Debtors' interests in the oil and gas lease.  Operators would be able to assert liens against the Debtors and their interests in the relevant oil and gas properties if the Debtors failed to pay their pro rata share of Operating Expenses when due.  As such, failure to timely pay the Joint Interest Billings owing by the Debtors is likely to result in Operators asserting lien rights under applicable state laws on the Debtors' interest in the Oil and Gas Leases or the production therefrom.  If asserted, I understand such liens could restrict the Debtors' ability to dispose, transfer, or otherwise alienate its property, potentially severely impairing the Debtors' business.  Accordingly, to preserve and protect their share of production from such oil and gas properties and to maintain their relationships with the applicable third party Operators, both during and after the pendency of these chapter 11 cases, the Debtors request approval to pay up to $4.1 million in prepetition Joint Interest Billings on an interim basis, up to $17.2 million upon entry of the Final Order, and to continue paying such Joint Interest Billings in the ordinary course of business on a postpetition basis.

33.    To effectively market or sell production from oil and gas properties operated by the Debtors, the Debtors, as Operator, will make Marketing Arrangements by which third parties will charge the Operator for the Marketing Expenses.  The Debtors similarly may incur Marketing Expenses on non-operated oil and gas properties where the Debtors make their own Marketing Arrangements by electing to take their production "in-kind," separate and apart from the other Working Interest Holders rather than requesting that the third party Operator market the production associated with the Debtors' Non-Op Working Interests in the Debtors' behalf.

Where the Debtors take their production in-kind, the Debtors similarly will incur Marketing Expenses.

34.    In the twelve months preceding the Petition Date, the Debtors paid approximately $42.9 million in Marketing Expenses.  As of the Petition Date, the Debtors estimate that they have approximately $6.9 million of prepetition Marketing Expenses outstanding.

35.    I understand that failure to pay the Marketing Expenses when due could result in counterparties to the Marketing Arrangements refusing to release production or revenues associated with the Marketed Production in their possession or refusing to accept delivery of additional Marketed Production.  In instances where delivery of Marketed Production is refused, the Debtors may be forced to shut-in a well.  Shutting in a well may have economic consequences to the Debtors beyond temporary cessation of production and revenue therefrom. The act of shutting in a well can trigger obligations to other interest holders in that well, including payment obligations or potential forfeiture of the Debtors' interest under the terms of an Oil and Gas Lease.  Accordingly, to preserve and protect their relationships with the applicable Marketing Arrangement counterparties, both during and after the pendency of these chapter 11 cases, the Debtors request approval to pay up to $4.1 million in prepetition Marketing Expenses on an interim basis, up to $6.9 million upon entry of the Final Order, and to continue paying such Marketing Expenses in the ordinary course of business on a postpetition basis.

36.    The Debtors also engage Shippers to transport or deliver Materials from a manufacturer to a storage yard, between a storage yard and an oil and gas property, between oil and gas properties, or between storage yards.  Additionally, while the Debtors own multiple storage yards, they rely on approximately 30 additional Warehousemen in the ordinary course of

business to store Materials when not being used.    On average, the Debtors pay the Warehousemen approximately $13,000 per month in arrears.

37.    In the twelve months preceding the Petition Date, the Debtors paid approximately $220,000 in Shipping and Warehousing Claims.  As of the Petition Date, the Debtors estimate that they have approximately $30,000 of prepetition Shipping and Warehousing Claims outstanding.

38.    I understand that under most state laws, a Shipper or a Warehouseman may have a lien on the goods in its possession, which lien secures the charges or expenses incurred in connection with the transportation or storage of such goods.[2]  As a result, certain Shippers and Warehousemen may refuse to deliver or release Materials or other property in their possession or control, as applicable, before the Shipping and Warehousing Claims have been satisfied and their liens redeemed.    Accordingly, to continue using the Shippers' and Warehousemen's transportation and storage services and have access to the Materials held or controlled thereby, the Debtors request approval to pay up to $14,000 in prepetition Shipping and Warehousing Claims on an interim basis, up to $30,000 upon entry of the Final Order, and to continue paying such Shipping and Warehousing Claims in the ordinary course of business on a postpetition basis.

