**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) | Case No. 15-11934 (___) |
| | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE JOINT
CHAPTER 11 PLAN OF REORGANIZATION OF SAMSON
RESOURCES CORPORATION AND ITS DEBTOR AFFILIATES**

Paul M. Basta, P.C. (*pro hac vice* pending)
Edward O. Sassower, P.C. (*pro hac vice* pending)
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Ryan J. Dattilo (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900

-and-

James H.M. Sprayregen, P.C. (*pro hac vice* pending)
Brad Weiland (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200

Domenic E. Pacitti (DE Bar No. 3989)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street
Suite 1000
Wilmington, Delaware
Telephone:       (302) 426-1189
Facsimile:       (302) 426-9193

-and -

Morton Branzburg (*pro hac vice* pending)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street
Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:       (215) 569-2700
Facsimile:       (215) 568-6603

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227).  The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is:  Two West Second Street, Tulsa, Oklahoma 74103.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT PLAN OF REORGANIZATION OF SAMSON RESOURCES CORPORATION AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE XI HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS, THE SPONSORS, AND CERTAIN HOLDERS OF SECOND LIEN LOANS (INCLUDING THOSE HOLDERS THAT HAVE COMMITTED TO BACKSTOP THE RIGHTS OFFERING CONTEMPLATED BY THE PLAN), AND ALL SUCH PARTIES URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES.  WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

# TABLE OF CONTENTS

Page

I.      INTRODUCTION...................................................................................................................5

II.     PRELIMINARY STATEMENT..........................................................................................5

III.    OVERVIEW OF THE PLAN...............................................................................................6

IV.     QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
        PLAN......................................................................................................................................8

        A.      What is chapter 11?........................................................................................................8
        B.      Why are the Debtors sending me this Disclosure Statement?........................................9
        C.      Am I entitled to vote on the Plan?..................................................................................9
        D.      What will I receive from the Debtors if the Plan is consummated? ...............................9
        E.      What will I receive from the Debtors if I hold an Allowed Administrative Claim or a
                Priority Tax Claim?......................................................................................................13
        F.      Are any regulatory approvals required to consummate the Plan? .................................13
        G.      What happens to my recovery if the Plan is not confirmed or does not go effective? ...13
        H.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
                Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
                "Consummation"?..........................................................................................................13
        I.      What are the sources of Cash and other consideration required to fund the Plan?.........13
        J.      Are there risks to owning the New Common Stock upon emergence from chapter 11?.....14
        K.      Is there potential litigation related to the Plan?...........................................................14
        L.      What is the Management Incentive Plan and how will it affect the distribution I receive
                under the Plan?.............................................................................................................14
        M.      Will the final amount of Allowed General Unsecured Claims affect my recovery under
                the Plan?.......................................................................................................................14
        N.      How will Claims asserted with respect to rejection damages affect my recovery under the
                Plan?.............................................................................................................................15
        O.      How will the preservation of the Causes of Action impact my recovery under the Plan?.....15
        P.      How will the release of Avoidance Actions affect my recovery under the Plan? ..............16
        Q.      Will there be releases and exculpation granted to parties in interest as part of the Plan? ...16
        R.      What impact does the Claims Bar Date have on my Claim? ..........................................20
        S.      What is the deadline to vote on the Plan? ...................................................................21
        T.      How do I vote for or against the Plan?..........................................................................21
        U.      Why is the Bankruptcy Court holding a Confirmation Hearing?....................................21
        V.      When is the Confirmation Hearing set to occur? .........................................................21
        W.      What is the purpose of the Confirmation Hearing?.......................................................21
        X.      What is the effect of the Plan on the Debtors' ongoing business? ..................................22
        Y.      Will any party have significant influence over the corporate governance and operations of
                the Reorganized Debtors? ............................................................................................22
        Z.      Who do I contact if I have additional questions with respect to this Disclosure Statement
                or the Plan? ..................................................................................................................22
        AA.     Do the Debtors recommend voting in favor of the Plan?...............................................23
        BB.     Who Supports the Plan?................................................................................................23

V.      THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN .................23

        A.      Restructuring Support Agreement.................................................................................23
        B.      The Plan .......................................................................................................................23
        C.      363 Sale.......................................................................................................................27

VI.     IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT .....................27

    A.     Certain Key Terms Used in this Disclosure Statement ......................................27
    B.     Additional Important Information.....................................................................28

VII.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW...........31

    A.     The Debtors....................................................................................................31
    B.     Assets and Operations.....................................................................................31
    C.     Prepetition Capital Structure ...........................................................................32

VIII.   EVENTS LEADING TO THE CHAPTER 11 FILINGS ..........................................34

    A.     Commodity Price Decline ................................................................................34
    B.     Restructuring Initiatives..................................................................................34
    C.     Negotiations with Creditors .............................................................................36

IX.     ANTICIPATED EVENTS OF THE CHAPTER 11 CASES ......................................39

    A.     Corporate Structure upon Emergence ...............................................................39
    B.     Expected Timetable of the Chapter 11 Cases ....................................................39
    C.     First Day Relief...............................................................................................39

X.      PROJECTED FINANCIAL INFORMATION..........................................................39

XI.     RISK FACTORS ..............................................................................................39

    A.     Bankruptcy Law Considerations.......................................................................40
    B.     Risks Related to Recoveries under the Plan .......................................................43
    C.     Risks Related to the Debtors' and the Reorganized Debtors' Businesses..............45

XII.    SOLICITATION AND VOTING PROCEDURES ....................................................51

    A.     Holders of Claims Entitled to Vote on the Plan .................................................51
    B.     Voting Record Date .........................................................................................51
    C.     Voting on the Plan ...........................................................................................51
    D.     Ballots Not Counted........................................................................................52

XIII.   CONFIRMATION OF THE PLAN.......................................................................52

    A.     Requirements for Confirmation of the Plan .......................................................52
    B.     Best Interests of Creditors/Liquidation Analysis ...............................................53
    C.     Feasibility.......................................................................................................53
    D.     Acceptance by Impaired Classes.......................................................................53
    E.     Confirmation Without Acceptance by All Impaired Classes ................................54
    F.     Valuation of the Debtors ..................................................................................55

XIV.    CERTAIN SECURITIES LAW MATTERS ...........................................................55

    A.     New Common Stock ........................................................................................55
    B.     Issuance and Resale of New Common Stock Under the Plan ................................55

XV.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
       PLAN..............................................................................................................57

    A.     Introduction....................................................................................................57
    B.     Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized
          Debtors...........................................................................................................58
    C.     Certain U.S. Federal Income Tax Consequences to Certain Holders of Claims ............61

**XVI.    RECOMMENDATION** ...................................................................................................................**72**

**EXHIBITS**

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Restructuring Support Agreement

EXHIBIT C    Disclosure Statement Order

EXHIBIT D    Financial Projections

EXHIBIT E    Valuation Analysis

EXHIBIT F    Liquidation Analysis

EXHIBIT G    Solicitation and Voting Procedures

## I.    INTRODUCTION

Samson Resources Corporation ("<u>Samson</u>") and its debtor affiliates, as debtors and debtors in possession (collectively, the "<u>Debtors</u>"), submit this disclosure statement (the "<u>Disclosure Statement</u>") pursuant to section 1125 of the Bankruptcy Code to holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances with respect to the *Joint Plan of Reorganization of Samson Resources Corporation and its Debtor Affiliates* (the "<u>Plan</u>"), dated September 17, 2015.[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for Samson and each of its eight affiliated Debtors.

**THE DEBTORS, SPONSORS, BACKSTOP PARTIES, AND CERTAIN HOLDERS OF SECOND LIEN LOANS (COLLECTIVELY, THE "<u>CONSENTING PARTIES</u>") BELIEVE THAT THE COMPROMISE CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES AND PROVIDES THE BEST RECOVERY TO CLAIM HOLDERS.  AT THIS TIME, THE DEBTORS AND THE OTHER CONSENTING PARTIES BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT

The Debtors are an independent oil and gas company focused on the exploration, development, and production of natural gas and oil through their ownership interests in approximately 1.6 million net acres located in some of the most prolific and long-lived basins in the United States.  Headquartered in Tulsa, Oklahoma, the Debtors produced approximately 530 million cubic feet equivalents (MMcfe) of gas and oil per day in 2014 from their producing wells but have temporarily suspended their exploration and drilling operations in light of their current financial distress and recent market turmoil.

A number of unexpected and unprecedented challenges have crippled the Debtors' ability both to sustain their leveraged capital structure and commit the capital necessary for exploration and production ("<u>E&P</u>").  The continuation of dramatically low natural gas prices, a steep drop in the price of oil, and general market uncertainty has created an incredibly challenging operational environment for all exploration and production companies.  In just twelve months, the price of oil has dropped more than 50 percent—from approximately $92 a barrel to below $50 a barrel as of September 15, 2015.  With the price of natural gas at a recent historic low, the commodity price decline creates a perfect storm necessitating immediate action to restore the health of the Debtors.

The Debtors have aggressively attacked these challenges, including internal cost cutting (including recent suspension of drilling activity in February 2015) and performance improvement initiatives, together with isolated asset sales following an in-depth strategic review of a significant portion of the Debtors assets and operations.  Notwithstanding these initiatives, it became clear that these steps were not sufficient to insulate the Debtors from the market turmoil that has hit every level of the oil and gas industry worldwide.

In March 2015, the Debtors organized their major constituents and engaged in negotiations.  Specifically, the Debtors entered into dual-track negotiations with certain Second Lien Lenders and certain holders of senior unsecured notes.  The Debtors also explored the possibility of selling all or substantially all of their businesses or assets to third parties.

---

[1]    Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan. **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern**.

On August 14, 2015, the Debtors entered into the Restructuring Support Agreement with their owners and a group of Second Lien Lenders holding approximately 45.5 percent of Second Lien Secured Claims.  Over the last 30 days, the Debtors successfully have worked to document this transaction, resulting in today's filing of the Plan and this Disclosure Statement that contemplates the implementation of a debt-for-equity conversion and $450 or $485 million Rights Offering.  The proposed restructuring will result in deleveraging more than $3 billion and a reduction in interest expenses of more than $250 million.  With approximately $250 million of projected cash on hand at emergence, the Debtors will be able to restart drilling operations with a renewed dedication to growth even in a still-challenging environment.

Notably, the Debtors are the only exploration and production company to file for bankruptcy protection with a consensual, pre-negotiated restructuring transaction in place.  The Debtors strongly believe that the Plan is in the best interests of the Debtors' estates, especially in the face of significant market instability, represents the best available alternative, and provides the Debtors with a post-restructuring capital structure that allows for future growth and expansion.

## III.    OVERVIEW OF THE PLAN

The Plan provides for the reorganization of the Debtors as a going concern and will significantly reduce long-term debt and annual interest payments and infuse at least $450 million of new capital, resulting in a stronger, de-levered balance sheet for the Debtors.  Specifically, the Plan contemplates a restructuring of the Debtors through a debt-for-equity conversion and rights offering.  The key terms of the Plan are as follows:

### 1)    *New Money Investment*

The new money investment (the "New Money Investment") will include (a) a **minimum** of $325 million in equity rights to purchase New Common Stock of the Reorganized Debtors and (b) a **maximum** of $125 million of new second lien debt issued in the Reorganized Debtors.  By November 1, 2015 (or as otherwise agreed by the Debtors and the Backstop Parties), the Debtors' management will estimate the pro forma liquidity of the Debtors as of the Effective Date of the Plan.  In the event that such estimated liquidity is less than $350 million, the New Money Investment will be increased by $35 million to a total of $485 million.

### 2)    *Rights Offering*

The Debtors intend to commence a Rights Offering open to the holders of Second Lien Claims and the Backstop Parties.  Under the Plan, each holder of Allowed Second Lien Claims will receive, as distributions, its Pro Rata share of New Second Lien Loan Rights and the New Common Stock Rights.  These Rights entitle each Eligible Holder to purchase New Second Lien Loans, New Common Stock, or both, through the Rights Offering in a total amount up to its Pro Rata share of the New Money Investment, after accounting for the Backstop Holdback Equity (as described below).  Rights Offering Participants may also request to oversubscribe for additional New Common Stock or additional New Second Lien Term Loans in excess of their Pro Rata share of the Rights.  Participation in the Rights Offering by holders other than the Backstop Parties is voluntary, and even if a holder of an Allowed Second Lien Claim elects not to participate in the Rights Offering, such holder will be entitled to receive its Pro Rata share of certain distributions of New Common Stock on account of its Allowed Second Lien Claim (as described below).

### 3)  *Backstop Terms*

The Rights Offering will be backstopped, on a several but not joint basis, by the Backstop Parties, which are comprised of certain of the Second Lien Lenders.  The backstop will include up to $36.75 million in new second lien debt in the Reorganized Debtors (the "Debt Backstop") funded by certain of the Backstop Parties (the "Debt Backstop Parties") and New Common Stock up to an amount equal to the shortfall between the New Money Investment and the aggregate amount raised through the Rights Offering and the Debt Backstop (the "Equity Backstop").  If any backstop funding is required, the Debt Backstop will be used first to satisfy any capital shortfall (subject to a Debt Backstop maximum of $36.75 million and an aggregate new debt maximum of $125 million).  If additional backstop funding is required after exhaustion of the Debt Backstop (or the maximum amount of new debt under the Rights Offering is reached), the Equity Backstop will be used.

In connection with the Rights Offering, pursuant to the Backstop Commitment Agreement, the Company will set aside rights offering shares in an amount equal to 22.5 percent of the New Money Investment (the "Backstop Holdback Equity") to be offered solely to the Backstop Parties who are backstopping the equity portion of the New Money Investment (the "Equity Backstop Parties").  Thereafter, the Equity Backstop Parties shall purchase the Backstop Holdback Equity.

In addition, the Debtors shall issue and grant to the Backstop Parties New Common Stock, issued at the Purchase Price, in an aggregate amount equal to $45 million,[2] of which approximately $43.7 million will be allocated pro rata to each Equity Backstop Party and approximately $1.3 million will be allocated pro rata to each Debt Backstop Party, each in accordance with its relative equity or debt backstop commitments, as applicable.  The Backstop Parties will also be paid a transaction fee (the "Transaction Fee") in the amount of $10 million.

### 4)  *Use of Proceeds*

The Rights Offering proceeds will be used to pay down the First Lien Credit Facility to $650 million as well as to pay the fees and expenses of the Backstop Parties (including the Transaction Fee).  The remainder will be used for general corporate purposes.

### 5)  *Distributions*

The Second Lien Lenders shall receive all of the New Common Stock in the Reorganized Debtors, less the New Common Stock issued to the Rights Offering Participants (including the Backstop Parties), Noteholders, and participants in the Management Incentive Plan.  The holders of General Unsecured Claims (including the Noteholders, the Second Lien Lenders on account of their deficiency claim, and other general unsecured creditors) will receive in the aggregate 1.0 percent of the New Common Stock if the class of holders of General Unsecured Claims votes in favor of the Plan and 0.5 percent of the New Common Stock if the class votes against the Plan (each of the percentages above are prior to management incentive plan dilution).

### 6)  *Exit First Lien Credit Facility*

On the Effective Date, the Reorganized Debtors shall enter into the New Credit Facilities:  the Exit First Lien Credit Facility and the New Second Lien Facility.

---

[2]    The $45 million Equity Grant assumes that the Accordion is not exercised.  In the event the Accordion is exercised the Equity Grant shall be increased by an additional $3.5 million of New Common Stock (issued at the Purchase Price).

The terms of the Exit First Lien Credit Facility will be set forth in the Exit First Lien Credit Facility Documents, and will include, among other terms, a borrowing base of at least $750 million on the Effective Date, shall have a five-year term, initial borrowings on the Effective Date in an amount not to exceed $650 million, and unused availability on the Effective Date of not less than $100 million, each of the foregoing unless otherwise agreed by the Debtors, the Required Backstop Parties, and the Majority Consenting Lenders, and other terms reasonably acceptable to the Debtors and the Required Backstop Parties.

### 7) *New Second Lien Facility*

The terms of the New Second Lien Facility will be set forth in the New Second Lien Loan Documents, and will include, among other terms, that the obligations under the New Second Lien Loan Documents shall be secured by second-priority liens and security interests in the collateral securing the Exit First Lien Credit Facility, shall have a maximum principal amount outstanding equal to the lesser of the amount of New Second Lien Facility subscribed for under the Rights Offering and $125 million, shall have a five-year term, shall bear interest (payable in Cash on a quarterly basis) at 8.5 percent per annum for the first 12 months following the Effective Date, and the interest rate shall increase by 50 basis points on the 12-month anniversary of the Effective Date and each six-month anniversary thereafter, shall not be subject to any prepayment penalty for voluntary prepayments on or prior to the first anniversary of the closing or after the third anniversary of the closing, but shall be subject to a 2.0 percent and 1.0 percent prepayment premium for voluntary prepayments during the 12-month period on or before the second and third anniversaries of the closing date, respectively, and shall include a cash funding fee under the New Second Lien Credit Agreement equal to 2.0 percent of the aggregate principal amount of New Second Lien Facility.

