## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) ) Chapter 11 |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) ) Case No. 15-11934 (___) |
| Debtors. | ) ) (Joint Administration Requested) |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POSTPETITION USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, AND 507, BANKRUPTCY RULES 2002, 4001, AND 9014, AND LOCAL BANKRUPTCY RULE 4001-2, (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(B), AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state the following in support of this motion.

### Introduction

1.     The Debtors' access to cash collateral is critical to effectuate this restructuring. Without access to cash collateral, the Debtors would be incapable of operating their businesses and these estates (and all stakeholders) would be immediately and irreparably harmed.

2.     The path forward for Samson is clear and time is of the essence. With the support of more than 68.5 percent of the holders of second lien claims, Samson commences these cases with a commitment for up to $485 million in hand and a chapter 11 plan already on file. Immediate access to cash will facilitate the Debtors' progression through chapter 11 after a

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227). The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is: Two West Second Street, Tulsa, Oklahoma 74103.

coordinated dual-track negotiation two of its major constituencies resulted in a viable and actionable restructuring that will help Samson avoid the fate of many similarly situated companies. The need to move quickly cannot be overstated. The consensual use of cash collateral will terminate on January 15, 2016. Accordingly, the Debtors hope and expect to confirm and consummate the plan by this date.

3.      The proposed debt-for-equity conversion and new money investment will deleverage the company by more than $3 billion and reduce debt service by more than $250 million per year. With approximately $250 million of projected cash on hand at emergence, Samson will be able to resume competing in the oil and gas exploration and production industry with a strong foundation primed for future success.

4.      Following entry into the restructuring support agreement on August 14, 2015, the Debtors approached the agent under their first lien revolving credit facility to discuss the consensual use of cash in chapter 11. The second lien agent participated in these discussions. After several weeks of good-faith, arm's length negotiations, the parties have agreed to the terms of the Debtors' use of cash collateral. Importantly, certain of the counterparties to the Debtors' hedging agreements have agreed to allow the Debtors' prepetition hedging agreements to remain in place, notwithstanding the termination provisions included in the Bankruptcy Code. As part of the consensual arrangement, and as adequate protection for any diminution in value during these cases, the Debtors have agreed to provide the first lien and second lien secured parties with an adequate protection package that includes replacement liens, superpriority administrative claims, certain payments, and budget and reporting requirements.

5.      Access to cash is critical for the Debtors to proceed through chapter 11. Absent approval of this motion, the Debtors will be unable to operate their businesses and the nearly six

2

months of restructuring negotiations, which preceded the comprehensive restructuring transaction detailed in the plan, could be jeopardized. Accordingly, the Debtors respectfully request authority to use cash collateral on an interim basis and subject to the terms and conditions set forth in the interim order.

## Relief Requested

6. The Debtors seek entry of an interim order (the "Interim Order"), substantially in the form attached hereto as **Exhibit A**, and a final order (the "Final Order," and together with the Interim Order, the "Orders"): (a) authorizing the Debtors to use "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code[2] (as defined below); (b) granting adequate protection to the Prepetition Secured Parties (as defined herein); and (c) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the Orders. The Debtors also request that the Court schedule a final hearing on the motion (the "Final Hearing") within approximately 25 days of the commencement of these chapter 11 cases.

## Jurisdiction and Venue

7. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C.

---

[2]    Section 363(a) of the Bankruptcy Code defines "cash collateral" as follows:

> Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

3

§ 157(b)(2). The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 4001-2.

## Background

10.     The Debtors are a privately held onshore oil and gas exploration and production company with headquarters in Tulsa, Oklahoma and operations primarily located in Colorado, Louisiana, North Dakota, Oklahoma, Texas and Wyoming. The Debtors operate, or have royalty or working interests in, approximately 8,700 oil and gas production sites.

11.     Each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on September 16, 2015 (the "Petition Date"). The facts and circumstances supporting this motion are set forth in the *Declaration of Philip Cook in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 2], which is incorporated by reference.

12.     The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have concurrently filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

4

## Concise Statement of the Material Terms of the Interim Order

13.    Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2(a)(ii), the Debtors

submit the following concise statement of the material terms of the Interim Order:[3]

