## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | Case No. 15-11934 (CSS) |
| Debtors. | (Jointly Administered) |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING AND APPROVING THE DEBTORS' PERFORMANCE AWARD PROGRAM

The above-captioned debtors and debtors in possession (collectively, the "Debtors") seek entry of an order, substantially in the form attached hereto as **Exhibit A**, authorizing and approving the Debtors' Performance Award Program for the four senior officers of the Debtors. In support of this motion, the Debtors respectfully submit (a) the Declaration of Douglas J. Friske, Managing Director of Towers Watson Delaware Inc., attached hereto as **Exhibit B** (the "Friske Declaration") and (b) the Declaration of Dean Swick, Senior Managing Director of Alvarez & Marsal North America, LLC, attached hereto as **Exhibit C** (the "Swick Declaration"). In further support of this motion, the Debtors respectfully state as follows:

### Introduction

1.     To operate their business, the Debtors **must** compensate and incentivize their senior management team.  The Debtors' production of oil and natural gas across the country requires their relatively small and highly skilled workforce—including their senior leadership team—to drive complex operations.  The Debtors have historically offered various plans and

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227).  The location of parent Debtor Samson Resources Corporation's corporate headquarters and the Debtors' service address is:  Two West Second Street, Tulsa, Oklahoma 74103.

programs designed to compensate, motivate, and retain their key employees.  When it became

clear in February 2015 that a comprehensive restructuring of the Debtors' balance sheet was

necessary, the Debtors engaged compensation consultant Towers Watson to conduct a review of

existing retention and incentive arrangements and make recommendations to the compensation

committee of Samson's board of directors regarding potential modifications or adjustments.

More specifically, Towers Watson reviewed the compensation offered by the Debtors with an

eye towards a potential in-court restructuring and the need to ensure that the applicable

provisions of the Bankruptcy Code were adhered to in designing compensation arrangements for

all employees, including insiders.

2.     Having reviewed Towers Watson's analysis, and in consultation with the Debtors'

advisors, the compensation committee adopted the Performance Award Program on March 10,

2015, a copy of which is attached hereto as **Exhibit D**.[2]  The analysis provided to Samson's

management team and the compensation committee determined that the payments contemplated

under the Performance Award Program were in line with market practice both for companies in

the exploration and production industry and those in chapter 11.  The Debtors also enlisted the

help of industry experts at Alvarez & Marsal to ensure that the Performance Award Program

incorporated value-driving performance metrics and targets within management's control that

would incentivize management and maximize stakeholder value.

3.     Approval of the Performance Award Program comes at a critical juncture for

these Debtors.  While the Debtors had secured a prepetition commitment of $450 million to

restart drilling operations and move these cases forward on an expedited basis, the timing of

---

[2]     The compensation committee also adopted a non-insider incentive program, as more fully described in the *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, (II) Continue Non-Insider Incentive Plans, and (III) Continue Employee Benefit Programs* [Docket No. 4].

KE 38100451
PHIL1 4984016v.1

these cases and the path forward is now uncertain. This, together with overall market uncertainty and general concerns about the future prospects for Samson, has created deep consternation among the entire workforce, including the executive management team. The Debtors' Chief Executive Officer, Randy Limbacher, has recently resigned, effective early December 2015. He will be succeeded by current Chief Operating Officer Richard Fraley, who will serve as interim Chief Executive Officer. While Mr. Limbacher will remain a member of Samson's board of directors and assist the Debtors for transition purposes to the extent he is available, Mr. Limbacher will no longer be a full-time employee. As a result, Mr. Limbacher will not participate in the Performance Award Program during the fourth quarter. The other insiders— Richard Fraley (Chief Operating Officer/Interim Chief Executive Officer), Philip Cook (Chief Financial Officer), and Andrew Kidd (General Counsel)—will work with Mr. Limbacher in the near term to ensure a smooth transition and in the longer term continue ordinary course operations in an effort to solidify the Debtors' prospects for a reorganization. To further aid in this transition and maintain stability, Samson's board of directors has appointed John Stuart of Alvarez & Marsal as the Debtors' Chief Restructuring Officer.[3]

4.    The Performance Award Program provides the four insiders on the Debtors' management team with the opportunity to earn quarterly incentive-based cash awards if the Debtors achieve pre-established financial and operational targets tied to the Debtors' business plan. The Performance Award Program is incentive- (as opposed to retention-) based— payments are only made if certain targets, as set by the compensation committee, are achieved. Moreover, and consistent with the analysis conducted by Towers Watson with respect to total compensation for the insiders, the payments contemplated under the Performance Award

---

[3]    The Debtors intend to amend the previously filed application to retain Alvarez & Marsal North America, LLC [Docket No. 120] to appropriately address the CRO appointment.

Program are market-based—the insiders' proposed total compensation will be, at maximum, approximately 18 percent below the bottom quartile of market compensation, on average.

5. The Debtors have also engaged with creditor groups regarding the Performance Award Program (and will continue to do so). The Debtors' advisors have had multiple discussions with creditor constituencies, including advisors to the Debtors' second lien lenders, the Debtors' first lien lenders, and the official committee of unsecured creditors (the "Committee"). The Debtors have proactively provided summaries of the Performance Award Program, the plan document, and other information to creditors and responded to multiple follow-up inquiries about the Performance Award Program, including about program design, cost, Towers Watson's benchmark analyses, and the financial and operational metrics and targets in the Performance Award Program. Indeed, the Debtors worked closely with the second lien lender to finalize the program and made certain adjustments to develop the current program, which is fully supported by the second lien group.

