**<u>EXHIBIT A</u>**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| SAMSON RESOURCES CORPORATION, *et al.*,[1] | ) Case No. 15-11934 (CSS) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |
|  | ) **Re: Docket Nos. 22, 111** |

**SECOND INTERIM ORDER (I) AUTHORIZING POSTPETITION**
**USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION**
**TO THE PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 105,**
**361, 362, 363, AND 507, BANKRUPTCY RULES 2002, 4001, AND 9014, AND LOCAL**
**BANKRUPTCY RULE 4001-2, (III) SCHEDULING A FINAL HEARING PURSUANT**
**TO BANKRUPTCY RULE 4001(B), AND (IV) GRANTING RELATED RELIEF**

Upon the motion dated September 17, 2015 (the "<u>Motion</u>") of the above-captioned

debtors, as debtors in possession (collectively, the "<u>Debtors</u>"), pursuant to sections 105, 361,

362, 363, and 507 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), rules 2002,

4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and

rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), for the Debtors, *inter alia*:

 (a) to use the cash collateral, as such term is defined in section 363(a) of the
Bankruptcy Code ("<u>Cash Collateral</u>") of (i) JPMorgan Chase Bank, National Association,
as administrative agent (the "<u>First Lien Agent</u>") for the lenders (the "<u>First Lien Lenders</u>")
party to the First Lien Credit Agreement (as defined below), as well as the Hedge Banks
and Letter of Credit Issuers thereunder (each as defined in the First Lien Credit
Agreement, and together with the First Lien Agent and the First Lien Lenders, the "<u>First
Lien Secured Parties</u>"); and (ii) Deutsche Bank Trust Company Americas, as successor

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, include:  Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour
Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson
Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and
Samson Resources Corporation (1227).  The location of parent Debtor Samson Resources Corporation's
corporate headquarters and the Debtors' service address is:  Two West Second Street, Tulsa, Oklahoma 74103.

administrative and collateral agent (the "Second Lien Agent" and, together with the First Lien Agent, the "Prepetition Agents") for the lenders (the "Second Lien Lenders" and, together with the Second Lien Agent, the "Second Lien Secured Parties"; and the First Lien Secured Parties and the Second Lien Secured Parties collectively, the "Prepetition Secured Parties") party to the Second Lien Credit Agreement (as defined below), pursuant to section 363(c) of the Bankruptcy Code, on an interim basis and upon the terms and conditions set forth in this order (the "Second Interim Order") during the period following the date of commencement of these Chapter 11 Cases (as defined herein) and pending the Final Hearing referred to below;

(b) to provide adequate protection to the Prepetition Agents and the Prepetition Secured Parties pursuant to sections 361 and 363(e) of the Bankruptcy Code, of the Prepetition Secured Parties' interests in the Prepetition Collateral (defined below) for such interim use;

(c) to modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Second Interim Order and the Final Order (as defined below);

(d) subject solely to entry of the Final Order (as defined below), authorization to grant adequate protection liens on the proceeds and property recovered in respect of the Debtors' claims and causes of action (but not on the actual claims and causes of action) arising under sections 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code or any other state or federal law (collectively, the "Avoidance Actions");

(e) subject solely to entry of the Final Order, and except to the extent of the Carve Out (as defined below), the waiver by the Debtors of any right to surcharge against the Prepetition Collateral or the Adequate Protection Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code or any other applicable principle of equity or law, as identified pursuant to Local Rule 4001-2(a)(i)(C); and

(f) requesting that a final hearing (the "Final Hearing") be scheduled by the Court to consider entry of a final order (the "Final Order") authorizing on a final basis, *inter alia*, the use of Cash Collateral and the provision of adequate protection of the Prepetition Agents and the Prepetition Secured Parties' interests in the Prepetition Collateral;

notice of the Motion under the circumstances having been given, the Court having conducted a preliminary hearing on the Motion (the "Preliminary Hearing"), at which time the Debtors presented, among other things, the *Declaration of Philip Cook in Support of Chapter 11 Petitions and First Day Pleadings*, (the "First Day Declaration"); and the Court having entered the *Interim Order (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to*

2

*the Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 507, Bankruptcy Rules 2002, 4001, and 9014, and Local Bankruptcy Rule 4001-2, (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(B), and (IV) Granting Related Relief* [Docket No. 111] (the "Interim Order"); the evidence adduced by the parties, and the representations of counsel, and upon the entire record made at the Preliminary Hearing; and it appearing to the Court that granting the relief sought in the Motion, as modified on the record and on the terms and conditions contained herein, is necessary and essential to enable the Debtors to preserve the value of their businesses and assets and to prevent immediate and irreparable harm to the Debtors' estates and to facilitate the reorganization of the Debtors' businesses and that such relief is fair and reasonable.  Accordingly, the Court hereby finds and determines as follows:

A.      This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 1334 and 157. Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. §§ 157(b)(2).  Venue for the Chapter 11 Cases (as defined herein) and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      On September 16, 2015 (the "Petition Date"), Samson Investment Company ("Samson") and each of the other Debtors filed a voluntary petition for relief with this Court under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").  The Chapter 11 Cases are being jointly administered under Case No. 15-11934.

C.      The Debtors are continuing in possession of their property and are operating and managing their businesses as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

3

D.     On September 30, 2015, the United States Trustee appointed an official committee of unsecured creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code.  No other committee has been appointed in the Chapter 11 Cases.

E.     Without prejudice to the rights of any other party-in-interest in the Chapter 11 Cases (but subject to the limitations with respect to such rights contained in paragraphs 22 and 23 of this Second Interim Order), the Debtors (i) acknowledge, (ii) admit, (iii) agree and (iv) stipulate (which stipulations are not findings of the Bankruptcy Court) that:

1.     The First Lien Agent, the First Lien Lenders and Samson are parties to that certain Credit Agreement, dated as of December 21, 2011 (as amended, restated, supplemented or otherwise modified prior to the commencement of these Chapter 11 Cases, the "First Lien Credit Agreement").  Pursuant to that certain Guarantee dated as of December 21, 2011 (the "First Lien Guarantee Agreement"), each of the Debtors other than Samson have guaranteed the obligations of Samson pursuant to the First Lien Credit Agreement.  Pursuant to, *inter alia*, that certain Security Agreement, dated as of December 21, 2011, and that certain Pledge Agreement, dated as of December 21, 2011 (together with all other mortgages, deeds of trust, pledge agreements, or similar security documents entered into by any loan party and the First Lien Agent in respect of the properties owned by such loan party and all other documentation executed in connection with any of the foregoing, each as amended, restated, supplemented or otherwise modified from time to time, the "First Lien Collateral Agreements"), the Debtors have granted a first-priority lien and security interests (the "Prepetition First Liens") in, to, and against substantially all of the real and personal property described in the First Lien Collateral Agreements, including, without limitation, the cash and noncash proceeds and other rights arising from all prepetition collateral, including any cash held by the Debtors that constitutes Cash Collateral (collectively, the "Prepetition Collateral"), to the First Lien Agent and the First Lien Secured Parties (the First Lien Credit Agreement, the First Lien Guarantee Agreement, the First Lien Collateral Agreements, the Hedge Agreements, the Letter of Credit documentation and any other collateral and ancillary documents executed in connection therewith, collectively, the "First Lien Loan Documents").  Pursuant to the First Lien Loan Documents, the Debtors are jointly and severally indebted and liable to the First Lien Secured Parties for all loans, letter of credit obligations, hedging obligations, and other obligations described therein and payable thereunder (the "First Lien Indebtedness").

2.     In accordance with the terms of the First Lien Credit Agreement, in addition to other amounts owed by Samson in accordance with the terms thereof, certain Hedge Banks entered into Hedge Agreements (as defined in the First Lien Credit Agreement) with Samson pursuant to which Samson is obligated to such Hedge Banks for the Hedging Obligations (as defined in the First Lien Credit Agreement).

4

3.      The Second Lien Agent, the Second Lien Lenders and Samson are parties to that certain Second Lien Term Loan Credit Agreement, dated as of September 25, 2012 (as amended, supplemented or otherwise modified prior to the commencement of these Chapter 11 Cases, the "Second Lien Credit Agreement").  Pursuant to that certain Second Lien Guarantee dated as of September 25, 2012 (the "Second Lien Guarantee Agreement"), each of the Debtors other than Samson have guaranteed the obligations of Samson pursuant to the Second Lien Credit Agreement.  Pursuant to, *inter alia*, that certain Second Priority Security Agreement, dated as of September 25, 2012, and that certain Second Priority Pledge Agreement, dated as of September 25, 2012 (together with all other mortgages, deeds of trust, pledge agreements, or similar security documents entered into by any loan party and the Second Lien Agent in respect of the properties owned by such loan party and all other documentation executed in connection with any of the foregoing, each as amended, restated, supplemented or otherwise modified from time to time, the "Second Lien Collateral Agreements"), the Debtors have granted a second-priority lien and security interests (the "Prepetition Second Liens") in, to, and against the Prepetition Collateral, subject in each case to the Intercreditor Agreement (as defined herein), to the Second Lien Agent for the benefit of the Second Lien Secured Parties (the Second Lien Credit Agreement, the Second Lien Guarantee Agreement, the Second Lien Collateral Agreements and any collateral and ancillary documents executed in connection therewith, collectively, the "Second Lien Loan Documents" and, collectively with the First Lien Loan Documents, the "Prepetition Loan Documents").  Pursuant to the Second Lien Loan Documents, the Debtors are jointly and severally indebted and liable to the Second Lien Agent and Second Lien Secured Parties for all loans and other obligations described therein and payable thereunder (the "Second Lien Indebtedness" and, together with the First Lien Indebtedness, the "Prepetition Indebtedness").

4.      Pursuant to that certain Second Lien Intercreditor Agreement, dated as of September 25, 2012, by and among Samson, the other Grantors listed on Annex I thereto, the First Lien Agent and the Second Lien Agent (as amended, restated or otherwise modified from time to time, the "Intercreditor Agreement"), the Prepetition First Liens have priority over and are senior in all respects to the Prepetition Second Liens.

5.      In accordance with the terms of the First Lien Loan Documents, all amounts payable thereunder are now fully due and payable by the Debtors.  The Debtors are each jointly and severally indebted and liable to the First Lien Agent and the First Lien Secured Parties for such amounts without defense, counterclaim or offset of any kind.  As of the Petition Date, the Debtors were indebted and liable to the First Lien Agent and the First Lien Secured Parties without defense, counterclaim or offset of any kind, for all of the First Lien Indebtedness, comprised of the Loans (as defined in the First Lien Credit Agreement) made by the First Lien Lenders in the aggregate principal amount of not less than $941,594,586.37 under the First Lien Credit Agreement and not less than $1,956,369.00 in face amount of undrawn Letters of Credit issued by the Letter of Credit Issuer (each as defined in the First Lien Credit Agreement) plus accrued and unpaid interest, indemnification obligations, obligations arising under the Hedge Agreements, obligations arising under the Secured Cash Management Agreements (as defined in the First Lien Credit Agreement), and fees and expenses (including, without limitation, the reasonable and documented fees and expenses of the First Lien Agent's

5

attorneys, consultants, accountants, experts and financial advisors) and other obligations incurred in connection therewith, in each case in accordance with the terms of the First Lien Loan Documents. Each of the First Lien Loan Documents is valid, binding, and subject to applicable bankruptcy law, enforceable against the Debtors in accordance with its terms.

6.      Pursuant to the First Lien Loan Documents, the First Lien Indebtedness is secured by valid, perfected, enforceable, non-avoidable, first-priority liens and security interests in, to and against the Prepetition Collateral, and there exists no basis upon which the Debtors can properly challenge or avoid the validity, enforceability, priority or perfection of the First Lien Indebtedness or the Prepetition First Liens.

7.      In accordance with the terms of the Second Lien Loan Documents, all amounts payable thereunder are now fully due and payable by the Debtors. The Debtors are each jointly and severally indebted and liable to the Second Lien Agent and the Second Lien Secured Parties for such amounts without defense, counterclaim or offset of any kind. As of the Petition Date, the Debtors were indebted and liable to the Second Lien Agent and the Second Lien Secured Parties, without defense, counterclaim or offset of any kind, for all of the Second Lien Indebtedness, comprised of the Loans (as defined in the Second Lien Credit Agreement) and other financial accommodations made by the Second Lien Secured Parties in the aggregate principal amount of not less than $1,000,000,000 under the Second Lien Credit Agreement plus accrued and unpaid interest, indemnification obligations, obligations arising under or in connection with any Cash Management Services (as defined in the Second Lien Credit Agreement), and fees and expenses (including, without limitation, the reasonable and documented fees and expenses of the Second Lien Agent's attorneys, consultants, accountants, experts and financial advisors) and other obligations incurred in connection therewith, in each case in accordance with the terms of under the Second Lien Loan Documents. Each of the Second Lien Loan Documents is valid, binding, and subject to applicable bankruptcy law, enforceable against the Debtors in accordance with its terms.

