**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re<br><br>SAMSON RESOURCES CORPORATION, *et al.*,[1]<br><br>                 Debtors. | )<br>)  Chapter 11<br>)<br>)  Case No. 15-11934 (CSS)<br>)<br>)  (Jointly Administered)<br>)<br>)  **Hearing Date and Time: December 29, 2015 at 4:00 p.m. (Eastern)**<br>)  **Objection Deadline: January 5, 2016 at 10:00 a m. (Eastern)**<br>)<br>)  **Related D.I. 474** |

## OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO ACTING UNITED STATES TRUSTEE'S MOTION FOR AN ORDER DIRECTING THE APPOINTMENT OF AN EXAMINER

The Official Committee of Unsecured Creditors of Samson Resources Corporation (the "**Committee**"), appointed in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), submits this objection (the "**Objection**") to the *Acting United States Trustee's Motion for an Order Directing the Appointment of an Examiner* [D.I. 474] (the "**Motion**") filed by Andrew R. Vara, Acting United States Trustee for Region 3 (the "**U.S. Trustee**"), in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") of the debtors and debtors in possession (collectively, the "**Debtors**"). In support of this Objection, the Committee respectfully represents as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Geodyne Resources, Inc. (2703); Samson Contour Energy Co. (7267); Samson Contour Energy E&P, LLC (2502); Samson Holdings, Inc. (8587); Samson-International, Ltd. (4039); Samson Investment Company (1091); Samson Lone Star, LLC (9455); Samson Resources Company (8007); and Samson Resources Corporation (1227).

**PRELIMINARY STATEMENT**

1.      Although the Committee is concerned about the theft of approximately $1.78 million of the Debtors' funds (the "**Theft**") and allegations that the Debtors have been miscalculating royalty interest payments (the "**Royalty Miscalculation Allegations**"), it submits that the appointment of an examiner is not necessary to address such concerns, at least at this time, and would result in needless costs to the Debtors' estates.

2.      The Debtors appear to be handling the Theft with the seriousness it deserves. After discovering the Theft, the Debtors worked closely with their depository bank and the wire destination bank, and have recovered more than 80% of the stolen funds, leaving approximately $300,000 missing (which the Debtors believe will be covered by their insurers).  The Debtors have hired a third-party forensic analyst to investigate the Theft, which investigation is expected to be complete in the next several weeks.  The Debtors also have put safeguards and procedures in place to prevent similar incidents from occurring in the future.  Accordingly, the appointment of an examiner to investigate the Theft is duplicative of the Debtors' own efforts.

3.      With respect to the Royalty Miscalculation Allegations, upon information and belief, out of the thousands of royalty owners to whom the Debtors remit royalty interest payments, only a few individuals—in two families—appear to have raised such allegations.  One family—the Seamster Heirs (as hereinafter defined)—has not alleged fraud, but rather expressed concern regarding the decreasing amounts of their royalty interest checks and indicated their intention to retain counsel to look into any potential underpayment.  The other family—Lloyd and Mary Ness (the "**Nesses**")—have been very vocal in alleging that the Debtors and their management have improperly deducted postproduction costs from their royalty interest payments.  The Nesses have raised these allegations in a lawsuit in the U.S. District Court for the

District of North Dakota and filed a proof of claim in the Chapter 11 Case of Samson Resources Corporation. The Committee has looked into the Nesses' allegations and has not uncovered any facts that suggest that the dispute is anything other than a two-party contractual dispute. Accordingly, the appointment of an examiner to investigate the Royalty Miscalculation Allegations does not appear to be necessary or justified by the costs to the Debtors' estates. Notably, such costs would be significant as the Motion seems to suggest that the examiner would look at royalties paid under all of the Debtors' thousands of oil and gas leases, governed by various state laws, thereby requiring significant legal and accounting expertise.

4. Given that the Debtors have repeatedly indicated that the value of their businesses is eroding, these Chapter 11 Cases must be managed in a cost-efficient manner so as to preserve value for the Debtors' estates and creditors. The costs and expenses of appointing an examiner for the purposes requested in the Motion is disproportionately high as compared to any benefit that would inure to the Debtors' estates, particularly since the Committee—which is authorized to investigate such matters under 11 U.S.C. § 1103(c)(2)—can undertake any supplemental investigation more efficiently.

5. For the foregoing reasons, and as set forth more fully herein, the Motion should be denied.

**BACKGROUND**

6. <u>The Chapter 11 Cases</u>. On September 16, 2015, each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11, United States Code (the "**Bankruptcy Code**"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On September 30, 2015, the U.S. Trustee appointed the Committee [D.I. 129].

7.      <u>The Theft</u>.  According to the Debtors, on November 17, 2015, an outside party hacked into the Debtors' e-mail system and sent an e-mail from the account of Philip Cook, the Debtors' chief financial officer, to the Debtors' treasury department with instructions for Samson Investment Company to wire approximately $1.78 million to a third party bank account maintained at Regions Bank.  The Debtors' treasury department wired the funds in compliance with such instructions, and the Debtors discovered the fraud shortly thereafter.  The Debtors promptly contacted the appropriate authorities, their auditor and insurance carrier, and key parties in the Chapter 11 Cases.