39.    Additionally, the Debtors may have received goods from 503(b)(9) Claimants within the 20 days before the Petition Date. Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.  As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claims.  The Debtors also

---

[2]    By this Motion, the Debtors do not concede that any liens (contractual, common law, statutory, or otherwise) described in this Motion are valid, and the Debtors expressly reserve the right to contest the extent, validity, and perfection of any and all such liens, and to seek avoidance thereof.

KE 37723069

believe certain 503(b)(9) Claimants could reduce the Debtors' existing trade credit—or demand payment in cash on delivery—further exacerbating the Debtors' limited liquidity.  Absent payment of the Section 503(b)(9) Claims at the outset of these chapter 11 cases—which I am advised merely accelerates the timing of payment and not the ultimate treatment of such claims—the Debtors could be denied access to the equipment and goods necessary to maintain the Debtors' business operations.

40.      By the Lien Claimant Motion, the Debtors seek authority, but not direction, to pay up to $2.7 million to the 503(b)(9) Claimants on account of their prepetition claims.

41.      Finally, the Debtors may have placed Outstanding Orders for goods that will not be delivered until after the Petition Date.  To avoid becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.  To prevent any disruption to the Debtors' business operations, the Debtors seek an order (a) granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the postpetition acceptance of goods subject to Outstanding Orders and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

F.      **Debtors' Motion for Entry of Interim and Final Orders Authorizing Payment of (I) Mineral Payments and (II) Working Interest Disbursements ("Royalty Payments Motion")**

42.      Pursuant to the Royalty Payments Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to pay or apply in the ordinary course of business, any and all amounts owed to Mineral Payees and Working Interest Holders in the ordinary course of business, whether such obligations were incurred prepetition or will be incurred postpetition. For the reasons set forth below, I believe that the relief requested in the Royalty Payments

17

Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in the ordinary course without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Royalty Payments Motion should be approved.

43.    The Debtors hold Working Interests in approximately 7,500 Oil and Gas Properties.  On average in 2014, the Debtors generated approximately $98.8 million of revenue each month on account of their Working Interests in the Oil and Gas Properties.  The Debtors' Working Interests generally are subject to Interest Burdens.

44.    It is my understanding that in the states in which the Debtors have Working Interests, Interests Burdens are interests in real property and the Debtors have no equitable interest in such property.  The Debtors take possession of the proceeds from the Mineral Payees' share of oil and gas production because they market and sell the oil and gas production on behalf of the Mineral Payees prior to remitting the Mineral Payments to them.

45.    In general, the Debtors make approximately 7,800 Mineral Payments totaling approximately $16.1 million per month.   The Debtors estimate that, as of the Petition Date, there is approximately $33.8 million in as-yet unpaid Mineral Payments,[3] including approximately $15.9 million in such payments due in the next three weeks.

46.    The Debtors are the Operators for a number of their Oil and Gas Leases, many under Joint Operating Agreements with other parties.  I understand that, as an Operator, the Debtors are responsible for making Working Interest Disbursements.  In the twelve months

---

[3]    Included in this amount is approximately $440,000 of "suspended funds" (the "Suspended Funds").  The Suspended Funds represent amounts that are due and owing to certain Mineral Payees but are otherwise unpayable for a variety of reasons, including incorrect contact information, unmarketable title, and ongoing disputes over ownership of the underlying interest. Subject to applicable laws, when and to the extent the Debtors are provided evidence or sufficient notice that the issue preventing payment of the Suspended Funds to a particular Mineral Payee is resolved, the Debtors release the Suspended Funds in question.

ending June 30, 2015, the Debtors remitted approximately $167.7 million in Working Interest Disbursements.  I understand that failure to timely pay the Working Interest Disbursements could expose the Debtors to statutory enforcement mechanisms, and that holders of Non-Operating Working Interests often have contractual remedies under the applicable Joint Operating Agreement, including the grant of a security interest in production, the right to remove the Debtors as Operator, and the right to interest on the amount owed.  And, the Working Interest Disbursements held by the Debtors prior to remittance to the appropriate Working Interest holders may not be property of the Debtors' estates.  I understand that as of the Petition Date, the Debtors estimate that they have approximately $35.6 million of Working Interest Disbursements outstanding,[4] including approximately $14.8 million in such disbursements due in the next three weeks.   Of the $35.6 million Working Interest Disbursements currently outstanding, approximately $8.4 million of such Working Interest Disbursements will be set-off in the ordinary course of business against Joint Interest Billings owed to the Debtors by third parties.