### 8) *Releases*

The Plan contains certain releases (as described more fully in Article IV.Q hereof), including mutual releases between Debtors, on the one hand, and the First Lien Agent, the First Lien Lenders, the Second Lien Agent, the Second Lien Lenders, each of the Sponsors, the Backstop Parties, and the Consenting Lenders, on the other hand.  The Plan also provides that each holder of a Claim or an Interest that (i) votes to accept or is deemed to accept the Plan or (ii) votes to reject the Plan, is deemed to reject the Plan, or is in a voting Class that abstains from voting on the Plan but does not elect to opt out of the release provisions contained in Article VII of the Plan, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.

## IV.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.       Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  This Disclosure Statement is being submitted in accordance with these requirements.

**C.       Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depensd on what type of Claim or Interest you hold.  Each category of holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below.

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote |
| 3 | First Lien Claims | Impaired | Entitled to Vote |
| 4 | Second Lien Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Convenience Claims | Impaired | Entitled to Vote |
| 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote |
| 8 | Intercompany Claims | Un/impaired | Not Entitled to Vote |
| 9 | Intercompany Interests | Un/impaired | Not Entitled to Vote |
| 10 | Interests in Parent | Impaired | Not Entitled to Vote |

**D.       What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[3]**

---

[3]   The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.  "Allowed" means with respect to any Claim:  (a) a Claim that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated and for which no contrary proof of claim has been filed; (b) a Claim that is not a Disputed Claim or has been allowed by a Final Order; (c) a Claim that is allowed (i) pursuant to the terms of the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court or

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
|---|---|---|---|---|
| | | **SUMMARY OF EXPECTED RECOVERIES** | | |
| | Administrative Claims | Except with respect to Administrative Claims that are Fee Claims and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each holder of an Allowed Administrative Claim shall be paid in full in Cash on the unpaid portion of its Allowed Administrative Claim on the latest of: (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order. | $[●] | [100]% |
| 1 | Other Priority Claims | Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such holder shall receive payment in full, in Cash, of the unpaid portion of its Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of an Other Priority Claim and the Debtors. | $[●] | [100]% |

(iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; or (d) a Claim as to which a Proof of Claim has been timely Filed and as to which no objection has been Filed as of the Claims Objection Deadline. Except for any Claim that is expressly Allowed pursuant to the Plan, any Claim that has been, or is hereafter, listed in the Schedules as contingent, unliquidated, or disputed and for which no Proof of Claim has been Filed is not considered Allowed and shall be deemed expunged upon entry of the Confirmation Order.

| 2 | Other Secured Claims | On the Effective Date, except to the extent that a holder of an Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such holder shall receive either (i) payment in full in Cash of the unpaid portion of its Other Secured Claim on the Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, shall be paid in accordance with its terms), (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. | $[●] | [100]% |
| 3 | First Lien Claims | On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Allowed First Lien Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed First Lien Claim, each holder of a First Lien Claim shall receive (i) if the First Lien Credit Facility is refinanced through a new Exit First Lien Credit Facility, payment in full of such holder's First Lien Claim in Cash; or (ii) if the First Lien Credit Facility is amended and restated by the Exit First Lien Credit Facility, such holder shall receive a distribution of Cash and loans arising under the Exit First Lien Credit Facility having an aggregate value equal to such holder's First Lien Claim. | $942 million | [100]% |
| 4 | Second Lien Secured Claims | On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of a Second Lien Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Second Lien Secured Claim, each holder of an Allowed Second Lien Secured Claim shall receive its Pro Rata share of (a) (x) [●] percent of the New Common Stock, if Class 5 votes to reject the Plan by the Voting Deadline or (y) [●] percent of the New Common Stock, if Class 5 votes to accept the Plan by the Voting Deadline, in each case, subject to dilution for the Management Incentive Plan, and (b) Rights to purchase its Pro Rata share of the Rights Offering Units (subject to the sale of the Backstop Holdback Equity). | $1,012 million | [●]%[4] |

---

[4]   Assumes fully subscribed Rights Offering for $125 million debt and $325 million equity.  Calculated prior to management incentive plan dilution.

| 5 | General Unsecured Claims | On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of a General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of either (i) if the class of General Unsecured Claims votes to accept the Plan by the Voting Deadline, 1.0 percent of New Common Stock (subject to dilution for the Management Incentive Plan), or (ii) if the class of General Unsecured Claims votes to reject the Plan by the Voting Deadline, 0.5 percent of the New Common Stock (subject to dilution for the Management Incentive Plan).  For the avoidance of doubt, Class 5 shall not include any Claim that would otherwise be a General Unsecured Claim if the holder of such Claim has elected to have such Claim treated as a Convenience Claim. | [●] | [●]%[5] |
| 6 | Convenience Claims | On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a holder of an Allowed Convenience Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Convenience Claim, each holder of an Allowed Convenience Claim shall receive, subject to applicable law, Cash in an amount equal to its pro rata share of $[1 million] less the costs of administering such distributions. | $[●] | [●]% |
| 7 | Section 510(b) Claims | On the Effective Date, each Section 510(b) Claim shall be cancelled without any distribution and such holders of Section 510(b) Claims will receive no recovery. | $[●] | 0% |
| 8 | Intercompany Claims | Intercompany Claims may be Reinstated as of the Effective Date or, at the Debtors' or the Reorganized Debtors' option, with the consent of the Required Backstop Parties, be cancelled, and no distribution shall be made on account of such Claims. | $[●] | [●]% |
| 9 | Intercompany Interests | Intercompany Interests may be Reinstated as of the Effective Date or, at the Debtors' or the Reorganized Debtors' option, with the consent of the Required Backstop Parties, be cancelled, and no distribution | $[●] | [●]% |

---

[5]    Assumes fully subscribed Rights Offering, and class voted in favor of the Plan.  Calculated prior to management incentive plan dilution.

| | | shall be made on account of such Interests. | | |
|---|---|---|---|---|
| 10 | Interests in Parent | On the Effective Date, existing Interests in the Parent shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to holders of Interests in the Parent on account of such Interests. | N/A | 0% |

**E.      What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.  Administrative Claims will be satisfied as set forth in Article II.A of the Plan, and Priority Tax Claims will be satisfied as set forth in Article II.C of the Plan.

**F.      Are any regulatory approvals required to consummate the Plan?**

No.  There are no known regulatory approvals that are required to consummate the Plan.

**G.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative, including a potential 363 Sale under the terms of the Restructuring Support Agreement, may provide holders of Claims and Interests with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* "Confirmation of the Plan - Best Interests of Creditors/Liquidation Analysis," which begins on page 53 of this Disclosure Statement, and the Liquidation Analysis attached as **Exhibit F**.

**H.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan.  *See* "Confirmation of the Plan," which begins on page 52 of this Disclosure Statement, for a discussion of the conditions precedent to consummation of the Plan.

**I.      What are the sources of Cash and other consideration required to fund the Plan?**

The Plan will be funded by the following sources of Cash and consideration:  (a) Cash on hand; (b) new capital provided pursuant to an exit financing facility with a contemplated borrowing base of $750 million, which initial borrowings not to exceed $650 million on the Effective Date; and (c) at least $450 million of new capital provided in connection with the Rights Offering.

**J.      Are there risks to owning the New Common Stock upon emergence from chapter 11?**

Yes.  *See* "Risk Factors," which begins on page 39 of this Disclosure Statement.

**K.      Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objection potentially could give rise to litigation.  *See* Article XI.C.9), which begins on page 50 of this Disclosure Statement.  More specifically, the Debtors are aware that certain holders of unsecured senior notes intend to challenge the Plan and the pace at which the Debtors seek to effectuate their restructuring.  As detailed in Article IV below, these Noteholders previously engaged in restructuring negotiations with the Debtors in the months leading up to these chapter 11 cases.  Following payment of the $110 million interest payment under the Senior Notes Indenture in February 2015, the Debtors and the Noteholders exchanged at least ten different restructuring proposals.  Every proposal was conditioned on the Noteholders investing new capital and exchanging the Senior Notes (at a significant discount) into a senior position ahead of the Second Lien Claims.  The Noteholders never proposed to commit capital junior to the Second Lien Claims.  The Noteholders conducted significant due diligence and, in connection therewith, the Debtors paid several hundred thousand dollars to the Noteholders' legal and financial advisors, who have subsequently been replaced.

In the event that it becomes necessary to confirm the Plan over the objection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such objecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article XI.A.4), which begins on page 40 of this Disclosure Statement.

**L.      What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan?**

On the Effective Date, equity grants equal to ten percent of the New Common Stock (on a fully diluted basis) shall be reserved for continuing directors, officers, and certain employees of the Reorganized Debtors, on terms to be negotiated with certain material terms included in the Plan Supplement.  On or as soon after the Effective Date as is reasonably practicable, five percent of the New Common Stock will be preliminarily granted to Management Incentive Plan participants.  The form and timing of additional Management Incentive Plan grants, if any, will be determined by the compensation committee of the New Board of Reorganized Parent as set forth in the Plan Supplement.  The New Common Stock issued pursuant to the Management Incentive Plan will dilute the pro rata ownership of other holders of New Common Stock.

**M.      Will the final amount of Allowed General Unsecured Claims affect my recovery under the Plan?**

The Debtors estimate that General Unsecured Claims total approximately $[2.385 billion] including [●] on account of trade claims (plus the deficiency portion of the Allowed Second Lien Claims).  Each holder of a General Unsecured Claim shall receive its Pro Rata share of either (i) if the class of General Unsecured Claims votes to accept the Plan, 1.0 percent of New Common Stock (subject to dilution for the Management Incentive Plan), or (ii) if the class of General Unsecured Claims votes to reject the Plan, 0.5 percent of the New Common Stock (subject to dilution for the Management Incentive Plan).  For the avoidance of doubt, Class 5 shall not include any Claim that would otherwise be a General Unsecured Claim if the holder of such Claim has elected to have such Claim treated as a Convenience Claim. Although the Debtors' estimate of General Unsecured Claims is the result of the Debtors' and

14

their advisors' careful analysis of available information, General Unsecured Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided herein, which difference could be material. Moreover, the Debtors are rejecting and in the future may reject certain Executory Contracts and Unexpired Leases, which may result in additional rejection damages claims not accounted for in this estimate. Further, the Debtors or the official committee of unsecured creditors appointed in the Chapter 11 Cases (if any) may object to certain proofs of claim, and any such objections could ultimately cause the total amount of General Unsecured Claims to change. These changes could affect recoveries for holders of Claims in Class 5, and such changes could be material.

**N.    How will Claims asserted with respect to rejection damages affect my recovery under the Plan?**

The Debtors' estimate that General Unsecured Claims total approximately $[2.385 billion] (plus the deficiency portion of the Allowed Second Lien Claims), which includes approximately $[0] in estimated Claims arising from the Debtors' rejection of Executory Contracts and Unexpired Leases. To the extent that the actual amount of rejection damages claims changes, the value of recoveries to holders of Claims in Class 5 could change as well, and such changes could be material.

**O.    How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to the Restructuring Support Agreement and Articles VIII and IV.L of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled pursuant to the Restructuring Support Agreement or in the Plan or a Final Order of the Bankruptcy Court (or any other court of competent jurisdiction), the Debtors or the Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity, other than those released pursuant to the Restructuring Support Agreement or the Plan, shall vest in the Reorganized Debtors. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the

15

consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**P.     How will the release of Avoidance Actions affect my recovery under the Plan?**

On the Effective Date, and except to the extent otherwise reserved in the Plan Supplement, the Debtors, on behalf of themselves and their estates, shall release any and all Avoidance Actions and the Debtors and the Reorganized Debtors, and any of their successors or assigns, and any Entity acting on behalf of the Debtors or the Reorganized Debtors shall be deemed to have waived the right to pursue any and all Avoidance Actions; *provided that* unless otherwise released pursuant to the Restructuring Support Agreement or the Plan, the Debtors shall not release any Avoidance Actions arising out of or related to the 2011 Acquisition.  No Avoidance Actions shall revert to creditors of the Debtors.

**Q.     Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations between the Debtors, the Backstop Parties, and the Sponsors in obtaining their support for the Plan pursuant to the terms of the Restructuring Support Agreement.  Preserving the Debtors' valuable tax attributes—specifically, $1.4 billion of net operating losses ("NOLs") that can offset current and future tax obligations—is critical to any restructuring and was a component of the discussions with the Backstop Parties.  Preservation of the NOLs would not be possible without the support of the Sponsors.  Before the Petition Date, certain direct and indirect holders of common stock approached the Debtors and certain of the Sponsors seeking to have their interests repurchased so that these holders could take a worthless stock deduction in 2015.  These transactions were carefully considered and ultimately approved and executed in a manner that avoided triggering an ownership change.  Any additional transfer or redemption of common stock by the Sponsors, however, likely would impair substantially the value of, or otherwise restrict Samson's use of, the NOLs.  Like other equity owners, the Sponsors have indicated their desire to obtain the benefits associated with a worthless stock deduction in 2015.

To ensure that the valuable NOLs are preserved and can be utilized by Samson, the second lien transaction was structured to include certain agreements with the Sponsors.  More specifically, and in return for mutual releases between the parties, the Sponsors agreed subject to the terms of the Restructuring Support Agreement not to sell or transfer any of their equity interests in the Debtors (including by utilization of a worthless stock deduction) to the extent it would impair any of the Debtors' tax attributes.

The Sponsors together with the other equity owners collectively invested approximately $4.1 billion of equity to purchase the Debtors.  As part of the 2011 buyout and related equity investment, the Sponsors received certain fees of approximately $77.4 million.  Since the 2011 acquisition, the owners invested significant time and energy in the Debtors.  Pursuant to the terms of the Consulting Agreement dated as of December 21, 2011, which contract was entered into as part of the 2011 sale transaction, the Sponsors have received advisory fees totaling approximately $38.4 million through the end of 2014. Following the significant decline in the price of oil in late 2014, combined with the deterioration in the Debtors' asset base as reported in early 2015, the Debtors and the Sponsors executed the Consent to Extension dated March 30, 2015, pursuant to which advisory fees due in 2015 were temporarily deferred.

While the Sponsors could have pursued the noteholder-led transaction to preserve their 85 percent equity interests and hope for a turnaround, the Sponsors instead determined to support the transaction that

was achievable and in the best interests of the Debtors.  This will result in the cancellation of all existing equity interests.  In addition, the Sponsors are willing to forgo an immediate worthless stock deduction (that could have been taken in the weeks leading up to the filing of these chapter 11 cases) in return for the releases and other terms included in the Restructuring Support Agreement and the Plan.

The Plan will preserve the Debtors' valuable tax attributes to offset gains in the event the Plan is structured as a taxable sale of assets or to offset future operating income in the event the Plan is structured as a tax-free reorganization.  More specifically, the Sponsors have agreed subject to the terms of the Restructuring Support Agreement, in consideration of the releases included in the Restructuring Support Agreement and the Plan, not to pledge, encumber, assign, sell, or otherwise transfer, including by the utilization of a worthless stock deduction, offer, or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, any portion of their right, title, or interests in any of their shares, stock, or other interests in the Debtors to the extent it will impair any of the Debtors' tax attributes.

All of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

Each holder of a Claim or Interest that (i) votes to accept or is deemed to accept the Plan or (ii) votes to reject the Plan, is deemed to reject the Plan, or is in a voting Class that abstains from voting on the Plan but does not elect to opt out of the release provisions contained in Article VII of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.  The releases represent an integral element of the Plan.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

### 1)    *Release of Liens*

Except as otherwise specifically provided in the Plan, the New Credit Facilities Documents (including in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge, or other security interest under the New Credit Facilities Documents), or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors.  In addition, the First Lien Agent and the Second Lien Agent shall execute and deliver all documents reasonably requested by the Debtors, Reorganized Debtors, or administrative agent(s) for the New Credit Facilities to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.