| Summary of Material Terms | | Location |
|---|---|---|
| Parties with an Interest in Cash Collateral Bankruptcy Rule 4001(b)(1)(B)(i) | JPMorgan Chase Bank, N.A., as administrative agent, and each of the lenders, Hedge Banks, and Letter of Credit Issuers under the First Lien Credit Agreement (collectively, the "First Lien Secured Parties").<br><br>Deutsche Bank Trust Company Americas, as successor administrative and collateral agent, and each of the lenders under the Second Lien Credit Agreement (collectively, the "Second Lien Secured Parties" and, together with the First Lien Secured Parties, the "Prepetition Secured Parties"). | ¶ (a) |
| **Purposes for Use of Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(ii) | In accordance with the terms and conditions of the Interim Order and Interim Budget, for (i) working capital, general corporate purposes and administrative costs and expenses of the Debtors incurred in the Chapter 11 Cases, including first-day related relief subject to the terms hereof and (ii) adequate protection payments to the Prepetition Secured Parties. | ¶ 2 |
| **Budget** Bankruptcy Rule 4001(b)(1)(B)(ii) | An interim budget is attached as **Exhibit 1** to the Interim Order (the "Interim Budget"). For each Interim Budget Period, the aggregate actual expenditures by the Debtors for "Total Disbursements" shall not in any event exceed the aggregate amount budgeted therefor in the Interim Budget for such period by more than ten percent (10%) of the budgeted amount, and the actual expenditures of the Debtors shall not, for each line item in the Interim Budget labeled Lease Operating Expense, CapEx, Payroll & Benefits, and Bonus & Incentives, exceed the amount budgeted for such line item in the Interim Budget for such period by more than fifteen percent (15%) of the budgeted amount (the "Authorized Variance").<br><br>In the event that an expense budgeted under the line items labeled in the Interim Budget labeled Lease Operating Expense, CapEx, Payroll & Benefits, and Bonus & Incentives for payment during any particular week in the Interim Budget exceeds the amount actually paid in respect of such line item during such week (the difference between the budgeted amount and the amount actually paid, the "Line Item Carry Forward Amount"), the Debtors shall be authorized to use Cash Collateral in the Line Item Carry Forward Amount toward expenses of the same line item during any subsequent week within a four-week budgeted period thereafter. | ¶ 3 |
| **Termination Date** Bankruptcy Rule 4001(b)(1)(B)(iii) | The earliest to occur of:<br><br>• Forty-five (45) days after the date the Interim Order is entered if the Final Order has not been entered by the Court on or before such date (unless such period is extended by mutual agreement of the First Lien Agent and the Debtors); | ¶ 7 |

---

[3]    Any summary of any terms of the Interim Order contained in this motion is qualified in its entirety by reference to the provisions of the Interim Order. The Interim Order will control in the event of any inconsistency between this motion and the Interim Order. Unless otherwise defined herein, capitalized terms used in this section have the meanings ascribed to them in the Interim Order.

KE 35741078

| Summary of Material Terms | | Location |
|---|---|---|
| | <ul><li>January 15, 2016;</li><li>Occurrence of specific Termination Events detailed in the Interim Order; and</li><li>Five (5) business days following the delivery of a written notice by the First Lien Agent to certain parties of the occurrence of specific Termination Events detailed in the Interim Order unless such occurrence is cured by the Debtors, prior to the expiration of the five-day period following delivery of the notice, or waived by the First Lien Agent in its sole discretion.</li></ul> | |
| **Termination Events** Bankruptcy Rule 4001(b)(1)(B)(iii) | The events set forth in paragraphs 7(a) through 7(u) of the Interim Order are collectively referred to as the "Termination Events" and include termination events that are customary in a cash collateral order, such as failure to make timely payments, failure to comply with material terms of the Orders, dismissal or conversion of the Chapter 11 Cases, and appointment of a trustee, as well terms deemed appropriate by the Prepetition Secured Parties and the Debtors. These include, the occurrence of certain Hedge Termination Events, the Debtors' filing of a plan of reorganization that does not provide for payment in full in cash of the First Lien Indebtedness, failure to meet a minimum liquidity requirement, and the Debtors' commencement of litigation against the First Lien Agent or First Lien Secured Parties, amongst other things. | ¶ 7(a)–(u) |
| **Adequate Protection** Bankruptcy Rule 4001(b)(1)(B)(iv) | The adequate protection provided to the First Lien Agent and First Lien Secured Parties, includes:<ul><li>allowed superpriority administrative claims against the Debtors as provided in section 507(b) of the Bankruptcy Code, with priority in payment over any and all unsecured claims and administrative expense claims against the Debtors;</li><li>adequate protection liens, including a first priority lien and/or replacement lien on, and security interest in Unencumbered Property, a junior priority replacement lien on, and security interest in, all of Debtors' now owned and hereafter acquired real and personal property (subject to Other Senior Liens), and a priming lien on, and security interest in, the Prepetition Collateral and all of the Debtors' now owned and hereafter acquired real and personal property (subject to Other Senior Liens);</li><li>adequate protection payments on the last business day of each calendar month after the entry of the Interim Order in an amount equal to all accrued and unpaid prepetition or postpetition interest, fees and costs due and payable under the First Lien Credit Agreement;</li><li>payment of the reasonable and documented fees, expenses and disbursements incurred by the First Lien Agent under the First Lien Credit Agreement;</li><li>maintenance of the Debtors' cash management arrangements in a manner consistent with the Cash Management Order;</li><li>continued compliance with the financial reporting requirements set forth in the First Lien Credit Agreement and certain additional financial reporting requirements described in the Interim Order;</li><li>providing the First Lien Agent with certain information regarding authorizations for expenditures and consulting with the First Lien Agent regarding the Debtors' response, as further described in the Interim Order;</li><li>certain restrictions set forth in the Interim Order related to sales and dispositions of Prepetition Collateral and Adequate Protection Collateral; and</li></ul> | ¶¶4-6 |