6. Approval of the Performance Award Program does not guarantee successful operating performance or completely ensure against further insider attrition. Nonetheless, approval of the program is unquestionably critical to the Debtors' attempts to drive performance and avoid additional management departures. The Performance Award Program has and will continue to incentivize key employees to drive performance for the entire organization—at a time when drilling has been suspended and the future prospects of the company are uncertain— and should be approved.

## **Relief Requested**

7. The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A**, authorizing and approving the Performance Award Program. This includes

4

authorization to pay awards that have been earned during the third quarter and approve potential payments in the fourth quarter. The aggregate dollar amounts earned in the third quarter and potentially payable for the fourth quarter will not exceed $3,281,184 and are broken down as follows:

- $2,149,584 for the third quarter of 2015, including:

    - $760,833 for Randy Limbacher (Chief Executive Officer)

    - $504,167 for Richard Fraley (Chief Operating Officer)

    - $504,167 for Philip Cook (Chief Financial Officer)

    - $380,417 for Andrew Kidd (General Counsel)

- up to $1,131,600 for the fourth quarter of 2015, including:

    - $568,800 for Richard Fraley (Interim Chief Executive Officer/Chief Operating Officer)

    - $353,800 for Philip Cook (Chief Financial Officer)

    - $209,000 for Andrew Kidd (General Counsel)

## Jurisdiction and Venue

8.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties,

cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10. The statutory bases for the relief requested herein are sections 363(b) and 503(c) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

11. On September 16, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On September 18, 2015, the Court entered an order [Docket No. 70] authorizing joint administration and procedural consolidation of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No entity has requested the appointment of a trustee or examiner in these chapter 11 cases. On September 30, 2015, the the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Committee.

12. A description of the Debtors' businesses and the reasons for commencing the chapter 11 cases is set forth in the *Declaration of Philip Cook in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 2].

## The Performance Award Program

**I.** **Development of the Performance Award Program**

**A.** **The Debtors' Legacy Incentive Plans**

13. Before 2015, the Debtors' compensation arrangements included three primary components: (a) annual base salary; (b) annual cash bonus plans; and (c) grants of long-term cash and equity incentive awards ((b) and (c), the "Legacy Incentive Plans"). Payments under

6

the Legacy Incentive Plans were paid once annually and were put in place, following the buy-out in 2011, to attract the new management team.  The four insiders joined the Debtors during 2012 and 2013.  One component of the Legacy Incentive Plans, implemented in November 2014, provided that certain officers, including the insiders, who remained with the Debtors through September 2, 2015, would receive an equity award equal to two times the officer's base salary and annual cash bonus opportunity.

14.     By late 2014 and into early 2015, existing leverage combined with overall market volatility suggested a restructuring of the Debtors' balance sheet was necessary.  Drilling operations were suspended, and it was evident that equity-based incentive compensation would not deliver any value or incentivize employees.  Recognizing this, the Debtors engaged Towers Watson in February 2015 to conduct an immediate review of all compensation programs, with the goal of designing market-based plans across the entire workforce that would not only appropriately incentivize employees but also withstand scrutiny in any potential restructuring proceeding.

**B.     The Debtors' Transition to the Performance Award Program**

15.     As part of Towers Watson's review process, Towers Watson performed an overall competitive compensation analysis.  Towers Watson concluded that, absent a change to the Debtors' compensation structure, total direct compensation—a standard definition that includes the sum of base salary, target annual incentives, and long-term incentive grant values—levels for certain key management employees would fall to 79 percent below the market 25th percentile in a restructuring proceeding where equity had no value and each insider only received a base salary.  Towers Watson worked with the Debtors' management, and its outside advisors, to present the compensation committee with an updated compensation structure that would align

7

with the Debtors' restructuring realities, provide strong incentive value through the restructuring process, and reflect competitive target total direct compensation opportunities.

16.     Supported by market data and consultation from Towers Watson, on March 10, 2015, the compensation committee of Samson's board of directors approved an updated incentive structure for all employees.  The new incentive structure replaced the Legacy Incentive Plans for insider employees with the Performance Award Program.

17.     Each insider's first quarter cash award was set at two-thirds of his expected payment under the September 2015 award and 25 percent of his normal annual cash bonus.  For each of the second and third quarters, each insider's cash award was set at half of the remaining portion of the September 2015 award and an additional 25 percent of his normal annual cash bonus.  The fourth quarter cash awards for the participants were calibrated to position target total direct compensation for the insiders in line with competitive market pay considering the nature of the Debtors' restructuring.

## C.    The Quarterly Performance Award Program Metrics

18.     Beginning with the second quarter of 2015, each quarterly performance award under the Performance Award Program was tied to approved operational and/or financial metrics for each quarter.  In accordance with the terms of the Performance Award Program, the compensation committee establishes one or more performance goals that must be achieved to earn an award for each quarter.  The compensation committee can, but is not required to, establish minimum, target, and maximum levels for selected performance goals that provide for the payment of a fraction or multiple of the insiders' award.

19.     In setting the performance metrics each quarter, the compensation committee evaluated the metrics in light of the Debtors' historical performance, existing business plan, and

KE 38100451
PHIL1 4984016v.1

the extent to which the performance targets—if achieved—would demonstrate a material improvement in the Debtors' businesses as a whole.  The compensation committee evaluated management's and the Debtors' advisors' views on the significant employee effort necessary to attain the performance targets in the Performance Award Program and the resulting value created for the Debtors.[4]  The compensation committee deliberated about the Performance Award Program metrics and targets that were ultimately put in place each quarter.

20.     For the second quarter of 2015, payments under the Performance Award Program were based on (a) the Debtors' oil and gas production and (b) the Debtors' general and administrative expense reductions.  The Debtors met the targets for the second quarter and paid bonuses under this program in June 2015.