8.      Pursuant to the Second Lien Loan Documents, the Second Lien Indebtedness is secured by valid, perfected, enforceable, non-avoidable, second-priority liens and security interests in, to and against the Prepetition Collateral, and there exists no basis upon which the Debtors can properly challenge or avoid the validity, enforceability, priority or perfection of the Second Lien Indebtedness or the Prepetition Second Liens.

9.      All cash proceeds of the Prepetition Collateral, including all such cash proceeds of such Prepetition Collateral held in any of the Debtors' banking, checking or other deposit accounts with financial institutions (in each case, other than trust, escrow and custodial funds held as of the Petition Date in properly established trust, escrow and custodial accounts), are Cash Collateral of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code. Subject to the reservations of rights set forth in paragraph E of this Second Interim Order, all cash in the Debtors' bank accounts maintained at or controlled by the First Lien Agent as of the Petition Date or deposited into such accounts after the Petition Date constitutes Cash Collateral, and all

6

cash in the Debtors' bank accounts maintained at or controlled by any of the Prepetition Secured Parties are subject to valid rights of setoff of such entity.

10.　　The Debtors continue to collect cash, rents, income, offspring, products, proceeds and profits generated from the Prepetition Collateral and acquire equipment, inventory and other personal property, all of which constitute Prepetition Collateral under the First Lien Loan Documents and the Second Lien Loan Documents and are, accordingly, subject to the Prepetition Agents valid and perfected security interests.

F.　　The preservation, maintenance and enhancement of the value of the Debtors' assets are of the utmost significance and importance.  The Debtors lack sufficient available sources of working capital and financing, however, to carry on the operation of their businesses without the use of Cash Collateral.  Moreover, the Debtors' need to use Cash Collateral is immediate; absent the ability to use Cash Collateral, the continued operation of the Debtors' businesses would not be possible and immediate and irreparable harm to the Debtors and their estates would be inevitable.

G.　　The Debtors desire to use a portion of such cash, rents, income, offspring, products, proceeds and profits in their business operations which constitute Cash Collateral of the (i) First Lien Agent and the First Lien Secured Parties and (ii) Second Lien Agent and Second Lien Secured Parties under section 363(a) of the Bankruptcy Code.  Certain prepetition rents, income, offspring, products, proceeds and profits, in existence as of the Petition Date, including balances of funds in the Debtors' prepetition and postpetition operating bank accounts, also constitute Cash Collateral.  Funds held solely for the benefit of Working Interest Holders or Mineral Payees (each as defined in the *Debtors' Motion for Entry of Interim and Final Orders Authorizing Payment of (I) Mineral Payments and (II) Working Interest Disbursements* [Docket No. 7]) in the Debtors' accounts do not constitute Cash Collateral, although nothing contained in this Second Interim Order shall be deemed to constitute a finding or determination as to the rights of any of the Debtors' estates, the First Lien Agent, the First Lien Secured Parties, the

7

Second Lien Agent, the Second Lien Secured Parties or any other party in interest with respect to such funds or interests therein.

H.     The First Lien Agent on behalf of the First Lien Secured Parties, as well as the Second Lien Agent on behalf of the Second Lien Secured Parties, have consented to the Debtors' use of the Cash Collateral exclusively on and subject to the terms and conditions set forth herein and for the limited duration of this Second Interim Order.

I.     The Preliminary Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and Local Rule 4001-2(b).  Notice of the requested relief sought at the Preliminary Hearing was provided by the Debtors to:  (i) the U.S. Trustee for the District of Delaware (the "U.S. Trustee"); (ii) the First Lien Agent; (iii) counsel to the First Lien Agent; (iv) the Second Lien Agent; (v) counsel to the Second Lien Agent; (vi) the indenture trustee under the Debtors' 9.75% senior notes due 2020 (the "Indenture Trustee"); (vii) counsel to the prepetition shareholders; and (viii) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis).  Sufficient and adequate notice of the Motion and the hearing thereon was provided pursuant to Bankruptcy Rules 2002, 4001(b) and (d), and 9006, as required by sections 361 and 363 of the Bankruptcy Code and Local Rule 4001-2.  Except as provided herein with respect to notice of the Final Hearing and Final Order, no further notice of, or hearing on, the relief sought in the Motion is necessary or required.

J.     Based on the record before the Court, it appears (and the Debtors, the First Lien Agent on behalf of the First Lien Secured Parties, and the Second Lien Agent on behalf of the Second Lien Secured Parties have stipulated) that the terms of this Second Interim Order, including, without limitation, as to the Debtors' use of Cash Collateral and the provision of adequate protection therefor, are fair and reasonable, reflect the Debtors' exercise of prudent

8

business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. The terms of this Second Interim Order were negotiated in good faith and at arm's length between the Debtors and the Prepetition Agents on behalf of their respective Prepetition Secured Parties.

K.    The permission granted herein to use Cash Collateral (and provide adequate protection therefor) is necessary, essential, and appropriate to avoid immediate and irreparable harm to the Debtors. The Court concludes that entry of this Second Interim Order is in the best interests of the Debtors' estates and creditors as its implementation will, among other things, allow the Debtors to preserve and maintain the value of their assets and businesses and enhance the Debtors' prospects for a successful reorganization.

Based upon the foregoing findings, stipulations and conclusions, and upon the record made before the Court at the Preliminary Hearing, and good and sufficient cause appearing therefor;

**NOW, THEREFORE, IT IS HEREBY ORDERED, ON AN INTERIM BASIS:**

1.    <u>Motion</u>. The Motion is granted, subject to the terms and conditions set forth in this Second Interim Order. The Debtors shall not use any Cash Collateral except as expressly authorized and permitted herein or by subsequent order of the Court. Any objections to the Motion with respect to the entry of this Second Interim Order that have not been withdrawn, waived, or resolved at the Preliminary Hearing, and (except as set forth herein) all reservations of rights included therein, are hereby denied and overruled.

2.    <u>Use of Cash Collateral</u>. Subject to the terms and conditions of this Second Interim Order, including the Carve Out (as defined herein), the Debtors are hereby authorized to use the Cash Collateral in accordance with the Interim Budget (as defined below) during the

9

period from the Petition Date through and including the Termination Date for (i) working capital, general corporate purposes and administrative costs and expenses of the Debtors incurred in the Chapter 11 Cases, including first-day related relief subject to the terms hereof; and (ii) adequate protection payments to the Prepetition Agents and the Prepetition Secured Parties, as provided herein.

3.    <u>Budget; Use of Collateral Proceeds</u>.

(a)    The Debtors are authorized, on an interim basis, to use Cash Collateral and pay expenses of the estate pursuant to the Interim Budget attached hereto as **Exhibit 1** (the "<u>Interim Budget</u>").  For each Interim Budget Period (as defined below), the aggregate actual expenditures by the Debtors for Total Disbursements (as designated in the Interim Budget) shall not in any event exceed the aggregate amount budgeted therefor in the Interim Budget for such period by more than ten percent (10%) of the budgeted amount, and the actual expenditures of the Debtors shall not, for each line item in the Interim Budget labeled Lease Operating Expense, CapEx, Payroll & Benefits, and Bonus & Incentives, exceed the amount budgeted for such line item in the Interim Budget for such period by more than fifteen percent (15%) of the budgeted amount (the "<u>Authorized Variance</u>").

(b)    In the event that an expense budgeted under the line items in the Interim Budget labeled Lease Operating Expense, CapEx, Payroll & Benefits, and Bonus & Incentives for payment during any particular week in the Interim Budget exceeds the amount actually paid in respect of such line item during such week (the difference between the budgeted amount and the amount actually paid, the "<u>Line Item Carry Forward Amount</u>"), the Debtors shall be authorized to use Cash Collateral in the Line Item Carry Forward Amount toward expenses of the same line item during any subsequent week within a four-week budgeted period thereafter (but solely to the extent that the amount actually paid during such subsequent week exceeds the amount budgeted).

(c)    The authorization granted herein is solely with respect to the use of Cash Collateral.  This Second Interim Order shall not be deemed to authorize payment of non-ordinary course budgeted expenses that otherwise require Court approval (e.g., professional fees of professionals employed under Section 327 of the Bankruptcy Code).

(d)    Unless otherwise agreed to in writing by the First Lien Agent and the Second Lien Agent, the Debtors shall maintain no accounts except (i) those identified in <u>Exhibit 2</u> to the order [Docket No. 87] (the "<u>Cash Management Order</u>") granting the *Debtors' Motion for Entry of Order Authorizing the Debtors to (I) Continue to Operate the Cash Management System, (II) Honor Certain Prepetition Obligations Related Thereto, (III) Maintain Existing Business Forms, and (IV) Continue to Perform Intercompany Transactions* [Docket No. 5] (the "<u>Cash Management Motion</u>") and

10

(ii) any new accounts opened pursuant to the authority provided by, and subject to the terms of, the Cash Management Order, and at all times, all accounts (other than those specifically identified, and solely for the limited purposes set forth, in the Cash Management Motion) shall be maintained throughout this case in depository accounts at the First Lien Agent bank.  The Debtors will issue checks on their own accounts for the purpose of paying any Court-authorized prepetition obligations included in the Interim Budget only if and when authorized by a further order of the Court, and only when due and otherwise properly payable and not otherwise addressed herein.

(e)    Neither the Prepetition Secured Parties' consent to the Interim Budget nor anything else herein shall be deemed or construed as agreement by the Prepetition Secured Parties to be surcharged under section 506(c) or any other provision of the Bankruptcy Code or equitable doctrine.

4.    <u>Entitlement to Adequate Protection</u>.  The Prepetition Agents and the Prepetition Secured Parties assert that they are entitled, pursuant to sections 361, 363(c)(2) and 363(e) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral (including but not limited to Cash Collateral), in an amount equal to the aggregate postpetition diminution in value of the applicable Prepetition Agent's or Prepetition Secured Party's interest in the Prepetition Collateral from and after the Petition Date.  Solely for purposes of this Second Interim Order, the Court finds that the Prepetition Secured Parties are entitled, pursuant to sections 361, 363(c)(2) and 363(e) of the Bankruptcy Code, to adequate protection of their interests in the Cash Collateral, in an amount equal to the aggregate postpetition diminution in value of the applicable Prepetition Agent's or Prepetition Secured Party's interest in the Cash Collateral from and after the Petition Date (such diminution in value, the "<u>Adequate Protection Obligations</u>").  The Court shall consider at the Final Hearing (or such later date as the Debtors and the Prepetition Agents may agree, subject to the Court's approval) whether the Prepetition Agents and the Prepetition Secured Parties are entitled to adequate protection of their interests in Prepetition Collateral that is not Cash Collateral (the "<u>Non-Cash Prepetition Collateral</u>") and whether, for purposes of the Court's consideration of this issue, any postpetition diminution in value of such interests in the Non-Cash Prepetition Collateral should be measured from the

11

Petition Date.  For the avoidance of doubt, cash generated from the sale or other disposition of Prepetition Collateral, including, without limitation, collection of accounts receivable, shall constitute Cash Collateral for purposes of this Second Interim Order.

5.    Adequate Protection.

*First Lien Agent and First Lien Secured Parties*:  As adequate protection, the First Lien Agent and the First Lien Secured Parties are hereby granted the following claims, liens, rights, and benefits:

(a)    Section 507(b) Claim.  The Adequate Protection Obligations due to the First Lien Agent and the First Lien Secured Parties (the "First Lien Adequate Protection Obligations") shall constitute allowed joint and several superpriority administrative claims against the Debtors as provided in section 507(b) of the Bankruptcy Code, with priority in payment over any and all unsecured claims and administrative expense claims against the Debtors, now existing or hereafter arising in the Chapter 11 Cases (subject and subordinate only to the Carve Out (as defined below)), including all claims of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 105, 326, 328, 330, 331, 503(b), 506(c) (solely to the extent permitted in the Final Order), 507(a), 507(b), 726, 1113 or 1114, and shall at all times be senior to the rights of the Debtors, and any successor trustee or any creditor, in the Chapter 11 Cases or any subsequent proceedings, including without limitation any Chapter 7 proceeding, under the Bankruptcy Code (the "First Lien 507(b) Claim"), which administrative claim shall have recourse to and be payable from all prepetition and postpetition property of the Debtors including, without limitation, and solely upon entry of the Final Order, the proceeds and property recovered in respect of any Avoidance Actions.