8.      The Debtors' depository bank, JPMorgan Chase Bank, N.A., and Regions Bank have been able to locate and hold in suspense approximately $1.46 million of the stolen funds, which are expected to be remitted to the Debtors before the end of this year upon Court approval of a hold harmless and indemnity agreement, which was approved on December 29, 2015 [D.I. 517].  The Debtors have alerted their insurance carriers about the Theft, and the Debtors believe that they will have full coverage for any unrecovered sums.

9.      Under the direction of their audit committee, the Debtors have been conducting an independent investigation into the Theft with the assistance of legal counsel, auditors, and digital forensic experts.  Safeguards have been instituted in order to ensure that a similar theft does not occur again.

10.     <u>The Landowners</u>.  The Motion states that the U.S. Trustee has received correspondence from certain *pro se* landowners regarding royalty interest payments they receive from the Debtors in connection with certain oil and gas leases, which allege that the Debtors "over a period of years have intentionally and fraudulently miscalculated their Royalty Interest

4

payments." (Mot. ¶ 16)  The U.S. Trustee has inquired with the Debtors as to these allegations and provided the Debtors' response to the landowners.

11.    All of the public filings referenced in the Motion appear to relate to interests held by either: (a) heirs of William James Seamster and/or Beatrice Williams (the "**Seamster Heirs**") [D.I. 152, 153, 154, 155, 156, 157, 158, 160]; or (b) the Nesses [D.I. 161].  In their filings, the Seamster Heirs indicated that they will seek out an attorney to advise them in these Chapter 11 Cases.  Likewise, the Committee has repeatedly advised the Nesses that they should retain counsel.

12.    The Debtors have advised the Committee that, although they hold working interests in thousands of properties, only the Seamster Heirs and the Nesses have asserted Royalty Miscalculation Allegations, and the Nesses are the only landowners who have alleged a fraud.  The dispute with the Nesses, however, is solely a matter of contractual interpretation over the meaning of the terms "at the mouth of the well" and "prevailing market rate" in the North Dakota oil and gas lease between the Debtors and the Nesses.

## OBJECTION

13.    Section 1104(c) of the Bankruptcy Code provides that, on request of a party in interest or the United States trustee, a bankruptcy court "shall order the appointment of an examiner to conduct *such an investigation of the debtor as is appropriate*, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if – (1) such appointment is the interests of creditors, any equity security holders, and other interests of the estate; or (2) the debtor's fixed, liquidated,

unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000." 11 U.S.C. § 1104(c) (emphasis added).

14. The Motion asserts that appointment of an examiner is mandatory because the financial criteria set forth in section 1104(c)(2) have been met. Although there is a split of authority regarding whether appointment of an examiner is mandatory in cases in which a debtor's fixed debts exceed $5 million, this simplistic approach has been repeatedly rejected by this Court. The prevailing view in this District is that, regardless of whether the statutory threshold has been met, there "has to be an appropriate investigation that needs to be done." *In re Visteon Corp.*, Ch. 11 Case No. 09-11786 (CSS) (Bankr. D. Del. May 12, 2010), Hr'g Tr. at 170:16-20 ("[I]t would be an absurd result to find that in every case where the financial criteria is met and a party-in-interest asks, the Court must appoint an examiner."); *see also U.S. Bank Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion, Inc.)*, 426 B.R. 114, 127 (Bankr. D. Del. 2010) (holding that appointment of examiner was not warranted even though statutory debt threshold was met and rejecting notion that examiner with no duties should be appointed to reconcile the statute: "I find no sound purpose in appointing an examiner, only to significantly limit the examiner's role when there exists insufficient basis for an investigation. To appoint an examiner with no meaningful duties strikes me as a wasteful exercise, a result that could not have been intended by Congress."); *In re Am. Home Mortg. Holdings, Inc.*, Ch. 11 Case No. 07-11047 (CSS) (Bankr. D. Del. Oct. 31, 2007), Hr'g Tr. at 76:9-12 (rejecting mandatory interpretation of section 1104(c)(2) because the financial threshold was only one part of inquiry and "the other piece of the puzzle is that there has to be an investigation to perform that's appropriate").

15. Thus, the better view is that section 1104(c)(2) does not require the appointment of an examiner, but rather provides a limitation on the requirement for appointment of an

examiner.  This is supported by the legislative history of the statute, in which Congress explained that the "standards for the appointment of an examiner are the same as those for the appointment of a trustee; *the protection must be needed, and the cost and expense must not be disproportionately high*."  H.R. Rep. No. 95-595, at 402 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6359 (emphasis added).