47.    I believe that failure to pay the Mineral Payments and Working Interest Disbursements could materially jeopardize the Debtors' production ability and reliability. Failing to pay the Mineral Payments and Working Interest Disbursements would have a devastating impact on the Debtors' operations and would undoubtedly force the Debtors to spend significant time and resources resolving disputes with the very parties on whom they depend.  If the relationships established by the Debtors with the parties that are owed these payments are harmed, whether through non-payment or perceived difficulties of working with a chapter 11

---

[4]    Included in this amount is approximately $1.9 million of Working Interest Disbursements that the Debtors may have mistakenly withheld from certain Non-Operating Working Interest holders due to discrepancies in the amount of Operating Expenses attributable to the applicable Oil and Gas Leases.  In the ordinary course, if the Debtors determine that they have overbilled a particular Non-Operating Working Interest holder for such holder's share of Operating Expenses (and thus have not remitted such holder's full Working Interest Disbursement), the Debtors remit the remaining Working Interest Disbursement owed to such holder.  Also included in this amount is approximately $2.0 million of Suspended Funds.

debtor, the Debtors may be unable to secure future opportunities with those parties and other third-parties may be unwilling to engage in new business with the Debtors going forward. If that were to occur, the negative impact on the Debtors' business, estates, and creditors would be substantial.  Based on the foregoing, I believe that the relief requested in the Royalty Payments Motion is in the best interest of the Debtors, their estates, their creditors, and all parties in interest.

### G.    Debtors' Motion for Entry of Interim and Final Orders Authorizing the Payment of Certain Prepetition Taxes and Fees ("**Taxes Motion**")

48.    The Taxes Motion seeks the authority to remit and pay Taxes and Fees that accrued before the Petition Date and will become payable during the pendency of these cases in an aggregate amount not to exceed $45.4 million.  The Debtors also request that the Court authorize applicable financial institutions, when the Debtors so request, to receive, process, honor, and pay any and all checks or electronic payment requests in respect of the Taxes and Fees.

49.    In the ordinary course of business, the Debtors collect, withhold, and incur sales, use, income, franchise, severance, and property taxes, as well as environmental and business fees, as more fully described in the Taxes Motion.  The Debtors estimate that approximately $45.4 million in Taxes and Fees relating to the prepetition period will become due and owing to the Authorities after the Petition Date, and approximately $3.1 million of this amount will become due and payable within 21 days of the Petition Date.  Payment of the Taxes and Fees is critical to the Debtors' continued and uninterrupted operations.  The Debtors' failure to pay prepetition Taxes and Fees may cause the Authorities to take precipitous action, including, but not limited to, conducting audits, filing liens, preventing the Debtors from doing business in certain jurisdictions, seeking to lift the automatic stay, or pursuing payment of the Taxes and

Fees from the Debtors' officers and directors, all of which would greatly disrupt the Debtors' operations and ability to focus on their reorganization efforts.

50.     I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**H.     Debtors' Motion for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Preferred Stock ("Equity Trading Motion")**

51.     Pursuant to the Equity Trading Motion, the Debtors seek entry of orders (a) approving the procedures related to certain transfers of and declarations of worthlessness with respect to Common Stock and Preferred Stock, (b) directing that any purchase, sale, or other transfer of, or declaration of worthlessness with respect to Common Stock or Preferred Stock in violation of the procedures shall be null and void ab initio, and (c) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing to consider approval of the Equity Trading Motion on a final basis.

52.     As of the Petition Date, the Debtors estimate that they have NOLs in the amount of approximately $1.4 billion.  I understand that the NOLs are of significant value to the Debtors and their estates because the Debtors can carry forward their NOLs to offset their future taxable income for up to 20 years, thereby reducing their future aggregate tax obligations.  In addition, such NOLs may be utilized by the Debtors to offset any taxable income generated by transactions consummated during these chapter 11 cases.  The termination or limitation of the NOLs could be materially detrimental to all parties in interest.  The value of the NOLs will inure to the benefit of all of the Debtors' stakeholders.