### 2) *Debtor Release*

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, on and after the Effective Date, the Released Parties are deemed expressly, unconditionally, generally, and individually and collectively, acquitted, released and discharged by the Debtors, the Reorganized Debtors, and the Estates, each on behalf of itself and its predecessors, successors and assigns, subsidiaries, affiliates, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, any Claims asserted or assertable on behalf of any holder of any Claim against or Interest in the Debtors and any Claims asserted or assertable on behalf of any other entity, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute or otherwise, that such releasing party (whether individually or collectively), ever had, now has or hereafter can, shall or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring efforts, the Debtors' intercompany transactions (including dividends paid), any preference or avoidance claim pursuant to sections 544, 547, 548, and 549 of the Bankruptcy Code, the purchase, sale or rescission of the purchase or sale of, or any other transaction relating to any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is affected by or classified in the Plan, the business or contractual arrangements between the Debtors, on the one hand, and the First Lien Agent, the First Lien Lenders, the Second Lien Agent, the Second Lien Lenders, each of the Sponsors, the Backstop Parties, or the Consenting Lenders, on the other hand, the restructuring of Claims and Interests before or during the Restructuring Transactions implemented by the Plan or any other transaction or other arrangement with the Debtors whether before or during the Restructuring Transactions, the negotiation, formulation or preparation of the Restructuring Transactions, the Restructuring Support Agreement, the Plan, the Plan Supplement, the Disclosure Statement or any related agreements, any asset purchase agreement, instruments or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place or arising on or before the Effective Date related or relating to any of the foregoing, except for any act or omission that constitutes fraud, gross negligence or willful misconduct as determined by a Final Order of a court of competent jurisdiction; *provided* that nothing in the foregoing shall result in any of the Debtors' officers and directors waiving any indemnification Claims against the Debtors or any of their insurance carriers or any rights as beneficiaries of any insurance policies, which indemnification obligations and insurance policies shall be assumed by the Reorganized Debtors.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any of the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### 3) *Third Party Release*

Except as otherwise provided in the Plan, as of the Effective Date and to the fullest extent authorized by applicable law, each Releasing Party expressly, unconditionally, generally and individually

18

and collectively releases, acquits and discharges the Debtors, Reorganized Debtors, and Released Parties from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted or assertable on behalf of the Debtors, any Claims asserted or assertable on behalf of any holder of any Claim against or Interest in the Debtors and any Claims asserted or assertable on behalf of any other entity, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, by statute or otherwise, that such Releasing Party (whether individually or collectively), ever had, now has or hereafter can, shall or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring efforts, the Debtors' intercompany transactions (including dividends paid), any preference or avoidance claim pursuant to sections 544, 547, 548, and 549 of the Bankruptcy Code, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, or any other transaction relating to any security of the Debtors, or any other transaction or other arrangement with the Debtors whether before or during the Restructuring Transactions, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is affected by or classified in the Plan, the business or contractual arrangements between the Debtors, on the one hand, and the First Lien Agent, the First Lien Lenders, the Second Lien Agent, the Second Lien Lenders, each of the Sponsors, the Backstop Parties, or the Consenting Lenders, on the other hand, the restructuring of Claims and Interests before or during the Restructuring Transactions implemented by the Plan, the negotiation, formulation or preparation of the Restructuring Transactions, the Restructuring Support Agreement, the Plan, the Plan Supplement, the Disclosure Statement or any related agreements, any asset purchase agreement, instruments or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Chapter 11 Cases, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place or arising on or before the Effective Date related or relating to any of the foregoing, except for any act or omission that constitutes fraud, gross negligence or willful misconduct as determined by a Final Order of a court of competent jurisdiction; *provided* that nothing in the foregoing shall result in any of the Debtors' officers and directors waiving any indemnification Claims against the Debtors or any of their insurance carriers or any rights as beneficiaries of any insurance policies, which indemnification obligations and insurance policies shall be assumed by the Reorganized Debtors.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any of the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### 4)  *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim; *provided* that the foregoing "Exculpation" shall have no effect on the liability of any entity that results from any such act or omission that is determined by a Final Order to have constituted gross negligence or willful misconduct.  The Exculpated Parties have participated in any and all activities potentially underlying any Exculpated Claim in good faith and in compliance with the applicable laws.

5)  *Injunction*

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII.D or Article VIII.E of the Plan, discharged pursuant to Article VIII.B of the Plan, or are subject to exculpation pursuant to Article VIII.F of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Non-Debtor Subsidiaries, the Reorganized Debtors, the Released Parties, or the Exculpated Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan or under any document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement) executed to implement the Plan from bringing an action to enforce the terms of the Plan or such document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement) executed to implement the Plan.

For more detail see "Article VIII - Settlement, Release, Injunction and Related Provisions," which begins on page 34 of the Plan, and is incorporated herein by reference.

**R.      What impact does the Claims Bar Date have on my Claim?**

The Bankruptcy Court has established [October 30], 2015, at [5:00] p.m., prevailing Eastern Time, as the Claims bar date (the "Bar Date") in the Chapter 11 Cases.  The following entities holding Claims against the Debtors that arose (or that are deemed to have arisen) prior to the Petition Date, including without limitation Class 5 General Unsecured Claims, must file proofs of claim on or before the Bar Date:  (1) any entity whose Claim against a Debtor is not listed in the applicable Debtor's schedules of assets and liabilities ("Schedules") or is listed in the applicable Debtor's Schedules as contingent, unliquidated, or disputed if such entity desires to participate in any of the Chapter 11 Cases or share in any distribution in any of the Chapter 11 Cases; (2) any entity that believes its Claim is improperly classified in the Schedules or is listed in an incorrect amount and desires to have its Claim allowed in a different classification or amount from that identified in the Schedules; (3) any entity that believes its Claim as listed in the Schedules is not an obligation of the specific Debtor against which the Claim is listed and that desires to have its Claim allowed against a Debtor other than that identified in the Schedules; and (4) any entity that believes its Claim against a Debtor is or may be an administrative expense pursuant to section 503(b)(9) of the Bankruptcy Code (but not any entity that believes it holds an administrative expense Claim under section 503(b)(1) of the Bankruptcy Code).

In accordance with Bankruptcy Rule 3003(c)(2), if any person or entity that is required, but fails, to file a proof of claim on or before the Bar Date: (1) such person or entity will be forever barred, estopped, and enjoined from asserting such Claim against the Debtors (or filing a proof of claim with respect thereto); (2) the Debtors and their property may be forever discharged from any and all indebtedness or liability with respect to or arising from such Claim; (3) such person or entity will not

receive any distribution in the Chapter 11 Cases on account of that Claim; and (4) such person or entity will not be permitted to vote on any plan or plans of reorganization for the Debtors on account of these barred Claims or receive further notices regarding such Claim.

As described in this Disclosure Statement, the distribution you receive on account of your Claim (if any) may depend, in part, on the amount of Claims for which proofs of claim are filed on or before the Bar Date.

**S.      What is the deadline to vote on the Plan?**

The Voting Deadline is [November 20], 2015 at 4:00 p.m. (prevailing Eastern Time).

**T.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be completed and signed so that it is **actually received** by [November 18], 2015 at [4:00 p.m.] (prevailing Eastern Time) at the following address: Samson Resource Corporation, c/o GCG, P.O. Box 10238, Dublin, OH 43107-5738 *See* Article XII of this Disclosure Statement, which begins on page 51 of this Disclosure Statement.

**U.      Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**V.      When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for [December 1], 2015 at [●] (prevailing Eastern Time). The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than [November 25,] 2015 at [●] (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit C** and incorporated herein by reference.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *The New York Times* and *Tulsa World* to provide notification to those persons who may not receive notice by mail. The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

**W.      What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and

provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

### X.    What is the effect of the Plan on the Debtors' ongoing business?

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, Confirmation means that the Debtors will not be liquidated or forced to go out of business.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtors that is the first business day after which all conditions to Consummation have been satisfied or waived.  *See* Article IX of the Plan.  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

### Y.    Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?

As of the Effective Date, the term of the current members of the boards of directors of the Debtors shall expire, and the initial boards of directors, including the New Boards, as well as the officers of each of the Reorganized Debtors, shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor.  The New Board of Reorganized Parent shall have seven directors, consisting of: (1) the Chief Executive Officer; (2) two directors elected by the Second Lien Lenders; and (3) four directors elected by the Backstop Parties.

### Z.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' notice, claims, and solicitation agent, Garden City Group, LLC:

> *By regular mail at:*
> Samson Resources Corporation
> c/o GCG
> P.O. Box 10238
> Dublin, OH 43017-5738
>
> *By hand delivery or overnight mail at:*
> Samson Resources Corporation
> c/o GCG
> 5151 Blazer Parkway, Suite A
> Dublin, OH 43017
>
> *By electronic mail at:*
> SMNinfo@gardencitygroup.com
>
> *By telephone at:*
> (888) 547-8096 (U.S. and Canada)
> (614) 779-0358 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Debtors' notice, claims, and solicitation agent at the address above or by downloading the exhibits and documents from the website of the Debtors' notice, claims, and solicitation agent at www.GardenCityGroup.com/cases/SamsonRestructuring (free of charge) or the Bankruptcy Court's website at www.deb.uscourts.gov (for a fee).

### AA.    Do the Debtors recommend voting in favor of the Plan?

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.   The Debtors believe the Plan, which contemplates a significant deleveraging, is in the best interest of all holders of Claims, and that other alternatives fail to realize or recognize the value inherent under the Plan.

### BB.    Who Supports the Plan?

The Plan is supported by the Debtors, the Sponsors, the Backstop Parties, and certain holders of Second Lien Loans, all as set forth in the Restructuring Support Agreement.

## V.    THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN

### A.    Restructuring Support Agreement

On August 14, 2015, the Debtors, a group of Second Lien Lenders holding approximately 45.5 percent of outstanding loans and obligations under the Second Lien Credit Agreement, and the Sponsors entered into the Restructuring Support Agreement.   In connection with entry into the Restructuring Support Agreement, the Debtors elected to forgo their unsecured notes' interest payment on August 17, 2015, and utilize the corresponding 30-day grace period allowed under the Senior Notes Indenture to fully document the restructuring transaction.

Since the signing of the Restructuring Support Agreement, the Debtors have in fact documented the terms of the prearranged restructuring, including the Plan.  At the time of execution, the Restructuring Support Agreement had support from certain Second Lien Lenders holding approximately 45.5 percent of outstanding loans and obligations under the Second Lien Credit Agreement.  As of the Petition Date, the Consenting Lenders, including additional Second Lien Lenders who subsequently executed the Restructuring Support Agreement, represent holdings over 68 percent of the outstanding loans and obligations under the Second Lien Credit Agreement.  As a result of this level of support from the Second Lien Lenders, the requisite Second Lien Lenders have waived the Debtors' obligation under the Restructuring Support Agreement to comply with all sale-related milestones contained therein.  The Plan effectuates a debt-for-equity conversion and the Rights Offering, which will significantly reduce long-term debt and annual interest payments and result in a stronger balance sheet for the Debtors.

The Plan represents the last step in the Debtors' months-long restructuring process.  It allows— and, indeed, requires—the Debtors to proceed expeditiously through chapter 11 to a successful emergence.  The Plan will significantly deleverage the Debtors' balance sheet and provide the capital injection needed for the Debtors to return to competitive operations going forward.  The key terms of the Plan and the Sale are discussed in greater detail in Articles V.B and V.C, herein.

### B.    The Plan

As discussed in Article III herein, the Plan contemplates a debt-for-equity conversion and rights offering effectuated through a chapter 11 plan under the following key terms:

### 1)  New Money Investment

The New Money Investment will include (a) a **minimum** of $325 million in equity rights to purchase New Common Stock of the Reorganized Debtors and (b) a **maximum** of $125 million of new second lien debt issued by the Reorganized Debtors.

### 2)  New Money Expansion

By November 1, 2015 (or as otherwise agreed by the Debtors and the Backstop Parties), the Debtors' management will estimate the pro forma liquidity of the Debtors as of the Effective Date of the Plan.  In the event that such estimated liquidity is less than $350 million, the New Money Investment will be increased by $35 million to a total of $485 million.

### 3)  Backstop Terms

The Rights Offering will be backstopped, on a several but not joint basis, by the Backstop Parties, which are comprised of certain of the Second Lien Lenders.  The backstop will include the Debt Backstop funded by the Debt Backstop Parties and New Common Stock up to an amount equal to the shortfall between the New Money Investment and the aggregate amount raised through the Rights Offering and the Debt Backstop.  If any backstop funding is required, the Debt Backstop will be used first to satisfy any capital shortfall (subject to a Debt Backstop maximum of $36.75 million and an aggregate new debt maximum of $125 million).  If additional backstop funding is required after exhaustion of the Debt Backstop (or the maximum amount of new debt under the Rights Offering is reached), the Equity Backstop will be used.

In connection with the Rights Offering, pursuant to the Backstop Commitment Agreement, the Company will set aside the Backstop Holdback Equity to be offered solely to the Equity Backstop Parties. Thereafter, the Equity Backstop Parties shall purchase the Backstop Holdback Equity.

In addition, the Debtors shall issue and grant to the Backstop Parties New Common Stock, issued at the Purchase Price, in an aggregate amount equal to $45 million,[6] of which approximately $43.7 million will be allocated pro rata to each Equity Backstop Party and approximately $1.3 million will be allocated pro rata to each Debt Backstop Party, each in accordance with their relative equity or debt backstop commitments, as applicable.  The Backstop Parties will also be paid the Transaction Fee in the amount of $10 million.

### 4)  Use of Proceeds

The Rights Offering proceeds will be used to pay down the First Lien Credit Facility to $650 million as well as the fees and expenses of the Backstop Parties (including the Transaction Fee). The remainder will be used for general corporate purposes.

### 5)  Non-Core Asset Sale

As determined by the Reorganized Debtors' board of directors (the "New Board"), after the Effective Date the Debtors shall sell certain non-core assets and use the resulting proceeds (a) to pay down the First Lien Credit Facility to the extent necessary to remain in compliance with the pro forma borrowing base level and provide sufficient liquidity, (b) to partially prepay any new debt with the remaining proceeds, and (c) for general corporate purposes.

---

[6]    The $45 million Equity Grant assumes that the Accordion is not exercised.  In the event the Accordion is exercised, the Equity Grant shall be increased by an additional $3.5 million of New Common Stock (issued at the Purchase Price).

### 6)  *Management Incentive Plan*

On the Effective Date, equity grants equal to 10 percent of the New Common Stock (on a fully diluted basis) shall be reserved for continuing directors, officers, and employees of the Reorganized Debtors, on terms to be negotiated and included in the Plan Supplement.  On or as soon after the Effective Date as is reasonably practicable, five percent of the New Common Stock will be granted to Management Incentive Plan participants, which grants shall be subject to ratification by the New Board of the Reorganized Parent.  The form and timing of additional Management Incentive Plan grants, if any, will be determined by the compensation committee of the New Board of the Reorganized Parent.

### 7)  *Governance*

The Reorganized Debtors' New Board will be a seven-person board of directors, consisting of (a) the Chief Executive Officer (the "CEO"), (b) two directors elected by the Second Lien Lenders, and (c) four directors elected by the Backstop Parties.  The Backstop Parties will select a nationally-recognized executive search firm to assist with the identification of New Board candidates and selections shall be made in consultation with the CEO.

### 8)  *Exit First Lien Credit Facility*

The terms of the Exit First Lien Credit Facility will be set forth in the Exit First Lien Credit Facility Documents, and will include, among other terms, a borrowing base of at least $750 million on the Effective Date, shall have a five-year term, initial borrowings on the Effective Date in an amount not to exceed $650 million, and unused availability on the Effective Date of not less than $100 million, each of the foregoing unless otherwise agreed by the Debtors, the Required Backstop Parties, and the Majority Consenting Lenders, and other terms reasonably acceptable to the Debtors and the Required Backstop Parties.

### 9)  *New Second Lien Facility*

The terms of the New Second Lien Facility will be set forth in the New Second Lien Loan Documents, and will include, among other terms, that the obligations under the New Second Lien Loan Documents shall be secured by second-priority liens and security interests in the collateral securing the Exit First Lien Credit Facility, shall have a maximum principal amount outstanding equal to the lesser of the amount of New Second Lien Facility subscribed for under the Rights Offering and $125 million, shall have a five-year term, shall bear interest (payable in Cash on a quarterly basis) at 8.5 percent per annum for the first 12 months following the Effective Date, and the interest rate shall increase by 50 basis points on the 12-month anniversary of the Effective Date and each six-month anniversary thereafter, shall not be subject to any prepayment penalty for voluntary prepayments on or prior to the first anniversary of the closing or after the third anniversary of the closing, but shall be subject to a 2.0 percent and 1.0 percent prepayment premium for voluntary prepayments during the 12-month period on or before the second and third anniversaries of the closing date, respectively, and shall include a cash funding fee under the New Second Lien Credit Agreement equal to 2.0 percent of the aggregate principal amount of New Second Lien Facility.

### 10)  *Recovery to Second Lien Lenders*

The Second Lien Lenders will receive all of the New Common Stock in the Reorganized Debtors, less the New Common Stock issued to the Rights Offering Participants (including the Backstop Parties), and the holders of Allowed General Unsecured Claims (subject to dilution on account of the Management Incentive Plan).

### 11) *Recovery to Holders of General Unsecured Claims*

Holders of Allowed General Unsecured Claims (including Noteholders) will receive 1.0 percent of the New Common Stock if they vote to accept the Plan and 0.5 percent if they vote to reject (subject to dilution on account of the Management Incentive Plan).

### 12) *Releases*

The Plan contains certain releases (as described more fully in Article IV.Q hereof), including mutual releases between Debtors, on the one hand, and the First Lien Agent, the First Lien Lenders, the Second Lien Agent, the Second Lien Lenders, each of the Sponsors, the Backstop Parties, and the Consenting Lenders, on the other hand.  The Plan also provides that each holder of a Claim or an Interest that (i) votes to accept or is deemed to accept the Plan or (ii) votes to reject the Plan, is deemed to reject the Plan, or is in a voting Class that abstains from voting on the Plan but does not elect to opt out of the release provisions contained in Article VII of the Plan, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.