6

| Summary of Material Terms | | Location |
|---|---|---|
| | • the Debtors will provide the First Lien Agent with certain inspection and examination rights detailed in the Interim Order.<br><br>The adequate protection provided to the Second Lien Agent and Second Lien Secured Parties, includes:<br>• allowed superpriority administrative claims against the Debtors as provided in section 507(b) of the Bankruptcy Code, with priority in payment over any and all unsecured claims and administrative expense claims against the Debtors; (subject and subordinate only to the Carve Out and the First Lien Secured Parties' allowed superpriority administrative expense claims);<br>• adequate protection liens on the Adequate Protection Collateral subject to the the Carve Out, First Lien Adequate Protection Liens, and Prepetition First Liens, and subject further to the Intercreditor Agreement;<br>• payment of the reasonable and documented fees, expenses and disbursements incurred by the Second Lien Agent under the Second Lien Credit Agreement;<br>• maintenance of the Debtors' cash management arrangements in a manner consistent with the Cash Management Order;<br>• continued compliance with the financial reporting requirements set forth in the Second Lien Credit Agreement and certain additional financial reporting requirements described in the Interim Order;<br>• providing the Second Lien Agent with certain information regarding authorizations for expenditures and consulting with the Second Lien Agent regarding the Debtors' response, as further described in the Interim Order;<br>• certain restrictions set forth in the Interim Order related to sales and dispositions of Prepetition Collateral and Adequate Protection Collateral; and<br>• the Debtors will provide the Second Lien Agent with certain inspection and examination rights detailed in the Interim Order. | |
| **Carve-Out**<br>Bankruptcy Rule 4001(b)(1)(B)(iii) | The Interim Order provides a "Carve Out" of certain statutory fees, allowed professional fees of the Debtors and any Committee appointed in the Chapter 11 Cases pursuant to section 1103 of the Bankruptcy Code, and a Post-Carve Out Notice Cap, all as detailed in the Interim Order. | ¶5(c) |
| **Waiver/Modification of Automatic Stay**<br>Bankruptcy Rule 4001(b)(1)(B)(iii) | The Debtors are authorized and directed to perform all acts and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Interim Order and the transactions contemplated hereby. The stay of section 362 of the Bankruptcy Code is hereby modified to permit the Debtors and each of the Prepetition Agents and Prepetition Secured Parties to accomplish the transactions contemplated by this Interim Order. | ¶ 19 |
| **Stipulations of the Debtors**<br>Local Rule 4001-2(a)(i)(B) | The Interim Order contains certain stipulations by the Debtors, among other things, to:<br>• the amount of the claims of the Prepetition Agents and Prepetition Secured Parties as of the Petition Date;<br>• the validity and priority of the liens and security interests securing the First Lien Indebtedness and Second Lien Indebtedness;<br>• the lack of a basis to challenge or avoid the validity, enforceability, priority, or perfection of the liens and security interests securing the First Lien | ¶ D |

KE 35741078

| Summary of Material Terms | | Location |
|---|---|---|
| | Indebtedness and Second Lien Indebtedness; | |
| | • the relative priority of the liens securing the First Lien Indebtedness and Second Lien Indebtedness as to each other, pursuant to the Intercreditor Agreement; and | |
| | • the fact that all cash proceeds, subject to certain exceptions set forth in the Interim Order, are Cash Collateral of the Prepetition Secured Parties. | |
| **Binding Effect of the Debtors' Stipulations on Third Parties** Bankruptcy Rule 4001(b)(1)(B)(iii); Local Rule 4001-2(a)(i)(B) | As a result of the Debtors' review of the First Lien Loan Documents, the Second Lien Loan Documents and the facts relating thereto, the Debtors have admitted, stipulated and agreed to the various stipulations and admissions contained in the Interim Order, which stipulations and admissions shall be binding upon the Debtors and any successors thereto in all circumstances. <br><br> The stipulations and admissions contained in the Interim Order, including without limitation, in paragraph D of the Interim Order, shall also be binding upon all other parties in interest unless (a) such party (subject in all respects to any agreement or applicable law which may limit or affect such entity's right or ability to do so) has properly filed an adversary proceeding or contested matter, as required under the Bankruptcy Rules by no later than the date that is seventy-five (75) days from the date of entry of the Interim Order (or, in the case of the Committee, sixty (60) days from the date the date of the appointment of the Committee (x) challenging the amount, validity, enforceability, priority or extent of the First Lien Indebtedness or Second Lien Indebtedness or the liens on the Prepetition Collateral securing the First Lien Indebtedness or Second Lien Indebtedness, or (y) otherwise asserting any other claims, counterclaims, causes of action, objections, contests or defenses against the First Lien Agent, the First Lien Secured Parties, the Second Lien Agent or the Second Lien Secured Parties on behalf of the Debtors' estates (collectively, the "Claims and Defenses"), and (b) the Court rules in favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding or contested matter; *provided* that, as to the Debtors, all such Claims and Defenses are hereby irrevocably waived and relinquished effective as of the Petition Date. | ¶ 22 |

KE 35741078

| Summary of Material Terms | | Location |
|---|---|---|
| **506(c) Waiver**<br>Local Rule<br>4001-2(a)(i)(C)) | Subject to and effective upon entry of the Final Order, except to the extent of the Carve Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or the Adequate Protection Collateral, the Prepetition Agents or the Prepetition Secured Parties pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the affected party, and no such consent shall be implied from any other action, inaction, or acquiescence by any of the Prepetition Agents or Prepetition Secured Parties. | ¶ 13 |
| **Provisions Affecting Consideration of the Equities of the Case under Section 552(b)(1)**<br>Local Rule<br>4001-2(a)(i)(H) | In no event shall any of the Prepetition Agents or Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral, the Adequate Protection Collateral or otherwise.<br><br>Each of the Prepetition Agents and the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to entry of the Final Order, the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to the Prepetition Agents and the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral or the Adequate Protection Collateral. | ¶¶ 8, 15 |