21.     At the end of the second quarter, as the Debtors experienced financial distress and continued suspension of their drilling program, the Debtors considered which compensation metrics would ensure that employees were properly incentivized to meet the difficult goals ahead and to maximize value for stakeholders.  The Debtors sought to design third quarter goals that would provide a balanced set of metrics for which the Debtors could reasonably forecast targets based on their financial projections.  The Debtors ultimately proposed setting the third quarter Performance Award Program metrics to (a) the Debtors' oil and gas production and (b) the Debtors' lease operating expenses.  On June 25, 2015, the compensation committee approved these metrics for the third quarter and set targets based on the Debtors' financial forecasts.  As determined at a meeting of the compensation committee on October 28, 2015, the Debtors met the targets for the third quarter and now seek authority to pay the awards.  As a result of discussions with their second lien lenders, who support the relief sought herein, the Debtors will

---

[4]     No compensation committee member is a participant in the Performance Award Program.

KE 38100451
PHIL1 4984016v.1

pay the insiders 75 percent of their third-quarter awards upon entry of the order approving this motion and the remaining 25 percent on December 15, 2015.

22.     At the end of the third quarter, the Debtors again sought to establish a balanced set of metrics that would meaningfully drive value for the fourth quarter.  The Debtors began this process with an analysis of their historical performance and existing business plan.  With the assistance of A&M, the Debtors updated their business projections as late as September 2015 to reflect the then current view of management regarding the future operating state of the company. Using their revised financial forecasts, the Debtors, in consultation with their advisors, ultimately proposed setting the fourth quarter Performance Award Program metrics to (a) the Debtors' oil and gas production and (b) the Debtors' total operating expenses.  On October 28, 2015, the compensation committee approved these metrics for the fourth quarter.  As a result of discussions with their second lien lenders, the Debtors seek authority to pay the insiders, if earned, 25 percent of their fourth-quarter awards on January 15, 2016, and the remaining 75 percent on the earlier of the Debtors' emergence from bankruptcy or March 15, 2016.

## II.     Terms and Conditions of the Performance Award Program

23.     The Debtors seek authority to make payments to the insiders under the Performance Award Program for the third quarter, and continue the Performance Award Program during the fourth quarter in accordance with the metrics recently approved by the compensation committee.  Approval of this relief will incentivize and reward the core leadership team to continue in their efforts to achieve financial and operational metrics that drive value for the entire enterprise and are necessary to a successful restructuring.

KE 38100451
PHIL1 4984016v.1

### A.     The Participants

24.     The participants include the four senior-most officers of the Debtors, including the CEO, the chief operating officer, the chief financial officer, and the general counsel.  As noted above, the Debtors request authority to pay only earned third quarter compensation to the CEO.

25.     These officers are "insiders" as defined in section 101(31) of the Bankruptcy Code and generally direct overall strategy and direction of the Debtors' enterprise as a whole. For example, these officers have played a critical role in determining which of the Debtors' assets are "core" (i.e., capable of supporting long-term and sustainable drilling programs with acceptable returns) and which are "non-core" (i.e., assets that do not integrate well with the rest of the asset profile).  (*See* Cook Decl. ¶¶ 64–65.)  Similarly, the Debtors' leadership has identified "upside assets," which have reasonable resource potential, but require further exploration and development.  (*Id.*)

26.     In addition, each of the participants has been intimately involved in managing the Debtors' business and restructuring efforts to date.  The Performance Award Program was intended to stimulate that involvement and drive the successful performance of the Debtors' business.  And the impending departure of the Debtors' CEO only highlights the need to approve third quarter payments and continue the Performance Award Program in the fourth quarter.

### B.     The Performance Metrics

27.     The Performance Award Program provides for the payment of incentive-based cash awards if the Debtors achieve certain financial and operational goals that have been set for each quarter during the second half of 2015.  The Performance Award Program utilizes two

11

equally-weighted metrics (the "Performance Metrics") each quarter to measure employee performance:

- for the third quarter:

    - "Total Production," which includes targets for the average daily production of oil and gas from wells, operated and non-operated, drilled both before and during each quarter, adjusted for any divestiture, as reported for financial statements; and

    - "Lease Operating Expenses," which includes pumper and supervision labor, allocated corporate overhead (per the Council of Petroleum Accountants Societies), utilities, fuel, saltwater disposal, surface and subsurface repairs and maintenance and supplies, compression, chemical treating, and other miscellaneous expenses. Lease Operating Expenses do not include marketing, transportation and/or processing expenses, stock-based compensation, or production and ad valorem taxes.

- for the fourth quarter:

    - Total Production; and

    - "Total Operating Expense," (and together with the Lease Operating Expenses, the "Operating Expenses"), which includes Lease Operating Expenses and general and administrative costs ("G&A") that are incurred at a level above Lease Operating Expense. G&A includes employee compensation (including benefits and bonuses) and non-compensation corporate overhead items, such as professional fees (including non-restructuring accounting, consulting, and legal), rent, utilities, automobile and transportation, insurance, telecom, information technology (including hardware, software, and data), office supplies, dues and subscriptions, franchise and filing fees, charitable contributions, training, tuition, and other miscellaneous expenses. G&A excludes stock-based compensation, restructuring, nonrecurring and one-time charges, and assumes no capitalization of costs.

28.     The Performance Metrics are key indicators of the Debtors' operational performance. The Debtors track their performance against the Performance Metrics, among other financial and operational results, to gauge their business performance. Further, the Performance Metrics are designed to measure outcomes within management's control (as opposed to being so driven by commodity pricing as to be beyond the Debtors' control).