(b)    Adequate Protection Liens.  Effective as of the Petition Date, solely to the extent of the Adequate Protection Obligations, and in each case perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the First Lien Agent of any Adequate Protection Collateral (as defined below), the following security interests and liens are hereby granted as set forth herein to the First Lien Agent for the benefit of the First Lien Secured Parties (all property identified in clauses (i), (ii), (iii) and (iv) below being collectively referred to as the "Adequate Protection Collateral"), subject only to the Carve Out (as defined in paragraph 5(c) below) (all such liens and security interests, the "First Lien Adequate Protection Liens"):

(i)    First Priority on Unencumbered Property.  Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, and subject to entry of the Final Order (as requested by the Debtors and subject to the rights of all

12

other parties in interest to object and be heard at the Final Hearing), a valid, binding, continuing, enforceable, fully-perfected, non-voidable first priority lien and/or replacement lien on, and security interest in, all of the Debtors' now owned and hereafter acquired real and personal property, tangible and intangible assets, and rights of any kind or nature, wherever located, including, without limitation, all prepetition and postpetition assets of the Debtors' estates, and all products, proceeds, rents and profits thereof, whether existing on or as of the Petition Date or thereafter acquired, that is not subject to (x) valid, perfected, non-avoidable and enforceable liens in existence on or as of the Petition Date or (y) valid and unavoidable liens in existence for amounts outstanding as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code (collectively, the "Unencumbered Property"), including without limitation, oil and gas properties (including "Oil & Gas Properties" as defined in that certain form of deed of trust attached as Exhibit G to the First Lien Credit Agreement, and any as-extracted collateral, goods, fixtures and hydrocarbons), goods and other personal property, accounts receivable, other rights to payment, cash, inventory, general intangibles, contracts, servicing rights, swap and hedge proceeds and termination payments, servicing receivables, securities (including equity interests in all of the Debtors' wholly-owned subsidiaries), chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, claims and causes of action (including those arising under section 549 Bankruptcy Code), commercial tort claims, and the proceeds of all of the foregoing, *provided* that the Unencumbered Property shall not include the Avoidance Actions, but, upon the entry of the Final Order (as requested by the Debtors and subject to the rights of all other parties in interest to object and be heard at the Final Hearing), the Unencumbered Property shall include, and the First Lien Adequate Protection Liens shall attach to, any proceeds or property recovered in respect of any Avoidance Action;

(ii)     Liens Junior to Certain Existing Liens. Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected non-voidable junior priority replacement lien on, and security interest in, (A) the Prepetition Collateral, including Cash Collateral, (other than the property described in clause (i) or (iii) of this paragraph 5(b)) that is subject to (x) valid, perfected and unavoidable liens in existence as of the Petition Date or (y) valid and unavoidable liens in existence for amounts outstanding as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which valid, perfected and unavoidable liens are senior in priority to the security interests and

liens in favor of the First Lien Agent (the liens described in (x) and (y), the "Other Senior Liens"), and (B) upon the entry of the Final Order (as requested by the Debtors and subject to the rights of all other parties in interest to object and be heard at the Final Hearing), all of Debtors' now owned and hereafter acquired real and personal property, tangible and intangible assets, and rights of any kind or nature, wherever located, including without limitation, all prepetition and postpetition property of the Debtors' estates, and all products and proceeds thereof, whether now existing or hereafter acquired (other than the property described in clause (i) or (iii) of this paragraph 5(b)) that is subject to Other Senior Liens;

(iii)     Liens Senior to Certain Existing Liens.  Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected non-voidable priming lien on, and security interest in, (A) the Prepetition Collateral, including Cash Collateral, and (B) upon the entry of the Final Order (as requested by the Debtors and subject to the rights of all other parties in interest to object and be heard at the Final Hearing), all of the Debtors' now owned and hereafter acquired real and personal property, tangible and intangible assets, and rights of any kind or nature, wherever located, including, without limitation, all prepetition and postpetition property of the Debtors' estates, and all products, proceeds, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise; *provided* that such liens and security interests shall not prime the Other Senior Liens;

(iv)     Status of the Adequate Protection Claims.  Subject to the Carve Out, the Adequate Protection Liens (as defined below) shall not be (i) subject or subordinate to any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) except as otherwise set forth in clauses (i), (ii) and (iii) of this paragraph 5(b), subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise; *provided* that the Debtors shall not create, incur or suffer to exist any postpetition liens or security interests other than: (i) those granted pursuant to this Second Interim Order; (ii) carriers', mechanics', operators', repairmen's, warehousemen's, or other similar liens arising in the ordinary course of business; (iii) pledges and deposits in connection with workers' compensation, unemployment insurance and other social security legislation; and (iv) deposits to secure the payment of any postpetition statutory obligations and performance bonds.

(c)     For purposes hereof, the "Carve Out" means the sum of the following: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of

14

the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (irrespective of whether the notice set forth in (iii) below has been delivered); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee appointed in the Debtors' cases under section 726(b) of the Bankruptcy Code (irrespective of whether the notice set forth in (iii) below has been delivered); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (any such persons or firms, collectively, the "Debtor Professionals") and the Committee pursuant to section 1103 of the Bankruptcy Code (any such persons or firms, together with the Debtor Professionals, collectively, the "Professionals") at any time before or on the first business day following delivery by the First Lien Agent of a Carve Out Notice (defined below), whether allowed by the Court prior to or after delivery of a Carve Out Notice; and (iv) the Professional Fees of Professionals in an aggregate amount not to exceed $2,500,000 incurred after the first business day following delivery by the First Lien Agent of the Carve Out Notice to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Notice Cap"). The term "Carve Out Notice" shall mean a written notice delivered by electronic mail (or other electronic means) by the First Lien Agent to Samson's Chief Financial Officer, Kirkland & Ellis LLP, the U.S. Trustee, counsel to the Second Lien Agent, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of a Termination Event stating that the Post-Carve Out Notice Cap has been invoked.

(i)    Carve Out Reserves.  Following the delivery of a Carve Out Notice given by the First Lien Agent to the Debtors, the Carve Out Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid Professional Fees.  The Debtors shall deposit and hold cash in an amount equal to the then unpaid amounts of the Professional Fees in a segregated account at the First Lien Agent in trust to pay any then-unpaid Professional Fees (the "Pre-Carve Out Notice Reserve") prior to any and all other claims.  The Debtors shall deposit and hold cash in an amount equal to the then unpaid amounts of the Professional Fees in a segregated account at the First Lien Agent in trust to pay such Professional Fees benefiting from the Post-Carve Out Notice Cap (the "Post-Carve Out Notice Reserve," and, together with the Pre-Carve Out Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  All funds in the Pre-Carve Out Notice Reserve shall be used first to pay the obligations set forth in clauses (ii) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Notice Reserve has not been reduced to zero, to pay the Prepetition Secured Parties in accordance with their rights and priorities under

15

applicable law.   All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has been reduced to zero, to pay the Prepetition Secured Parties in accordance with their rights and priorities under applicable law.   Notwithstanding anything to the contrary in this Second Interim Order, if either of the Carve Out Reserves are not funded in full in the amounts set forth in this paragraph 5(c), then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 5(c), prior to making any payments to the Prepetition Agents or Prepetition Secured Parties out of such Carve Out Reserve funds.   Notwithstanding anything to the contrary in any of the Prepetition Loan Documents, the Interim Order, this Second Interim Order, or the Final Order, with the exception of paragraph 11 hereof, following delivery of a Carve Out Notice, the Prepetition Agents and the Prepetition Secured Parties shall not, and shall not direct any entity to, sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded.   Further, notwithstanding anything to the contrary herein, (a) disbursements by the Debtors from the Carve Out Reserves shall not constitute Prepetition Indebtedness and shall not increase or reduce the Prepetition Indebtedness; (b) the failure of the Carve Out Reserves to satisfy in full the Professional Fees shall not affect the priority of the Carve Out; and (c) in no way shall the Interim Budget, Carve Out, Post-Carve Out Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Professional Fees due and payable by the Debtors; *provided* that the foregoing shall not be construed as an authorization to use the Cash Collateral to pay any such amounts.

(ii)     Any payment or reimbursement made prior to delivery of the Carve Out Notice in respect of any Professional Fees allowed at any time by the Court and payable under sections 328, 330 and 331 of the Bankruptcy Code, shall not reduce the Carve Out.   Any payment or reimbursement made on or after the delivery of the Carve Out Notice in respect of any Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.   Any funding or payment of the Carve Out from cash on hand or other available cash shall not reduce the First Lien Prepetition Indebtedness or Second Lien Prepetition Indebtedness secured by the Adequate Protection Collateral.

16

*Second Lien Agent and Second Lien Secured Parties*:   In addition to all the existing security interests and liens granted to or for the benefit of the Second Lien Agent and Second Lien Secured Parties in and with respect to the Cash Collateral, as adequate protection for, and to secure payment of an amount equal to the Adequate Protection Obligations, and as an inducement to the Second Lien Agent and Second Lien Secured Parties to permit the Debtors' use of the Cash Collateral as provided for in this Second Interim Order, the Debtors hereby grant the following:

(d)    507(b) Claim.  The Adequate Protection Obligations due to the Second Lien Agent and Second Lien Secured Parties (the "Second Lien Adequate Protection Obligations") shall constitute joint and several superpriority administrative claims against the Debtors as provided in section 507(b) of the Bankruptcy Code and as described and limited in paragraph 5(a), junior to the First Lien 507(b) Claim (the "Second Lien 507(b) Claim", collectively with the First Lien 507(b) Claim, the "507(b) Claims"), subject and subordinate only to the Carve Out and the First Lien 507(b) Claim.

(e)    Adequate Protection Liens.  Effective as of the Petition Date, solely to the extent of the Second Lien Adequate Protection Obligations, and in each case perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the Second Lien Agent or Second Lien Secured Parties of any collateral, security interests and liens are hereby granted as set forth herein to the Second Lien Agent for the benefit of the Second Lien Secured Parties on the Adequate Protection Collateral, subject and subordinate only to the (i) the Carve Out, (ii) the First Lien Adequate Protection Liens and (iii) the Prepetition First Liens, and subject further to the Intercreditor Agreement (all such liens and security interests, the "Second Lien Adequate Protection Liens," and collectively with the First Lien Adequate Protection Liens, the "Adequate Protection Liens"); *provided* that the Second Lien Adequate Protection Liens on Unencumbered Property are subject to entry of the Final Order (as requested by the Debtors and subject to the rights of all other parties in interest to object and be heard at the Final Hearing).

Notwithstanding anything to the contrary in this Second Interim Order, none of the Adequate Protection Liens under this Second Interim Order shall be, nor shall be deemed to be, granted on the Unencumbered Property or any other property of the Debtors' estates that is not Prepetition Collateral.

6.    Additional Adequate Protection.  As additional adequate protection:

17

(a)  Payments:  The Debtors are authorized and directed to pay to the First Lien Agent for the ratable benefit of the First Lien Secured Parties (including to Hedge Banks with respect to any unpaid outstanding obligations due to any such Hedge Banks), adequate protection payments on the last business day of each calendar month after the entry of this Second Interim Order, in each case, in an amount equal to all accrued and unpaid prepetition or postpetition interest, fees and costs due and payable under the First Lien Credit Agreement (including, without limitation, interest on loans, breakage costs and accrued fees owing to the First Lien Secured Parties), such payments to be calculated (i) based on the ABR plus the Applicable Margin for ABR Loans and (ii) based on the relevant LIBOR Rate plus the Applicable Margin for LIBOR Loans (as set forth in the First Lien Credit Agreement or the other applicable documents).  For the avoidance of doubt, all payments of interest pursuant to this paragraph shall be without prejudice to the rights of the First Lien Agent and the First Lien Secured Parties to assert a claim for payment of additional interest at any other rates in accordance with the First Lien Credit Agreement.