16.     The Motion fails to demonstrate that appointment of an examiner is appropriate under section 1104(c)(2) or is in the best interest of creditors and the Debtors' estates under section 1104(c)(1).  In the event circumstances develop warranting a further investigation of the Theft or the Royalty Miscalculation Allegations, such investigation can be conducted by the Committee, which is authorized by the Bankruptcy Code to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business . . . and any other matter relevant to the case . . . and perform such other services as are in the interest of those represented."  11 U.S.C. § 1103(c)(2), (5).

17.     With respect to the Theft, the Debtors are already in the process of conducting their own investigation, obviating the need for an examiner to conduct a duplicative one.  *See In re Am. Home Mortg. Holdings, Inc.*, Oct. 31, 2007 Hr'g Tr. at 77:2-8 (noting that because there were already ongoing investigations, the Court did not "think … there would be anything to be gained by appointing an examiner …").  The Debtors have already spent considerable time and resources in connection with their recovery of the stolen funds, and the U.S. Trustee has not alleged that the Debtors' efforts have been deficient in any way. *See In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 639 (Bankr. S.D.N.Y. 2012) (denying motion to appoint examiner where debt threshold was met and "the Debtor and its professionals conducted an appropriate inquiry and analysis of the facts and circumstances of this case").  The Debtors have been providing the

Committee with updates on the status of the Debtors' investigation. Because the Debtors expect to recover all of the stolen funds, the Committee does not believe that it is appropriate to have an examiner investigate the Theft.[2] In the event that a further investigation of the Theft becomes necessary, the Committee can conduct such investigation pursuant to section 1103(c) in a more efficient manner.

18.  Similarly, it is not appropriate to appoint an examiner to investigate the Royalty Miscalculation Allegations at this time. The concerns expressed by the Seamster Heirs and the Nesses are entirely personal to themselves. The Seamster Heirs have not alleged that the Debtors committed any fraud; their only concern relates to the decreasing amounts of their royalty interest checks and they have indicated that they intend to retain counsel in connection with same. The Nesses have alleged that the Debtors improperly deducted postproduction costs from their royalty interest payments, including in a lawsuit they commenced in the U.S. District Court for the District of North Dakota. The Nesses also have filed a proof of claim in the Chapter 11 Case of Samson Resources Corporation. Accordingly, the Seamster Heirs and the Nesses hold contingent, disputed, prepetition claims, which likely can be resolved based on the terms of their respective oil and gas leases. The Committee is positioned, and statutorily authorized, to investigate the validity of the claims under section 1103(c) of the Bankruptcy Code in a more efficient manner than that conducted by a newly-appointed examiner.

19.  Without more, the foregoing fails to support the assertion that the appointment of an examiner is appropriate. The Motion fails to demonstrate that the appointment of an examiner

---

[2] The U.S. Trustee, on the other hand, is required to notify the "appropriate United States attorney of matters which relate to the occurrence of any action which may constitute a crime under the laws of the United States and, on the request of the United States attorney, assist[] the United States attorney in carrying out prosecutions based on such action." 28 U.S.C. § 586(a)(3)(F).

for these purposes is in the interests of any creditors other than the Seamster Heirs or the Nesses. These parties should bear their own costs of investigation and litigation; they should not be borne by the Debtors' estates.

20. In sum, the appointment of an examiner as requested in the Motion is not in the interests of creditors (other than the Seamseter Heirs and the Nesses) or the Debtors' estates and is not appropriate. Any benefit to the appointment of an examiner is far outweighed by the incurrence of disproportionately high costs and expenses to the Debtors' estates. And any investigation that is necessary can be conducted by the Committee in a more efficient manner.

## **CONCLUSION**

WHEREFORE the Committee requests that the Court deny the Motion and grant such further relief as the Court deems just and proper.

Dated: December 30, 2015

        FARNAN LLP

        /s/ Michael J. Farnan_____
        Joseph J. Farnan, Jr. (Bar No. 100245)
        Joseph J. Farnan, III (Bar No. 3945)
        Michael J. Farnan (Bar No. 5165)
        919 North Market St., 12th Floor
        Wilmington, DE 19801
        Telephone:  (302) 777-0300
        Facsimile:  (302) 777-0301
        farnan@farnanlaw.com
        jjfarnan@farnanlaw.com
        mfarnan@farnanlaw.com

        WHITE & CASE LLP
        Thomas E Lauria (pro hac vice)
        Southeast Financial Center, Suite 4900
        200 South Biscayne Blvd.
        Miami, FL 33131
        Telephone:  (305) 371-2700
        Facsimile:  (305) 358-5744
        tlauria@whitecase.com

        Glenn M. Kurtz (pro hac vice)
        J. Christopher Shore (pro hac vice)
        Michele J. Meises (pro hac vice)
        Thomas MacWright (pro hac vice)
        1155 Avenue of the Americas
        New York, NY 10036
        Telephone:  (212) 819-8200
        Facsimile:  (212) 354-8113
        gkurtz@whitecase.com
        cshore@whitecase.com
        michele.meises@whitecase.com
        tmacwright@whitecase.com

        *Attorneys for the Official Committee of Unsecured Creditors*