KE 37723069

53.    The NOLs are a key asset of the Debtors' estates and essential to the Debtors' restructuring.  The loss of the NOLs would therefore cause immediate and irreparable harm to the Debtors' estates.  The Procedures are the mechanism by which the Debtors will monitor and object to certain transfers of and declarations of worthlessness with respect to Common Stock or Preferred Stock to ensure preservation of the NOLs.  I further believe that the Procedures and other relief requested in the Equity Trading Motion are critical for maximizing estate value and will help ensure a meaningful recovery for creditors.  If no restrictions on trading or worthlessness deductions are imposed as requested in the Equity Trading Motion, such trading or deductions could severely limit or even eliminate the Debtors' ability to utilize the NOLs.  I believe that the loss of these valuable estate assets could lead to significant negative consequences for the Debtors, their estates, their stakeholders, and the overall reorganization process.  Accordingly, on behalf of the Debtors, I respectfully submit the Court should grant the relief requested in the Equity Trading Motion.

I.    **Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, and (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests ("Utilities Motion")**

54.    Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders (a) approving the Debtors' Proposed Adequate Assurance of payment for future utility services; (b) prohibiting Utility Companies from altering, refusing, or discontinuing services; and (c) approving the Debtors' proposed procedures for resolving Adequate Assurance Requests.

55.    In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, natural gas, propane, telecommunications, water, waste management (including sewer and trash), internet, cable, and other similar services from a number of utility companies or brokers.  On average, the Debtors pay approximately $793,000

each month for third party Utility Services, calculated as a historical average the twelve-month period ended July 31, 2015.  Two Utility Companies hold deposit of approximately $75,000 and $33,000 from the Debtors.

56.    Preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.   Indeed, any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue operations and explore and produce oil and gas.  I believe this disruption would adversely impact customer relationships and result in a decline in the Debtors' revenues and profits.   Such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, value and creditor recoveries.  It is critical, therefore, that Utility Services continue uninterrupted during these chapter 11 cases.   Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Utilities Motion should be granted.

**J.    Debtors' Motion for Entry of an Order Approving Continuation of Surety Bond Program ("Surety Bond Motion")**

57.    Pursuant to the Surety Bond Motion, the Debtors seek entry of an order authorizing the Debtors to continue and renew their Surety Bond Program on an uninterrupted basis, including paying bond premiums as they come due, providing the Sureties with collateral, renewing or potentially acquiring additional bonding capacity as needed in the ordinary course of their business, and executing other agreements, as needed, in connection with the Surety Bond Program.

58.    In the ordinary course of business, the Debtors are required to provide surety bonds to certain third parties, often governmental units or other public agencies, to secure the Debtors' payment or performance of certain obligations.   These obligations relate to, among other things:  (a) conservation; (b) oil and natural gas drilling and exploration operations; (c)

23

rights-of-way; (d) land use; (e) utilities; and (f) litigation judgments.    Often, statutes or ordinances require the Debtors to post surety bonds to secure these obligations.    As such, failures to provide, maintain, or timely replace their surety bonds may prevent the Debtors from undertaking essential functions related to their operations.    As of the Petition Date, the Debtors have approximately $11.3 million in outstanding surety bonds.

59.    To continue their business operations during the reorganization, the Debtors must be able to provide financial assurances to local governments, regulatory agencies, and other third parties.    This in turn requires the Debtors to maintain the existing Surety Bond Program and potentially to acquire additional bonding capacity as needed in the ordinary course of the Debtors' business.

60.    Continuing the Surety Bond Program is thus necessary to maintain the Debtors' current terms and existing relationships with their Sureties.    Based on the Debtors' current circumstances, I do not believe that it is likely that the Debtors will be able to renew, or obtain replacement of, existing bonds on terms more favorable than those offered by the Sureties.    The process of establishing a new surety bond program, moreover, would be burdensome to the Debtors, and it is doubtful that the Debtors could replace all of the surety bonds in time to avoid defaults or other consequences of the applicable obligations.

61.    I believe that the relief requested in the Surety Bond Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.    Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Surety Bond Motion should be granted.