### 13) *Preservation of Tax Attributes*

In connection with the Restructuring Support Agreement and the Plan, the Debtors have taken steps to preserve their valuable tax attributes, which may be used to offset gains in the event the Plan is structured as a taxable sale of assets or to offset future operating income in the event the Plan is structured as a tax-free reorganization.  More specifically, the Sponsors have agreed, subject to the terms of the Restructuring Support Agreement, in consideration of the releases included in the Plan, not to pledge, encumber, assign, sell, or otherwise transfer, including by the utilization of a worthless stock deduction, offer, or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, any portion of their right, title, or interests in any of their shares, stock, or other interests in the Debtors to the extent it will impair any of the Debtors' tax attributes.  Accordingly, on the Petition Date, the Debtors sought relief from the Bankruptcy Court (a) approving certain notification and hearing procedures related to certain transfers of and declarations of worthlessness for federal or state tax purposes with respect to certain common and preferred stock of the Samson and (b) directing that any purchase, sale, other transfer of, or declaration of worthlessness with respect to such common or preferred stock in violation of the procedures shall be null and void *ab initio*.

### 14) **The Rights Offering Procedures**

The Rights Offering process will run parallel to, but independently of, the Plan solicitation process.  The fully backstopped Rights Offering is a key component of the Plan.  The proposed Rights Offering Procedures for Eligible Offerees are annexed as **Exhibit 2** to **Exhibit A** attached to the *Debtors' Motion to Approve (I) Adequacy of the Disclosure Statement, (II) Solicitation and Notice Procedures, (III) Rights Offering Procedures, (IV) Forms of Ballots and Notices in Connection Therewith, and (V) Certain Dates with Respect Thereto.*

On or before the Solicitation Deadline, the Debtors will cause Garden City Group, LLC, as subscription agent (the "Subscription Agent"), to distribute the following materials (collectively, the "Rights Offering Materials") to certain qualifying holders of Allowed Second Lien Claims and certain affiliates thereof (collectively, the "Eligible Offerees"):

- a subscription form to participate in the Rights Offering (the "Subscription Form"); and

- the Plan, the Disclosure Statement, the Plan Supplement, the Rights Offering Procedures, and

the documents referenced therein.

In order to exercise the Rights, each Eligible Offeree must (a) return a duly completed and executed Subscription Form to the Subscription Agent and the other documents referenced therein, including a W-8 or W-9, as applicable and (b) pay an amount equal to the Subscription Purchase Price (as calculated pursuant to the Subscription Form) by wire transfer, as set forth in the Subscription Form. All of such forms, documents, and payment must be actually received by the Subscription Agent on or before the Subscription Deadline [November 23], 2015 at 5:00 p.m. (prevailing Eastern Time).  Each Eligible Offeree that elects to exercise its Rights must fund 100 percent of such its Subscription Purchase Price.  If the Subscription Agent for any reason does not receive from a given Eligible Offeree both a timely and duly completed Subscription Form and timely payment of such Eligible Offeree's Subscription Purchase Price, then such Eligible Offeree will be deemed to have relinquished and waived its right to participate in the Rights Offering.

*Please refer to Article XIV herein for a more detailed discussion of securities law considerations related to the securities to be issued pursuant to the Rights Offering.*

**C.    363 Sale**

At the time of execution of the Restructuring Support Agreement, the Debtors had support therefor from holders of approximately 45.5 percent of outstanding loans and obligations under the Second Lien Credit Agreement.  As of the Petition Date, the Consenting Lenders, including additional Second Lien Lenders who subsequently executed the Restructuring Support Agreement, represent holdings over 68 percent of the outstanding loans and obligations under the Second Lien Credit Agreement.  As a result of this level of support from the Second Lien Lenders, the requisite Second Lien Lenders have waived the Debtors' obligation under the Restructuring Support Agreement to comply with all sale-related milestones contained therein.

## VI.    IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

### A.    Certain Key Terms Used in this Disclosure Statement

The following are some of the defined terms used in this Disclosure Statement.  This is not an exhaustive list of defined terms in the Plan or this Disclosure Statement, but is provided for ease of reference only.  Please refer to the Plan for additional defined terms.

Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the District of Delaware.

"Bankruptcy Rules" means Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

"Chapter 11 Cases" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

"Claim" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

"Confirmation Date" means the date upon which the Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

"Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

"Interests" means the common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor and options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement), including any claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

"Person" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

"Plan Supplement" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, each of which shall be in form and substance reasonably acceptable to the Debtors, the Sponsors (solely with respect to the Sponsor Consent Right) and the Required Backstop Parties (as amended, supplemented, or modified from time to time with the reasonable consent of the Required Backstop Parties and the Sponsors (solely with respect to the Sponsor Consent Right) in accordance with the terms hereof and the Bankruptcy Code and the Bankruptcy Rules), to be filed by the Debtors no later than 10 days before the Voting Deadline, and additional documents or amendments to previously filed documents, filed before the Confirmation Date as amendments to the Plan Supplement, including the following, as applicable: (a) New Organizational Documents; (b) Exit First Lien Credit Agreement; (c) New Second Lien Credit Agreement; (d) Schedule of Rejected Executory Contracts and Unexpired Leases; (e) a list of retained Causes of Action; (f) Management Incentive Plan; (g) a document listing the members of the New Boards; (h) the Stockholders Agreement; and (i) the New Intercreditor Agreement. The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date with the reasonable consent of the Sponsors (solely with respect to the Sponsor Consent Right) and the Required Backstop Parties.

## B.    Additional Important Information

The confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to go effective will be satisfied (or waived).

You are encouraged to read this Disclosure Statement in its entirety, including the section entitled "Risk Factors," and the Plan before submitting your ballot to vote on the Plan.

***The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.***

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan.  The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to those documents.  The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein

will be correct at any time after such date.  Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose.  In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provisions of the Plan will govern.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC") or any similar federal, state, local or foreign regulatory agency, nor has the SEC or any other agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement; however, the financial information contained in this Disclosure Statement or incorporated herein by reference has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Upon Confirmation of the Plan, certain of the securities described in this Disclosure Statement will be issued without registration under the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder (the "Securities Act"), or similar federal, state, local, or foreign laws, in reliance on the exemption set forth in section 1145 of the Bankruptcy Code.  Other securities may be issued pursuant to other applicable exemptions under the federal securities laws.  To the extent exemptions from registration under section 1145 of the Bankruptcy Court do not apply, the securities may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under federal securities laws.  The Debtors consider all statements regarding anticipated or future matters, to be forward-looking statements.  Forward-looking statements may include statements about the Debtors':

- business strategy;

- estimated future net reserves and present value thereof;

- technology;

- financial condition, revenues, cash flows, and expenses;

- levels of indebtedness, liquidity, and compliance with debt covenants;

- financial strategy, budget, projections, and operating results;

- oil and natural gas realized prices;

- timing and amount of future production of oil and natural gas;

- availability of drilling and production equipment;

- availability of oilfield labor;

- availability of third-party natural gas gathering and processing capacity;

- the amount, nature, and timing of capital expenditures, including future development costs;

- availability and terms of capital;

- drilling of wells, including the Debtors' identified drilling locations;

- successful results from the Debtors' identified drilling locations;

- marketing of oil and natural gas;

- the integration and benefits of asset and property acquisitions or the effects of asset and property acquisitions or dispositions on the Debtors' cash position and levels of indebtedness;

- infrastructure for salt water disposal and electricity;

- sources of electricity utilized in operations and the related infrastructures;

- costs of developing the Debtors' properties and conducting other operations;

- general economic conditions;

- effectiveness of the Debtors' risk management activities;

- environmental liabilities;

- counterparty credit risk;

- the outcome of pending and future litigation;

- governmental regulation and taxation of the oil and natural gas industry;

- developments in oil-producing and natural gas-producing countries;

- uncertainty regarding the Debtors' future operating results; and

- plans, objectives, and expectations;

- variations in the market demand for, and prices of, oil, natural gas liquids and natural gas;

- uncertainties about the Debtors' estimated quantities of oil and natural gas reserves;

- the adequacy of the Debtors' capital resources and liquidity including, but not limited to, access to additional borrowing capacity under the Debtors' First Lien Credit Facility;

- access to capital and general economic and business conditions;

- uncertainties about the Debtors' ability to replace reserves and economically develop their current reserves;

- risks in connection with acquisitions;

- risks related to the concentration of the Debtors' operations onshore in Oklahoma, Texas, and Louisiana;

- drilling results;

- the potential adoption of new governmental regulations; and

- the Debtors' ability to satisfy future cash obligations and environmental costs.

Statements concerning these and other matters are not guarantees of the Reorganized Debtors' future performance. There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein. These risks, uncertainties, and factors may include: the Debtors' ability to confirm and consummate the Plan; the potential that the Plan may be converted to a process to sell substantially all of the Debtors' assets under section 363 of the Bankruptcy Code; the Debtors' ability to reduce its overall financial leverage; the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees, and the risks associated with operating the Debtors' businesses during the Chapter 11 Cases; customer responses to the Chapter 11 Cases; the Debtors' inability to discharge or settle Claims during the Chapter 11 Cases; general economic, business and market conditions; currency fluctuations; interest rate fluctuations; price increases; exposure to litigation; a decline in the Debtors' market share due to competition or price pressure by customers; the Debtors' ability to implement cost reduction initiatives in a timely manner; the Debtors' ability to divest existing businesses; financial conditions of the Debtors' customers; adverse tax changes; limited access to capital resources; changes in domestic and foreign laws and regulations; trade balance; natural disasters; geopolitical instability; and the effects of governmental regulation on the Debtors' businesses.

## VII.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.    The Debtors

The Debtors are an onshore oil and gas exploration and production company with royalty and working interests in various oil and gas leases primarily located in Colorado, Louisiana, North Dakota, Oklahoma, Texas, and Wyoming, which generated approximately $290 million of commodity revenue in the first half of 2015. The Debtors generate most of their revenue through three operating companies: Samson, Samson Contour Energy E&P, LLC ("Contour"), and Samson Lone Star, LLC ("Lone Star," and together with Samson and Contour, the "Operating Companies"). The Operating Companies operate or have joint working interests in approximately 8,700 oil and gas production sites, generating revenue through sales of oil and natural gas to wholesale oil and natural gas buyers and distributors throughout the United States. Below is a summary of the Debtors' businesses and operations.

### B.    Assets and Operations

The Debtors operate throughout the United States and organize their operations into an East Division and a West Division.

The East Division comprises approximately 6,900 wells, a net acreage of 811,000, and proved reserves totaling 1,048 billions of cubic feet equivalent ("Bcfe"). The 2014 net production in the East Division was approximately 343 millions of cubic feet equivalent per day ("MMcfe/d").

The West Division comprises approximately 1,600 wells, a net acreage of 656,000, and proved reserves totaling 443 Bcfe. The 2014 net production in the West Division was approximately 185 MMcfe/d.



**West Division**
2014 Production: 185 MMcfe/d
Proved Reserves:  443 Bcfe
Net Acreage: 656,000

**East Division**
2014 Production: 343 MMcfe/d
Proved Reserves:  1,048 Bcfe
Net Acreage: 811,000

Total Co. 2014 Production[1]:  530 MMcfe/d   /   Proved Reserves:  1.5 Tcfe

In response to current commodity prices and a leveraged balance sheet, the Debtors have suspended drilling and are not currently developing any new wells.

As of the Petition Date, the Debtors have approximately 600 full-time employees.  None of their employees are represented by a collective bargaining unit.  A corporate organization chart is attached as to the First Day Declaration as **Exhibit B**.

### C.    Prepetition Capital Structure

As of the Petition Date,[7] the Debtors reported approximately $4.9 billion in total liabilities.  As described in greater detail below, Debtors' significant funded debt obligations include: (a) approximately $942 million in principal amount of obligations under the Debtors' First Lien Credit Facility; (b) approximately $1.0 billion in principal amount of obligations under the Debtors' Second Lien Credit Agreement; and (c) approximately $2.25 billion in principal amount of Senior Notes.

#### *1)    First Lien Credit Facility*

The Debtors maintain a reserve-based revolving credit facility of approximately $942 million under the First Lien Credit Agreement, which provides for a borrowing base of $950 million, subject to redetermination by the agent and lenders based on the value of the Debtors' oil and gas reserves.

The First Lien Credit Agreement has been amended five times, including most recently on March 18, 2015.                                under the First Lien Credit Facility is $950 million, and the facility is approximately fully drawn.  The First Lien Credit Facility bears interest at a floating

---

[7]    These financial figures reflect the Debtors' most recent review of their businesses.  The Debtors reserve all rights to revise and supplement the figures presented herein.

1)    *Includes a small "Other" business unit that reflects our interest in certain non-core assets located throughout the continental United States.*

rate; for the six months ended June 30, 2015, the weighted average interest rate was 3.5 percent.   The First Lien Credit Facility matures in 2016.

The First Lien Credit Facility is guaranteed by each of the Debtors and is secured by a lien on substantially all assets and capital stock of Samson Investment Company and all wholly-owned domestic restricted subsidiaries, including a security interest in the Debtors' approximately $130 million in cash on hand and real property mortgages on at least 95 percent of the Debtors' oil and gas properties.

The Debtors routinely enter into hedging arrangements with certain counterparties to provide partial protection against declines in oil and natural gas prices.   The Debtors base their hedging strategy on a view of existing and forecasted production volumes, budgeted drilling projections, and current and future market conditions and take the form of oil and natural gas price collars and swap agreements. Certain of the counterparties under the hedging agreement are also lenders under the First Lien Credit Agreement.   As of the Petition Date, the hedges currently stand in the Debtors' favor in an aggregate amount of approximately $105 million.   Certain hedge counterparties may elect to terminate the Debtors' hedges in connection with the commencement of these chapter 11 cases.

### 2)   *Second Lien Term Loan*

As the Debtors sought to maximize the value of their operations after the 2011 acquisition, they considered various options to stimulate their production and growth.   In September of 2012, the Debtors determined to obtain additional financing to take advantage of market conditions to convert their short-term revolver debt to longer duration second lien term debt.

On September 25, 2012, the Debtors entered into the Second Lien Credit Agreement.   The term loan under the Second Lien Credit Agreement totals approximately $1.0 billion in principal amount and matures in 2018.   It bears interest at a floating rate; for the six months ended March 31, 2015, the weighted average interest rate was 5.0 percent.   In 2014, the Debtors explored refinancing the second lien term loan.

Obligations under the Second Lien Credit Agreement are guaranteed by all of the Debtors and secured by a second lien on substantially all assets and capital stock of Samson Investment Company and all wholly-owned domestic restricted subsidiaries, including real property mortgages on at least 95 percent of the Debtors' oil and gas properties.   An intercreditor agreement governs the relative rights of the First Lien Lenders and Second Lien Lenders, and provides other protections for the benefit of such parties.

### 3)   *Senior Unsecured Notes*

On February 8, 2012, the Debtors issued $2.25 billion in principal amount of 9.75% senior unsecured notes under the Senior Notes Indenture.   Proceeds from the issuance of the Senior Notes were used to repay borrowings under a bridge facility associated with the 2011 leveraged buyout.

The interest rate under the Senior Notes Indenture and the Senior Notes is 9.75%, payable semi-annually in February and August, subject to a 30-day grace period.   The Senior Notes are guaranteed by all of the Debtors.   The Debtors did not make the approximately $110 million interest payment on the notes due on August 17, 2015.

## VIII.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    Commodity Price Decline

Over the course of the last three years, macroeconomic factors have made it difficult for the Debtors to support their leveraged debt obligations.  After the 2011 leveraged buyout, already-low natural gas prices declined significantly to $1.95 per MMBtu in April 2012, down approximately 40 percent since the buyout—materially reducing the cash flows the Debtors had to meet their interest payment burden and invest in developing their oil, natural gas, and natural gas liquids (the "NGLs") assets.  At the same time, overall oil and gas drilling activity in North America continued to rise, putting pressure on service costs due to high demand for oilfield services.

The Debtors also faced their own difficulties.  Challenges with then-existing management necessitated the replacement of the entire senior executive team starting in 2012.  Moreover, certain of the Debtors' assets proved to be less productive than originally anticipated, and the Debtors' drilling program failed to deliver the expected results.

With natural gas prices remaining low, oil prices likewise began a steep descent beginning in mid-2014.  Worsening the decline, in November 2014, the Organization of Petroleum Exporting Countries ("OPEC")—after years of tempering significant fluctuations in oil prices through the control of supply—announced that it would not reduce production quotas in the face of the significant decrease in the price of oil.  OPEC's announcement drove the price of oil below $54 a barrel by the end of 2014, a total drop of more than 50 percent from the beginning of the year.  In addition to decreasing revenue, the lower commodity prices resulted in lower borrowing capacity under the Debtors' revolving credit facility (and a lack of viable financing from other potential sources).  The Debtors' commodity hedges partially offset the impact of these price changes, but nonetheless the Debtors' struggles to meet their interest burden and invest in the growth of the business continued.