## Highlighted Provisions under Local Rule 4001-2(a)(i)

14.    The Interim Order includes certain terms that constitute material provisions requiring explicit disclosure under the Local Rules.[4]  The provisions described in Local Rule 4001-2(a)(i), to the extent applicable, are set out at the following sections of the Interim Order:

a.    **Local Rule 4001-2(a)(i)(A) — *Cross-Collateralization*.**  The Orders do not provide for cross-collateralization, other than replacement liens as adequate protection.

b.    **Local Rule 4001-2(a)(i)(B) — *Validity, Perfection, and Amount of Prepetition Liens*.**  The Debtors acknowledge, agree, admit, and stipulate to various matters, including, the validity, perfection, and priority of the liens securing the Prepetition Indebtedness.  *See* Interim Order ¶ D. The stipulations set forth in paragraph D of the Interim Order are binding on the Debtors and any successors thereto.  *See id.* at ¶ 22. In compliance with Local Rule 4001-2(a)(i)(B), parties in interest have seventy-five (75) days from the entry of the Interim Order, and the Committee, if formed,

---

[4]    While the Debtors have attempted to highlight the provisions required by the Bankruptcy Rules and Local Rules, as well as certain other material provisions, the Debtors reserve the right to supplement this list at the Interim Hearing.

9

will have sixty (60) days from the date of its appointment, to investigate the stipulations set forth in paragraph D. *See id.*

c.      **Local Rule 4001-2(a)(i)(C) — *506(c) Waiver*.** Subject to and effective only upon entry of the Final Order, except to the extent of the Carve Out, no expenses of administration of the Debtors' chapter 11 cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral, the Adequate Protection Collateral, or the Prepetition Secured Parties pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the affected party, and no such consent shall be implied from any other action, inaction, or acquiescence by any of the Prepetition Secured Parties. *See* Interim Order ¶ 13.

d.      **Local Rule 4001-2(a)(i)(D) — *Liens on Avoidance Actions*.** Subject only to entry of the Final Order, the Adequate Protection Liens shall attach to any proceeds or property recovered in respect of any Avoidance Actions. *See* Interim Order ¶ 5.

e.      **Local Rule 4001-2(a)(i)(E) — *Provisions Deeming Prepetition Debt to be Post Petition Debt*.** The Orders do not deem prepetition secured debt to be postpetition debt.

f.      **Local Rule 4001-2(a)(i)(F) — *Disparate Treatment of Professionals Retained by the Committee*.** In compliance with Local Rule 4001-2(a)(i)(F), the Interim Order contains no provisions that provide for disparate treatment for professionals retained by the Committee, if any, with respect to the Carve Out. The Interim Budget does include a line item for Committee professional fees. *See* Interim Order, Ex. 1.

g.      **Local Rule 4001-2(a)(i)(G) — *Non-Consensual Priming*.** The Orders do not provide for non-consensual priming of any existing secured lien. The priming liens granted to the Prepetition Agents as adequate protection expressly shall not prime (i) valid, perfected, and unavoidable liens in existence as of the Petition Date or (ii) valid and unavoidable liens in existence for amounts outstanding as of the Petition Date that are perfected after the Petition Date, as permitted by Bankruptcy Code section 546(b), which valid, perfected, and unavoidable liens are senior in priority to the security interests and liens in favor of the First Lien Agent. *See* Interim Order ¶ 5(b)(iii).

h.    **Local Rule 4001-2(a)(i)(H) — *Provisions Affecting the Court's Power to Consider the Equities of the Case*.** Subject to entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Agents and the Prepetition Secured Parties with respect to proceeds, products, offspring, or profits of any of the Prepetition Collateral or the Adequate Protection Collateral. *See* Interim Order ¶ 15.

**The Debtors' Prepetition Secured Indebtedness**

A.    **First Lien Credit Agreement**

15.    Debtor Samson Investment Company ("Samson") maintains a reserve-based revolving credit facility with a borrowing base of approximately $950 million under that certain Credit Agreement, dated as of December 21, 2011 (as amended, restated, supplemented, or otherwise modified from time to time, the "First Lien Credit Agreement"), by and between Samson, as borrower, JPMorgan Chase Bank, N.A., as administrative and collateral agent (the "First Lien Agent"), and the lenders and other secured parties thereto (the "First Lien Secured Parties"). The First Lien Credit Agreement provides for total lending commitments of $2.25 billion, subject to a borrowing base that may be adjusted by the agent and lenders based on the value of the Debtors' oil and gas reserves.

16.    The First Lien Credit Agreement has been amended five times, including most recently on March 18, 2015. As of the Petition Date, the borrowing base under the first lien credit facility is $950 million, and the facility is approximately fully drawn. The first lien credit facility bears interest at a floating rate; for the six months ended June 30, 2015, the weighted average interest rate was 3.5 percent. The first lien credit facility matures in 2016.

17.    The collateral securing the Debtors' obligations under the First Lien Credit Agreement and the guarantees provided by the Debtors are described below.