Accordingly, the Performance Metrics are well-suited to incentivize, measure, and reward employee performance.

29.     The Performance Metrics link payment of the performance awards to key performance levers (as noted above, levers which may be effectively driven by management, not merely commodity prices). These levers include production levels and management of operating expenses.     As such, the Performance Award Program is incentive-based, tying pay to achievement of near-term goals that are essential to the Debtors' restructuring efforts.

### C.     The Performance Targets

30.     Participants qualify for incentive payments if the Debtors achieve specified targets (the "Performance Targets") for each of the Performance Metrics. For the third quarter, the Debtors established a single target level of Performance Targets. For the fourth quarter, the Debtors established two levels of Performance Targets for each Performance Metric:  (a) a threshold performance level; and (b) a target performance level.

31.     The Debtors crafted the target performance level for each Performance Metric with consideration of their financial forecasts, completely separate from the compensation process. For the third quarter, 100 percent of the target payout level was earned because the single target outcome was achieved (the insiders would not have been paid for below-target performance).

32.     For the fourth quarter, threshold and target performance levels are set to a range of 90 to 100 percent of the target for Total Production, and a range of 85 to 100 percent of the target for Total Operating Expense (with the respective ranges based on each metrics' underlying variability and volatility). Awards are calculated based on the performance level achieved for each Performance Metric. Payout amounts for threshold and target performance outcomes are

13

set within a range of 50 to 100 percent of the target payout levels.[5]  No Performance Award will be paid if the Debtors fail to achieve the threshold performance level for applicable metrics during the fourth quarter.  Performance for the fourth quarter is assessed over the period of October 1, 2015 through December 31, 2015.

33.     The Performance Metrics, Performance Targets for each metric, and associated payout levels are summarized below:

| Third Quarter 2015 | | | |
|---|---|---|---|
| Performance Metric | Performance Target (Annual in $000's) | | Earned Payout (% of Target Quarterly Incentive Amount Earned) |
| | Target (Also Serves as Threshold) | | Target (Also Serves as Threshold) |
| Total Production | 425 Mmcfe/d | | 100% |
| Lease Operating Expense | $42,300 | | 100% |
| Fourth Quarter 2015 | | | |
| Performance Metric | Performance Target (Annual in $000's) | | Payout Potential (% of Target Quarterly Incentive Amount Earned) |
| | Threshold | Target | Threshold | Target |
| Total Production | 357 Mmcfe/d | 396 Mmcfe/d | 50% | 100% |
| Total Operating Expense | $71,760 | $62,400 | 50% | 100% |

34.     For the third quarter, the aggregate cost of the Performance Award Program is approximately $2.1 million at the target pay-out level.  For the fourth quarter, the aggregate cost

---

[5]     If performance falls between the threshold and target performance levels, the award payouts will be interpolated on a straight-line basis.  Performance Award participants must reach the target performance level to receive the entire payout; otherwise, payouts are reduced on a prorated basis.

KE 38100451
PHIL1 4984016v.1

of the Performance Award Program is approximately $565,000 at the threshold pay-out levels and $1.1 million at target pay-out levels.

### D.    Necessity of the Performance Award Program

35.    The Debtors' need to incentivize insider members of their management team is crucial.  Dramatic declines in oil and natural gas prices have challenged the Debtors' ability to achieve favorable results, highlighting the significance of management's operational decisions. With drilling suspended, the Debtors rely heavily on their ability to drive performance from current active operations.  The Debtors have little room for error as they cannot fall back on growth from new operations.

36.    In addition to running the Debtors' day-to-day affairs, the participants have been, and continue to be, actively involved in all restructuring initiatives.  The participants have seen a substantial increase in their workloads in recent months, without any concomitant increase in their compensation.  Following the departure of the CEO, the remaining insiders will again see their workload increase, and it will be essential to incentivize performance.  It will be important to maintain operations to ensure the possibility of a going concern restructuring.  Providing incentive opportunities, such as those contemplated by the Performance Award Program, will enable the Debtors not only to achieve, but possibly to exceed, their near-term operational goals.

37.    The Performance Award Program is reasonable and well within the Debtors' business judgment.  The Performance Award Program provides market-based bonuses to the Debtors' management if—and only if—the Debtors achieve challenging financial and operational targets that will generate substantial value for the Debtors' constituencies, particularly their creditors.

KE 38100451
PHIL1 4984016v.1

38.    Moreover, as discussed below, failure to continue the Performance Award Program will result in total compensation opportunities for the participants that are significantly below market and would leave the Debtors vulnerable to more departures, causing substantial disruption to the Debtors' operations.  Properly incentivizing, compensating and rewarding the Debtors' remaining leadership team at this critical juncture is in the best interests of the Debtors, the Debtors' estates, and all parties in interest.

<u>Basis for Relief</u>

**I.    Implementing the Performance Award Program Is an Exercise of the Debtors' Sound Business Judgment.**

39.    The Debtors' implementation of the Performance Award Program is a sound exercise of their business judgment and should be approved.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that debtors "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Under section 363(b), courts require only that the debtor "show that a sound business purpose justifies such actions."  *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted); *see also In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 WL 6090194, at *5 (Bankr. D. Del. Nov. 20, 2012) (noting that it is "well-settled" that a debtor may use its assets outside the ordinary course where such use "represents the sound exercise of business judgment"); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (stating that judicial approval under section 363 of the Bankruptcy Code requires a showing that the proposed action is fair and equitable, in good faith, and supported by a good business reason).  Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *In re Johns-Manville Corp.*, 60 B.R. 612, 616

(Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

40.    Implementing the Performance Award Program is a proper exercise of the Debtors' business judgment and is in the best interests of the Debtors, their estates, and all of their stakeholders.  The Performance Award Program, which has been developed by industry experts, is reasonable and appropriately tailored to incentivize management in a manner that will benefit all stakeholders.  There can be no serious dispute, however, that the Debtors have a grave and immediate business need to approve the Performance Award Program, that the program is a market response to that need, and that the program is the product of a diligent process undertaken by experienced professionals and an independent compensation committee.