(b)  Fees and Expenses:  Subject to the rights of all other parties in interest to object and be heard at the Final Hearing, the Debtors are authorized and directed on an interim basis to pay the reasonable and documented fees, expenses and disbursements (including, but not limited to, contractual agency fees and the reasonable fees, disbursements, and other charges of counsel, third-party consultants, including financial consultants and auditors) incurred by (A) the First Lien Agent under the First Lien Credit Agreement arising on or subsequent to the Petition Date through the date that is the earliest to occur of (i) the Termination Date and (ii) the date the Final Order is entered and (B) the Second Lien Agent under the Second Lien Credit Agreement arising on or subsequent to the Petition Date through the date that is the earliest to occur of (i) the Termination Date and (ii) the date the Final Order is entered.  Subject to the rights of all other parties in interest to object and be heard at the Final Hearing, the Debtors may request that the Final Order authorize and direct the Debtors to pay, subject to the Hedge Bank Fee Cap (defined below), the reasonable and documented fees, expenses and disbursements of outside counsel to each Current Hedge Bank (as defined below) arising on or subsequent to the Petition Date; provided that the fees payable to the Hedge Banks under this paragraph shall be limited to those Consenting Hedge Banks (as defined in paragraph 9) with existing swap, hedge, derivative, or other similar transactions in place with the Debtors as of the Petition Date (such Consenting Hedge Banks, the "Current Hedge Banks").  The payment of the fees, expenses and disbursements set forth in this paragraph 6(b) of this Second Interim Order shall be made within ten (10) business days after the receipt by the Debtors, the Committee, and the U.S. Trustee of invoices thereof (the "Invoiced Fees") (subject in all respects to applicable privilege or work product doctrines) and without the necessity of filing formal fee applications, including such amounts arising before and after the Petition Date; provided that, without prejudice to the reservation of all parties' rights and remedies under paragraph 16 of this Second Interim Order, the Debtors, the Committee, and the U.S. Trustee may dispute the payment of any specific portion of the Invoiced Fees (the "Disputed Invoiced Fees") by filing with the Court a motion or other pleading setting forth the specific objections to the Disputed Invoiced Fees within ten (10) business days of the date such disputing party received the

18

applicable invoice; and *provided further* that pending the resolution of such a dispute, the Debtors shall pay in full the Invoiced Fees as set forth above, including the Disputed Invoiced Fees.  To the extent that the Court, after notice and a hearing on at least ten (10) days prior written notice to the First Lien Agent, Hedge Bank, or Second Lien Agent, as applicable, enters an order sustaining any such objections by the Debtors, the Committee, or the U.S. Trustee to the Disputed Invoiced Fees, the Court shall determine the applicable remedy with respect to the disallowed amount of the Invoiced Fees.  Within two (2) business days of the entry of the Interim Order, the Debtors shall pay (X) any accrued but unpaid, reasonable and documented fees, expenses and disbursements (including, but not limited to, contractual agency fees and the reasonable fees, disbursements, and other charges of counsel, third-party consultants, including financial consultants, and auditors) incurred by (i) the First Lien Agent under the First Lien Credit Agreement before the Petition Date and (ii) the Second Lien Agent under the Second Lien Credit Agreement before the Petition Date; and (Y) subject to the Hedge Bank Fee Cap (defined below), any accrued but unpaid, reasonable and documented fees, expenses and disbursements of outside counsel to the Current Hedge Banks incurred by the Current Hedge Banks before the Petition Date, which fees, expenses and disbursements shall be subject to the dispute resolution procedures provided in this paragraph 6(b) of the Second Interim Order.  "Hedge Bank Fee Cap" shall mean, for each Current Hedge Bank, outside counsel fees, expenses and disbursements incurred by the Current Hedge Banks both before, and subsequent to, the date of the entry of this Second Interim Order in an amount not to exceed $25,000.  For the avoidance of doubt, all payments to the Current Hedge Banks pursuant to this paragraph shall be without prejudice to the rights of any Hedge Bank to assert a claim for payment of additional amounts in accordance with the Hedge Agreements.

(c)    Other Covenants:  The Debtors shall maintain their cash management arrangements in a manner consistent with the Cash Management Order.  The Debtors shall not use, sell or lease any material assets outside the ordinary course of business, or seek authority of the Court to do any of the foregoing, without prior consultation with the Prepetition Agents at least five (5) business days prior to the date on which the Debtors seek the authority of the Court for such use, sale or lease; for the avoidance of doubt, nothing herein shall limit the Debtors' right to use, sell, or lease assets in the ordinary course of business, including in connection with any "farm-in," "farm-out," or trade or swap of oil and gas properties where the aggregate PV-9 (as defined in the First Lien Credit Agreement) of the related oil and gas properties at the time of such "farm-in," "farm-out," or trade or swap is less than or equal to $1,000,000.  The Debtors shall comply with the covenants contained the First Lien Credit Agreement and the Second Lien Credit Agreement regarding the maintenance and insurance of the Prepetition Collateral and the Adequate Protection Collateral.

(d)    Reporting:  The Debtors shall comply with the reporting requirements set forth in the First Lien Credit Agreement (including timely provision of Reserve Reports as required under Section 9.14 thereof) and the Second Lien Credit Agreement, all of which reports shall be provided to both Prepetition Agents.  In addition, the Debtors shall provide the following additional reporting to the Prepetition Agents and, subject to appropriate confidentiality provisions, the Committee (if any):

19

(i)     (A) on or before the twentieth (20th) day of each calendar month, an updated rolling 13-week cash flow forecast of the Debtors and their subsidiaries substantially in the form of the Interim Budget (each, a "Proposed Budget"), which Proposed Budget, upon written approval by the First Lien Agent, shall become the Interim Budget effective as of the first Monday on or after the twenty-fifth (25th) day of such month (the "Budget Effective Date"), and each such Interim Budget shall run from its respective Effective Date through the Sunday prior to the Budget Effective Date of the next Interim Budget (the "Interim Budget Period"); (B) on or before each Thursday of each calendar week, (1) a weekly report of receipts, disbursements and a reconciliation of actual expenditures and disbursements with those set forth in the Budget for the prior week, which report and reconciliation shall be presented in the same form as the Interim Budget (i.e., with directly corresponding line items and variances for each on a line item by line item basis) and otherwise in form and detail reasonably satisfactory to the First Lien Agent (the "Budget Reconciliation") and (2) a statement setting forth in reasonable detail the cash balance for each deposit account of the Debtor and its subsidiaries as of the previous Friday; (C) the Debtors will provide, and/or make themselves available to representatives of the First Lien Agent and the Second Lien Agent to discuss, qualitative explanations with respect to the foregoing; and (D) the Debtors will provide a copy of the Proposed Budget to the U.S. Trustee contemporaneously with provision of the Proposed Budget to the Prepetition Agents;

(ii)    (A) Within 5 days of entry of the Interim Order, a copy of each of the Debtors' business plan (the "Business Plan") supporting the disclosure statement filed, or to be filed, by the Debtors in support of the Debtors' proposed plan of reorganization, which Business Plan shall include, among other things, a monthly cash forecast for the Debtors for the period through December 2016; and (B) any update of the Business Plan that is presented to Samson's board of directors as soon as reasonably practicable after it becomes available (for which the referenced monthly cash forecast shall cover the period that is at least 6 months after such plan), together with a reconciliation to the prior Business Plan;

(iii)   A list of all hedge agreements of Samson in place as of the first business day of the month on entry of this Second Interim Order and updated monthly thereafter (each such period, a "Hedge Reporting Period"), which list contains (A) the material terms thereof (including type, remaining term, counterparty, and mark-to-market value as of the first business day of the month (as reflected in the statements, if any, provided by the counterparties under such hedge agreements)), and (B) information on any hedge agreements terminated or unwound during such Hedge Reporting Period;

20

(iv)   Detailed accounts payable aging for the Debtors as of month-end to be provided within twenty (20) days after the last day of each calendar month, including and identifying all accounts payable in respect of the Debtors' joint interest billing obligations and all written demands or claims related to or asserting any liens in respect of any of the Debtors' property or assets (including liens imposed by law, such as landlord's, vendors', suppliers', carriers', warehousemen's, repairmen's, construction contractors', workers' and mechanics' liens and other similar liens) if the amount demanded or claimed exceeds $500,000 individually;

(v)    A monthly report of capital expenditures (including cash calls made in respect of capital expenditures by operators of properties in which the Debtors have a non-operating interest) subject to a level of detail mutually agreed by the Debtors and the Prepetition Agents (beginning with the year-to-date period ended August 2015) for the Debtors to be provided as soon as available, but in any event within twenty (20) days after the last day of each month;

(vi)   Detailed accounts receivable aging for the Debtors as of month end to be provided within twenty (20) days after the last day of each month. The Debtor will inform the First Lien Agent within three (3) business days of any notice by any operator of any withheld production revenue distributions due to any asserted right of offset or other asserted right, if the withheld production revenue exceeds $500,000, along with the Debtor's estimate of the impact of any such asserted right on the Interim Budget;

(vii)  Promptly, and in no event later than the thirtieth (30th) day of each month, a monthly and year-to-date income statement, balance sheet and monthly and year-to-date detail of capital expenditures and workovers as of the last day of the preceding calendar month;

(viii) Copies of all reports provided to any Committee, the U.S. Trustee, or any other party in interest in the Chapter 11 Cases; and

(ix)   Such other reports and information as the Prepetition Agents may reasonably request.

(e)    All authorizations for expenditures ("AFEs") either submitted to the Debtors, or requiring a response or consent from the Debtors, on a date following the Petition Date shall be provided to the Prepetition Agents as soon as reasonably practicable following receipt by the Debtors, and, at least ten (10) business days prior to any decision on such AFEs, the Debtors shall provide the Prepetition Agents with information and explanation regarding, (1) whether such AFE relates to any wells within the Borrowing Base (as defined in the First Lien Credit Agreement), (2) the Debtors' view as to whether to accept or decline any such AFEs, (3) the supporting materials for

21

such decision, (including, but not limited to: (i) analysis of expected timing of cash outlays related to such AFE, (ii) the Debtors' financial analysis of the expected economics associated with such AFE, including expected oil and/or gas reserves, (iii) expected net revenue from any successful drilling under such AFE, (iv) expected returns associated with wells, if successful, (v) a reasonable estimate of the market value of any reserves expected associated with such AFEs, (vi) underlying geologic data associated with such AFEs, (vii) explanations of penalties associated with failure to consent to such AFE, (viii) qualitative analyses prepared by the Debtors associated with the AFE process, (ix) underlying contractual agreements that support the AFE activity (i.e., joint operating agreement and Pooling Agreements), (x) if available, detailed information associated with previous capital expenditures occurring in the same field or pooled area including but not limited to time from spud to total depth, variance analysis to AFE supporting previous capital expenditures, and initial production rates and subsequent production results and (xi) other information with respect to the AFE consent process as reasonably requested by the Prepetition Agents), and (4) the source and timing of funds required by any accepted AFE.  The Debtors will also provide the Prepetition Agents and their professionals underlying joint operating agreements or similar contractual agreements between the Debtor and any operators submitting AFEs to the Debtor.  Debtors shall consult with the Prepetition Agents with respect to the impact of such AFE on the Prepetition Collateral and/or Adequate Protection Collateral, the Debtors' proposed actions in response thereto (including the filing of any related proceedings, motions or pleadings, to protect any and all collateral of the Prepetition Secured Parties).

(f)     All royalty payments received by the Debtor and/or coming due and payable to all royalty holders postpetition shall be timely and promptly paid to such royalty holders either directly or by first party purchasers in accordance with the applicable division orders, unless otherwise subject to suspension by the Debtor in the ordinary course as an operator.  For the avoidance of doubt, all such royalty payments received by the Debtors and/or payable by the Debtors shall include the satisfaction or disbursement of royalties by netting, setoff, or otherwise.

(g)     Unless otherwise agreed to by the First Lien Agent in writing (such consent to be obtained in accordance with the First Lien Credit Agreement), all sales and other dispositions (including casualty and condemnation events) of Prepetition Collateral or Adequate Protection Collateral ("Collateral Sales") shall be subject to arms-length terms and in exchange for 100 percent (100%) cash consideration; *provided* that this limitation on Collateral Sales shall not prohibit any "farm-in," "farm-out," or trade or swap of oil and gas properties where the aggregate PV-9 (as defined in the First Lien Credit Agreement) of the related oil and gas properties at the time of such "farm-in," "farm-out," or trade or swap is less than or equal to $1,000,000.  The Debtors shall deposit 100 percent (100%) of the net cash proceeds of any Collateral Sale into a deposit account maintained with the First Lien Agent, and such cash proceeds shall be used either (i) consistent with the terms of the Interim Budget or (ii) to repay or otherwise reduce or offset the outstanding First Lien Indebtedness.  In regards to any such "farm-in," "farm-out," or trade or swap, and oil and gas properties or other non-cash consideration received by the Debtors shall be subject in all respects to the Adequate Protection Liens granted herein.