**K.    Debtors' Motion for Entry of an Order Authorizing the Debtors to (I) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto and (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies ("Insurance Motion")**

62.    Pursuant to the Insurance Motion, the Debtors seek entry of an order authorizing the Debtors to (a) continue existing insurance coverage entered into prepetition and satisfy payment of prepetition obligations related thereto and (b) renew, amend, supplement, extend, or purchase insurance coverage in the ordinary course of business.  In the ordinary course of business, the Debtors maintain 27 Insurance Policies that are administered by multiple third-party Insurance Carriers.  The Insurance Policies provide coverage for, among other things, the Debtors' property, general liability, automobile liability, energy liability, pollution liability, trip travel liability, umbrella coverage, excess liability, directors and officers liability (including tail coverage), and aviation coverage.  The Debtors typically obtain their insurance policies through their Insurance Brokers, for which services the Debtors pay Brokerage Fees.  As of the Petition Date, I do not believe that the Debtors owe any amounts on account of the Insurance Policies, including the Brokerage Fees.  Out of an abundance of caution, however, the Debtors are seeking authority to honor any amounts owed on account of the Insurance Policies, including the Brokerage Fees, to ensure uninterrupted coverage of the Insurance Policies.

63.    Continuation and renewal of the Insurance Policies and entry into new insurance policies is essential to preserving the value of the Debtors' business, properties, and assets. Moreover, in many cases, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the requirements of the U.S. Trustee.

64.    I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors

KE 37723069

to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of

the Debtors, I respectfully submit that the Insurance Motion should be approved.

L.    **Debtors' Application for Appointment of Garden City Group, LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date (the "Claims Agent Application")**

65.    Pursuant to the Claims Agent Application, the Debtors seek entry of an order

appointing Garden City Group, LLC as the Claims and Noticing Agent for the Debtors in their

chapter 11 cases, including assuming full responsibility for the distribution of notices and the

maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11

cases.

66.    Garden City Group is one of the country's leading chapter 11 administrators and

its professionals have experience in noticing, claims administration, solicitation, balloting, and

facilitating other administrative aspects of chapter 11 cases and experience in matters of this size

and complexity.  Garden City Group's professionals have acted as debtor's counsel or official

claims and noticing agent in many large bankruptcy cases in this District and in other districts

nationwide.  Garden City Group is well-qualified to provide experienced claims and noticing

services in connection with these Chapter 11 Cases.

67.    Given the complexity of these chapter 11 cases and the number of creditors and

other parties in interest involved in these chapter 11 cases, I believe that appointing Garden City

Group as the notice and claims agent in these chapter 11 cases will maximize the value of the

Debtors' estates for all its stakeholders.

KE 37723069

**M.    Debtors' Motion for Entry of an Order Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix of Each Debtor (the "Creditor Matrix Motion")**

68.    Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order authorizing the Debtors to file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor.

69.    Because requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings, I believe that the permitting the Debtors to maintain a single consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor, will maximize the value of the Debtors' estates and is in the interests of all of the Debtors' stakeholders.

**N.    Debtors' Motion for Entry of an Order Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business ("OCP Motion")**

70.    Pursuant to the OCP Motion, the Debtors request that the Court enter an order authorizing the Debtors to continue to retain and compensate the OCPs on a postpetition basis in accordance with the OCP Procedures, without the need for each OCP to file formal applications for retention and compensation, and granting related relief.

71.    The Debtors retain various attorneys in the ordinary course of their business.  The OCPs render a wide range of services to the Debtors in a variety of matters unrelated to these chapter 11 cases, including litigation, regulatory, labor and employment, and general corporate matters, as well as other services for the Debtors in relation to issues that have a direct and significant impact on the Debtors' day-to-day operations.

72.    Due to the number of OCPs that are regularly retained by the Debtors, I believe it would be unwieldy and burdensome to both the Debtors and the Court to request each such OCP

to apply separately for approval of its employment and compensation.  While I believe that some OCPs may wish to continue to represent the Debtors on an ongoing basis, others may be unwilling to do so if the Debtors cannot pay them on a regular basis.  Without the background knowledge, expertise, and familiarity that the OCPs have relative to the Debtors and their operations, the Debtors undoubtedly would incur additional and unnecessary expenses in educating replacement professionals about the Debtors' business and financial operations. Moreover, I believe that the Debtors' estates and their creditors are best served by avoiding any disruption in the professional services that are required for the day-to-day operation of the Debtors' business.

73.    The Debtors have prepared, and submit to the Court for approval, the OCP Procedures which are included in the OCP Motion.  I believe that the continued retention and payment of the OCPs in accordance with the OCP Procedures, will allow the Debtors to continue to utilize and benefit from the OCPs' services.  I believe that the continued retention and compensation of the OCPs is in the best interests of the Debtors' estates, creditors, and other parties in interest, and that the OCP Motion should be granted.

KE 37723069