In early 2014, the Debtors developed a plan to improve performance and profitability by selling certain non-core assets, limiting capital to the most repeatable drilling opportunities, and looking for opportunities to add new assets.  Management considered creating a spin-off master limited partnership with a portion of the Debtors' assets and also considered creating a publicly traded growth platform with the Debtors' growth assets.  The Debtors aggressively pursued this non-core asset plan until the most recent commodity price declines made clear it was not feasible for the Debtors to execute on the strategy.  Although the Debtors were able to sell their Arkoma Basin properties in Oklahoma for approximately $48 million in March 2015, the price drops hampered their ability to sell any other assets to help alleviate liquidity problems.

The difficulties faced by the Debtors are consistent with problems faced industry-wide.  Exploration and production companies and others have been challenged by relatively low natural gas prices for several years, and prices remain below $3.00/MMBtu today.  The scale of the oil price decline cannot be understated.  On August 24, 2015, the price of West Texas Intermediate oil hit a six-year low, dipping below $39 per barrel, and has since remained below $50 per barrel.

### B.    Restructuring Initiatives

Given their significant debt obligations and the state of the pricing environment for hydrocarbons at the end of 2014, the Debtors faced immediate challenges.  With liquidity under severe pressure from lower pricing and revenues, the Debtors faced an interest payment of approximately $110 million under the Debtors' senior unsecured notes due on February 17, 2015.  Additionally, a redetermination of the

borrowing base under the First Lien Credit Facility was scheduled for April 1, 2015 (which likely would significantly reduce availability given the decline in oil and gas prices).

The Debtors took aggressive and proactive steps—from significant cost-cutting measures (including as the suspension of all drilling activity, a significant reduction in work force, and a shut-in well project to increase cash flow) and performance improvement initiatives to select asset sales and an in-depth strategic review of all assets and operations—to address these challenges. In addition, in December 2014, the Debtors hired restructuring professionals, including Kirkland & Ellis LLP and Blackstone Advisory Partners L.P.,[8] to begin exploring restructuring alternatives. In February 2015, the Debtors also retained Alvarez & Marsal North America, LLC.

With the help of their advisors, the Debtors began working in earnest to consider restructuring alternatives and ensure that their businesses were best positioned to compete in the exploration and production industry going forward. To achieve an orderly restructuring and maximize the value of the Debtors' businesses, a series of steps were undertaken in a coordinated manner leading up to the filing of the Chapter 11 Cases.

### 1)   *Strategic Review of Assets*

Starting as early as 2014, in anticipation of the issues they face today, the Debtors began evaluating their asset base to determine which assets are "core" (i.e., capable of supporting long-term and sustainable drilling programs with acceptable returns) and which assets are "non-core" (i.e., assets that do not integrate well with the rest of the asset profile). The Debtors also identified "upside assets," which had reasonable potential, but required further exploration. The Debtors have continued this analysis throughout the first three quarters of 2015 and intend to retain core assets and pursue divestitures of non-core assets to support their capital program and increase available funds for acquisition of complimentary oil and gas properties.

### 2)   *January Revolver Draw*

Given the significant disruptions and uncertainty in the oil and gas industry and a need to bolster liquidity to maximize flexibility as they considered potential restructuring options, the Debtors determined that a full draw of the First Lien Credit Facility was necessary to best position the Debtors in the short and longer term. Consequently, the Debtors drew the remainder of available commitments under the First Lien Credit Facility on January 16, 2015.

### 3)   *Noteholder Initial Proposal*

On January 30, 2015, the Debtors received a debt exchange and financing proposal from Oaktree Capital Management, L.P. ("Oaktree") and GSO Capital Partners LP ("GSO"). The proposal from Oaktree and GSO contemplated an exchange at 60 percent of the aggregate outstanding amount of the existing Senior Notes held by Oaktree and GSO into 12 percent "1.5" lien notes that would constitute "First Priority Debt" under the Second Lien Credit Agreement, have the benefit of the Intercreditor Agreement, and be subject to a new intercreditor agreement between the First Lien Agent and the trustee under the indenture for the new notes. In connection with the exchange, Oaktree and GSO would provide $200 million ($100 million each) of new "last out" loans, bearing interest at 8 percent per annum, which would rank *pari passu* in right of payment with Samson's First Lien Credit Facility.

---

[8]   Effective October 1, 2015, Blackstone Advisory Partners L.P. will be spun off from the Blackstone Group L.P. and combined with PJT Partners L.P.

After reviewing the proposal and clarifying several questions with Oaktree and GSO, the Debtors determined that this initial proposal was not actionable. Among other issues, the initial proposal did not take into account the deterioration in the asset base and current valuation that would be reflected in the Debtors' upcoming financial disclosures. As a result, and because the Debtors were just beginning discussions with the First Lien Lenders regarding the March borrowing base redetermination, the Debtors explained to Oaktree and GSO that they would be in a better position to engage in discussions beginning in March or April, once all relevant financial information was publicly disclosed.

### 4)  Suspension of Drilling and Workforce Reduction

Beginning in February 2015, in an effort to decrease costs, streamline operations, and preserve necessary liquidity, the Debtors suspended all drilling activity and limited capital spending. The Debtors also announced a plan to reduce their workforce by approximately 35 percent (approximately 375 employees) in March 2015. The workforce reduction affected management, technical, back office, and field operations. The Debtors closed small offices in the Woodlands, Texas, Oklahoma City, Oklahoma, and Bossier City, Louisiana, reduced their vehicle fleet by approximately 100, and consolidated technical software applications. These cuts resulted in approximately $60 million of annualized savings.

Despite these efforts, the Debtors were not able to insulate themselves from the market turmoil that has hit every level of the oil and gas industry worldwide, and it became clear that the Debtors would not be able to continue to support their capital structure and comply with restrictive covenants in their credit documents without a comprehensive balance sheet restructuring. Thus, to optimize their ability to restructure effectively—whether through an in- or out-of-court transaction—the Debtors took steps to engage their creditor constituents in meaningful negotiations on a comprehensive financial reorganization.

### C.    Negotiations with Creditors

Following the March 2015 amendment, the Debtors kicked-off discussions with advisors to the Second Lien Agent and advisors to certain holders of Senior Notes (the "Noteholders") regarding potential restructuring solutions. The primary objective was to find a solution that satisfied the following main parameters:

- deleveraging the Debtors' debt obligations and reducing their debt-service expenses to a level more manageable under expected operating cash flow;

- facilitating the availability of new capital to restart drilling activity and to support operations as the challenges facing the E&P industry continue;

- providing sufficient runway should pricing improvements not materialize in the short term; and

- maximizing enterprise value.

The Debtors and their advisors held initial meetings with advisors to the Second Lien Agent on April 14, 2015 and advisors to the Noteholders on April 17, 2015. Following those meetings, the Debtors and their advisors quickly provided extensive diligence materials including detailed information on the Debtors' operations and financials.

As potential transaction discussions progressed with the respective advisors to each of the Second Lien Agent and the Noteholders, the Debtors negotiated confidentiality agreements with the principal Second Lien Lenders and Noteholders themselves. Certain of the Second Lien Lenders and the Noteholders entered into confidentiality agreements in early June 2015.

After entering into these confidentiality agreements, the Debtors engaged in extensive discussions with each of the two groups. These discussions led to the negotiation with both groups of draft term sheets for two potential transactions, both aimed at maximizing value for all stakeholders and providing the Debtors with a manageable debt load and available capital to ensure that they would be best-positioned to compete in the exploration and production industry after their restructuring.

### 1) Noteholder Negotiations

The discussions with the Noteholders focused on a potential out-of-court exchange and recapitalization transaction (the "Noteholder Transaction"). More specifically, the Noteholder Transaction contemplated an exchange of all of the Debtors' Senior Notes for new secured notes and a new-money investment of $650 million. In all of the Noteholder-led proposals, both the exchanged existing notes and the new money investment would be invested on a priming basis vis-à-vis the $1 billion second lien credit facility. And whereas the initial Noteholder proposal contemplated an exchange at 60 percent of the aggregate outstanding Senior Notes, the last contemplated an exchange at 20 percent of the aggregate outstanding Senior Notes. While the Noteholder Transaction would have resulted in deleveraging through the exchange of existing Senior Notes at a significant discount, the transaction would have left the Debtors with approximately $2.9 billion of indebtedness. Notably, the implied valuation in each of the Noteholder-led proposals equaled or exceeded the valuation in the Second Lien Lenders' proposal.

For the Noteholder Transaction to be successful, broad Noteholder support was necessitated so as to actually achieve deleveraging and avoid holdouts. The Noteholder group itself had approximately 50 percent of the outstanding Senior Notes, and the term sheet contemplated achieving 95 percent support from all Noteholders. In addition, the Debtors and the Noteholders needed to reach an agreement on a refinancing of the First Lien Credit Facility with JPMorgan or an alternative provider of financing. None of the potential financing sources approached by the Debtors indicated a willingness to finance this transaction. Further, the Debtors would need to reach an agreement with the holders of the Preferred Interests. Because of the upcoming coupon payment due under the Senior Notes Indenture on August 17, 2015, the exchange would need to be launched and closed before the expiration of the grace period on September 16, 2015. Thus, these contingencies needed to be resolved in that timeframe.

A number of factors contributed to the inability to reach an agreement on the Noteholder Transaction, including:

- During discussions with the Noteholders from early June through the end of July 2015, oil prices, which at one point had rebounded to approximately $60 per barrel, again dropped precipitously. Because of this and other factors, including fears regarding China's economic growth, the credit markets softened significantly for exploration and production companies and made it difficult to agree on the terms of the new money investment. In fact, during the course of negotiations, the proposed interest on the new money investment proposed by the Noteholder group increased from 9 percent cash and three percent payment-in-kind to 16 percent cash.

- The Debtors' ability to obtain a first lien facility to accommodate the "layered" new money investment and exchanged debt was doubtful. The Debtors needed to refinance or amend the First Lien Credit Facility in connection with the Noteholder Transaction (in unfavorable market conditions), which created additional material execution risk and could have heightened the impact the credit market restrictions would have had on the Debtors post-transaction. In addition, the Second Lien Lenders fervently opposed, and indicated that they would challenge the legality of, the proposed Noteholder Transaction. This potential litigation with the Second Lien Lenders was concerning to potential first lien financing

sources.

- The Noteholder group insisted that the Debtors' current equity owners invest incremental capital as part of recapitalization. The equity owners, though, were not prepared to make an additional investment in light of the current commodity price environment (among other things).

For these reasons, among others, the Debtors and the Noteholders were unable to reach an agreement regarding the terms of a transaction and terminated their negotiations in late July 2015. This decision was made notwithstanding threats of litigation in any corresponding bankruptcy proceeding if the Debtors did not capitulate to the Noteholder Transaction.

### 2) *Second Lien Lender Negotiations*

At the same time as the Noteholder negotiations, the Debtors continued to discuss and negotiate a potential restructuring and recapitalization led by certain of its Second Lien Lenders. The Debtors employed a dual-path approach to foster competition between the two constituencies and negotiate the best overall solution for all stakeholders. Moreover, the Debtors believed it was prudent to ensure that if a Noteholder Transaction was not workable or otherwise could not come together, it was critical to have a restructuring arrangement with the Second Lien Lenders negotiated in advance to avoid a long protracted restructuring where access to liquidity could lead to an entirely undesirable outcome. After ceasing discussions with the group of Noteholders, the Debtors focused 100 percent of their efforts on negotiating a viable, consensual transaction with the Second Lien Lenders.

The large group of Second Lien Lenders proposed to deleverage the Debtors' balance sheet by eliminating more than $3 billion of debt and contributing fresh capital to fund operations.

Preserving the Debtors' valuable tax attributes—specifically, approximately $1.4 billion of NOLs as of December 31, 2014, that can offset current and future income tax obligations—is critical to any restructuring and was a component of the discussions with the Second Lien Lenders. Before the Petition Date, certain direct and indirect holders of common stock approached the Debtors and the Sponsors seeking to have their interests repurchased so that these holders could take a worthless stock deduction in 2015. These transactions were carefully considered and ultimately approved and executed in a manner so as to avoid triggering an "ownership change" within the meaning of section 382 of the Internal Revenue Code, which would substantially limit the use of such NOLs going forward. Certain additional transfers or redemptions of common stock by the Sponsors, however, may impair substantially the value or otherwise restrict the Debtors' use of the NOLs. Like other equity owners, the Sponsors have indicated their desire to obtain the benefits associated with the loss inherent in their stock.

To ensure that the valuable NOLs are preserved and can be utilized by the Debtors, the transaction negotiated with the Second Lien Lenders was structured to include certain agreements as set forth in the Restructuring Support Agreement with the Sponsors. More specifically, and in return for certain releases contained in the Restructuring Support Agreement and in the Plan, the Sponsors agreed subject to the terms of the Restructuring Support Agreement not to sell or transfer any of their shares, stock, or other interests in the Debtors (including by utilization of a worthless stock deduction) to the extent it would impair any of the Debtors' tax attributes.

The Debtors filed the Chapter 11 Cases to implement their prearranged plan pursuant to the terms of the Restructuring Support Agreement, enhance liquidity, and bolster their long-term growth prospects and operating performance. The Plan represents the successful culmination of months of restructuring efforts and offers the Debtors a path to emerge from chapter 11 as a substantially deleveraged business well-positioned to compete in the competitive exploration and production industry going forward.

### IX.    ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

####    A.    Corporate Structure upon Emergence

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

####    B.    Expected Timetable of the Chapter 11 Cases

The Debtors expect the Chapter 11 Cases to proceed quickly.  Should the Debtors' projected timelines prove accurate, the Debtors could emerge from chapter 11 within 91 days of the Petition Date. **No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.**

####    C.    First Day Relief

On the Petition Date, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases.  The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at www.GardenCityGroup.com/cases/SamsonRestructuring.

### X.    PROJECTED FINANCIAL INFORMATION

Attached hereto as **Exhibit D** is a projected consolidated income statement, which includes the following:  (a) the Debtors' consolidated, unaudited, preliminary, financial statement information for the fiscal year ended December 31, 2015 and (b) consolidated, projected, unaudited, financial statement information of the Reorganized Debtors (collectively, the "Financial Projections") for the period beginning 2016 and continuing through 2020.  The Financial Projections are based on an assumed Effective Date of December 31, 2015.  To the extent that the Effective Date occurs before or after December 31, 2015, recoveries on account of Allowed Claims could be impacted.

Creditors and other interested parties should see the below "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

### XI.    RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.    Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

#### 1)    *Parties in Interest May Object to the Plan's Classification of Claims and Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2)    *The Conditions Precedent to the Effective Date of the Plan May Not Occur*

As more fully set forth in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.

#### 3)    *The Debtors May Fail to Satisfy Vote Requirements*

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or proceed with the Sale.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

#### 4)    *The Debtors May Not Be Able to Secure Confirmation of the Plan*

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear

whether the Debtors will be able to reorganize their business and what, if anything, holders of Allowed Claims against them would ultimately receive on account of such Allowed Claims.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims will receive won account of such Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5)  *Nonconsensual Confirmation*

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6)  *Continued Risk Upon Confirmation*

Even if a chapter 11 plan of reorganization is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in consumer demand for, and acceptance of, their oil and gas, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code will give the Debtors the exclusive right to propose the Plan and will prohibit creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their petitions for chapter 11 relief. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 7) *The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code*

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, and including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 8) *The Debtors May Object to the Amount or Classification of a Claim*

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9) *Risk of Non-Occurrence of the Effective Date*

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 10) *Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan*

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

### 11) *Releases, Injunctions, and Exculpations Provisions May Not Be Approved*

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the

Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

### B.    Risks Related to Recoveries under the Plan

#### 1)    *The Debtors May Not Be Able to Achieve Their Projected Financial Results*

With respect to holders of Allowed General Unsecured Claims, the claims filed against the Debtors' estates may be materially higher than the Debtors have estimated. As holders of Allowed General Unsecured Claims receive a Pro Rata distribution, additional claims could reduce the recovery.

With respect to holders of Interests in the Reorganized Debtors, the Reorganized Debtors may not be able to achieve their projected financial results. The Financial Projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the particular industry segments in which the Debtors operate in particular. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Debtors do not achieve their projected financial results, (a) the value of the New Common Stock may be negatively affected, (b) the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date and (c) the Debtors may be unable to service their debt obligations as they come due. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

#### 2)    *The Reorganized Debtors' New Common Stock Will Not Be Publicly Traded*

There can be no assurance that an active market for the New Common Stock will develop, nor can any assurance be given as to the prices at which such stock might be traded. The New Common Stock to be issued under the Plan will not be listed on or traded on any nationally recognized market or exchange. Further, the New Common Stock to be issued under the Plan has not been registered under the Securities Act, any state securities laws or the laws of any other jurisdiction. Absent such registration, the New Common Stock may be offered or sold only in transactions that are not subject to, or that are exempt from, the registration requirements of the Securities Act and other applicable securities laws. As explained in more detail in Article XIV herein, most recipients of New Common Stock will be able to resell such securities without registration pursuant to the exemption provided by Rule 144 of the Securities Act, subject to any restrictions set forth in the certificate of incorporation and bylaws of Samson.