11

**B.    Second Lien Credit Agreement**

18.    Samson is the borrower under that certain Second Lien Term Loan Credit Agreement, dated as of September 25, 2012 (as amended, restated, supplemented, or otherwise modified from time to time, the "Second Lien Credit Agreement"), by and between Samson, Deutsche Bank Trust Company Americas, as successor administrative and collateral agent (the "Second Lien Agent" and, together with the First Lien Agent, the "Prepetition Agents") and the lenders party thereto (the "Second Lien Secured Parties" and, together with the First Lien Secured Parties, the "Prepetition Secured Parties"). The Second Lien Credit Agreement provides the Debtors with a term loan of approximately $1.0 billion and matures in 2018. It bears interest at a floating rate; for the three months ended March 31, 2015, the weighted average of the interest rate was 5.0 percent.

**C.    Security**

19.    Samson's obligations under the First Lien Credit Agreement are guaranteed by all of the Debtors, other than Samson (the borrower), pursuant to that certain Guarantee dated as of December 21, 2011. The Debtors have granted a first-priority lien on and security interest in substantially all assets and capital stock of Samson and all wholly-owned domestic restricted subsidiaries, including a security interest in Samson's approximately $129.5 million in cash on hand and real property mortgages on 95 percent of the Debtors' oil and gas properties to the First Lien Agent for the benefit of the First Lien Secured Parties.

20.    Samson's obligations under the Second Lien Credit Agreement are guaranteed by all of the Debtors, other than Samson (the borrower), pursuant to that certain Guarantee dated as of September 25, 2012. The Debtors have granted a second-priority lien on and security interest in substantially all assets and capital stock of Samson and all wholly-owned domestic restricted subsidiaries, including a security interest in Samson's approximately $129.5 million in cash on

12

hand and real property mortgages on 95 percent of the Debtors' oil and gas properties and related assets to the Second Lien Agent for the benefit of the Second Lien Secured Parties.

21.    The Prepetition Secured Parties do not have security interests in all of Samson's assets. In connection with the March 2015 amendment of the First Lien Credit Agreement, the First Lien Secured Parties' collateral coverage of mortgaged properties was increased from 80 to 95 percent of the company's PV-9 total proved reserves.[5] As a result, five percent of Samson's real property is unencumbered as is certain personal property. Samson's unencumbered real property is scattered throughout the United States and includes reserves, undeveloped acreage, mineral rights, and real estate. Samson's unencumbered personal property includes certain limited equipment, machinery, vehicles, and office furniture. Samson believes that the unencumbered assets are not concentrated or readily marketable, are of little value to third parties, and are only valuable for use by Samson in connection with its business.

### D.    Intercreditor Agreement

22.    The relationship and relative lien priorities among the Prepetition Agents and Prepetition Secured Parties is subject to that certain Second Lien Intercreditor Agreement, dated as of September 25, 2012 (as amended from time to time and with all supplements and exhibits thereto, the "Intercreditor Agreement"), by and among Samson, certain grantors, the First Lien Agent, and the Second Lien Agent. The Intercreditor Agreement, among other things, provides that the liens and security interests of the Second Lien Agent and Second Lien Secured Parties are subordinate to the liens and security interests of the First Lien Agent and First Lien Secured Parties with respect to shared collateral. The Intercreditor Agreement also governs certain of the respective rights and interests among the secured parties, including, limitations on the Second

---

[5]    "PV-9" is a commonly used methodology in the energy industry to derive the present value of estimated future oil and gas revenues, net of estimated direct expenses, and discounted at an annual rate of 9 percent.

Lien Agent and Second Lien Secured Parties' rights to object to the Debtors' proposed use of cash collateral in connection with a chapter 11 proceeding where the First Lien Agent, on behalf of itself and the First Lien Secured Parties, has consented to the use of such cash collateral. *See* Intercreditor Agreement, § 6.01. As described below, the First Lien Agent on behalf of the First Lien Secured Parties and the Second Lien Agent on behalf of the Second Lien Secured Parties have consented to the Debtors' use of Cash Collateral.

### E.    Other Secured Obligations

#### 1.    Hedging Arrangements

23.    Samson routinely enters into hedging arrangements (each, a "Hedge Agreement," and, collectively, the "Hedge Agreements") with counterparties to provide partial protection against declines in oil and natural gas prices. Samson bases its hedging strategy on a view of existing and forecasted production volumes, budgeted drilling projections, and current and future market conditions and takes the form of oil and natural gas price collars and swap agreements.

24.    Certain of the counterparties under the Hedging Agreements are also lenders under the First Lien Credit Agreement (the "Hedge Banks"). When the First Lien Credit Agreement was last amended, on March 18, 2015, the terms of the First Lien Credit Agreement providing for a reduction of the borrowing base and the off-setting of outstanding obligations thereunder upon termination of any Hedge Agreements were modified to include not only termination by the Debtors, but also termination by a hedge counterparty, whether such counterparty is a Hedge Bank or not. *See* First Lien Credit Agreement, § 2.14(f). The First Lien Credit Agreement also provides each First Lien Lender, with the right to set-off, *to the extent permitted by applicable law*, the proceeds of any terminated Hedge Agreement where the hedge counterparty is a First Lien Lender, the First Lien Agent, or either of their respective affiliates,

14

against any amount owing by Samson under the First Lien Credit Agreement. *See* First Lien Credit Agreement, § 3.18(b).