41.    The insider members of the Debtors' leadership team possess the skills, knowledge, and experience that are critical to the Debtors' ability to generate value for their creditors through improved operations and decreased costs.  Moreover, it is clear that the Debtors' restructuring initiatives have placed additional demands on the insiders—demands that will only continue to increase with the impending departure of the Debtors' CEO.  These participants and their skills, expertise, and motivation are essential to the Debtors' ability to achieve a successful reorganization in these chapter 11 cases and will position the Debtors for future success.  It is therefore essential—and in the best interests of the Debtors and all stakeholders—that the participants receive competitive pay and are properly incentivized to achieve the Debtors' financial and operational objectives.  Towers Watson believes that the absence of an incentive opportunity for the participants significantly undermines the current

competitiveness of the Debtors' compensation programs, which could impact the Debtors' ability to motivate current management to achieve desired business objectives in these chapter 11 cases.

42.     By linking participants' increased compensation opportunities to critical financial and operational indicators for the Debtors' businesses, the Performance Award Program effectively aligns the interests of management with those of creditors.  Performance Award Program participants only earn awards if the Debtors meet the difficult-to-attain goals on the key performance measures of Production and Operating Expense metrics.  Achievement of these targets will result in enhanced value for the Debtors' estates and creditors.  Thus, the Performance Award Program is designed to "achieve the desired performance" to enhance value to all stakeholders.  *See In re Dana Corp.*, 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006) (approving incentive plan that required management to achieve superior operating results, particularly "in [a] difficult and rapidly deteriorating" industry).

43.     Not only will the Performance Award Program encourage achievement of value-driving performance goals, but the incentive structure and award levels of the Performance Award Program are reasonable in light of market practice in the E&P industry.  As detailed in the Friske Declaration, Towers Watson analyzed the Performance Award Program in two main ways—each of which demonstrates the reasonableness of the program.

44.     First, Towers Watson compared the Debtors' threshold and target compensation opportunities (reflecting base salary and the annualized value of Performance Award Program opportunities) to target compensation data for comparable roles using market data from two published surveys that focused exclusively on E&P firms and companies that operate more broadly in the energy industry.  The result of Towers Watson's analysis was that, without the Performance Award Program, the Debtors' senior management would be compensated well

18

below market competitive levels.  If the Court does not approve the Performance Award Program, the Debtors' leadership team would be left with their base salaries alone as their only form of direct compensation—placing them at 79 percent below the 25th percentile of the market, on average.  Such a scenario could significantly undermine the Debtors' ability to motivate their senior management to achieve desired business objectives.

45.     Towers Watson's analysis also confirmed the Debtors' need to continue the Performance Award Program to be able to offer competitive pay and incentives to its leadership team.  Indeed, even assuming that the Performance Award Program is approved and that the Debtors achieve all the target performance levels, total direct compensation for Performance Award participants would position them at 18 percent below the 25th percentile of the market target total direct compensation levels, on average, and 29 percent below the 50th percentile, on average.  And, there is no upside incentive potential above targeted levels in the Performance Award Program, whereas most, if not all, of the Debtors' peers have plans that provide for upside potential above targeted performance.  The Performance Award Program pay-out levels are more than reasonable in light of market practice.

46.     Second, Towers Watson compared the general structure of the Performance Award Program with incentive plans offered by a comparable group of industry peers which were historically used by the Debtors to determine market pay practices.   Towers Watson found that the general structure of the Performance Award Program aligned with those of the Debtors' peers.  For example, each peer company used multiple metrics within their incentive programs, with 90 percent of all the peer companies using production as a metric and 75 percent using expense or cost containment metrics.  Additionally, the median range of the peer companies' payouts relative to the target amounts was 50 percent for threshold performance and 200 percent

for maximum performance, which provides for a greater upside opportunity than contemplated under the Debtors' Performance Award Program.

47.    Moreover, and importantly, participants can earn payments if—and only if—the Debtors meet objective, value-maximizing performance-based metrics.  Courts routinely approve employee incentive programs like the Performance Award Program that incentivize management to achieve financial and other performance targets to maximize value for a debtor's estate at a reasonable cost—a win for all stakeholders.  *See, e.g.*, *In re Global Home Prods. LLC*, 369 B.R. 778, 784 (Bankr. D. Del. 2007) ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment." (internal citation omitted))*; see also In re Energy Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr. D. Del. Oct. 28, 2014) (approving debtors' key employee incentive plan); *In re Longview Power, LLC*, No. 13-12211 (BLS) (Bankr. D. Del. Dec. 18, 2013) (same); *In re IPC Int'l Corp.*, No. 13-12050 (MFW) (Bankr. D. Del. Sept. 3, 2013) (approving debtors' key employee incentive plan); *In re Synagro Techs., Inc.*, No. 13-11041 (BLS) (Bankr. D. Del. May 13, 2013) (same); *In re Prommis Holdings*, No. 13-10551 (BLS) (Bankr. D. Del. Apr. 16, 2013) (same).