22

(h)    The Debtors will provide the Prepetition Agents information pertaining to any proposed payments or distributions for prepetition obligations, working interest distributions, or royalties regardless of whether such prepetition obligations were included in the Interim Budget.  With respect to proposed payments or distributions for prepetition obligations to vendors (not including working interest distribution or royalties), where the payment or distribution is greater than $65,000 individually, the information shall include information regarding the vendor, nature of goods or services rendered and received, timing and aging for such invoices, and length of service relationship with such vendors.  Notwithstanding the entry of any order authorizing payments to vendors or lien claimants, any individual payment to any potential lien claimant greater than $65,000 will only be made following the Debtors' provision to the First Lien Agent of such information reasonably satisfactory to the First Lien Agent of (i) such claimant's potential seniority in right to payment or (ii) other necessity of payment.

(i)    In addition to, and without limiting, whatever rights to access the Prepetition Agents and Prepetition Secured Parties have under their respective Prepetition Loan Documents, upon reasonable prior written notice, at reasonable times during normal business hours, and otherwise not to be unreasonably withheld, the Debtors shall permit representatives, advisors, agents, and employees of the Prepetition Agents (i) to have access to and inspect the Debtors' properties, (ii) to examine the Debtors' books and records, and (iii) discuss the Debtors' affairs, finances, and condition with the Debtors' officers, management, financial advisors and counsel.

7.    <u>Termination</u>.  The Debtors' right to use the Cash Collateral pursuant to this Second Interim Order shall terminate (the date of any such termination, the "<u>Termination Date</u>") without further notice or court proceeding on the earliest to occur of (i) November 18, 2015 if the Final Order has not been entered by the Court on or before such date (unless such period is extended by mutual agreement of the First Lien Agent and the Debtors); (ii) January 15, 2016; and (iii) five (5) business days (any such five-business-day period of time, the "<u>Default Notice Period</u>") following the delivery of a written notice (any such notice, a "<u>Default Notice</u>") by the First Lien Agent to the Debtors, Kirkland & Ellis LLP, the U.S. Trustee, counsel to the Second Lien Agent, counsel to the Ad Hoc Group of Senior Noteholders, and counsel to the Committee of the occurrence of any of the events set forth in any of clauses (a) through (u) below unless such occurrence is cured by the Debtors prior to the expiration of the Default Notice Period with respect to such clause or such occurrence is waived by the First Lien Agent in its sole discretion,

23

provided that, during the Default Notice Period, the Debtors shall be entitled to continue to use the Cash Collateral in accordance with the terms of this Second Interim Order (the events set forth in clauses (a) through (u) below are collectively referred to herein as the "Termination Events"):

     (a)    Failure of the Debtors to make any payment under this Second Interim Order to the Prepetition Agents or Prepetition Secured Parties after such payment becomes due;

     (b)    Failure of the Debtors to: (i) comply with any material provision of this Second Interim Order; or (ii) comply with any other covenant or agreement specified in this Second Interim Order (other than those described in clause (i) above) in any material respect;

     (c)    The occurrence of a Hedge Forbearance Termination Event as defined in subclause (b) or (c) thereof;

     (d)    The occurrence of a Hedge Forbearance Termination Event as defined in subclause (a) thereof;

     (e)    The Debtors shall grant, create, incur or suffer to exist any postpetition liens or security interests other than: (i) those granted pursuant to this Second Interim Order; (ii) carriers', mechanics', operator's, warehousemen's, repairmen's or other similar liens arising in the ordinary course of business for amounts outstanding as of the Petition Date, even if recorded after the Petition Date; (iii) pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation; (iv) deposits to secure the payment of any postpetition statutory obligations, performance bonds and other obligations of a like nature incurred in the ordinary course of business; and (v) any other junior liens or security interests that the Debtors are permitted to incur under the First Lien Loan Documents;

     (f)    An order shall be entered reversing, amending, supplementing, staying, vacating or otherwise modifying this Second Interim Order without the written consent of the First Lien Agent and the Second Lien Agent;

     (g)    The Debtors' filing of any plan of reorganization (other than the *Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Debtors Affiliates* [Docket No. 15] or any amendment, modification, or supplement thereof that is filed with the Court that would not result in less favorable plan treatment of the First Lien Agent or First Lien Secured Parties (such plan, collectively with any such amendment, modification, or supplement, the "Proposed Plan")) that does not provide for indefeasible payment in full in cash of the First Lien Indebtedness on the effective date of the plan (a "Payment-in-Full Plan");

(h)     The Debtors' commencing, or participating in furtherance of, any solicitation of any plan of reorganization unless it is (i) a Payment-in-Full Plan or (ii) provides for, at individual First Lien Secured Parties' sole election, distribution of cash plus participation in a consensual new exit credit facility or amended and restated exit facility, as the case may be, in an aggregate amount equal to the First Lien Indebtedness owing to such First Lien Secured Party on the effective date of the plan (each of (i) and (ii), an "Acceptable Plan");

(i)     The Bankruptcy Court shall terminate or reduce the period pursuant to section 1121 of the Bankruptcy Code during which the Debtors have the exclusive right to file a plan of reorganization and solicit acceptances thereof;

(j)     There shall be a breach by any Debtor of any material provisions of the Final Order, or the Final Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any modification or amendment;

(k)     The entry of an order in the Chapter 11 Cases charging any of the Prepetition Collateral or Adequate Protection Collateral under section 552(b) of the Bankruptcy Code or section 506(c) of the Bankruptcy Code against the First Lien Agent, or the First Lien Secured Parties under which any person takes action against the Prepetition Collateral or Adequate Protection Collateral or that becomes a final non-appealable order, or the commencement of other actions that are materially adverse to the First Lien Agent, or the First Lien Secured Parties or their respective rights and remedies under the First Lien Loan Documents in the Chapter 11 Cases;

(l)     The entry of an order granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure (or granting of a deed in lieu of foreclosure) or other remedy against any asset with a value in excess of $5 million;

(m)     The entry of any postpetition judgment against any Debtor in excess of $5 million;

(n)     The Debtors shall at any time fail to hold in accounts with the First Lien Agent bank, including the Hedge Account (as defined below), unrestricted cash or cash equivalents in an aggregate amount of not less than $25 million;

(o)     The payment of any prepetition claims that are junior in interest or right to the liens and mortgages on such collateral held by the First Lien Agent on behalf of the First Lien Secured Parties, other than as permitted by an order entered in the Chapter 11 Cases;

(p)     The existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than as permitted under the Interim Order or this Second Interim Order, entitled to superpriority under section 364(c)(1) of the Bankruptcy Code *pari passu* or senior to the First Lien Indebtedness, or

25

there shall arise or be granted by the Bankruptcy Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 or clause (b) of section 507 of the Bankruptcy Code (other than the Carve Out), including the 507(b) Claims, or (ii) subject to the Other Senior Liens, any lien on the Prepetition Collateral or Adequate Protection Collateral having a priority senior to or *pari passu* with the liens and security interests granted herein, except as expressly provided in the Prepetition Loan Documents or in this Second Interim Order (but only in the event specifically consented to by the First Lien Agent), whichever is in effect;

(q)     The Court shall have entered an order dismissing any of the Chapter 11 Cases;

(r)     The Court shall have entered an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(s)     The Court shall have entered an order appointing a chapter 11 trustee, responsible officer, or any examiner with enlarged powers relating to the operation of the businesses in the Chapter 11 Cases, unless consented to in writing by the First Lien Agent;

(t)     A filing by any Debtor of any motion, pleading, application or adversary proceeding challenging the validity, enforceability, perfection or priority of the liens securing the First Lien Indebtedness or Second Lien Indebtedness or asserting any other cause of action against and/or with respect to the First Lien Indebtedness, the Second Lien Indebtedness, the Prepetition Collateral, or the First Lien Agent, any of the First Lien Secured Parties, Second Lien Agent or Second Lien Lenders (or if the Debtors support any such motion, pleading, application or adversary proceeding commenced by any third party); and

(u)     The Debtors or any of their subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the First Lien Agent or any of the First Lien Secured Parties relating to the First Lien Indebtedness.

8.     Remedies upon the Termination Date.  Upon the occurrence of the Termination Date, and subject in all respects to the Debtors' reservation of rights included in paragraph 18, (a) the Adequate Protection Obligations, if any, shall become due and payable, and (b) the First Lien Agent, each First Lien Secured Party and, subject to the Intercreditor Agreement, the Second Lien Agent, may exercise the rights and remedies available under the First Lien Loan Documents, the Second Lien Loan Documents, this Second Interim Order or applicable law (subject only to the Carve Out), including without limitation, foreclosing upon and selling all or

26

a portion of the Prepetition Collateral or Adequate Protection Collateral in order to collect the Adequate Protection Obligations.  The automatic stay under section 362 of the Bankruptcy Code is hereby deemed modified and vacated to the extent necessary to permit such actions, *provided* that during the Default Notice Period, unless the Court orders otherwise, the automatic stay under section 362 of the Bankruptcy Code (to the extent applicable) shall remain in effect.  Any delay or failure of the Prepetition Agents or Prepetition Secured Parties to exercise rights under the First Lien Loan Documents, the Second Lien Loan Documents or this Second Interim Order shall not constitute a waiver of their respective rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable document.  Without limiting the Debtors' rights under, and subject in all respects to, paragraph 18, the Prepetition Agents shall be entitled to apply the payments or proceeds of the Prepetition Collateral and the Adequate Protection Collateral in accordance with the provisions of the First Lien Loan Documents, the Second Lien Loan Documents and the Intercreditor Agreement and, subject to the rights of all other parties in interest to object and be heard at the Final Hearing, the Debtors may request that the Final Order provide that none of the Prepetition Agents or Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral, the Adequate Protection Collateral or otherwise. Notwithstanding the occurrence of the Termination Date or anything herein, all of the rights, remedies, benefits and protections provided to the First Lien Agent and the First Lien Secured Parties and the Second Lien Agent and Second Lien Secured Parties (subject to the Intercreditor Agreement) under this Second Interim Order shall survive the Termination Date.

9.      <u>Modification and Amendment of Prepetition Hedge Agreements</u>.  The Debtors, First Lien Agent and Hedge Banks agree and stipulate, and the Court finds, that: (a) each Hedge Bank has the current right to terminate each of its respective Hedge Agreements pursuant to the express terms thereof as a result of the Debtors' commencement of the Chapter 11 Cases (each, a "<u>Bankruptcy Termination Event</u>"); and (b) as an express accommodation to the Debtors, certain of the Hedge Banks (the "<u>Consenting Hedge Banks</u>") have agreed that they shall forbear from any exercise of their rights and remedies associated with the occurrence of such Bankruptcy Termination Event (including, without limitation, the right to liquidate, terminate or accelerate such Hedge Agreements, or to offset or net termination values, payment amounts or other transfer obligations thereunder), and shall continue to be bound by, and perform under, such Hedge Agreements unless and until (a) an Event of Default (as such term, or similar term, is defined in such Hedge Agreements) other than a Bankruptcy Termination Event occurs under such Hedge Agreements, or (b) a Hedge Forbearance Termination Event (as defined below) occurs hereunder.   Upon the occurrence of an Event of Default or Hedge Forbearance Termination Event, (i) the Consenting Hedge Banks shall be entitled, without further order of the Court, to liquidate, terminate or accelerate any Hedge Agreement as if the occurrence of the Event of Default or Hedge Forbearance Termination Event were a Bankruptcy Termination Event, and the Consenting Hedge Banks shall be entitled to all the protections of section 560 of the Bankruptcy Code, which applies to such Hedge Agreements, with respect thereto, and (ii) so long as the Consenting Hedge Banks gives written notice of their intent to liquidate, terminate or accelerate any Hedge Agreement within fifteen (15) days after the notice of occurrence of such Event of Default or Hedge Forbearance Termination Event (such notice to be provided to the U.S. Trustee), and liquidate, terminate or accelerate such agreement within thirty (30) days after