#### 3)    *The Restructuring Support Agreement Requires the Debtors to Toggle to a 363 Sale Upon the Occurrence of Certain Events*

In light of the fact that the Second Lien Lenders holding, in the aggregate, at least 66 2/3 percent of all outstanding Second Lien Loans have become parties to the Restructuring Support Agreement as of the Petition Date, the Majority Consenting Lenders have waived the Debtors' obligation under the Restructuring Agreement to satisfy all sale-related milestones set forth therein.

#### 4)    *The Restructuring of the Debtors May Adversely Affect the Debtors' Tax Attributes*

Under federal income tax law, a corporation is generally permitted to deduct from taxable income NOLs carried forward from prior years. The Debtors have NOL carryforwards of

approximately $1.4 billion as of December 31, 2014, of which approximately $[138] million is subject to limitation under section 382 of the Internal Revenue Code as of December 31, 2014.  The Debtors' ability to utilize their NOL carryforwards and other tax attributes to offset future taxable income and to reduce federal income tax liability is subject to certain requirements and restrictions.  If the Debtors experience an "ownership change," as defined in section 382 of the Internal Revenue Code, then their ability to use the NOL carryforwards may be substantially limited, which could have a negative impact on the Debtors' financial position and results of operations.  Generally, there is an "ownership change" if one or more stockholders owning 5 percent or more of a corporation's common stock have aggregate increases in their ownership of such stock of more than 50 percentage points over the prior three-year period.  Following the implementation of a plan of reorganization, it is possible that an "ownership change" may be deemed to occur.  Under section 382 of the Internal Revenue Code, absent an applicable exception, if a corporation undergoes an "ownership change," the amount of its NOLs that may be utilized to offset future taxable income generally is subject to an annual limitation.  Even if the NOL carryforwards are subject to limitation under section 382, such NOLs can be reduced by the amount of discharge of indebtedness arising in a chapter 11 case under section 108 of the Internal Revenue Code or to offset any taxable gains recognized by the Debtors attributable to the restructuring transactions.  The Debtors currently expect that their net operating loss carryforwards and other tax attributes may be significantly reduced in connection with the restructuring transactions, through a combination of one or more of the above factors.

For a detailed description of the effect consummation of the Plan may have on the Debtors' tax attributes, see "Certain United States Federal Income Tax Consequences of the Plan," which begins on page 57 herein.

### 5) *The Debtors May Not Be Able to Accurately Report Their Financial Results*

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud.  Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements.  If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness.  Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition.

By rules of the Securities and Exchange Commission, the Debtors have not evaluated their internal controls over financial reporting, the purpose of which would be for management to report on the effectiveness of the Debtors' internal controls over financial reporting that would be needed to comply with Section 404(a) of the Sarbanes Oxley Act of 2002.  As the Debtors progress towards preparing for the reporting requirements associated with internal controls over financial reporting as prescribed in the Sarbanes Oxley Act of 2002, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors'' businesses, results of operations, and financial condition.

Additionally, as a result of our March 2015 workforce reduction and additional employee turnover beyond the March 2015 workforce reduction, the Debtors have experienced changes in their internal controls over financial reporting.  The changes in the Debtors' workforce have resulted in necessary changes to the Debtors' system of internal controls as certain employees are performing control activities that they were not previously performing.  The Debtors expect continued changes in their

system of internal controls as the Debtors align their control structure with the Debtors' current workforce.    A changing internal control environment increases the risk that the Debtors' system of internal controls is not designed effectively or that internal control activities will not occur as designed.

### C.    Risks Related to the Debtors' and the Reorganized Debtors' Businesses

#### 1)    *The Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness*

The Debtors' ability to make scheduled payments on, or refinance their debt obligations, including the notes, depends on the Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Debtors' control (including the factors discussed in Article XI.C.6), which begins on page 47, herein).  The Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Debtors to pay the principal, premium, if any, and interest on their indebtedness, including the notes.

#### 2)    *The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases*

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following:  (a) ability to develop, confirm, and consummate the restructuring transactions specified in the Plan or an alternative restructuring transaction, including the Sale; (b) ability to obtain court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, service providers, customers, employees, royalty interest holders, working interest holders, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

#### 3)    *Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses*

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization.  A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the

reorganization instead of focusing exclusively on business operations.  A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses.  In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.  The chapter 11 proceedings may also require the Debtors to seek debtor-in-possession financing to fund operations.  If the Debtors are unable to obtain such financing on favorable terms or at all, the chances of successfully reorganizing the Debtors' businesses may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate their assets may be enhanced, and, as a result, creditor recoveries may be significantly impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization.  Even after a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 4) *Financial Results May Be Volatile and May Not Reflect Historical Trends*

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements.  As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.  The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

### 5) *The Debtors' Substantial Liquidity Needs May Impact Production Levels and Revenue*

The Debtors' principal sources of liquidity historically have been cash flow from operations, sales of oil and gas properties, borrowings under the First Lien Credit Facility and issuances of debt securities.  The Debtors' capital program will require additional financing above the level of cash generated by operations to fund growth.  If the Debtors' cash flow from operations remains depressed or decreases as a result of lower commodity prices or otherwise, the Debtors' ability to expend the capital necessary to replace proved reserves, maintain leasehold acreage, or maintain current production may be limited, resulting in decreased production and proved reserves over time.  In addition, drilling activity may be directed by the Debtors' joint venture partners in certain areas and the Debtors may have to forfeit acreage if the Debtors do not have sufficient capital resources to fund their portion of expenses.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources and have extremely limited, if any, access to additional financing. In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases. The Debtors cannot guarantee that cash on hand and cash flow from operations will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) ability to comply with the terms and condition of any cash collateral order entered by the Bankruptcy Court in connection with the Chapter 11 Cases; (b) ability to maintain adequate cash on hand; (c) ability to generate cash flow from operations; (d) ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (e) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that cash on hand and cash flow from operations are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

### 6) *Oil and Natural Gas Prices Are Volatile, and Low Oil or Natural Gas Prices Could Materially Adversely Affect the Debtors' Businesses, Results of Operations, and Financial Condition*

The Debtors' revenues, profitability and the value of the Debtors' properties substantially depend on prevailing oil and natural gas prices. Oil and natural gas are commodities, and therefore, their prices are subject to wide fluctuations in response to changes in supply and demand. Oil and natural gas prices historically have been volatile and are likely to continue to be volatile in the future, especially given current economic and geopolitical conditions. During the second half of 2014, prompt month[9] NYMEX-WTI[10] oil prices fell from in excess of $100 per Bbl to the mid $50s, the lowest price since 2009 when prices briefly fell below $35 per Bbl. Thus far in 2015, commodity prices have continued to be depressed, with NYMEX-Henry Hub[11] natural gas prices ranging from approximately $2.55 per MMBtu to $3.30 per MMBtu and NYMEX-WTI oil prices ranging from approximately $38 per Bbl to $61 per Bbl through September 16, 2015. The Debtors expect such volatility to continue in the future. The prices for oil and natural gas are subject to a variety of factors beyond the Debtors' control, such as:

- domestic and global economic conditions impacting the supply and demand of oil and natural gas;

- uncertainty in capital and commodities markets;

---

[9]   Prompt-month, also called near-month, refers to the futures contract that is closest to expiration and is usually for delivery in the next calendar month.

[10]   West Texas Intermediate light sweet crude oil delivered to Cushing, Oklahoma and listed with the New York Mercantile Exchange.

[11]   Natural gas delivered to the Henry Hub in Louisiana and listed on the New York Mercantile Exchange.

- the price and quantity of foreign imports;

- domestic and global political conditions, particularly in oil and natural gas producing countries or regions, such as the Middle East, Russia, the North Sea, Africa and South America;

- the ability of members of the OPEC and other producing countries to agree upon and maintain oil prices and production levels;

- the level of consumer product demand, including in emerging markets such as China;

- weather conditions and force majeure events such as earthquakes and nuclear meltdowns;

- technological advances affecting energy consumption and the development of oil and natural gas reserves;

- domestic and foreign governmental regulations and taxes, including administrative or agency actions and policies;

- commodity processing, gathering and transportation cost and availability, and the availability of refining capacity;

- the price and availability of alternative fuels and energy;

- the strengthening and weakening of the United States dollar relative to other currencies; and

- variations between product prices at sales points and applicable index prices.

Oil and natural gas prices affect the amount of cash flow available to the Debtors to meet their financial commitments and fund capital expenditures. Moreover, because only approximately 40 percent and 36 percent of the Debtors' total expected hydrocarbon production in 2015 and 2016, respectively, is hedged, a significant portion of the Debtors' estimated production is particularly exposed to commodity price volatility. Oil and natural gas prices also impact the Debtors' ability to borrow money and raise additional capital. For example, the amount the Debtors will be able to borrow under the Exit First Lien Credit Facility will be subject to periodic redeterminations based, in part, on current oil and natural gas prices and on changing expectations of future prices. Lower prices may also reduce the amount of oil and natural gas that the Debtors can economically produce and have an adverse effect on the value of the Debtors' reserves, which could result in material impairments to the Debtors' oil and natural gas properties. As a result, if there is a further decline or sustained depression in commodity prices, the Debtors may, among other things, be unable to maintain or increase their borrowing capacity, meet their debt obligations or other financial commitments, or obtain additional capital, all of which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

### 7) *Drilling for and Producing Oil and Natural Gas Are High Risk Activities with Many Uncertainties That Could Materially Adversely Affect the Debtors' Businesses, Results of Operations, and Financial Condition*

The Debtors' operations are subject to many risks, including the risk that the Debtors will not discover commercially productive reservoirs. Drilling for oil and natural gas can be unprofitable, not only from dry holes, but from productive wells that do not produce sufficient revenue to return a profit. The Debtors decisions to purchase, explore, develop, or otherwise exploit prospects or properties will depend in part on the evaluation of data obtained through geophysical and geological analyses, as well as

production data and engineering studies, the results of which are often inconclusive or subject to varying interpretations.  In addition, the results of the Debtors' exploratory drilling in new or emerging areas are more uncertain than drilling results in areas that are developed and have established production, and the Debtors' operations may involve the use of recently-developed drilling and completion techniques.  The Debtors' cost of drilling, completing, equipping, and operating wells is often uncertain before drilling commences.  Declines in commodity prices and overruns in budgeted expenditures are common risks that can make a particular project uneconomic or less economic than forecasted.  Further, many factors may curtail, delay, or cancel drilling and completion projects, including the following:

- delays or restrictions imposed by or resulting from compliance with regulatory and contractual requirements;

- delays in receiving governmental permits, orders, or approvals;

- differing pressure than anticipated or irregularities in geological formations;

- equipment failures or accidents;

- adverse weather conditions;

- surface access restrictions;

- loss of title or other title related issues;

- shortages or delays in the availability of, increases in the cost of, or increased competition for, drilling rigs and crews, fracture stimulation crews and equipment, pipe, chemicals, and supplies; and

- restrictions in access to or disposal of water resources used in drilling and completion operations.

Historically, there have been shortages of drilling and workover rigs, pipe, other oilfield equipment, and skilled personnel as demand for rigs, equipment, and personnel has increased along with the number of wells being drilled.  These factors may, among other things, cause significant increases in costs for equipment, services, and/or personnel.  Such shortages or increases in costs could significantly decrease the Debtors' profit margin, cash flow, and operating results, or restrict the Debtors' operations in the future.

The occurrence of certain of these events, particularly equipment failures or accidents, could impact third parties, including persons living in proximity to the Debtors' operations, the Debtors' employees, and employees of the Debtors' contractors, leading to possible injuries, death, or significant property damage.  As a result, the Debtors face the possibility of liabilities from these events that could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

### 8)    *Commodity Prices and Hedging May Present Additional Risks*

During the Chapter 11 Cases, the Debtors' ability to enter into new commodity derivatives covering additional estimated future production will depend upon either entering into unsecured hedges or obtaining Bankruptcy Court approval to enter into secured hedges.  As a result, the Debtors may not be able to enter into additional commodity derivatives covering their production in future periods on favorable terms or at all.  If the Debtors cannot or choose not to enter into commodity derivatives in the future, the Debtors could be more affected by changes in commodity prices than their competitors that engage in hedging arrangements.  The Debtors' inability to hedge the risk of low commodity prices in the

future, on favorable terms or at all, could have a material adverse impact on their businesses, financial condition, and results of operations.

If the Debtors are able to enter into any commodity derivatives, such derivatives may limit the benefit the Debtors would receive from increases in commodity prices. These arrangements would also expose the Debtors to risk of financial losses in some circumstances, including the following: (a) the Debtors' production could be materially less than expected; or (b) the counterparties to the contracts could fail to perform their contractual obligations.

If the Debtors' actual production and sales for any period are less than the production covered by any commodity derivatives (including reduced production due to operational delays) or if the Debtors are unable to perform their exploration and development activities as planned, the Debtors might be required to satisfy a portion of their obligations under those commodity derivatives without the benefit of the cash flow from the sale of that production, which may materially impact the Debtors' liquidity. Additionally, if market prices for production exceed collar ceilings or swap prices, the Debtors would be required to make monthly cash payments, which could materially adversely affect their liquidity.

### 9)    *The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases*

In the future, the Reorganized Debtors may become party to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 10) *The Loss of Key Personnel Could Adversely Affect the Debtors' Operations*

The Debtors' operations are dependent on a relatively small group of key management personnel, including the Debtors' executive officers. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition. Because competition for experienced personnel in the oil and gas industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

### 11) *Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations*

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all claims that arise prior to the Debtors' filing a petition for reorganization under the Bankruptcy Code or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any claims not ultimately discharged through a plan of reorganization could be asserted

against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations on a post-reorganization basis.

## XII.   SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit C**.

*The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan*.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.   Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against a debtor are entitled to vote on a chapter 11 plan. The table in section IV.C of this Disclosure Statement, which begins on page 9 hereof, provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class absent an objection to the holder's Claim) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from holders of Claims in Classes 3, 4, 5, and 6 (collectively, the "Voting Classes"). The holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from holders of Claims and Interests in Classes 1, 2, 7, 8, 9, and 10. Additionally, the Disclosure Statement Order provides that certain holders of Claims in the Voting Classes, such as those holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B.   Voting Record Date

**The Voting Record Date is [October 8], 2015**. The Voting Record Date is the date on which it will be determined which holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the holder of a Claim.

### C.   Voting on the Plan

**The Voting Deadline is [November 20], 2015 at 4:00 p.m.** prevailing Eastern Time. In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered (either by using the return envelope provided, by first class mail, overnight courier, or personal

delivery) so that the ballots are **actually received** by the Debtors' voting and claims agent (the "<u>Voting and Claims Agent</u>") on or before the Voting Deadline at the following address:

---

**DELIVERY OF BALLOTS**

**SAMSON RESOURCES CORPORATION**
**C/O GCG**
**P.O. BOX 10238**
**DUBLIN, OH 43017-5738**

If you received an envelope addressed to your nominee, please return your ballot to your nominees, allowing enough time for your nominee to cast your vote on a ballot before the Voting Deadline.

---

    **D.**    **Ballots Not Counted**

    <u>**No ballot will be counted toward Confirmation if, among other things**</u>:  (1) it is illegible or contains insufficient information to permit the identification of the holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Voting and Claims Agent), an indenture trustee, or the Debtors' financial or legal advisors instead of the Voting and Claims Agent; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE VOTING AND CLAIMS AGENT TOLL-FREE (888) 547-8096. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

---

**XIII.    CONFIRMATION OF THE PLAN**

    **A.**    **Requirements for Confirmation of the Plan**

    Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims and Interests.

    At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

B.      **Best Interests of Creditors/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit F** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of Alvarez & Marsal North America, LLC, the Debtors' financial advisor.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of Claims as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan.  In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.  Any distribution to holders of Claims under a chapter 11 liquidation plan would most likely be substantially delayed.  Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the New Common Stock to be distributed under the Plan.  Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

C.      **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared the Financial Projections.  Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

D.      **Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A

class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[12]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

### E.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, *however*, the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

#### 1)    No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

#### 2)    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

---

[12]    A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

**F.      Valuation of the Debtors**

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors. The Valuation Analysis is set forth in **Exhibit E** attached hereto and incorporated herein by reference.

**XIV.   CERTAIN SECURITIES LAW MATTERS**

**A.      New Common Stock**

As discussed herein, the Plan provides for Samson to distribute New Common Stock to the Second Lien Lenders.

The Debtors believe that the class of New Common Stock will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable state securities law (a "Blue Sky Law"). The Debtors further believe that the offer and sale of the New Common Stock pursuant to the Plan are, and subsequent transfers of the New Common Stock by the holders thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) will be, exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law.