25. As of the Petition Date, the hedges currently stand in Samson's favor in an aggregate amount of approximately $105 million. As a result of commencement of the Debtors chapter 11 cases, the hedge counterparties would be permitted to terminate the Hedge Agreements by their terms and pursuant to section 560 of the Bankruptcy Code. Certain of the Hedge Banks, however, have agreed not to exercise their rights of termination based on the Debtors' chapter 11 filing, and will allow the Hedge Agreements to remain in place, subject to certain exceptions outlined in the Interim Order. Additionally, if the Debtors receive any monthly settlement amounts pursuant to the Hedge Agreements, or any other proceeds from a terminated hedge (where the termination is not as a result of an event of default or other termination event outlined in the Interim Order), these funds will be placed in a separate escrow account. The Debtors will be permitted to access the funds in the escrow account if the Debtors' cash on hand falls below $50 million during certain test period outlined in the Interim Order.

26. Further, to the extent any Hedge Bank does not consent to the terms of the Interim Order, the Debtors have expressly preserved their rights to contest any setoff or other application of proceeds from any terminated Hedge Agreement by any Hedge Bank that has not consented to the terms outlined in the Interim Order.

### 2. Other Secured Claims

27. In the ordinary course of business, the Debtors routinely transact with a number of third-party contractors and vendors who may seek to assert liens against the Debtors and their property (such as equipment and, in certain circumstances, mineral interests) if the Debtors fail

to pay for the goods delivered or services rendered.[6] These parties perform various services for the Debtors, including, without limitation, manufacturing and repairing equipment and component parts necessary for the Debtors' oil field activities, contracting, drilling, hauling, and supplying oil and gas-related services, as well as shipping the Debtors' products.

### The Debtors' Need to Use Cash Collateral

28.     The Debtors use cash on hand and cash flow from operations to fund their working capital needs, capital expenditures, and for other general corporate purposes. An inability to use these funds during the chapter 11 cases could cripple the Debtors' business operations. Indeed, without access to Cash Collateral the Debtors and their estates would suffer immediate and irreparable harm.

29.     A significant portion of the Prepetition Collateral includes oil and gas properties and related assets (including real property and personal property related thereto) on which the Prepetition Secured Parties have liens, including the oil and gas extracted by the Debtors from those properties and the proceeds generated from sales thereof. The Debtors' business model is predicated upon their ability to exploit their oil and gas assets, bring them to market, and utilize the proceeds in their business operations. Thus, the orderly continuation of the Debtors' operations and the preservation of their going concern value is largely dependent upon their ability to regularly convert the Prepetition Collateral into Cash Collateral and use it in their operations.

---

6   The liens certain mineral contractors, vendors, and other suppliers may be able to assert against the Debtors are described in more detail in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of (A) Operating Expenses, (B) Joint Interest Billings, (C) Marketing Expenses, (D) Shipping and Warehousing Claims, and (E) 503(B)(9) Claims and (II) Confirming Administrative Expense Priority of Outstanding Orders* [Docket No. 6].

16

30.     The Debtors also rely on the encumbered cash generated from their operations to fund working capital, capital expenditures, research and development efforts, and for other general corporate purposes.  During these chapter 11 cases, the Debtors will need this operating revenue to satisfy payroll, pay suppliers, meet overhead, pay expenses pursuant to joint operating agreements for properties operated by the Debtors, satisfy joint interest billings for properties where the Debtors are a non-operating working interest holder, and make any other payments that are essential for the continued management, operation, and preservation of the Debtors' businesses.  The ability to satisfy these expenses as and when due is essential to the Debtors' continued operation of their businesses during the pendency of these cases.

### Summary of Proposed Use of Cash Collateral

31.     The Debtors seek authority to use Cash Collateral in accordance with the Interim Budget (as defined herein) for working capital, general corporate purposes, administrative costs and expenses of the chapter 11 cases, and adequate protection payments to the Prepetition Secured Parties.  Pursuant to the Interim Order, the Debtors' right to use Cash Collateral will commence on the Petition Date and shall remain in effect until the earlier of (a) 45 days after the date the Interim Order is entered if the Final Order has not been entered by this Court on or before such date (unless such period is extended by mutual agreement of the First Lien Agent and the Debtors); (b) January 15, 2016; (c) immediately upon certain Termination Events; and (d) five business days following delivery of a notice from the First Lien Agent to the Debtors that any of the other Termination Events has occurred (unless cured by the Debtors or waived by the First Lien Agent before the five-day period expires).

32.     The Debtors, with the assistance of their advisors, have formulated a 13-week cash flow budget, in form and substance satisfactory to the First Lien Agent, for the use of Cash Collateral during the interim period (the "Interim Budget").  For each Interim Budget Period, the

17

Debtors will be permitted to exceed aggregate expenditures by 10 percent in the aggregate, and 15 percent for certain specific line items outlined in the Interim Order (the "Authorized Variance"). The Debtors believe that the Interim Budget and Authorized Variance will provide the Debtors with adequate liquidity during the interim period.

33.    The Interim Budget contains line items for each category of cash flows anticipated to be received or disbursed during the time period for which the Interim Budget is prepared. The Debtors believe that the Interim Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of their business for the period set forth in the Interim Budget.