## II.    The Performance Award Program Satisfies the Requirements of Section 503(c) of the Bankruptcy Code.

48.    The Performance Award Program is permissible under section 503(c) of the Bankruptcy Code.  Section 503(c)(1) of the Bankruptcy Code restricts payments made to "insiders of the debtor for the purpose of inducing such person to remain with the debtor's business"—i.e., those insider plans that are essentially "pay to stay" plans.  *See, e.g.*, *Velo Holdings*, 472 B.R. at 209 (finding that an incentive-based plan alleviated the need for a section 503(c)(1) analysis); *Borders Grp.*, 453 B.R. at 471 (finding that "the Debtors [had] met their burden of establishing that the [compensation program was] incentivizing, thereby alleviating the

need for a section 503(c)(1) analysis") (quoting *Dana Corp.*, 358 B.R. at 584); *In re Velo*

*Holdings, Inc.*, No. 12-11384 (MG), 2012 WL 2015870, at *6 (Bankr. S.D.N.Y. June 6, 2012)

(finding that an incentive-based plan alleviated the need for a section 503(c)(1) analysis);

*Borders Grp.*, 453 B.R. at 471 (finding that "the Debtors [had] met their burden of establishing

that the KEIP [was] incentivizing, thereby alleviating the need for a section 503(c)(1) analysis");

*Dana Corp.*, 358 B.R. at 584 (concluding that sections 503(c)(1) and 503(c)(2) did not apply to

incentive plans); *In re Nobex Corp.*, No. 05-20050 (CSS) (Bankr. D. Del.), Hr'g Tr. 67, Jan. 12,

2006 (explaining that section 503(c)(1) does not apply to incentive programs).

49.    The Debtors recognize that the participants are insiders.  Because the Performance

Award Program is primarily incentivizing, however, section 503(c)(1) of the Bankruptcy Code

does not apply.  Moreover, consistent with section 503(c)(3) of the Bankruptcy Code, the

Performance Award Program is "justified by the facts and circumstances" of these chapter 11

cases and should be approved.

 **A.**  **The Performance Award Program Is Permissible Under Section 503(c)(1) of the Bankruptcy Code.**

   **1.**  **The Performance Award Program Is Not a Retention-Based Plan.**

50.    The Performance Award Program is primarily incentivizing in nature and is not a

retention-based plan subject to section 503(c)(1) of the Bankruptcy Code.  Section 503(c)(1) of

the Bankruptcy Code imposes limitations solely with respect to Insider retention plans.  *See*

11 U.S.C. § 503(c)(1).  The provision does not apply to performance-based incentive plans.[6]

*See, e.g.*, *Velo Holdings*, 472 B.R. at 209 (finding that an incentive-based plan alleviated the

need for a section 503(c)(1) analysis); *Borders Grp.*, 453 B.R. at 471 (finding that "the Debtors

---

[6] Section 503(c)(2) of the Bankruptcy Code imposes limitations solely with respect to insider severance plans. That provision does not apply to the Performance Award Program.

[had] met their burden of establishing that the [compensation program was] incentivizing, thereby alleviating the need for a section 503(c)(1) analysis"). In determining whether an employee bonus plan is primarily incentivizing, courts consider whether the plan is "designed to motivate insiders to rise to a challenge or merely report to work." *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012).

51. While, as noted above, the Debtors are concerned with limiting any further management attrition, the Performance Award Program is primarily incentive-based. The program provides award opportunities if—and only if—the Debtors satisfy a series of objective operational and financial goals that require a strong performance from the participants for the benefit of all stakeholders. *Cf. In re Molycorp, Inc.*, Case No. 15-11357 (CSS), Hr'g Tr. 57–59, Oct. 2, 2015 (denying plan based on confirmation and operating report milestones that provided no objective way to measure concrete financial benefits). The Performance Award Program does not contain retention-based components, as participants are not paid merely for maintaining their employment for a certain time period.

### 2. The Performance Targets Were Developed with the Assistance of the Debtors' Advisors.

52. The Performance Targets are difficult to attain. The Debtors crafted the benchmarks for each Performance Metric with consideration of their financial forecasts. The third-quarter performance targets were set in June 2015 using financial projections that were developed over the course of several months by the Debtors, in consultation with A&M, through an iterative, ground-up process involving multiple rounds of management input, review, and calibration. The fourth-quarter performance targets were also based on projections that were developed over the course of several months by the Debtors, in consultation with A&M; these projections were updated as late as September 2015 to reflect the then current view of

22

management regarding the future operating state of the company.  From there, the Debtors refined each of the performance targets, ensuring that each threshold or target provided an appropriately challenging goal.  These targets—which are especially challenging in an industry as complicated and volatile as the E&P sector—were then incorporated directly into the Performance Award Program.  The Debtors' management and advisors rigorously considered and examined these targets.  The compensation committee, which does not include any Performance Award Program participants, similarly scrutinized the metrics and targets each quarter before ultimately approving them.

53.    The Debtors also called upon Dean Swick and his A&M team to perform an independent assessment of the reasonableness of the third-quarter Performance Targets to determine whether they were, in fact, incentivizing.  Mr. Swick has considerable experience advising companies in a variety of sectors and situations, developing business plans, and evaluating compensation packages for management teams of distressed businesses involving in-court and out-of-court scenarios.  Mr. Swick "stress-tested" the Debtors' Performance Targets and verified that they are goals that will require the participant's best efforts—not easy-to-achieve milestones—and align the interests of the Debtors' management team with those of creditors.

### 3.    The Performance Targets Are Incentivizing and Subject to Uncertainty.

54.    While the Performance Metrics are designed to be within the control of the insider team, each of the Performance Targets in the Performance Award Program represents a challenging—and meaningful—performance goal.  The Performance Metrics are also subject to considerable uncertainty as the Debtors face a number of risks that might affect operations and profitability.