28

written notice of occurrence of such Event of Default or Hedge Forbearance Termination Event is either given or received by the Hedge Bank, any such actions are conclusively determined to be timely (and the Debtors' estates shall be deemed to have waived any argument that such action is untimely).  In addition, upon the liquidation, termination or acceleration of a Hedge Agreement following the occurrence of an Event of Default or Hedge Forbearance Termination Event, the First Lien Agent (for the ratable benefit of the First Lien Secured Parties) and/or the Consenting Hedge Bank shall be entitled to immediately offset, net and/or apply, without further order of the Court, any termination values or payment amounts that any Consenting Hedge Bank counterparty would otherwise owe to any Debtor to instead repay the principal portion of the First Lien Indebtedness (or to setoff against such principal portion of the First Lien Indebtedness) in accordance with the terms of the Hedge Agreement, the First Lien Loan Documents and the Intercreditor Agreement, as applicable, and the automatic stay under section 362 of the Bankruptcy Code is hereby deemed modified and vacated (to the extent necessary) to require the Debtors or the Consenting Hedge Bank, as the case may be, to turn over to the First Lien Agent any proceeds of any Hedge Agreement that expires, is terminated or unwound and to permit the First Lien Agent to immediately distribute such proceeds for the ratable benefit of the First Lien Secured Parties.  Prior to entry of the Final Order, and notwithstanding the preceding sentence, any setoff, netting or application of amounts shall occur no earlier than three (3) business days following written notice delivered by electronic mail (or other electronic means) to:  (i) the Debtors; (ii) proposed counsel to the Debtors, Kirkland & Ellis LLP; (iii) counsel to the First Lien Agent, Mayer Brown LLP; (iv) counsel to the Second Lien Agent, Willkie Farr & Gallagher LLP; and (v) counsel to the Committee.  Each of the following shall constitute a "Hedge Forbearance Termination Event":

(a)    the date on which the Restructuring Support Agreement (the "Restructuring Support Agreement") by and among, among other parties, the Debtors and certain of the Second Lien Secured Parties is validly terminated or is amended or extended pursuant to an amendment or extension which contains terms or provisions that result in less favorable plan treatment of the First Lien Agent or First Lien Secured Parties than currently contemplated by the Restructuring Support Agreement;

(b)    either (i) 12:01 a.m. on December 16, 2015 or (ii) if the Effective Date Outside Date (as defined in the Restructuring Support Agreement) is extended pursuant to the terms of the Restructuring Support Agreement, 12:01 a.m. on January 1, 2016, in either case unless the Court has entered an order confirming an Acceptable Plan;

(c)    12:01 a.m. on February 1, 2016, unless an Acceptable Plan has been substantially consummated by such date (including indefeasible payment in full in cash of the First Lien Indebtedness or such other plan treatment as may be consented to by each individual First Lien Secured Party (it being understood that if such Acceptable Plan is not a Payment-in-Full Plan, each Hedge Bank that has not consented shall have the option to declare a Hedge Forbearance Termination Event with respect to its respective Hedge Agreements);

(d)    the expiration or termination of Debtors' right to use Cash Collateral unless, within five (5) business days thereof, the Court has entered an order authorizing the Debtors' continued use of cash collateral that is in form and substance reasonably satisfactory to the First Lien Agent;

(e)    with respect to any individual swap or hedge under a Hedge Agreement with a Debtor counterparty, the date on which the benchmark price set forth in the relevant trade confirmation against which such swap or hedge is marked for settlement is within 25 cents ($0.25) of the strike price of any such gas-related instrument (e.g., a January 2016 swap for $5.00 that would currently settle at $4.75 or more) and ten dollars ($10) for any such oil-related instrument (e.g., a January 2016 swap for $90 that would currently settle at $80 or more); and

(f)    with respect to any individual collar (put and call) under a Hedge Agreement with a Debtor counterparty, the date on which the benchmark price set forth in the relevant trade confirmation against which such swap or hedge is marked for settlement falls between the put strike price and the call strike price of any such collar.

Nothing herein authorizes or otherwise allows any Hedge Bank who is not a Consenting Hedge Bank (subject to the terms hereof) to set-off proceeds of any terminated Hedge Agreement. The Debtors' rights to contest any setoff or other application of any proceeds of any terminated Hedge Agreement (based on a Bankruptcy Termination Event or otherwise) by any Hedge Bank that does not agree to be a Consenting Hedge Bank are expressly preserved.

PHIL1 4993454v.1

10.     <u>Provisions with Respect to Bank of Montreal Hedge Agreements</u>. Notwithstanding anything in paragraph 9 above, the commodity Hedge Agreements with Bank of Montreal, as Hedge Bank, that are out of the money for the Debtors are not subject to the provisions of paragraph 9.   Upon the acceleration, termination, or liquidation of such Hedge Agreements following the Petition Date (to which the Debtors shall be deemed to have consented hereunder) the obligations owing to Bank of Montreal thereunder shall constitute First Lien Indebtedness under the First Lien Loan Documents and for all purposes hereunder, and shall rank *pari passu* with the other First Lien Indebtedness.

11.     <u>Termination of Prepetition Hedge Agreements</u>.   If (a) any Hedge Agreement expires, matures, or is terminated for any reason other than (i) an Event of Default (as such term, or similar term, is defined in such Hedge Agreements) other than a Bankruptcy Termination Event occurs under such Hedge Agreements or (ii) a Hedge Forbearance Termination Event such that any Debtor receives cash proceeds from such expiration, maturity or termination or (b) to the extent that any Debtor otherwise receives postpetition cash proceeds under any Hedge Agreement (including, without limitation, monthly settlement receipts or other payments required to be made by a Hedge Bank) (collectively, "<u>Hedge Agreement Proceeds</u>"), such Hedge Agreement Proceeds shall be immediately deposited by such Debtor into a segregated account maintained with the First Lien Agent for the benefit of the Debtors and the First Lien Secured Parties, as applicable in accordance herewith (the "<u>Hedge Account</u>"); *provided* that the First Lien Agent, as depository, shall be deemed to be the collateral agent with respect to the cash deposited therein, as to which for each such Hedge Bank shall remain entitled in all respects to the protections of sections 362(b)(17) and 560 of the Bankruptcy Code as if such cash were held by the Hedge Bank.   The Prepetition Secured Parties shall at all times be deemed to have perfected

31

liens and security interests in the Hedge Agreement Proceeds and the Hedge Account.  The treatment of such Hedge Agreement Proceeds upon the occurrence of an Event of Default or Hedge Forbearance Termination Event shall be governed by the provisions of Paragraph 9, and prior to the consummation or closing of an Acceptable Plan, the Debtors shall not be entitled to use Hedge Agreement Proceeds or to release or transfer them from the Hedge Account except in accordance with Paragraph 12 hereof.  Upon the consummation of an Acceptable Plan, any Hedge Agreement Proceeds in the Hedge Account shall be released to the Debtors without further order of the Court.

12.    Usage of Hedge Agreement Proceeds.  If the Proposed Budget approved by the First Lien Agent pursuant to Paragraph 6(d)(i) indicates that, in the following four-week period, amounts held by the Debtors in accounts other than the Hedge Account (the "Non-Hedge Accounts") will be less than $50,000,000 at any time during such following four-week period, the Debtors shall be permitted to transfer funds from the Hedge Account to any Non-Hedge Accounts maintained by the Debtors with the First Lien Agent in an amount equal to the difference between (a) the lowest amount projected to be held by the Debtors in the Non-Hedge Accounts for such four-week period and (b) $50,000,000 and, following such transfer, be authorized to use such funds, subject to the terms of this Second Interim Order.

13.    Limitation on Charging Expenses Against Collateral.  Subject to the rights of all other parties in interest to object and be heard at the Final Hearing, the Debtors may request that the Final Order provide that, effective upon entry of the Final Order, except to the extent of the Carve Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or the

Adequate Protection Collateral, the Prepetition Agents or the Prepetition Secured Parties pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the affected party, and no such consent shall be implied from any other action, inaction, or acquiescence by any of the Prepetition Agents or Prepetition Secured Parties.  Neither the Prepetition Secured Parties' consent to the Interim Budget nor anything else herein shall be deemed or construed as agreement by the Prepetition Secured Parties to be surcharged under section 506(c) or any other provision of the Bankruptcy Code or equitable doctrine.

14.    <u>Payments Free and Clear</u>.  Subject to the rights of all other parties in interest to object and be heard at the Final Hearing, the Debtors may request that the Final Order provide that, effective upon entry of the Final Order, except to the extent of the Carve Out, any and all payments or proceeds remitted to the Prepetition Agents on behalf of the Prepetition Secured Parties pursuant to the provisions of this Second Interim Order or any subsequent order of the Court shall be irrevocable (subject to paragraph 21 of this Second Interim Order), received free and clear of any claim, charge, assessment or other liability, including without limitation, subject to entry of the Final Order, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtors) or 552(b) of the Bankruptcy Code.

15.    <u>Bankruptcy Code Section 552(b)</u>.  Each of the Prepetition Agents and Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to the rights of all other parties in interest to object and be heard at the Final Hearing, the Debtors may request that the Final Order provide that the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the

33

Prepetition Agents and the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral or the Adequate Protection Collateral.

16.     <u>All Parties' Reservation of Rights</u>.   Subject to the Intercreditor Agreement and notwithstanding any other provision hereof, the respective rights and remedies of all parties are reserved with respect to any cash payments of interest, fees and expenses as adequate protection to the Prepetition Agents and Prepetition Secured Parties, including the right to argue that, to the extent that any such payment is not allowed under section 506(b) of the Bankruptcy Code or on any other basis (including, without limitation, on account of the Debtors' use of Prepetition Collateral), such payments should be disgorged or recharacterized (and applied as payments of principal owed under the First Lien Loan Documents or Second Lien Loan Documents, as applicable) for any reason, *provided* that the Prepetition Agents and Prepetition Secured Parties reserve their rights to assert defenses to any such arguments and to otherwise oppose any remedy sought with respect to such adequate protection payments.

17.     <u>Reservation of Rights of the Prepetition Agents and Prepetition Secured Parties</u>. Notwithstanding any other provision hereof, the grant of adequate protection to the First Lien Agent and the First Lien Secured Parties pursuant hereto is without prejudice to the right of the First Lien Agent and the First Lien Secured Parties to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection with respect to any postpetition diminution in value of the First Lien Agent's or the First Lien Secured Parties' interest in any Prepetition Collateral from and after the Petition Date, and without prejudice to the right of the Debtors or any other party in interest to contest any such modification.   Subject to the Intercreditor Agreement, notwithstanding any other provision hereof, the grant of adequate protection to the Second Lien Agent and Second Lien Secured

34

Parties pursuant hereto is without prejudice to the right of the Second Lien Agent to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection with respect to any postpetition diminution in value of the Second Lien Agent's or the Second Lien Secured Parties' interest in any Prepetition Collateral from and after the Petition Date *provided* that all such additional adequate protection shall be junior to that adequate protection granted to the First Lien Agent or the First Lien Secured Parties and without prejudice to the right of the Debtors or any other party in interest to contest any such modification sought by the Second Lien Secured Parties.  Nothing herein shall be deemed to waive, modify or otherwise impair the respective rights of the Prepetition Agents or the Prepetition Secured Parties under the First Lien Loan Documents, Second Lien Loan Documents, and the Intercreditor Agreement, or under equity or law, and the Prepetition Agents and the Prepetition Secured Parties expressly reserve all of their respective rights and remedies whether now existing or hereafter arising under the First Lien Loan Documents or Second Lien Loan Documents, respectively, and/or equity or law in connection with all Termination Events and Defaults and Events of Default (as defined in the First Lien Loan Documents or Second Lien Loan Documents, respectively, and whether arising prior to or after the Petition Date).  This Second Interim Order shall not modify Section 13.1 of the First Lien Credit Agreement in any respect, and, to the extent that any action of the First Lien Agent contemplated by this Second Interim Order requires the consent or approval of some or all of the First Lien Secured Parties, such consent or approval shall be obtained in accordance with Section 13.1 of the First Lien Credit Agreement.

18.    Debtors' Reservation of Rights.  Notwithstanding anything to the contrary in this Second Interim Order, following receipt of a Default Notice, and at any time before or after the

occurrence of the Termination Date, including without limitation as a result of a Termination Event pursuant to paragraphs 7(g) or 7(h) of this Second Interim Order, the Debtors may seek authority to use the Cash Collateral without the consent of the Prepetition Agents or Prepetition Secured Parties, and the Prepetition Agents and Prepetition Secured Parties reserve all rights to contest such relief.