**B.      Issuance and Resale of New Common Stock Under the Plan**

*1)      Private Placement Exemptions*

[All shares of New Common Stock issued under the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 4(2) of the Securities Act or Regulation D promulgated thereunder. All shares of New Common Stock issued pursuant to the exemption from registration set forth in section 4(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

Persons who purchase the New Common Stock pursuant to the exemption from registration set forth in section 4(2) of the Securities Act or Regulation D promulgated thereunder will hold "restricted securities." Resales of such restricted securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Holders of restricted securities would, however, be permitted to resell New Common Stock without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A under the Securities Act, or if such securities are registered with the Securities and Exchange Commission.]

*Recipients of the New Common Stock are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Law.*

### 2)  Resale of New Common Stock; Definition of Underwriter

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer":  (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the New Common Stock by Entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Under certain circumstances, holders of New Common Stock who are deemed to be "underwriters" may be entitled to resell their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met.  Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Common Stock would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Common Stock and, in turn, whether any Person may freely resell New Common Stock.  **The Debtors recommend that potential recipients of New Common Stock consult their own counsel concerning their ability to freely trade such securities without compliance with the federal law and any applicable state Blue Sky Law.**

### 3)   *New Common Stock / Management Incentive Plan*

The Plan contemplates the implementation of the Management Incentive Plan, which will be included with the Plan Supplement and will reserve Cash incentives and equity grants equal to 10 percent of the New Common Stock (on a fully diluted basis) for distribution to continuing officers, directors, and employees of the Reorganized Debtor.  In addition, on or as soon after the Effective Date as is reasonably practicable, five percent of the New Common Stock will be granted to Management Incentive Plan participants, which grants shall be subject to ratification by the New Board of the Reorganized Parent. The form and timing of additional Management Incentive Plan grants, if any, will be determined by the compensation committee of the New Board of the Reorganized Parent, as set forth in the Plan Supplement.

## XV.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and certain holders of Claims.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law").  Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not apply to holders of Claims that are not "United States persons" (as such phrase is defined in the Tax Code).  This summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, persons who hold Claims or who will hold the New Common Stock as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and holders of Claims who are themselves in bankruptcy).  Furthermore, this summary assumes that a holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code).  This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code.  This summary does not discuss differences in tax consequences to holders of Claims that act as Backstop Parties or otherwise act or receive consideration in a capacity other than any other holder of a Claim of the same Class or Classes, and the tax consequences for such holders may differ materially from that described below.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**B.      Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors**

### 1)   *Potential Characterization of Restructuring Transaction or Sale as a Taxable Transaction*

The U.S. federal income tax consequences of the implementation of the Plan to the Debtors will depend on, among other things, whether the restructuring transactions are structured as a taxable sale of the Debtors' assets and/or stock (such a structure, a "Taxable Transaction"). Whether the restructuring transactions occur pursuant to a Plan or a Sale transaction, the Debtors expect that they generally will be able to structure such transaction as a Taxable Transaction, if desired. Conversely, if the restructuring is consummated pursuant to a Sale, the Debtors may be able to structure the transaction in a manner intended to be treated as a reorganization for tax purposes, rather than a Taxable Transaction. The Debtors have not yet determined whether or not they intend to structure the restructuring transactions as a Taxable Transaction, whether in whole or part.

If the transaction undertaken pursuant to the Plan or a Sale is structured as a Taxable Transaction with respect to the assets of any Debtor, the Debtors would recognize taxable gain or loss upon the transfer in an amount equal to the difference between the fair market value of the assets treated as sold in the Taxable Transaction, and the applicable Debtor's tax basis in such assets. Thus the amount of gain or loss recognized upon a Taxable Transaction will depend on the value of the assets treated as sold at the time the Taxable Transaction is effected, which cannot be known with certainty before the date the transaction is effected. It is possible the Debtors will recognize a substantial amount of taxable income or gain in connection with a Taxable Transaction and may not have sufficient net operating loss carryforwards or other tax attributes to apply to fully offset the amount of gain recognized, in which case the Debtors will be required to pay cash income taxes (federal and state) with respect the net amount of taxable income (and the Debtors' ability to apply NOLs to reduce any such taxable income is also subject to "Alternative Minimum Tax" discussed in Article XV.B.4, herein).

If the restructuring transactions occur pursuant to a Plan and not a Sale, the Debtors intend to cause the New Common Stock that will be received by the holders of Claims entitled to New Common Stock in exchange for their Claims pursuant to the Plan to first be issued and contributed by Reorganized Parent to Reorganized Samson Investment Company, and then exchanged (in addition to the other consideration) by Reorganized Samson Investment Company with such holders pursuant to the Plan, and to treat such transactions as occurring in the same order (issuance, contribution, and exchange) for U.S. federal income tax purposes. The discussion applicable to holders of Claims entitled to receive New Common Stock (whether or not other consideration is received in addition to such New Common Stock) assumes this treatment applies.

If a Reorganized Debtor purchases assets or stock of any Debtor pursuant to a Taxable Transaction, it will take a fair market value basis in the transferred assets or stock. However, if a Taxable Transaction involves a purchase of stock of an entity treated as a corporation for income tax purposes, the Debtor whose stock is transferred would retain its basis in its assets (unless the seller of such stock and the Reorganized Debtor of such stock make an election under Tax Code section 338(h)(10) to treat the

transaction as a taxable sale of the underlying assets), subject to reduction due to COD Income (as defined herein).

### 2)   *Cancellation of Debt and Reduction of Tax Attributes*

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a debtor is not required to include COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to the rule discussed in the preceding sentence.  In general, tax attributes will be reduced in the following order:  (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets; (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers.  Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.  The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.  Any excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

The Treasury Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations.  Under these Treasury Regulations, the tax attributes of each member of an affiliated group of corporations that is excluding COD Income is first subject to reduction.  To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member.  If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to reduce certain remaining consolidated tax attributes of the affiliated group.  Because the Plan provides that the holders of First Lien Claims will receive the Exit First Lien Credit Facility, the holders of the Second Lien Claims will receive New Common Stock and Rights, and the holders of General Unsecured Claims will receive New Common Stock, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend on the issue price of the Exit First Lien Credit Facility and the fair market value of the New Common Stock and the Rights.  This value cannot be known with certainty at this time.  However, as a result of Confirmation, the Debtors expect that there will be material reductions in, or elimination of, NOLs, NOL carryforwards and other tax attributes.

### 3)   *Limitation of NOL Carryforwards and Other Tax Attributes*

As of December 31, 2014, the Debtors had approximately $1.4 billion of NOLs.  Following Confirmation, the Debtors anticipate that any remaining NOL carryover, capital loss carryover, tax credit carryovers, and certain other tax attributes (such as losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of the Reorganized Debtors allocable to periods before the Effective Date (collectively, the "Pre-Change Losses") may be subject to limitation or elimination under sections 382 and 383 of the Tax Code as a result of an "ownership change" of the Reorganized Debtors by reason of the transactions pursuant to the Plan.

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. The rules of section 382 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the distribution of the New Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

If the restructuring transactions are consummated as a Taxable Transaction, the Reorganized Debtors generally would not succeed to any of the Pre-Change Losses of the Debtors, and thus any remaining Pre-Change Losses would be unavailable to offset any of the taxable income of the Reorganized Debtors.

(a)      General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs: 2.82 percent for September 2015). The section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

(b)      Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOL carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses effectively would be eliminated in their entirety.

60

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is not required to reduce their NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.

The Debtors have not yet determined whether or not to utilize the 382(l)(5) Exception in the event the restructuring transactions are not structured as a Taxable Transaction. It is possible that the Debtors will not qualify for the 382(l)(5) Exception. Alternatively, the Reorganized Debtors may decide to elect out of the 382(l)(5) Exception, particularly if it appears likely that another ownership change will occur within two years after emergence. In either case, the Debtors expect that their use of the Pre-Change Losses (if any) after the Effective Date will be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception. Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the Tax Code were to occur after the Effective Date.

### 4)    *Alternative Minimum Tax*

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20 percent rate to the extent such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, except for alternative tax NOLs generated in certain years, which can offset 100 percent of a corporation's AMTI, only 90 percent of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. The effect of this rule could cause the Reorganized Debtors to owe a modest amount of federal and state income tax on taxable income in future years even if NOL carryforwards are available to offset that taxable income. Additionally, under section 56(g)(4)(G) of the Tax Code, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under section 382(h) of the Tax Code, immediately before the ownership change, the effect of which may increase the amount of AMT owed by the Reorganized Debtors.

### C.    **Certain U.S. Federal Income Tax Consequences to Certain Holders of Claims**

The following discussion assumes that the Debtors will undertake the restructuring transactions currently contemplated by the Plan. Holders of Claims and Interests are urged to consult their tax advisors regarding the tax consequences of the restructuring transactions.

### 1)  *Consequences to Holders of Class 3 Claims*

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release and discharge of the First Lien Claims, the holder of the First Lien Claim shall receive either (a) if the First Lien Credit Facility is amended and restated by the Exit First Lien Credit Facility, a distribution of Cash and an interest in loans arising under the Exit First Lien Credit Facility, or (b) if the First Lien Credit Facility is refinanced, payment in full in Cash.  If the holder receives payment in full in Cash, the holder will recognize taxable gain or loss equal to the difference between (x) the amount of Cash received and (y) the holder's adjusted tax basis in its Allowed First Lien Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the holder previously has claimed a bad debt deduction with respect to its Claim.  If recognized gain is capital gain, it generally would be long-term capital gain if the holder held its Allowed First Lien Claim for more than one year at the time of the exchange.  The deductibility of capital losses is subject to certain limitations as discussed below.  To the extent that Cash received in exchange for its Allowed First Lien Claim is allocable to accrued but untaxed interest, the holder may recognize ordinary income.  *See* "Accrued Interest" and "Market Discount" in Articles XV.C.5) and XV.C.6), respectfully, which begin on page 69 herein.

If the First Lien Credit Facility is not refinanced, whether the holder of such First Lien Claim recognizes gain or loss as a result of such exchange depends, in part, on (a) whether the Exit First Lien Credit Facility constitutes a "signification modification" of the First Lien Credit Facility within the meaning of applicable tax regulations, and (b) whether the exchange qualifies as a tax-free exchange of securities in pursuance of a plan of reorganization (within the meaning of applicable tax rules), which in turn depends on whether the debt underlying the First Lien Claim surrendered and the debt constituting the Exit First Lien Credit Facility are treated as a "securities" for the reorganization provisions of the Tax Code.  In general, if the restructuring transactions are consummated as a Taxable Transaction, then the exchange is expected to constitute a fully taxable exchange, with consequences described below.

### (a)  Treatment of Exchange as Significant Modification

The exchange of existing First Lien Claims for an interest in the Exit First Lien Credit Facility (plus Cash) is analyzed as if the exchange were simply a modification of the debt underlying the First Lien Claims.  Under general principles of U.S. federal income tax law, the modification of a debt instrument can give rise to a deemed exchange under section 1001 of the Tax Code upon which gain or loss is realized if the modified debt instrument differs materially either in kind or in extent from the original debt instrument.  In this regard, the Treasury Regulations concerning the modification of debt instruments (the "Modification Regulations") provide that, as a general rule, a deemed exchange occurs when, based on all the facts and circumstances and taking into account all changes in the terms of the debt instrument collectively (other than certain specified changes), the legal rights or obligations that are altered, and the degree to which they are altered, are economically significant (a "significant modification").  The Modification Regulations state that they can apply to any modification of a debt instrument, regardless of the form of the modification, including an exchange of a new debt instrument for an existing debt instrument.  Therefore, the Modification Regulations are relevant in determining the consequences of an exchange of First Lien Claims for an interest in the Exit First Lien Credit Facility (plus Cash).

Under the Modification Regulations, a change in yield of a debt instrument (including the receipt of additional consideration) is a significant modification if the yield of the modified debt instrument varies from the yield on the unmodified instrument (determined as of the date of the modification) by more than the greater of (a) 25 basis points or (b) 5 percent of the annual yield on the unmodified

instrument. For this purpose, the yield of the modified debt instrument is the annual yield of a debt instrument with (x) an issue price equal to the adjusted issue price of the unmodified debt instrument on the date of the modification, increased by any accrued but unpaid interest, and decreased to reflect payments made to the holders as consideration for the modification and (y) payments equal to the payments on the modified debt instrument from the date of the modification. The Modification Regulations further provide that a change in the timing of payments due under a debt instrument is a significant modification if it results in the material deferral of scheduled payments, which depends on all the facts and circumstances. The Modification Regulations provide in this respect a safe harbor under which a deferral of one or more scheduled payments within the safe harbor period, which is the lesser of 5 years or 50 percent of the original term of the instrument, is not a material deferral if the deferred payments are unconditionally payable no later than the end of the safe harbor period. A change in the obligor of a debt instrument also generally results in a significant modification under the Modification Regulations (unless the new obligor is treated as the successor and recipient of substantially all of the assets of the prior obligor under the tax rules governing reorganizations). Finally, the Modification Regulations provide that a modification of a debt instrument that results in an instrument or property right that is not debt for federal income tax purposes is a significant modification. The Debtors expect, and this discussion assumes, that the exchange of First Lien Claims for an interest in the Exit First Lien Credit Facility (plus Cash) will be treated as a "significant modification" of debt underlying the First Lien Claims because it is likely that the Exit First Lien Credit Facility will have terms that cause it to fail one or more of the tests described above (e.g., more than de minimis change in yield, change in identity of obligor, or material deferral of scheduled payments). However, it cannot be known with certainty whether each such exchange will constitute a significant modification until the terms of the Exit First Lien Credit Facility (if ultimately issued) are finalized.

(b)      <b>Treatment of a Debt Instrument as a "Security"</b>

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. This discussion assumes that both the First Lien Credit Facility and the Exit First Lien Credit Facility are treated as "securities" under the applicable guidance, however, if either of the First Lien Credit Facility or the Exit First Lien Credit Facility was not treated as a security, the discussion below applicable to fully taxable exchanges would apply to the exchange of the First Lien Claim for an interest in the Exit First Lien Credit Facility (plus Cash).

(c)      <b>Treatment of a Holder of an Allowed First Lien Claim if the Exchange of Its Claim Is Treated as an Exchange of Securities Pursuant to a Reorganization</b>

If a debt instrument constituting a surrendered Allowed First Lien Claim is treated as a "security" for U.S. federal income tax purposes, the exchange of such holder's Claim for the Exit First Lien Credit Facility should be treated as a partially tax-free exchange pursuant to a plan of reorganization. In such case, a holder should not recognize loss with respect to the exchange and should not recognize gain (subject to "Accrued Interest" discussed in Article XV.C.5), herein) except to the extent of Cash received.

63

Such holder's tax basis in its Exit First Lien Credit Facility interest should be equal to the holder's tax basis in the Allowed First Lien Claim surrendered therefor increased by any gain recognized in the transaction and reduced by the amount of Cash received in exchange therefor, and a holder's holding period for its interest in the Exit First Lien Credit Facility should include the holding period for the surrendered Allowed First Lien Claim; *provided* that the tax basis of any Exit First Lien Credit Facility interest treated as received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest, and the holding period for any such Exit First Lien Credit Facility interest should not include the holding period of the surrendered Allowed First Lien Claim.

**(d)** **Treatment of a Holder of an Allowed First Lien Claim if the Exchange of Its Claim Is not Treated as an Exchange of Securities Pursuant to a Reorganization**

If the exchange of a First Lien Claim for an interest in the Exit First Lien Credit Facility (plus Cash) is not treated as an exchange of securities pursuant to a plan of reorganization for U.S. federal income tax purposes, a holder of a First Lien Claim should be treated as exchanging its Allowed First Lien Claim for the Exit First Lien Credit Facility and Cash in a fully taxable exchange. A holder of an Allowed First Lien Claim who is subject to this treatment should recognize gain or loss equal to the difference between (a)(i) the amount of Cash received plus (ii) the issue price of the Exit First Lien Credit Facility interest received, in each case to the extent not allocable to accrued but untaxed interest (see "Accrued Interest" in Article XV.C.5), herein), and (b) the holder's adjusted tax basis in its Allowed First Lien Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the holder held its Allowed First Lien Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed herein. To the extent that a portion of the Exit First Lien Credit Facility or Cash received in exchange for its Allowed First Lien Claim is allocable to accrued but untaxed interest, the holder may recognize ordinary income. *See* "Accrued Interest" and "Market Discount" in Articles XV.C.5) and XV.C.6), respectively, which begin on page 69, herein. A holder's tax basis in the Exit First Lien Credit Facility interest should equal its issue price. A holder's holding period for the Exit First Lien Credit Facility received on the Effective Date should begin on the day following the Effective Date.