**Supporting Authority**

**A.    The Use of Cash Collateral Is Warranted and Should Be Approved.**

34.    The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code, which provides in relevant part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1). Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

35.    It is essential to the Debtors' successful reorganization and the going concern value of their businesses that they have sufficient funds to operate in the ordinary course, and at a level that is on par with their prepetition performance. Absent the use of Cash Collateral, the

18

Debtors will not have sufficient working capital to (a) make payments to employees, operators, royalty interest holders, working interest holders, vendors, or suppliers, (b) satisfy ordinary operating costs, and (c) fund the administrative costs of these chapter 11 cases. Furthermore, as discussed above, and in accordance with section 363(c)(2) of the Bankruptcy Code, the parties have consented to the Debtors' use of Cash Collateral pursuant to the terms of the Interim Order, including the Interim Budget. Accordingly, the Debtors submit that the use of Cash Collateral is in the best interests of the Debtors' estates and should be approved.

**B.    The Debtors' Proposed Grant of Adequate Protection to Use Cash Collateral Is Appropriate.**

36.    Pursuant to section 363(c) of the Bankruptcy Code, the Debtors may only use Cash Collateral of the Prepetition Secured Parties, subject to the consent of those parties or the grant of adequate protection. 11 U.S.C. § 363(c)(2). Section 363(e) of the Bankruptcy Code provides that upon request of an entity that has an interest in property to be used by a debtor, the court shall prohibit or condition such use as is necessary to provide adequate protection of such interest. 11 U.S.C. § 363(e).

37.    Generally, what constitutes adequate protection is decided on a case-by-case basis. *See In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *see also In re Realty Southwest Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted); *see also In re Continental Airlines Inc.*, 154 B.R. 176, 180-181 (Bankr. D. Del. 1993).

19

38.     The Debtors intend to provide the First Lien Secured Parties with adequate protection, which includes:  (a) allowed superpriority administrative claims pursuant to section 507(b) of the Bankruptcy Code;  (b) liens, including first-priority liens on Unencumbered Property, junior priority liens on certain existing liens, and certain priming liens on the Prepetition Collateral, to the extent of any diminution in value of their interests in the Prepetition Collateral, including Cash Collateral (collectively, the "First Lien Adequate Protection Liens"); (c) adequate protection payments; (d) fees and expenses incurred by the First Lien Agent, including the reasonable and documented fees, expenses, and disbursements (of counsel and other third-party consultants); (e) maintenance of the Debtors existing cash management system; (f) the Debtors' compliance with the Interim Budget, subject to certain variances, and other financial reporting; and (g) providing the First Lien Agent with certain information and consultation rights related to authorizations for expenditures.

39.     The Debtors intend to provide the Second Lien Secured Parties with adequate protection, which includes:  (a) allowed superpriority administrative claims pursuant to section 507(b) of the Bankruptcy Code; (b) adequate protection liens, to the extent of any diminution in value of their interests in the Prepetition Collateral, including Cash Collateral, subject to the First Lien Adequate Protection Liens and the Intercreditor Agreement; (c) fees and expenses incurred by the Second Lien Agent, including the reasonable and documented fees, expenses, and disbursements (of counsel and other third-party consultants); (d) maintenance of the Debtors existing cash management system; (e) the Debtors' compliance with the Interim Budget, subject to certain variances, and other financial reporting; and (f) providing the Second Lien Agent with certain information and consultation rights related to authorizations for expenditures.

KE 35741078

40.    The Prepetition Secured Parties will inherently benefit from the Debtors'
proposed use of the Cash Collateral, which will prevent avoidable diminution of the value of the
Cash Collateral and enhance the likelihood of preserving, or even increasing, the Debtors'
overall going concern value as the Debtors proceed with their chapter 11 cases.  Preservation of
the Debtors' business as a going concern in and of itself serves to provide such parties "adequate
protection" for Bankruptcy Code purposes.  *See 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631
(Bankr. S.D.N.Y. Feb. 4, 1992) (noting that, in determining whether protection is "adequate,"
courts consider "whether the value of the debtor's property will increase as a result of the" use of
collateral or provision of financing); *In re Sky Valley, Inc.*, 100 B.R. 107, 114 (Bankr. N.D. Ga.
1988) ("an increase in the value of the collateral . . . resulting from superpriority financing could
result in adequate protection." (citation omitted)), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989).

41.    The Debtors believe that the proposed adequate protection is necessary and
appropriate to ensure that the Debtors can continue to use Cash Collateral.  Accordingly, the
Debtors submit that the adequate protection is (a) fair and reasonable, (b) necessary to satisfy the
requirements of sections 363(c)(2) and 363(e) of the Bankruptcy Code, and (c) in the best
interests of the Debtors and their estates.  Moreover, courts in this district and others have
approved similar adequate protection packages in other recent chapter 11 cases.  *See e.g.*, *In re
Sabine Oil & Gas Corp.*, No. 15-11835 (SCC) (Bankr. S.D.N.Y. July 17, 2015); *In re
Quicksilver Res. Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. Mar. 19, 2015) (interim order); *In re
Entegra Power Grp. LLC*, No. 14-11859 (PJW) (Bankr. D. Del. Aug. 6, 2014) (same); *In re
Energy Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr. D. Del. May 2, 2014) (same); *In re
Physiotherapy Holdings, Inc.*, No. 13-12965 (KG) (Bankr. D. Del. Nov. 14, 2013) (same); *In re
Longview Power, LLC*, No. 13-12211 (BLS) (Bankr. D. Del. Sept. 5, 2013) (same); *In re Dex*

21

*One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. Mar. 19, 2013) (same); *In re TMP Direction Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Dec. 7, 2011) (same).[7]

**C.    The Scope of the Carve Out Is Appropriate.**

42.    The Adequate Protection Obligations are subject to the Carve Out. Without the Carve Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these chapter 11 cases would be restricted. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). The Carve Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers. Additionally, the Carve Out protects against administrative insolvency during the course of these chapter 11 cases by ensuring that assets remain for the payment of the Clerk of the Court or U.S. Trustee fees and professional fees of the Debtors and a statutory committee.