KE 38100451
PHIL1 4984016v.1

55.     First, to achieve the Total Production target, the Debtors' management will need to proactively manage production levels.  Attaining these goals will not be easy.  For example, the participants will need to respond to, amongst other things, expected well down time due to normal well, machinery, mechanical, field-personnel, processing, vendor, transportation, and/or weather-related issues to be able to achieve the target production levels for the Performance Award Program.

56.     Second, meeting the Operating Expense targets will require precise execution on a significant cost-reduction plan, which will reduce costs across a range of Operating Expense outputs, including Lease Operating Expense and G&A.  The success of such reductions will depend on various factors, including management's ability to retain the services of existing vendors, successfully control Operating Expenses and Total Production, and efficiently deploy resources under these challenging conditions.

57.     Given the above risks, in conjunction with other challenges, the Performance Targets will require the Performance Award participants to achieve optimal performance by balancing various interconnected inputs that affect the Debtors' businesses.  In short, the Performance Targets challenge the Debtors' leadership team to perform at the highest levels. Because participants will receive payments under the Performance Award Program only upon the achievement of challenging, value-maximizing Performance Targets, this program is no different in kind than a host of similar incentive-based compensation programs that bankruptcy courts in this district and others have consistently approved.  *See, e.g.*, *Dana Corp.*, 358 B.R. at 584 (approving management incentive plan); *see also Energy Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr. D. Del. Oct. 28, 2014) (approving key employee incentive plan based on financial and operational metrics); *In re The Great Atl. & Pac. Tea Co.*, No. 10-24549 (RDD)

(Bankr. S.D.N.Y. May 2, 2011) (approving key employee incentive plan based on financial performance); *In re Neff Corp.*, No. 10-12610 (SCC) (Bankr. S.D.N.Y. June 30, 2010) (Dkt. 211) (approving key employee incentive plan based in part on financial performance); *In re Muzak Holdings LLC.*, No. 09-10422 (KJC) (Bankr. D. Del. Apr. 16, 2009) (Dkt. 239) (same); *In re WCI Cmtys., Inc.*, No. 08-11643 (KJC) (Bankr. D. Del. Feb. 4, 2009) (approving incentive plan based in part on financial performance); *In re Riverstone Networks, Inc.*, No. 06-10110 (CSS) (Bankr. D. Del. Mar. 28, 2006) (approving employee bonus program for successful completion of individual and company performance goals).  The Performance Award Program, like those before it, should be approved.

**B.    The Performance Award Program Satisfies the Requirements of Section 503(c)(3) of the Bankruptcy Code.**

58.    The Debtors believe that the Performance Award Program constitutes an exercise of the Debtors' business judgment.  *See* ¶¶ 39-47, *supra*.  Pursuant to section 503(c)(3) of the Bankruptcy Code, the Debtors need show only that approval of the programs is justified by the facts and circumstances of these chapter 11 cases.  This standard is essentially the same as the business judgment standard that is applied under section 363(b) of the Bankruptcy Code.  *See Velo Holdings*, 472 B.R. at 212 ("Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."); *Dana Corp.*, 358 B.R. at 576; *Global Home Prods.*, 369 B.R. at 783 ("If [the proposed plans are] intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363."); *In re Mesa Air Grp.*, No. 10-10018, 2010 WL

3810899, at *4 (Bankr. S.D.N.Y. Sept. 24, 2010); *In re Nobex Corp.*, No. 05-20050, 2006 WL 4063024, at *2 (Bankr. D. Del. Jan. 19, 2006).[7]

59.      In determining whether a compensation plan satisfies the justified-by-the-facts standard under section 503(c)(3) of the Bankruptcy Code, courts consider several factors, including:  (a) whether the plan is calculated to achieve the desired performance; (b) whether the cost of the plan is reasonable in the context of a debtor's assets, liabilities, and earning potential; (c) whether the scope of the plan is fair and reasonable or discriminates unfairly among employees; (d) whether the plan is consistent with industry standards; (e) whether the debtor performed due diligence in investigating the need for the plan; and (f) whether the debtor received independent counsel in performing due diligence, creating, and authorizing the plan. *See Global Home Prods.*, 369 B.R. at 786; *Dana Corp.*, 358 B.R. at 576–77.  Each of these factors favors approval of the Performance Award Program in this case.

60.      ***The Performance Award Program Is Calculated to Achieve the Desired Performance***.  The Performance Award Program incentivizes the Debtors' leadership team to achieve value-driving operational and financial objectives necessary to maximize value for stakeholders in a very challenging scenario of uncertain commodity prices and reduced capital for investment in a capital intensive, depleting asset business.  Payments under the Performance Award Program are directly tied to Total Production and Operating Expense—objectives which were developed to encourage and reward exceptional performance with compensation that is competitive with the E&P market.  Following the departure of the Debtors' CEO, the burden of

---

[7]      Although the Debtors believe that the business judgment rule applies to the "facts and circumstances" test of section 503(c)(3), some courts have applied a slightly higher bar.  *See In re Pilgrim's Pride Corp.*, 401 B.R. 229, 236–37 (Bankr. N.D. Tex. 2009) (finding that a proposed transfer was in the best interests of creditors and the debtors' estates in addition to the business judgment standard).  Even if this Court were to consider these additional factors, however, the Debtors have met this standard because the Performance Award Program contains value-driving operational and financial objectives designed to maximize value for the benefit of all creditors and the Debtors' estates.

achieving these objectives will fall on the shoulders of the remaining insiders, making it even more critical that they drive performance and remain incentivized to do so.  This program is calibrated to attain results that will benefit the Debtors' estates and all stakeholders.