19.    <u>Modification of Automatic Stay</u>.    The Debtors are authorized and directed to perform all acts and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Second Interim Order and the transactions contemplated hereby.    The stay of section 362 of the Bankruptcy Code is hereby modified to permit the Debtors and each of the Prepetition Agents, Prepetition Lenders, and Hedge Banks to accomplish the transactions contemplated by this Second Interim Order.

20.    <u>Perfection of Adequate Protection Liens</u>.

(a)    The First Lien Agent and the Second Lien Agent are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted to it hereunder. Whether or not the First Lien Agent and the Second Lien Agent shall, in its respective sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of entry of this Second Interim Order. If the First Lien Agent or the Second Lien Agent determines to file or execute any financing statements, agreements, notice of liens or similar instruments, the Debtors will cooperate and assist in any such execution and/or filings as reasonably requested by the First Lien Agent or the Second Lien Agent, and the automatic stay shall be modified to allow such filings.

(b)    A certified copy of this Second Interim Order may, in the discretion of the First Lien Agent or the Second Lien Agent be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Second Interim Order for filing and recording; *provided* that, notwithstanding the date of any such filing, the date of such perfection shall be the date of entry of this order.

(c)     Effective upon entry of the Final Order, any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Any such provision shall have no force and effect with respect to the granting of Adequate Protection Liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in accordance with the terms of the First Lien Loan Documents, the Second Lien Loan Documents, or this Second Interim Order.

21.     Preservation of Rights Granted Under this Second Interim Order.

(a)     Except as expressly provided in this Second Interim Order, and subject to the Intercreditor Agreement, no claim or lien having a priority senior to or *pari passu* with those granted by this Second Interim Order to the Prepetition Agents and Prepetition Secured Parties shall be granted or allowed, and the Adequate Protection Liens shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or, except as set forth in the Intercreditor Agreement, subordinated to or made pari passu with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)     Notwithstanding any order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise entered at any time, (x) the 507(b) Claims, the other administrative claims granted pursuant to this Second Interim Order and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Second Interim Order until all Adequate Protection Obligations shall have been paid and satisfied in full in cash (and such 507(b) Claims, the other administrative claims granted pursuant to this Second Interim Order and the Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); and (y) the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

(c)     If any or all of the provisions of this Second Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect: (i) the validity, priority or enforceability of any Adequate Protection Obligations incurred prior to the actual receipt of written notice by the First Lien Agent or the Second Lien Agent, respectively, of the effective date of such reversal, stay, modification or vacatur; or (ii) the validity, priority or enforceability of the Adequate Protection Liens. Notwithstanding any such reversal, stay, modification or vacatur, any use of the Cash Collateral or any Adequate Protection Obligations incurred by the Debtors hereunder, as the case may be, prior to the actual receipt of written notice by the First Lien Agent or the Second Lien Agent, respectively, of the effective date of such reversal, stay, modification or vacatur shall be governed in all respects by the original provisions of this Second Interim Order, and (i) the First Lien Agent and the First Lien

37

Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits granted herein and to the protections afforded in section 363(m) of the Bankruptcy Code with respect to all uses of the Cash Collateral and all First Lien Adequate Protection Obligations and (ii) subject to the Intercreditor Agreement, the Second Lien Agent and Second Lien Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits granted herein and to the protections afforded in section 363(m) of the Bankruptcy Code with respect to all uses of the Cash Collateral (other than Prepetition Collateral constituting setoff rights of the First Lien Agent and the First Lien Secured Parties) and all Second Lien Adequate Protection Obligations.

(d)    Subject to paragraphs 6(b), 16 and 22 of this Second Interim Order, the adequate protection payments made pursuant to this Second Interim Order shall not be subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance in the Chapter 11 Cases or any subsequent chapter 7 cases (other than a defense that the payment has actually been made).

(e)    Except as expressly provided in this Second Interim Order, the Adequate Protection Obligations, the 507(b) Claims and the Adequate Protection Liens and all other rights and remedies of the Prepetition Agents and the Prepetition Secured Parties granted by the provisions of this Second Interim Order shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases or by any other act or omission, or (ii) the entry of an order confirming a plan of reorganization in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining Adequate Protection Obligations. The terms and provisions of this Second Interim Order shall continue in the Chapter 11 Cases, in any successor cases if the Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the Adequate Protection Liens, the 507(b) Claims, the other administrative claims granted pursuant to this Second Interim Order, and all other rights and remedies of the Prepetition Agents and the Prepetition Secured Parties granted by the provisions of this Second Interim Order shall continue in full force and effect until all Adequate Protection Obligations are indefeasibly paid in full in cash.

22.    <u>Effect of Stipulations</u>.  As a result of the Debtors' review of the First Lien Loan Documents, the Second Lien Loan Documents and the facts relating thereto, the Debtors have admitted, stipulated and agreed to the various stipulations and admissions contained in this Second Interim Order, including without limitation, the stipulations and admissions included in paragraph E, which stipulations and admissions shall be binding upon the Debtors and any successors thereto in all circumstances (although such stipulations are not findings of the Bankruptcy Court).  The stipulations and admissions contained in this Second Interim Order,

38

including without limitation, in paragraph E of this Second Interim Order, shall also be binding upon all other parties in interest, including any Committee or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "Trustee"), for all purposes unless (a) such party (subject in all respects to any agreement or applicable law which may limit or affect such entity's right or ability to do so) has properly filed a motion seeking standing to file an adversary proceeding or contested matter (provided that such motion includes any applicable adversary complaint), as required under the Bankruptcy Rules (subject in either case to the limitations contained herein, including, without limitation, in paragraph 23) by no later than the date that is seventy-five (75) days from the date of entry of the Interim Order (or, in the case of the Committee, sixty (60) days from the date of the appointment of the Committee or any later date that is provided in the Final Order (or, if no Final Order has been entered on or before the expiration of such sixty-day period,  in such other order of the Court entered on or before the expiration of such sixty-day period)) (the "Challenge Period") (x) challenging the amount, validity, enforceability, priority or extent of the First Lien Indebtedness or Second Lien Indebtedness or the liens on the Prepetition Collateral securing the First Lien Indebtedness or Second Lien Indebtedness, or (y) otherwise asserting any other claims, counterclaims, causes of action, objections, contests or defenses against the First Lien Agent, the First Lien Secured Parties, the Second Lien Agent or the Second Lien Secured Parties on behalf of the Debtors' estates (collectively, the "Claims and Defenses"), and (b) the Court rules in favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding or contested matter; *provided* that, as to the Debtors, all such Claims and Defenses are hereby irrevocably waived and relinquished effective as of the Petition Date.  If no such motion seeking standing to file adversary proceeding or contested matter is timely filed prior to the expiration of the

Challenge Period, without further order of the Court: (w) the Debtors' stipulations and admissions contained this Second Interim Order shall be binding on all parties in interest, including the Committee; (x) the First Lien Indebtedness and Second Lien Indebtedness shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance, for all purposes in the Chapter 11 Cases and any subsequent chapter 7 case; (y) the respective Prepetition Agent's liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority specified in paragraph E, not subject to defense, counterclaim, recharacterization, subordination or avoidance; and (z) the First Lien Indebtedness and Second Lien Indebtedness, the respective Prepetition Agent's liens on the Prepetition Collateral and the respective Prepetition Secured Parties (and their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors) shall not be subject to any other or further challenge by the Committee or any other party in interest, and any such Committee or party in interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including without limitation, any successor thereto (including, without limitation, any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period); *provided* that if the Chapter 11 Cases are converted to chapter 7 or a Trustee is appointed prior to the expiration of the Challenge Period, any such estate representative or Trustee shall receive the full benefit of any remaining Challenge Period, subject to the limitations described herein.  If any such motion seeking standing to file adversary proceeding or contested matter (provided that such motion includes any applicable adversary complaint) is timely filed prior to the expiration of the Challenge Period, the stipulations and admissions contained in this Second Interim Order, including without limitation, in paragraph E of this Second Interim Order, shall nonetheless

40

remain binding and preclusive (as provided in the second sentence of this paragraph) on the Committee and any other person, including any Trustee, except as to any such findings and admissions that were expressly challenged in such adversary proceeding or contested matter. Nothing in this Second Interim Order vests or confers on any person, including a Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates. In the event that there is a timely successful challenge brought pursuant to this paragraph, the Court shall retain jurisdiction to fashion an appropriate remedy.

23.    <u>Limitation on Use of Cash Collateral</u>.  The Debtors shall use Cash Collateral solely as provided in this Second Interim Order.  Notwithstanding anything herein or in any other order of the Court to the contrary, and subject to the Carve Out, no Cash Collateral may be used to: (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of the Prepetition Indebtedness, or the liens or claims granted under this Second Interim Order, the First Lien Loan Documents or the Second Lien Loan Documents; (b) assert any Claims and Defenses against any of the Prepetition Agents and the Prepetition Secured Parties or their respective agents, affiliates, representatives, attorneys or advisors; (c) seek to modify any of the rights granted to the Prepetition Agents and the Prepetition Secured Parties hereunder, or (d) pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved by an order of the Court, *provided* that, notwithstanding anything to the contrary herein, no more than $50,000 (or any higher amount that is provided in the Final Order (or, if no Final Order has been entered on or before the expiration of the Challenge Period, in such other order of the Court entered on or before the expiration of the Challenge Period)) of the Prepetition Collateral or the Carve Out in the aggregate may be used by any Committee to investigate the validity, enforceability or priority of the First Lien

41

Indebtedness or Second Lien Indebtedness or the liens on the Prepetition Collateral or investigate any Claims and Defenses or other causes action against the Prepetition Agents or any of the Prepetition Secured Parties; *provided* that there shall be no such limit on use of cash that is not Cash Collateral with respect to the foregoing.

24. <u>Binding Effect; Successors and Assigns</u>.  The provisions of this Second Interim Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Cases, including without limitation, the Prepetition Agents and the Prepetition Secured Parties, the Committee and the Debtors, and their respective successors and assigns (including any Trustee hereinafter appointed or elected for the estate of any Debtor, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the Prepetition Agents, the Prepetition Secured Parties and the Debtors and their respective successors and assigns, *provided* that, except to the extent expressly set forth in this Second Interim Order, the Prepetition Agents and the Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral or extend any financing to any Trustee or similar responsible person appointed for the estate of any Debtor. For all adequate protection and stay relief purposes throughout the Debtors' Chapter 11 Cases, the Prepetition Agents and Prepetition Secured Parties shall be deemed to have requested relief from the automatic stay and adequate protection as of the Petition Date.  For the avoidance of doubt, such request will survive termination of this Second Interim Order.  Notwithstanding anything to the contrary herein, except with respect to paragraphs 9 and 11 of this Second Interim Order, the entry of this Second Interim Order, including, without limitation, the approval on an interim basis, pursuant to this Second Interim Order, of any adequate protection payments,

42

shall not constitute (i) an agreement by the Ad Hoc Group of Senior Noteholders or the Committee as to any of the terms of this Second Interim Order or (ii) a waiver of any of the objections, rights and arguments of either the Ad Hoc Group of Senior Noteholders or the Committee to object to all matters related to the Debtors' use of cash collateral at the Final Hearing on the Motion and any other relief sought in connection therewith on any grounds (all of which are preserved), except that the Ad Hoc Group of Senior Noteholders, the Committee and all other parties in interest shall be deemed to agree that the Hedge Banks' forbearance in exercising their termination, liquidation and acceleration rights as consequence of a Bankruptcy Termination Event shall not be a waiver or otherwise restrict or prevent the Hedge Banks from exercising such rights upon entry of the Final Order, unless the Hedge Banks otherwise agree. Notwithstanding anything else in this Second Interim Order, at the Final Hearing, the Court may modify in any way it determines to be appropriate the terms on which the Debtors may continue to use Cash Collateral from and after the Final Hearing (including the protections provided to other parties in connection therewith); *provided* that the Court's ruling at the Final Hearing shall have only prospective effect such that the protections provided by the Court in this Second Interim Order shall remain in place, and continue to have effect, with respect to the period between entry of this Second Interim Order and entry of the Final Order.

25.    <u>Limitation of Liability</u>.  In permitting the use of the Prepetition Collateral or in exercising any rights or remedies as and when permitted pursuant to this Second Interim Order, subject to entry of the Final Order, the Prepetition Agents and the Prepetition Secured Parties shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive

Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or state statute). Furthermore, nothing in this Second Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition Agents or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

26.    <u>Intercreditor Agreement</u>. Nothing in this Second Interim Order shall amend or otherwise modify the terms and enforceability of the Intercreditor Agreement. The rights of the Prepetition Agents and Prepetition Secured Parties shall at all times remain subject to the Intercreditor Agreement.