**2)** *Consequences to Holders of Second Lien Secured Claims and Second Lien Deficiency Claims*

From an income tax perspective, holders of Second Lien Secured Claims and the corresponding Second Lien Deficiency Claims will be treated as a holding a single claim in respect of their interest in second lien debt (collectively, a "Second Lien Claim"). Therefore, this discussion addresses the expected federal income tax consequences applicable to the combined recovery with respect to Allowed Second Lien Claims and Allowed Second Lien Deficiency Claims. Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release and discharge of the Second Lien Claims, the holder of such Claims shall receive (a) a Pro Rata distribution of the New Common Stock of Reorganized Parent (subject to dilution for the Management Incentive Plan), and (b) its Pro Rata share of the Rights. The Debtors currently expect, and this discussion assumes, that the exchange by holders of Second Lien Claims of their Claims in exchange for New Common Stock plus the Rights will be treated as a separate exchange transaction that is distinct from, and occurs immediately prior to, the exercise of the Rights by holders of Second Lien Claims electing to acquire the Rights Offering Equity Units and/or Rights Offering Debt Units. However, there can be no assurance that the IRS will agree with this treatment, and the IRS may

64

assert that the initial exchange and the exercise of Rights pursuant to the Rights Offering (and potentially also the backstop) should be combined as a single transaction, which may be treated as either a taxable exchange or a tax-free exchange depending on the form of the potential recast.  This discussion does not address the consequences to the Backstop Parties, which may differ materially from the consequences presented below.  The Backstop Parties are urged to consult their own tax advisors as to the expected tax consequences to them of participating in the Backstop, including any changes to such holders to the expected tax treatment described below for transactions pursuant to the Plan.

Whether and the extent to which the holder of such Second Lien Claim recognizes gain or loss as a result of the exchange of its claim for the New Common Stock and Rights depends, in part, on whether the exchange qualifies as an exchange of stock or securities pursuant to a tax-free reorganization, which in turn depends on whether (a) the restructuring transactions are structured in a manner such that they qualify as reorganization to which Reorganized Parent is treated as a party under the reorganization provisions of the Tax Code and (b) the debt underlying the Second Lien Claim surrendered and/or the Rights are treated as "securities" for purposes of the reorganization provisions of the Tax Code, as further described above under the discussion applicable to holders of Class 3 Claims.  The Debtors expect to take the position, and the discussion below assumes (unless otherwise indicated), that (x) the second lien debt constitutes a "security" for these purposes, (y) that the Rights to acquire Rights Offering Equity Units ("Equity Rights") constitute a "security" for these purposes, and (z) that the Rights to acquire Rights Offering Debt Units ("Debt Rights") do *not* constitute a security for these purposes.  In general, the Debtors expect and intend to take the position that if the restructuring transactions occur pursuant to the consummation of the Plan structured as a Taxable Transaction, then Reorganized Parent will *not* be treated as a party to a reorganization under the reorganization provisions of the Tax Code, whereas if the restructuring transactions occur pursuant to a Sale that is not structured as a Taxable Transaction, then Reorganized Parent will be treated as a party to a reorganization under the reorganization provisions of the Tax Code.  Because the Debtors have not yet determined whether the restructuring transactions will be structured as a Taxable Transaction or as a reorganization to which Reorganized Parent is treated as a party, the expected U.S. federal income tax consequences applicable to the holders of Second Lien Claims in each case are described below.

> **(a)**      **Treatment of a Holder of an Allowed Second Lien Secured Claim and Allowed Second Lien Deficiency Claim if the Exchange of Its Claims Is Treated as an Exchange of Securities Pursuant to a Reorganization**

If the exchange of an Allowed Second Lien Claim for New Common Stock and Rights is treated as an exchange of stock or securities pursuant to a plan of reorganization to which Reorganized Parent is a party, a holder should not recognize loss with respect to the exchange and should not recognize gain (subject to "Accrued Interest" in Article XV.C.5), herein) except to the extent of the fair market value of the Debt Rights received.  Such holder's tax basis in the Debt Rights received should equal their fair market value.  Such holder's total combined tax basis in its New Common Stock and Equity Rights received should equal the holder's tax basis in the Allowed Second Lien Claim surrendered therefor increased by any gain recognized in the transaction and reduced by the fair market value of the Debt Rights received in exchange therefor.  Such combined tax basis will be divided between the New Common Stock and Equity Rights based on their relative fair market value as of the Effective Date.  Subject to "Accrued Interest" discussed in Article XV.C.5) herein, a holder's holding period for its interest in the New Common Stock and Equity Rights should include the holding period for the surrendered Allowed Second Lien Claim surrendered therefor.

(b)    **Treatment of a Holder of an Allowed Second Lien Secured Claim and Allowed Second Lien Deficiency Claim if the Exchange of Its Claim Is not Treated as an Exchange of Securities Pursuant to a Reorganization**

If the exchange of an Allowed Second Lien Claim for New Common Stock and Rights, is not treated as an exchange of stock or securities pursuant to a plan of reorganization to which Reorganized Parent is a party, a holder of a Second Lien Claim should be treated as exchanging its Claims for the New Common Stock and Rights in a fully taxable exchange.  A holder of an Allowed Second Lien Claim who is subject to this treatment should recognize gain or loss equal to the difference between (a) the total fair market value of the New Common Stock and Rights received and (b) the holder's adjusted tax basis in its Allowed Second Lien Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the holder previously has claimed a bad debt deduction with respect to its Claim.  If recognized gain is capital gain, it generally would be long-term capital gain if the holder held its Allowed Second Lien Claim for more than one year at the time of the exchange.  The deductibility of capital losses is subject to certain limitations as discussed below.  To the extent that a portion of the consideration received in exchange for its Allowed Second Lien Claim is allocable to accrued but untaxed interest, the holder may recognize ordinary income.  *See* "Accrued Interest" and "Market Discount" in Articles XV.C.5) and XV.C.6), respectively, which begin on page 69, herein.  A holder's tax basis in each of the New Common Stock and Rights should be equal to their respective fair market values.  A holder's holding period for each item of consideration received on the Effective Date should begin on the day following the Effective Date.

(c)    **Treatment of Right to Acquire Rights Offering Units**

Holders who elect not to exercise their Equity Rights or Debt Rights (or both) may be entitled to claim a (likely short-term capital) loss equal to amount of tax basis allocated to the unexercised Debt Rights or Equity Rights they receive.  *See* "Limitation on Use of Capital Losses" in Article XV.C.8), which begins on page 71, herein.  Such holders are urged to consult with their own tax advisors as to the tax consequences of electing not to exercise the Rights they receive.  For a holder electing to exercise their Equity Rights or Debt Rights (or both), such a holder will be treated as purchasing, in exchange for its applicable Rights and the amount of Cash funded by the holder to exercise its applicable Rights, the New Second Lien Loan or New Common Stock (or, as applicable, both) it is entitled to pursuant to the terms of the exercised Rights.  Any such purchase generally will be treated as the exercise of an option under general tax principles, and as such a holder should not recognize income, gain, or loss for U.S. federal income tax purposes on the exercise.  A holder's tax basis in the New Common Stock or, as applicable, the New Second Lien Loan received pursuant to the exercise, will equal the sum of the amount of Cash paid by the holder to exercise its Equity Rights (or, as applicable, Debt Rights) plus such holder's tax basis in its Equity Rights (or, as applicable, Debt Rights) immediately before the exercise.  A holder's holding period for the New Common Stock and/or, as applicable, New Second Lien Loan received on the Effective Date pursuant to the exercise should begin on the day following the Effective Date.  The New Second Lien Loan may be treated as being issued with original issue discount ("OID") for tax purposes.  *See* "Original Issue Discount on the New Second Lien Loan" in Article XV.C.7), which begins on page 70, herein.

(d)    **Dividends on New Common Stock**

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the

Reorganized Debtors as determined under U.S. federal income tax principles.  To the extent that a holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the holder's basis in its shares.  Any such distributions in excess of the holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Dividends paid to holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits.  However, the dividends-received deduction is only available if certain holding period requirements are satisfied.  The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

### (e)    Sale, Redemption, or Repurchase of New Common Stock

Unless a non-recognition provision applies, holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of New Common Stock.  Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the holder held the New Common Stock for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described below.  The Debtors expect that Reorganized Parent will constitute a "United States real property holding corporation" within the meaning of section 897 of the Tax Code as of the Effective Date, and thus that the New Common Stock will constitute a United States real property interest, for the period required under the Tax Code.  As such, any non-U.S. holders of New Common Stock that sell, exchange, or otherwise dispose of their New Common Stock may be subject to 10 percent gross basis withholding, and generally will be required to file U.S. federal income tax returns and pay U.S. federal tax on a graduated basis on any gains recognized on such disposition.  Non-U.S. holders who may receive or acquire New Common Stock in connection with the restructuring transactions are urged to consult a U.S. tax advisor with respect to the U.S. tax consequences applicable to their acquisition, holding, and disposition of such New Common Stock.

**THE TAX CONSEQUENCES OF THE PLAN TO THE HOLDERS OF ALLOWED SECOND LIEN SECURED CLAIMS AND ALLOWED SECOND LIEN DEFICIENCY CLAIMS ARE HIGHLY UNCERTAIN.  HOLDERS OF SUCH CLAIMS SHOULD CONSULT THEIR TAX ADVISORS REGARDING WHETHER SUCH CLAIMS COULD BE TREATED AS "SECURITIES" FOR U.S. FEDERAL INCOME TAX PURPOSES.**

### 3)    *Consequences to Holders of Class 5 Claims*

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of the General Unsecured Claims, the holder of such Claims shall receive a Pro Rata distribution of 1.0 percent of the New Common Stock of Reorganized Parent (subject to dilution for the Management Incentive Plan) if the class of General Unsecured Claims votes to accept the plan or 0.5 percent of the New Common Stock (subject to dilution for the Management Incentive Plan) if the class of General Unsecured Claims votes to reject the Plan.  Whether and the extent to which the holder of a General Unsecured Claim recognizes gain or loss as a result of the exchange of its claim for the New Common Stock depends, in part, on whether the exchange qualifies as an exchange of securities pursuant to a tax-free reorganization, which in turn depends on whether (a) the restructuring transactions are structured in a manner such that they qualify as reorganization to which Reorganized Parent is treated as a party under

the reorganization provisions of the Tax Code and (b) the debt underlying the General Unsecured Claim surrendered is treated as a "security" for the reorganization provisions of the Tax Code, as further described above under the discussion applicable to holders of Class 3 Claims. The Debtors expect to take the position that the General Unsecured Claims attributable to Unsecured Debt Claims constitute "securities" for these purposes, and that all General Unsecured Claims other than Unsecured Debt Claims are not "securities" for these purposes. Because the Debtors have not yet determined whether the restructuring transactions or, as applicable, Sale, will be structured as a Taxable Transaction or as a reorganization to which Reorganized Parent is treated as a party, the expected U.S. federal income tax consequences applicable to the holders of General Unsecured Claims in each case are described below.

(a)     **Treatment of a Holder of an Allowed General Unsecured Claim if the Exchange of Its Claims Is Treated as an Exchange of Securities Pursuant to a Reorganization**

If the exchange of an Allowed Unsecured General Claim for New Common Stock is treated as an exchange of stock or securities pursuant to a plan of reorganization to which Reorganized Parent is a party, a holder should not recognize loss with respect to the exchange (subject to "Accrued Interest" in Article XV.C.5), herein). Such holder's tax basis in its New Common Stock received should be equal to the holder's tax basis in the Allowed General Unsecured Claim surrendered therefor increased by any gain recognized in the transaction. Subject to "Accrued Interest" discussed in Article XV.C.5) herein, a holder's holding period for its interest in the New Common Stock should include the holding period for the surrendered Allowed General Unsecured Claim surrendered therefor.

(b)     **Treatment of a Holder of an Allowed General Unsecured Claim if the Exchange of Its Claim Is not Treated as an Exchange of Securities Pursuant to a Reorganization**

If the exchange of an Allowed General Unsecured Claim for New Common Stock is not treated as an exchange of stock or securities pursuant to a plan of reorganization to which Reorganized Parent is a party, a holder of an Allowed General Unsecured Claim should be treated as exchanging its Claim for the New Common Stock in a fully taxable exchange. A holder of an Allowed General Unsecured Claim who is subject to this treatment should recognize gain or loss equal to the difference between (a) the fair market value of the New Common Stock and (b) the holder's adjusted tax basis in its Allowed General Unsecured Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Claim in such holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the holder held its Allowed General Unsecured Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below. To the extent that a portion of the consideration received in exchange for its Allowed General Unsecured Claim is allocable to accrued but untaxed interest, the holder may recognize ordinary income. *See* "Accrued Interest" and "Market Discount" in Articles XV.C.5) and XV.C.6), respectively, which begins on page 69, herein. A holder's tax basis in the New Common Stock should be equal to its respective fair market value on the Effective Date. A holder's holding period for each item of consideration received on the Effective Date should begin on the day following the Effective Date.

4)     *Consequences to Holders of Class 6 Claims*

Pursuant to the Plan, except to the extent that a holder of an Allowed Convenience Claim, agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge

68

of each Allowed Convenience Claim, each holder of such Allowed Convenience Claim shall receive Cash in an amount equal to its pro rata share of $[1 million] less the costs of administering such distributions.

A holder of an Allowed Convenience Claim will be treated as exchanging such Claim for Cash in a taxable exchange under section 1001 of the Tax Code. Accordingly, each holder of such Claim should recognize gain or loss equal to the difference between (a) the Cash received in exchange for its Allowed Convenience Claim and (b) such holder's adjusted basis, if any, in such Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Allowed Convenience Claim in such holder's hands, whether such Claim was purchased at a discount, and whether and to what extent the holder previously has claimed a bad debt deduction with respect to such Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the holder held its Allowed Convenience Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below. To the extent that a portion of the holder's Cash received in exchange for its Allowed Convenience Claim is allocable to accrued but untaxed interest, the holder may recognize ordinary income. *See* "Accrued Interest" and "Market Discount" in Articles XV.C.5) and XV.C.6), respectively, which begin on page 69, herein.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.**

### 5) *Accrued Interest*

To the extent that any amount received by a holder of a Claim is attributable to accrued but unpaid interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the holder as ordinary interest income (to the extent not already taken into income by the holder). Conversely, a holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest previously was included in the holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the holder should be allocated in some way other than as provided in the Plan. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

### 6) *Market Discount*

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as

ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the holder (unless the holder elected to include market discount in income as it accrued). To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.**

### 7)    *Original Issue Discount on the New Second Lien Loan*

A holder of a Pro Rata share of the New Second Lien Loan will be required to include stated interest on such shares of the New Second Lien Loan in income in accordance with the holder's regular method of accounting to the extent such stated interest is "qualified stated interest." Stated interest is "qualified stated interest" if it is payable in cash at least annually. Where stated interest payable on the Pro Rata shares of the New Second Lien Loan is not payable at least annually (the "deferred" interest), such portion of the stated interest will be included in the determination of the OID on such Pro Rata shares of the loans (as set forth below).

A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its "issue price" by more than a de minimis amount. The Debtors expect to take the position that the New Second Lien Loan will be treated as issued for non-money property that is not publicly-traded within the meaning of applicable tax regulations, and thus the "issue price" of the New Second Lien Loan instrument will equal its "stated principal amount" (i.e. face amount) as long as the New Second Lien Loan bears adequate stated interest (i.e., a stated yield greater than the relevant applicable federal rate). The Debtors expect the stated yield on the New Second Lien Loan to exceed the applicable federal rate and thus the issue price of the New Second Lien Loan is expected to be equal to its face amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than qualified stated interest. Thus, the deferred portion of the stated interest payments on Pro Rata shares of the New Second Lien Loan will be included in the stated redemption price at maturity and taxed as part of OID.

A holder of Pro Rata shares of the New Second Lien Loan that is issued with OID generally will be required to include any OID in income over the term of such shares of the loans in accordance with a constant yield-to-maturity method, regardless of whether the holder is a cash or accrual method taxpayer, and regardless of whether and when the holder receives cash payments of interest on such shares of the New Second Lien Loan (other than cash attributable to qualified stated interest). Accordingly, a holder could be treated as receiving income in advance of a corresponding receipt of cash. Any OID that a holder includes in income will increase the tax basis of the holder in the Pro Rata shares of the New

Second Lien Loan.  A holder of Pro Rata shares of the New Second Lien Debt will not be separately taxable on any cash payments that have already been taxed under the OID rules, but will reduce its tax basis in the Pro Rata shares of such loans by the amount of such payments.

### 8)   *Limitation on Use of Capital Losses*

A holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  A non-corporate holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate holders, capital losses may only be used to offset capital gains.  A corporate holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### 9)   *Information Reporting and Back-Up Withholding*

Payments in respect of Allowed Claims under the Plan may be subject to applicable information reporting and backup withholding.  Backup withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Plan if the holder of such Allowed Claim fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules.

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS**.

## XVI.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  September 16, 2015

Respectfully submitted,

Samson Resources Corporation,
on behalf of itself and each of the other Debtors

By: _____
Name: Philip W. Cook
Title:   Executive Vice President and Chief Financial
           Officer