**D.    The Automatic Stay Should Be Modified on a Limited Basis.**

43.    The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to grant the security interests and liens described above to the Prepetition Secured Parties, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens. The Interim Order further provides that the automatic stay is modified and vacated to the extent necessary, upon the occurrence of the Termination Date, to permit the Adequate Protection Obligations to become due and payable and to allow the Prepetition Secured Parties to exercise the rights and remedies available under the

---

[7]    Because of the voluminous nature of the orders cited herein, such orders are not attached to this motion. Copies of these orders are available upon request of the Debtors' counsel.

First Lien Loan Documents, the Second Lien Loan Documents, the Interim Order or applicable law (subject only to the Carve Out), including foreclosing upon and selling all or a portion of the Prepetition Collateral or Adequate Protection Collateral in order to collect the Adequate Protection Obligations. Stay modifications of this kind are ordinary and standard features for the use of cash collateral, and in the Debtors' business judgment, are reasonable and fair under the present circumstances.

E.    **Interim Relief Should Be Granted.**

44.    Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the court is empowered to conduct an interim expedited hearing on the motion at which it may authorize a debtor to use cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. *See* Bankruptcy Rule 4001(b)(2). Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3). Local Rule 4001-2(b) provides that the Court may grant interim relief pending review of interested parties of proposed debtor-in-possession financing arrangements, including use of cash collateral, provided that such relief is only what is necessary to avoid immediate and irreparable harm to the estate pending a final hearing and, absent extraordinary circumstances, the proposed interim order does not include any of the provisions identified in Local Rule 4001-2(a)(i)(A)-(F). Local Rule 4001-2(b).

45.    Pending the Final Hearing, the Debtors require immediate access to Cash Collateral in order to satisfy the day-to-day financing needs of the Debtors' business operations. Access to liquidity will address key constituents' concerns regarding the Debtors' financial

23

health and ability to continue operations in light of these chapter 11 cases. The Debtors have an immediate need for access to liquidity to, among other things, permit the orderly continuation of the operation of their business, maintain business relationships with their vendors, suppliers, and non-operating working interest holders, make payroll, and satisfy other essential working capital and operational needs, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest. To protect the Prepetition Secured Parties, the Debtors' use of Cash Collateral will be limited to the amounts set forth in the Interim Budget, subject to authorized variances, thereby providing additional safeguards for all creditors of the Debtors' estates.

46.    Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code, Bankruptcy Rule 4001(b), and Local Rule 4001-2(b), the Debtors request that the Court conduct an expedited hearing on this motion, and enter the Interim Order authorizing the Debtors to use Cash Collateral.

### Request for Final Hearing

47.    Pursuant to Bankruptcy Rule 4001(b)(2) and Local Rule 4001-2(c), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

### Waiver of Bankruptcy Rules 4001(a)(3) and 6004(a)

48.    The Debtors request a waiver of the stay of the effectiveness of the order approving this motion under Bankruptcy Rule 4001(a)(3). Bankruptcy Rule 4001(a)(3) provides that "[an] order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise." As set forth herein, the use of Cash Collateral is necessary to allow the Debtors to operate their business, transition smoothly into these chapter 11 cases and reorganize.

Furthermore, allowing the Debtors' use of Cash Collateral will prevent irreparable harm to the Debtors' estates. Accordingly, the Debtors submit that ample cause exists to justify the waiver of the fourteen-day stay imposed by Bankruptcy Rule 4001(a)(3). Additionally, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a).

### Notice

49.    The Debtors will provide notice of this motion to: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the agent under the Debtors' first lien credit facility; (c) counsel to the agent under the Debtors' first lien credit facility; (d) the agent under the Debtors' second lien credit facility; (e) counsel to the agent under the Debtors' second lien credit facility; (f) the indenture trustee under the Debtors' 9.75% senior notes due 2020; and (g) counsel to certain majority holders of the existing common stock of the Debtors. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request entry of an order, substantially in the form attached hereto as **Exhibit A**, (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Dated: September 17, 2015
Wilmington, Delaware

/s/ Domenic E. Pacitti

Domenic E. Pacitti (DE Bar No. 3989)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:    (302) 426-1189
Facsimile:    (302) 426-9193

-and -

Morton Branzburg (*pro hac vice* admission pending)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:    (215) 569-2700
Facsimile:    (215) 568-6603

-and-

Paul M. Basta, P.C. (*pro hac vice* admission pending)
Edward O. Sassower, P.C. (*pro hac vice* admission pending)
Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Ryan J. Dattilo (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

-and-

James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
Brad Weiland (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Co-Counsel for the Debtors and Debtors in Possession*