61.    *The Cost of the Performance Award Program Is Reasonable*.  The Performance Award Program will cost less than $2.2 million for the third quarter and approximately $1.1 million for the fourth quarter at target pay-out levels.  These costs are reasonable in the context of the Debtors' assets, liabilities, and earning potential.  Indeed, the Debtors' target total direct compensation, reflecting the sum of current base salaries and target annualized Performance Award Program opportunities, would be positioned 18 percent below the 25th percentile of the market target total direct compensation levels, on average, and 29 percent below the 50th percentile, on average.  The maximum cost of the Performance Award Program is far outweighed by the estimated incremental cash flow if the target performance levels are met.

62.    *The Scope of the Performance Award Program Is Fair and Reasonable*.  The scope of the Performance Award Program is fair, reasonable, and does not discriminate unfairly among employees.  The Performance Award Program includes only those insider employees who contribute to and direct significant aspects of the Debtors' restructuring efforts and operational performance—onerous tasks in light of the current energy market.  Furthermore, the Debtors other approximately 600 employees participate in compensation programs for which the Debtors have already sought Court approval.

63.    *The Performance Award Program Is Consistent with Industry Standards*.  The Debtors' compensation advisors at Towers Watson, including Mr. Doug Friske, worked with the Debtors' management and other advisors to ensure that the Performance Award Program is similar in structure, number, and scope to those of other companies in the energy industry.  In

conducting their analysis, Mr. Friske and his team reviewed a reasonable number of compensation programs offered by a comparable group of industry peers which were used historically by the Debtors to determine market pay practices, as well as compensation programs implemented by chapter 11 debtors in the broader energy industry.   The Performance Award Program, like other programs in the energy industry, relies heavily on performance metrics like Total Production and Operating Expense.   In addition, the insiders' proposed total compensation will be, at maximum, only approximately 18 percent below the bottom quartile of market compensation, on average.   Based on this data, Mr. Friske concluded that the design, structure, and award opportunities available under the Performance Award Program are reasonable and consistent with industry standards.

64.    ***The Debtors Performed Due Diligence in Developing the Performance Award Program***.   The Debtors actively sought the advice of their advisors and industry experts in assessing the Performance Award Program.   The compensation committee reviewed and evaluated the Performance Award Program and its metrics based on the input of the Debtors' management and independent advisors.   As a result of these efforts, the Debtors concluded that: (a) it was critical to continue the Performance Award Program (with certain refinements) to ensure the competitiveness of the Debtors' compensation practices; (b) the Performance Award Program is reasonable and consistent with market practice and industry standards; and (c) the Performance Award Program is appropriately tailored to incentivize financial and operational outperformance by the Debtors' leadership team and retain other key employees, thus positioning the Debtors for long-term success.

65.    ***The Debtors Developed the Performance Award Program Based on Independent Advice and Oversight***.   The Debtors received independent counsel from their

advisors and industry experts in benchmarking and evaluating the Performance Program, including regarding the participation in each program, the financial and operational targets, and the pay-out levels available to the participants.  The compensation committee, which includes three disinterested board members with substantial industry experience, evaluated the Performance Award Programs before ultimately approving the program in March 2015 and set the metrics and targets for each quarter.

66.    For these reasons, the Debtors respectfully submit that continuing the Performance Award Program is a proper exercise of the Debtors' business judgment, is justified by the facts and circumstances of these chapter 11 cases, and satisfy the requirements of section 503(c)(3) of the Bankruptcy Code.  The Performance Award Program will incentivize the participants to achieve the financial and operational results needed to successfully steer the Debtors through these chapter 11 cases and maximize value for the benefit the Debtors' stakeholders.  Accordingly, the Debtors respectfully request that the Court issue an order approving and authorizing the Debtors to continue the Performance Award Program.

### Reservation of Rights

67.    Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.  The Debtors expressly reserve their right to contest any claim related to the relief sought herein.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

KE 38100451
PHIL1 4984016v.1

## **Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

68.      To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **Notice**

69.      The Debtors will provide notice of this motion to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the Committee; (c) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (d) the agent under the Debtors' first lien credit facility; (e) counsel to the agent under the Debtors' first lien credit facility; (f) the agent under the Debtors' second lien credit facility; (g) counsel to the agent under the Debtors' second lien credit facility; (h) the indenture trustee under the Debtors' 9.75% senior notes due 2020; (i) counsel to certain majority holders of the existing common stock of the Debtors; (j) holders of the existing preferred stock of the Debtors; (k) counsel to holders of the existing preferred stock of the Debtors; (l) the United States Attorney's Office for the District of Delaware; (m) the Internal Revenue Service; (n) the United States Securities and Exchange Commission; (o) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (p) the state attorneys general for states in which the Debtors conduct business; and (q) those parties requesting notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

70.      No prior request for the relief sought in this motion has been made to this or any other court.

KE 38100451
PHIL1 4984016v.1

WHEREFORE, the Debtors respectfully request entry of an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other relief as is just and proper.

Dated: October 29, 2015
Wilmington, Delaware

*/s/ Michael W. Yurkewicz*

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (Del. Bar No. 4165)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:     (302) 426-1189
Facsimile:     (302) 426-9193

-and -

Morton Branzburg (admitted *pro hac vice*)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:     (215) 569-2700
Facsimile:     (215) 568-6603

-and-

Paul M. Basta, P.C. (admitted *pro hac vice*)
Edward O. Sassower, P.C. (admitted *pro hac vice*)
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Ryan J. Dattilo (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet (admitted *pro hac vice*)
Brad Weiland (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

32