27.    <u>Provisions with Respect to Wells Fargo</u>. With respect to the Wells Fargo Mastercard Multicard Agreement, Wells Fargo is authorized to make advances from time to time on behalf of the Debtors with a maximum exposure to Samson of $300,000.00. Samson is authorized to continue to use the Wells Fargo Mastercard Multicard Agreement subject to the terms and conditions thereof. All prepetition charges are authorized and required to be paid. For the avoidance of doubt, the Wells Fargo Mastercard Multicard Agreement shall continue to be considered a Secured Cash Management Agreement under the Credit Agreement, shall rank *pari passu* with the other First Lien Indebtedness, and will be managed as part of the "Cash Management System" discussed in the Cash Management Order.

28.    <u>No Impact on Certain Contracts/Transactions</u>. Except as provided in paragraph 9 of this Second Interim Order, no rights of any person under sections 555, 556, 559, 560 and 561 of the Bankruptcy Code shall be affected by the entry of this Second Interim Order as to any contract or transaction of the kind listed in such sections of the Bankruptcy Code.

44

29.    <u>Affirmation of Liens</u>.  Without prejudice to the rights of any other party (but subject to the limitations described herein in paragraphs 22 and 23), (a) the Debtors are hereby authorized and deemed to ratify, reaffirm and adopt the First Lien Loan Documents and the Second Lien Loan Documents, including the validity, extent, priority, perfection and enforceability of the liens, liabilities, and obligations to the First Lien Agent and Second Lien Agent incurred thereunder and the liens, security interests and mortgages granted to the First Lien Agent and Second Lien Agent thereunder and (b) the validity, extent, priority, perfection and enforceability of the First Lien Agent's, the First Lien Secured Parties', the Second Lien Agent's and the Second Lien Secured Parties' prepetition claims, liens, mortgages and security interests in the Debtors' assets shall not be subject to invalidation, avoidance, subordination, or other challenge by the Debtors, and in furtherance thereof the Debtors hereby release, waive and affirmatively agree not to allege or otherwise pursue any or all defenses, affirmative defenses, counterclaims, claims, causes of action, recoupments, setoffs or other rights that they may have to contest (i) any Defaults or Events of Default (as such terms, or similar terms are defined in the First Lien Loan Documents or Second Lien Loan Documents, respectively) that were or could have been declared by the First Lien Agent, the First Lien Secured Parties, the Second Lien Agent or the Second Lien Lenders as of the Petition Date and (ii) the amount of the Debtors' indebtedness to the First Lien Agent, the First Lien Secured Parties, the Second Lien Agent or the Second Lien Secured Parties as of the Petition Date.

30.    <u>Effectiveness</u>.  This Second Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062 or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal

45

Rules of Civil Procedure, this Second Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Second Interim Order.  To the extent that any finding of fact shall be determined to be a conclusion of law it shall be so deemed and vice versa.

31.    <u>Proofs of Claim</u>.  None of the Prepetition Agents nor the Prepetition Secured Parties will be required to file proofs of claim in any of the Chapter 11 Cases or successor cases, and the Debtors' stipulations in paragraph E herein shall be deemed to constitute a timely filed proof of claim against the applicable Debtor(s).  Any order entered by the Court in relation to the establishment of a bar date for any claim (including without limitation, administrative claims) in any of the Chapter 11 Cases or successor cases shall not apply to the Prepetition Agents or the Prepetition Secured Parties with respect to the First Lien Indebtedness or Second Lien Indebtedness, respectively.  Notwithstanding the foregoing, each of the First Lien Agent (on behalf of itself and the other First Lien Secured Parties) and the Second Lien Agent (on behalf of itself and the applicable Second Lien Secured Parties) is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a master proof of claim for any claims of the Prepetition Secured Parties arising from the applicable Prepetition Loan Documents; provided, that nothing herein shall waive the right of any Prepetition Secured Party to file its own proofs of claim against the Debtors.

32.    <u>Headings</u>.  The headings in this Second Interim Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Second Interim Order.

33.    <u>Final Hearing</u>.  The Final Hearing on the Motion is scheduled for November 17, 2015, at 11:00 a.m. before the Court.  The Debtors shall promptly mail copies of this Second Interim Order to the parties having been given notice of the Second Interim Hearing and to any

other party which has filed a request for notices with the Court.  Any party in interest objecting

to the relief sought at the Final Hearing shall submit any such objection in writing and file same

with the Court (with a courtesy copy to Chambers) and serve such objection on the following

parties so as to be received no later than 4:00 p.m. (Eastern Time) on November 10, 2015 (except

with respect to the Committee, which date shall be agreed by the Debtors and the Committee):

(i) the Debtors, Samson Resources Corporation, Two West Second Street, Tulsa, Oklahoma

74103, Attn:  Andrew Kidd; (ii) proposed counsel to the Debtors, Kirkland & Ellis LLP,

601 Lexington Avenue, New York, New York 10022, Attn.: Ryan J. Dattilo, and Kirkland &

Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn.:  Brad Weiland; (iii) counsel to the

First Lien Agent, Mayer Brown LLP, 71 South Wacker Drive, Chicago, Illinois 60606, Attn.:

Sean T. Scott, and Mayer Brown LLP, 700 Louisiana Street, Suite 3400, Houston, Texas 77002,

Attn.:  Charles S. Kelley; (iv) counsel to the Second Lien Agent, Willkie Farr & Gallagher LLP,

787 Seventh Avenue, New York, New York, 10019, Attn.:  Margot B. Schonholtz, and Ana M.

Alfonso; (v) the Office of the U.S. Trustee for the District of Delaware, Caleb Boggs Federal

Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn.:  Tiiara

N.A. Patton and David Buchbinder; and (vi) proposed co-counsel to the official committee of

unsecured creditors, White & Case LLP, 200 South Biscayne Boulevard Miami, Florida 33131,

Attn: Thomas E. Lauria, White & Case LLP, 1155 Avenue of the Americas, New York, New

York 10036, Attn:  J. Christopher Shore, and Farnan LLP, 919 North Market Street, 12th Floor,

Wilmington, Delaware 19801, Attn:  Joseph J. Farnan, Jr..

34.    <u>Jurisdiction</u>.  The Court shall retain jurisdiction to enforce the terms of this

Second Interim Order and to adjudicate any and all matters arising from or related to the

interpretation or implementation of this Second Interim Order.

35.    <u>Controlling Effect of Second Interim Order</u>.  To the extent any provision of this

Second Interim Order conflicts or is inconsistent with any provision of the Motion or the Interim

Order, the provisions of this Second Interim Order shall control to the extent of such conflict.

IT IS SO ORDERED.

DATED this _____ day of November, 2015.


_____
THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit 1</u>**

**Interim Budget**

# Interim Budget

| Samson Cash Flow Budget ($'s in 000's) | Filing 9/18/15 | Week 1 9/25/15 | Week 2 10/2/15 | Week 3 10/9/15 | Week 4 10/16/15 | Week 5 10/23/15 | Week 6 10/30/15 | Week 7 11/6/15 | Week 8 11/13/15 | Week 9 11/20/15 | Week 10 11/27/15 | Week 11 12/4/15 | Week 12 12/11/15 | Week 13 12/18/15 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | |
| **Consolidated Operations** | | | | | | | | | | | | | | | |
| Beginning Cash Balance | $135,241 | $129,484 | $144,207 | $139,120 | $145,832 | $129,956 | $134,092 | $121,180 | $120,467 | $114,950 | $126,789 | $116,519 | $128,913 | $127,758 | $135,241 |
| Net Collections[2] | $6,735 | $25,530 | $11,948 | $18,573 | $3,714 | $17,682 | $5,972 | $24,319 | $3,819 | $18,312 | $2,798 | $18,611 | $8,742 | $2,897 | $169,653 |
| **Disbursements** | | | | | | | | | | | | | | | |
| Lease Operating Expense | - | (5) | (853) | (1,242) | (1,560) | (1,794) | (2,548) | (2,424) | (2,615) | (2,759) | (2,222) | (2,592) | (2,582) | (2,574) | (25,760) |
| Transportation | (3,000) | - | - | (363) | (363) | (1,450) | (363) | (363) | (458) | (458) | (1,373) | (458) | (343) | (343) | (9,333) |
| JIB Payables | (354) | (674) | (605) | (659) | (330) | (627) | (563) | (665) | (333) | (632) | (568) | (371) | (371) | (371) | (7,123) |
| CapEx | - | (189) | (340) | (643) | (894) | (1,102) | (1,544) | (1,663) | (1,696) | (1,733) | (1,464) | (1,545) | (1,668) | (1,770) | (16,251) |
| Lien Motion | - | (8,027) | (8,027) | (8,027) | (7,054) | (7,054) | (7,054) | (7,054) | - | - | - | - | - | - | (52,299) |
| Payroll & Benefits | (1,118) | (199) | (3,501) | (156) | (3,504) | (157) | (3,482) | (134) | (3,479) | (136) | (3,460) | (134) | (156) | (3,459) | (23,074) |
| Rent & Utilities | (142) | (732) | (142) | (178) | (178) | (768) | (178) | (178) | (178) | (178) | (768) | (178) | (178) | (178) | (4,157) |
| UCC Professionals | - | - | - | - | - | - | - | (40) | - | - | - | - | (80) | - | (120) |
| Other | (1,906) | (481) | (884) | (593) | (593) | (593) | (593) | (9,522) | (577) | (577) | (577) | (939) | (489) | (2,489) | (20,812) |
| Total Disbursements | (6,521) | (10,307) | (14,351) | (11,861) | (14,465) | (13,547) | (16,325) | (22,043) | (9,336) | (6,473) | (10,432) | (6,217) | (5,867) | (11,184) | (158,929) |
| Net Cash Flow From Operations | 214 | 15,223 | (2,404) | 6,712 | (10,751) | 4,135 | (10,353) | 2,276 | (5,517) | 11,839 | (7,635) | 12,394 | 2,875 | (8,286) | 10,723 |
| **Other Expenses** | | | | | | | | | | | | | | | |
| Professional Fees | (2,867) | - | - | - | (2,975) | - | - | (2,990) | - | - | - | - | (4,030) | - | (12,862) |
| Bonus & Incentives | - | - | - | - | (2,150) | - | - | - | - | - | - | - | - | - | (2,150) |
| US Trustee Fees | - | - | (39) | - | - | - | - | - | - | - | - | - | - | - | (39) |
| Utility Deposit | - | (500) | - | - | - | - | - | - | - | - | - | - | - | - | (500) |
| Net Cash Flow After Other Expenses | (2,653) | 14,723 | (2,443) | 6,712 | (15,876) | 4,135 | (10,353) | (714) | (5,517) | 11,839 | (7,635) | 12,394 | (1,155) | (8,286) | (4,827) |
| Revolver Interest | - | - | (2,644) | - | - | - | (2,559) | - | - | - | (2,635) | - | - | - | (7,838) |
| 2nd Lien Interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Senior Notes Interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cash Flow After Debt Service | (2,653) | 14,723 | (5,086) | 6,712 | (15,876) | 4,135 | (12,911) | (714) | (5,517) | 11,839 | (10,270) | 12,394 | (1,155) | (8,286) | (12,665) |
| Paydowns to Revolver | (3,104) | - | - | - | - | - | - | - | - | - | - | - | - | - | (3,104) |
| Draw from Revolver | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Operating Cash | 129,484 | 144,207 | 139,120 | 132,783 | 116,908 | 121,043 | 108,132 | 94,947 | 89,430 | 101,269 | 90,999 | 96,910 | 90,750 | 82,464 | 82,464 |
| Restricted Cash | - | - | - | 13,049 | 13,049 | 13,049 | 13,049 | 25,520 | 25,520 | 25,520 | 25,520 | 32,003 | 37,008 | 37,008 | 37,008 |
| Ending Cash | $129,484 | $144,207 | $139,120 | $145,832 | $129,956 | $134,092 | $121,180 | $120,467 | $114,950 | $126,789 | $116,519 | $128,913 | $127,758 | $119,472 | $119,472 |

[1] The Interim Budget includes disbursements on account of prepetition and other claims that remain subject to court approval.

[2] Net Collections presented net of the revenue related disbursements described in the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Payment of (A) Mineral Payments and (B) Working Interest Disbursements.