IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| SAMSON RESOURCES CORPORATION, *et al.*, | ) Bankruptcy Case No. 15-11934(CSS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Related Docket Nos.: 675, 677, 1190 and 1193** |

## <u>MEMORANDUM ORDER</u>

Upon consideration of the *Debtors' First Omnibus Objection (Substantive) to Proofs of Claim 559, 753, 869, 1798, 1799, and 1800 Filed on Behalf of Lloyd Odell Ness and Certain Family Members*[1] (the "Ness Objection") which seeks an order disallowing, or in the alternative reducing and reclassifying, claim numbers 559, 753, 869, 1798, 1799 and 1800 (collectively, the "Ness Claims" filed by the "Ness Claimants"); the Court having held an evidentiary hearing on the Ness Objection on July 6, 2016 (the "Hearing");[2] and the Court having issued the *Order Regarding Supplemental Briefing;*[3] and the Court having held a telephonic status conference on July 12, 2016 (the "Status Conference");[4] and the parties having filed supplemental briefs;[5] and the Court finding that (1) it has jurisdiction over these matters,

---

[1] D.I. 675 and 677.

[2] *See* Transcript of Hearing on July 6, 2016 (D.I. 1151). Citations to the record of the Hearing will be referred to as "Tr. page:line."

[3] D.I. 1141.

[4] *See* Transcript of Status Conference on July 12, 2016 (D.I. 1180).

[5] D.I. 1190 and 1193.

pursuant to 28 U.S.C. § 1334; (2) this is a core proceeding, pursuant to 28 U.S.C. § 157(b);

and (3) this Court has the judicial power to enter a final order;

The Court hereby grants the Ness Objection for the reasons set forth herein:

## A. Factual Background

### a. Oil and Gas Lease

1.     On June 27, 2007, a predecessor to the Debtors, Sundance Oil and Gas, LLC

entered into an Oil and Gas Lease with Lois P. Ness[6] (the "Ness Lease").  The Ness Lease

created a one-sixth royalty interest in the oil and gas produced from wells drilled on the

Ness property.  The Debtors drilled and now operate 10 wells on the Ness property

(referred to herein as the "Ness Wells").

2.     The Ness Lease provides for the Debtors:

> 1st. To deliver to the credit of the Lessors, free or cost, in the pipe line to which Lessee may connect wells on said land, the equal [one-sixth (1/6th)] part of all oil produced and saved from the leased premise.
>
> 2nd. To pay Lessor [one-sixth (1/6th)] of the gross proceeds each year, payable quarterly, for the gas from each well where gas only is found, which the same is being used off the premises, and if used in the manufacturer of gasoline a royalty of [one-sixth (1/6th)], payable monthly at the prevailing market rate for gas.
>
> 3rd. To pay lessor for gas produced from any oil well and used off the premises or in the manufacture of gasoline or any other product a royalty of [one-sixth (1/6th)] of the proceeds, at the mouth of the well, payable monthly at the prevailing market rate.[7]

---

[6]  Ms. Lois Ness had a life-estate in the underlying property located in North Dakota; thus, her step-children, including Mr. Ness (identified in more detail *infra*), the remainder owners of the property, ratified the Ness Lease prior to Ms. Lois Ness entering the Ness Lease.

[7]  Ness Lease at ¶ 3.

3.     Later, Ms. Ness's interest in the Oil and Gas Lease was divided among her step-children, which includes Lloyd Odell Ness (hereinafter, "Mr. Ness").  Although the Ness Lease provides for a one-sixth aggregate royalty, Mr. Ness and the other individual Ness Claimants each own a fraction of this one-sixth interest based on the divided ownership of the Ness property.

### b. Post-Production of the Oil and Gas

4.     At the time of the drilling of the Ness Wells, there was no pipeline to take any oil and/or gas to the market.  As a result, the Debtors contracted with Oneok Rockies Midstream, LLC ("Oneok") to construct a pipeline for oil and gas.  Pursuant to the Gas Purchase Agreement between Oneok and Samson Resources Company, dated March 15, 2012 (the "Oneok Contract"), Oneok charges the Debtors for processing and bringing the oil and gas to market, referred to as "post-production" charges.

5.     The Ness Wells are in the Bakken Shale and the wells produce both oil and gas.  At the Hearing, Lance Price, the Debtors' General Manager of Production Marketing, testifying about the process of removing the oil and gas from the Bakken Shale, testified that upon reaching the surface the material is separated into water, gas, and oil.[8]  The gas then enters the gas pipeline owned by one of the Oneok entities and the oil enters a separate pipeline also owned by one of the Oneok entities.  Mr. Price testified that neither the gas nor the oil are ready for sale on the market when they are removed from the Bakken Shale.[9]  Mr. Price further testified that the gas from the wells must be put into the

---

[8] Tr. 92:18-22.

[9] Tr. 93:21-24.

gas pipeline because the North Dakota Industrial Commission ("NDIC"), which regulates the drilling and production of oil and gas in North Dakota, has issued regulations whereby the Debtors must capture a minimum of 80% of the gas production (rather than burning ("flaring") the gas at the well).[10]

6.    Mr. Price also testified that the gas that is removed from the Bakken Shale is very high in "British thermal units" ("Btus") and must be processed to reduce the natural gas liquids ("NGLs") in order to be used in the market.[11]  In other words, the gas is rich or "too strong" to be marketable without processing.[12]  In order to make the gas marketable, the gas must be processed, and in the case of the gas from the Ness Wells, the gas must enter the Oneok pipeline, thus, incurring post-production charges.[13]

7.    Due to the low market price of gas in recent times, the post-production costs related to the gas extracted from the Ness Wells exceeds the market price of the gas.[14]  However, the Debtors continue to pump at the Ness Wells.  Mr. Price testified as follows:

> Q.    Is Samson able to make a profit by extracting gas from Mr. Ness' wells?
>
> A.    Unfortunately, at this time, no.

---

[10] Tr. 93:25-94:23.

[11] Tr. 95:5-14.

[12] Several times during the hearing, Mr. Ness made the analogy likening "sour" gas to apples with worms, whereas the gas from the Bakken Shale was like a perfect, edible apple. *See, e.g.,* Tr. 128:4-8 and 140:22-141:2.  However, based on the testimony and evidence presented at the Hearing, the Court, continuing Mr. Ness's analogy, if sour gas is like a wormy-apple, the gas removed from the Bakken Shale is like a "gold-plated" apple – and in order to eat this apple, the gold must be removed.  Thus, even though the gas removed at from the Ness Wells is "rich," this gas must still be processed in order to be marketable.

[13] At the Hearing, Mr. Ness suggested that he could take his portion of the gas "in kind" rather than having it enter the pipeline.  However, as this is not occurring the Court declines to consider this hypothetical scenario.

[14] Tr. 101:12-17.

> Q.    Then why does Samson continue to pump gas if it's losing money?
>
> A.    It's *required* to in order to produce the oil which is the profitable product at this time.
>
> Q.    Are you aware of any way that Samson could extract the valuable profitable oil without also extracting the natural gas?
>
> A.    Not that I'm aware of.[15]

8.    At the Hearing, Mr. Ness suggested that the Debtors should stop removing gas from the Ness Wells.[16]  However, Mr. Ness did not present any evidence to support his position that it was possible to drill for oil in the Ness Wells without removing the gas.

### c.  Royalty Payments

9.    The amount of royalty payments starts with the market price received for the oil or gas and is divided among the fractional interest holders of each the well.[17] Unless otherwise specified in the lease, the Debtors then subtract the fractional costs for post-production charges from the royalties prior to issuing royalty checks.[18]  The fractional share of the expenses corresponds with the royalty owners' fractional interest in the well.

10.    From November 2012 to January 2016, the Debtors have made royalty payments to Mr. Ness in the total amount of approximately $48,123.49.  During that same

---

[15] Tr. 101:15-25 (emphasis added).

[16] *See, e.g.,* Tr. 155:11-15; 169:16-17.

[17] Tr. 99:11-13.

[18] Tr. 108:1-6.

period, the Debtors have deducted post-production costs in the total amount of approximately $1,930 from Mr. Ness' royalty payments.[19]

### d. Bankruptcy Claims and the Objection Thereto

11.    In November 2015, each of the Ness Claims were filed against Samson Resources Corporation.   Furthermore, each of the Ness Claims were substantially identical.  Mr. Ness's claim asserts "$75,000 - $1,000,000" for royalties allegedly owed by the Debtors to Mr. Ness, plus interest at an annual rate of 18 percent.[20]  Mr. Ness's claim also states that the claim is secured and entitled to priority as a mineral payee pursuant to section 507 of the Bankruptcy Code.

12.    The Debtors objected to the Ness Claims on the following bases: (i) the Debtors have made all royalty payments to date and Mr. Ness' theory of improper deductions is incorrect as a matter of law; (ii) even if the deductions were improper (which the Debtors assert they are not), the amount at stake is only a fraction of the asserted claim amount and the Ness Claimants are not entitled to interest; (iii) the Ness Claims are not supported by any documentation; (iv) the Ness Claims are asserted against the wrong debtor (all were asserted against Samson Resources Corporation when they should have been asserted against Samson Resources *Company*); (v) the Ness Claims are not secured because they have not identified any collateral and the Debtors are not aware of a perfected security interest; and (vi) the Ness Claims are not entitled to priority as there is no priority right in §507 for "mineral payee."

---

[19]  Tr. 108:11-17.

[20]  Certain of the Ness Claim include two asserted value ranges, $75,000-$1,000,000 and $750,000-$1,000,000.

13.     Although Mr. Ness did not file a written response,[21] Mr. Ness articulated several arguments at the Hearing.  Specifically, Mr. Ness responds to the Ness Objection on the following bases: (i) the relevant case (discussed below) law is only applicable to "sour" gas[22] and, furthermore, as the Ness Lease was entered into prior to the relevant case law such law should not apply to the Ness Lease;[23] (ii) the Debtors should only remove the oil from the wells and should not extract any natural gas from the wells;[24] (iii) even if Mr. Ness took his gas "in kind" from the well, pursuant to the Oneok Contract, Mr. Ness would have to deliver 52% of any monies earned to the Debtors;[25] (iv) the stay should be modified or, in the alternative, the Court should abstain from hearing this matter, to allow the North Dakota courts to hear this matter;[26] and (v) post-production costs of gas that exceed the amount the gas is sold for should not be netted against the oil royalties.[27]

---

[21] No written responses were made to the Ness Objection nor did any of the Ness Claimants, other than Mr. Ness, appear at the Hearing.  As Mr. Ness is a *pro se* litigant he is unable to represent the other Ness Claimants.  However, as all the Ness Claims are substantially identical and all relate to the Ness Wells, the Court hereby finds that all of the Ness Claims are modified by this Memorandum Order.  Furthermore, Mr. Ness did not move to admit his documents at the Hearing.  Thus, the Court hereby admits the following exhibits into the record: Ness Exhs. 1(a), 1(b), 2(a), 2.1, 2.2, 5, 7, 9, 11, 11(a), 11(b), and 20.  Any notes or commentary provided by Mr. Ness on these exhibits will be considered part of Mr. Ness's arguments in response to the Ness Objection.

[22] *See, e.g.*, Tr. 134:5-24.

[23] *See, e.g.*, Tr. 153:9-155:7.

[24] *See, e.g.*, Tr. 155:11-16.

[25] *See, e.g.*, Tr. 136:18-24; 158:17-159:7.

[26] *See, e.g.*, Tr. 158:10-11; 181:19-24.

[27] *See, e.g.*, Tr. 156:14-15; Tr. 168: 18-22; Tr. 169:13-19.

**B. The Ness Claims are modified so that the claims are asserted against the correct Debtor.**

14.     All of the Ness Claims are asserted against Samson Resources Corporation. One Ness Claim (claim no. 1799 filed by the Lassen, Robert L. & Velma J. Rev. Tr.) was also filed against Samson Resources Company, but under the Court's bar date order, a claim filed against multiple Debtors may be treated as filed against only the first-listed Debtor, which in this claim, was Samson Resources Corporation.[28]

15.     Under the Ness Lease, Sampson Resources *Company* is the lessee.  Thus, each of the Ness Claims will be modified to be asserted against Sampson Resources Company.

**C. The Ness Claims shall be reclassified as general unsecured claims for disputed amounts, if any, occurring prior to the Petition Date.**

16.     The Ness Claimants have not identified any terms of the Ness Lease, specified any assets that constitute their collateral, or provided any legal theory to establish their status as secured creditors.  It appears that the basis for Mr. Ness's asserted secured status is that his royalty interests were "bestowed upon severance" of the oil and gas from the land.  However, the Court could find no case law or statute to support such an assertion.  As such, Mr. Ness does not have a secured claim against the Debtors.

17.     The Ness Claimants also assert priority status for their claims.  However, the Ness Claimants do not qualify for any category of priority claim under section 507 of the Bankruptcy Code.

---

[28] D.I. 224 at ¶ 4(e).

18.     Thus, each of the Ness Claims, to the extent allowed, shall be reclassified as general unsecured claims.

**D. Post-production expenses, in accordance with North Dakota law, are properly charged against the royalties.**

    **a. Post-production expenses are properly charged to the Ness Claimants**

19.     Mr. Ness asserted at the hearing that post-production expenses should be limited to "sour gas" or to contracts entered into *after* the North Dakota Supreme Court decision in *Bice v. Petro-Hunt, L.L.C.*[29] (discussed below).

20.     However, the Court's discussion of the law will begin with *Hurinenko v. Chevron, USA, Inc.*,[30] issued in 1995.  In *Hurinenko*, the wells, also located in North Dakota, produced oil as well as "casinghead gas."[31]  The casinghead gas at issue was not pure natural gas and was not marketable until processed.  The Eighth Circuit, citing cases in 1987 and 1995, stated that "[t]he North Dakota Supreme Court calculates market value at the well by the "work-back" method: deducting processing costs from gross sales

---

[29] *Bice v. Petro-Hunt, L.L.C.*, 768 N.W.2d 496 (N.D. 2009).

[30] *Hurinenko v. Chevron, USA, Inc.*, 69 F.3d 283 (8th Cir. 1995).

[31] *Hurinenko*, 69 F.3d at 284.

revenues."[32]    The Eighth Circuit concluded that post-production costs should be deducted prior to the calculation of royalties.[33]

21.    Later, in *Bice v. Petro-Hunt, L.L.C.*,[34] the Supreme Court of North Dakota, persuaded by the *Hurinenko* holding,[35] held that post-production costs may be deducted prior to calculating royalties.  More specifically, the *Bice* court held:

> [T]he Little Knife Field produces sour gas with no discernible market value at the well before it is processed and the hydrogen sulfide and liquid hydrocarbons are removed. Since the contracted for royalty is based on the market value of the gas at the well and the gas has no market value at the well, the only way to determine the market value of the gas at the well is to work back from where a market value exists, meaning using the work-back method, by deducting post-production costs from the plant tailgate proceeds. . . .
>
> We conclude the term market value at the well is not ambiguous.  We join the majority of states adopting the "at the well" rule and rejecting the first marketable product doctrine.  Thus, we conclude the district court properly

---

[32]  *Id.* at 285 (*citing Koch Oil Co. v. Hanson*, 536 N.W.2d 702, 707 (N.D.1995); *Amerada Hess Corp. v. Conrad*, 410 N.W.2d 124, 127 n. 3 (N.D.1987)).  Specifically, in *Amerada Hess Corp.*, the North Dakota Supreme Court stated:

> The Commissioner based his assessment on the fair market value of the gas at the time of production and used the "work-back" method to arrive at his calculations.  The issue is which of these methods of valuing gas is authorized by our gross production tax laws under the circumstances presented.

*Amerada Hess Corp.*, 410 N.W.2d at 127 and n. 3.

[33]  *Id.* at 285 ("The North Dakota Supreme Court calculates market value at the well by the 'work-back' method: deducting processing costs from gross sales revenues.  Application of the work-back formula is particularly appropriate in this case. The gas had no readily discernible market value at the well before the incursion of processing costs to separate the compounds.  Indeed, in 1980 the state tax commissioner and the oil companies agreed to use the work-back method to calculate the gas's wellhead value for the purpose of state gas gross production taxes." (citations omitted)).

[34]  *Bice v. Petro-Hunt, L.L.C.*, 768 N.W.2d 496 (N.D. 2009).

[35]  *Id.* at 502.

determined Petro–Hunt can deduct post-production costs from the plant tailgate proceeds prior to calculating royalty.[36]

22.     Although *Bice* Court noted that the "market at the well" calculation had not been previously defined by the Supreme Court of North Dakota, the *Bice* Court stated:

> We have not explicitly defined how a royalty should be calculated when based upon "market value at the well." However, in two cases involving the North Dakota Tax Commissioner's assessment of oil and gas taxes, we held that the State Tax Commissioner could calculate the fair market value of the oil and gas for tax purposes by deducting processing costs from the gross sales revenues using the work-back method.[37]

Thus, consistent with its prior rulings, as well as the prior decision of the Eighth Circuit in *Hurinenko*, under North Dakota law, the operator may deduct all of post-production costs that incur after-extraction to prepare and transport the gas for sale on the market from royalty payments on account of a well's production.[38]

---

[36] *Id.*

[37] *Id.* (citing *Koch Oil Co. v. Hanson*, 536 N.W.2d 702, 707–08 (N.D.1995); *Amerada Hess Corp. v. Conrad*, 410 N.W.2d 124, 127 n. 3, 130 (N.D.1987)).

[38] *See also Kittleson v. Grynberg Petroleum Co.*, 876 N.W.2d 443 (N.D. 2016).  The *Kittleson* court explained *Bice*'s holding as follows:

> In *Bice*, the royalty clauses of the leases in dispute required the lessor's royalty to be calculated on the basis of the gas's market value at the well. We adopted the "at the well" rule in our interpretation of "market value at the well."  Under the "at the well" rule, a lessee may use the work-back or netback method to calculate the gas or oil's market value at the well. "Under the work-back method the lessee calculates the market value of the gas at the well 'by taking the sales price that it received for its oil or gas production at a downstream point of sale and then subtracting the reasonable post-production costs (including transportation, gathering, compression, processing, treating, and marketing costs) that the lessee incurred after extracting the oil or gas from the ground.'  "The work-back method under the "at the well" rule allows a lessee to deduct post-production costs from the plant tailgate proceeds before calculating royalty.

23.    There is nothing in the case law that limits these holdings to "sour gas" nor is it limited to post-*Bice* production of oil and gas.   In fact, the North Dakota Supreme Court describes its *Bice* holding as consistent with prior case law.   Thus, Mr. Ness's assertions that *Bice* should be limited to "sour gas" or should not be applicable to the Ness Lease (which was entered into prior to the *Bice* holding) must fail.   The Court finds that the holding in *Bice* includes all post-production fees regardless of whether the gas is "sour" or "rich" and regardless of when the lease was entered into.   As such, it is appropriate for the Debtors to deduct post-production expenses from Mr. Ness's royalties.

**b.   Evidence shows that the Debtors are unable to extract oil without extracting gas from these wells**

24.    Mr. Ness also asserted that the Debtors should "cap off" gas production, while still drilling for the oil in the Ness Wells.   However, the evidence at the Hearing was that Samson continues to pump gas from the Ness Wells because it is required to  in order to produce oil.[39]   The testimony continues as follows:

> Q.    Are you aware of any way that Samson could extract the valuable profitable oil without also extracting the natural gas?
>
> A.    Not that I'm aware of.[40]

---

*Kittleson*, 876 N.W.2d at 446-47 (citations omitted).  In *Kittleson*, the lease provided additional language stating: "provide however, that there shall be no deductions from the value of Lessor's royalty of any required processing, cost of dehydration, compression, transportation, or other matter to market such gas." *Id*. at 447.  Thus, the North Dakota Supreme Court held that such specific language altered the language in the royalty clause and held that deductions for post-production costs could not be subtracted from the royalty payments.  *Id*.  The Ness Lease contains no such limitation, thus *Kittleson* is not applicable to the case *sub judice*.

[39]  Tr. 101:18-20.

[40]  Tr. 101:22-25.

Mr. Ness did not produce any evidence to contradict this testimony.  Thus, the Court holds that Mr. Ness's argument that the Debtors should cap the gas production unpersuasive.

### c. The Oneok Contract does not provide a "kick-back" to the Debtors

25.    Mr. Ness asserted at the hearing that even if he took his portion of the gas produced from the Ness Wells "in kind," the Debtors would receive a 52% "kick-back." As Mr. Ness is not taking his portion of the gas "in kind," the Court does not need to reach this issue.

26.    However, the Court also believes that this assertion is a misunderstanding of the contract with Oneok.  The Oneok contract states:

> **Third Party Contract Additions.** Should BUYER contract for third party volumes (other than selling parties under the Concurrent Contracts) that will be delivered into the Facilities constructed hereunder . . a volume credit equal to such third party volumes, . . . delivered into the Facilities times SELLER's Proportionate share shall be credited to Seller, thereby reducing by such amount SELLER's ANNUAL Quantity ( . . . SELLER's credit for such month shall be . . . 52.5% . . . ).[41]

This credit only results in a reduction in seller's annual quantity, which is defined as the minimum volume that the Debtors (the seller) has to deliver in order to avoid a shortfall penalties to Oneok.  This provision is not a cash credit to the Debtors, it merely allows them to deliver less gas to Oneok without accruing shortfall penalties.  Thus, the Oneok Contract does not provide a "kick-back" to the Debtors in the event that Mr. Ness received his portion of the oil and gas "in kind."

---

[41] Oneok Contract, Exh. A, p. 7 "Minimum Quantity Agreement," subparagraph h.

### E. The Court will not modify the automatic stay nor abstain from hearing the Ness Objection.

27.     As discussed above, Mr. Ness asserted at the Hearing that this matter should be heard in North Dakota.[42]  Although Mr. Ness's arguments were not more specific than "I want to take this to North Dakota," the Court will view Mr. Ness's request as both a motion for relief from the automatic stay and a motion for this Court to abstain from hearing the Ness Objection.  In either scenario, and as set forth in more detail below, the Court denies Mr. Ness's request to "send" this matter to North Dakota.

28.     The Bankruptcy Code authorizes bankruptcy courts to grant relief from the automatic stay for "cause."[43]  Courts are to determine "cause" based on the totality of the circumstances in each particular case.[44]  The factors courts generally use in determining whether cause exists are: (1) whether any great prejudice to either the bankrupt estate or the debtor will result from a lifting of the automatic stay; (2) whether the hardship to the non-bankrupt party by maintenance of the automatic stay considerably outweighs the hardship to the debtor; and (3) the probability of the creditor prevailing on the merits.[45]

---

[42]  *See, e.g.,* Tr. 158:10-16 ("And if necessary, I'd like to take them back to North Dakota and address this in North Dakota 'cause we tried to address this in North Dakota and Samson came here.  And that's why we're here.  So I'm more than willing to be able to take these issues back to the state of where they came from with certain specifics that have occurred since then."); 181:19-24 ("I think I'd like to take this back to North Dakota, if at all possible, because I think the justices there will probably roll over if they really understood what was occurring.  And I don't think that they meant for this to occur.  I think they meant for hey, this is unmarketable gas.").

[43]  11 U.S.C. § 362(d)(1).

[44]  *In re Wilson,* 116 F.3d 87, 90 (3d Cir.1997).

[45]  *Delaware Trust Co. v. Energy Future Intermediate Holding Co. LLC (In re Energy Future Holdings Corp.),* 533 B.R. 106, 117 (Bankr. D. Del. 2015), *aff'd,* No. CV 15-620 RGA, 2016 WL 627343 (D. Del. Feb. 16, 2016).

29.     This matter has already been litigated with a full evidentiary Hearing, for the Debtors to re-try this matter in North Dakota would be a waste of estate resources. Furthermore, as stated above, the Ness Claims are general unsecured claims and Mr. Ness, nor the other Ness Claimants, provided any justification for the amount of their filed claims.  Thus, the Debtors would suffer extreme prejudice if the Debtors had to re-litigate this matter in North Dakota.

30.     Furthermore, prior to the Hearing, Mr. Ness was provided with written discovery.  Mr. Ness engaged an expert witness and excerpts of the expert witness deposition testimony were presented at the Hearing.[46]   Thus, at this point, Mr. Ness' hardship in not having the North Dakota courts hear this matter does not outweigh the prejudice to the Debtors.

31.     Lastly, as set forth herein, the Court finds that Mr. Ness would not prevail on the merits.  As such, the Court will not modify or lift the automatic stay for Mr. Ness to re-try this matter in North Dakota.

32.     The Court also concludes that neither mandatory abstention under 28 U.S.C. § 1334(c)(2) nor permissive abstention under 28 U.S.C. § 1334(c)(1) are warranted under the circumstances in this case.

> Mandatory abstention may only be warranted if each of the following six requirements are satisfied: (i) the motion to abstain is timely; (ii) the action is based upon a state law claim or cause of action; (iii) an action has been commenced in state court; (iv) the action can be timely adjudicated in state court; (v) there is no independent basis for federal jurisdiction which would have permitted the action to be commenced in federal

---

[46] *See, generally*, Tr. 171:21-178:19 and D.I. 1130.

court absent bankruptcy; and (vi) the matter is non-core and is only "related to" a case under title 11.  A party moving for mandatory abstention "must meet all the requirements of mandatory abstention for relief to be granted."  The purpose of mandatory abstention is "to require federal courts to defer to the state courts to handle lawsuits which, although 'related to' a bankruptcy, can be promptly resolved in state court without interfering with the proceedings pending in the federal courts."

Permissive abstention may nonetheless be appropriate where the requirements for mandatory abstention have not been met: "[N]othing in this section prevents a district court in the interest of justice, or in the interest of comity with state courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11."  The Bankruptcy Court in this District has previously held that "[a]bstention can exist only where there is a parallel proceeding in state court.  That is, inherent in the concept of abstention is the presence of a pendant state action in favor of which the federal court must, or may, abstain."[47]

33.    As all elements of mandatory abstention must be met, the Court will focus on the fact that Mr. Ness waited until the Hearing to request that this matter be heard by the North Dakota court.  Furthermore, other than comments made on the record during the Hearing,[48] Mr. Ness did not make a motion for the Court to abstain.[49]    As all the elements need to be met and two of those elements have not, mandatory abstention is not appropriate.  Thus, the Court will determine if permissive abstention is appropriate and finds that it is not.

---

[47] *Sportsman's Warehouse, Inc. v. McGillis/Eckman Investments-Billings, LLC (In re Sportsman's Warehouse, Inc.)*, 457 B.R. 372, 390 (Bankr. D. Del. 2011) (citations omitted).

[48] *See, supra,* fn. 42.

[49] *Owens-Illinois, Inc. v. Rapid American Corp. (In re Celotex Corp.)*, 124 F.3d 619, 631 (4th Cir. 1997) ("We do not address this argument, because Owens waived any right to invoke the mandatory abstention provision of § 1334(c)(2) by failing to make an appropriate motion.").

34.    Courts have identified twelve factors relevant to discretionary abstention:

> 1.  the effect or lack thereof on the efficient administration of the estate;
>
> 2.  the extent to which state law issues predominate over bankruptcy issues;
>
> 3.  the difficulty or unsettled nature of applicable state law;
>
> 4.  the presence of a related proceeding commenced in state court or other non-bankruptcy court;
>
> 5.  the jurisdictional basis, if any, other than section 1334;
>
> 6.  the degree of relatedness or remoteness of the proceeding to the main bankruptcy case;
>
> 7.  the substance rather than the form of an asserted "core" proceeding;
>
> 8.  the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court;
>
> 9.  the burden of the court's docket;
>
> 10.  the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties;
>
> 11.  the existence of a right to a jury trial; and
>
> 12.  the presence of non-debtor parties.[50]

35.    Here, first, the Ness Claimants filed significant claims against the Debtors' estate and these claims must be adjudicated for the estates to continue their administration. Thus, this factor does not favor abstention.

36.    Second, although state law underlies the dispute between the Ness Claimants and the Debtors, the Court is also adjudicating which estate the claims are

---

[50] *LaRoche Indus., Inc. v. Orica Notrogen LLC (In re LaRoche Indus., Inc.)*, 312 B.R. 249, 253-54 (Bankr. D. Del. 2004) (citations omitted).

against and the priority of those claims pursuant to the Bankruptcy Code.  Thus, this factor is neutral for abstention.

37.    Third, through *Bice* and its progeny, the state law issue of whether post-production costs may be subtracted before royalties are calculated is well settled; however, the issue of whether gas post-production costs may be subtracted from oil royalties is not as clear.  Thus, this issue favors abstention.

38.    Fourth, the Court understands that an action was filed in the United States District Court for the District of North Dakota (the "District Court Action") had been filed by the Ness Claimants several months prior to the Debtors' bankruptcy.  It is also this Court's understanding that this District Court Action has been stayed by the Debtors' bankruptcy.  However, no evidence was presented regarding the status of this District Court Action.  While this factor favors abstention, the Court gives it little weight as no evidence was presented concerning this District Court Action; furthermore, this matter is before this Court due to the claims filed by the Ness Claimants.

39.    Fifth, there is an independent basis for this Court's jurisdiction over this matter due to the claims filed by the Ness Claimants and the Ness Objection filed by the Debtors.  This factor does not favor abstention.

40.    Sixth, this matter is related to the bankruptcy cases due to the Ness Claims and the Ness Objection.  The Debtors have filed a plan of reorganization[51] and must

---

[51]  *See* D.I. 960 and 961; *see also* D.I. 1188.  It is the Court's understanding that negotiations between the Debtors and the creditor consistencies are ongoing.

understand the scope of the claims against the estates to proceed with this process. This factor does not favor abstention.

41.     Seventh, although the underlying dispute is based on North Dakota law, there are also several issues of bankruptcy law that must be decided in adjudicating the Ness Claims. This factor does not favor abstention.

42.     Eighth, there is no issue raised about severing core from state law matters, because the only matter before the Court is core. This factor does not favor abstention.

43.     Ninth, although this Court has a full and demanding docket, the Ness Objection will not unnecessarily add to that burden. This factor does not favor abstention.

44.     Tenth, there is no forum shopping issue. Delaware is the situs of the Debtors' bankruptcy cases and the Debtors' bankruptcy cases were not driven by the allegations in the Ness Claims. This factor does not favor abstention.

45.     Eleventh, this Court is unaware regarding whether the Ness Claimants sought or assert a right to a jury trial in the District Court Action. Thus, this factor is neutral.

46.     Twelfth, although the Court is aware of the District Court Action, the Court does not have any evidence regarding the other parties to the action. This factor is neutral.

47.     Evaluating these twelve factors is not a mathematical formula.[52]   However, under the circumstances of this matter and as discussed above, the factors do not weigh in favor of abstention.  As a result, the Court will deny Mr. Ness' request to abstain from hearing the Ness Objection and will not "send" this case to North Dakota to be litigated.

**F.  Post-Production costs related to gas that exceed the value of the gas can be netted against the oil royalties.**

48.     At the Hearing, the Debtors presented evidence regarding how the post-production costs were deducted from the royalties.  The Debtors also presented demonstrative evidence showing how such post-production costs were deducted.[53]  The demonstrative evidence reflects the "Percent of Proceeds Statement – Allocated" for July 2015 from Oneok and how those costs are carried over and then divided among the Ness Claimants.  This demonstrative exhibit *clearly* reflects that at least in July 2015, the Debtors subtracted all of the post-production costs, including post-production costs related to gas that exceeded the value of the gas received in the market.

49.     Furthermore, Mr. Ness made the following statements at the Hearing:

· "[the Debtors are] taking big [gas] gathering deductions and they're so big that it eats into our oil."[54]

· "Now $4,000 negative [from gas] goes into the oil.  At what point did the royalty owner become in business – at what

---

[52] *Trans World Airlines, Inc. v. Karabu Corp.*, 196 B.R. 711, 715 (Bankr. D. Del. 1996).

[53] The Debtors presented the expansive check detail supporting the demonstrative evidence, which was admitted by the Court.  *See,* Debtors Exh. 5.  The check detail is quite confusing, thus, the testimony at the hearing walked-through the demonstrative evidence.  Although, the Court is well aware that the demonstrative evidence is not admissible, thus while referring to the demonstrative as a clear example, the Court is specifically relying on the check detail and testimony in making these comments.  *See* Tr. 102:4-108:17 and 144:3-151:2.

[54] Tr. 156:14-15.

point did we become a working interest where we're going to be in business with them and we don't – it's royalties."[55]

· "That's based on two different products, two different transactions.  One transaction is a natural gas transaction which results in an unreasonable negative.  Now I'm not – I'm a business man.  I'm not going to do something like that, I'll cap the gas off.  But that negative seems to be a convenient way to debit into the oil royalties."[56]

50.    As a result of these explanations and statements, the Court requested additional briefing on whether post-production costs of gas that exceed the value of the gas can be deducted from oil royalties.  The Court also held a Status Conference with the Debtors and Mr. Ness.[57]

51.    At the Status Conference, the Debtors reported that such amounts were not netted, even though the evidence discussed at the Hearing reports otherwise.[58]  Mr. Ness responded that such amounts were deducted from his royalty.[59]

52.    In adjudicating a claim objection, the Court applies a burden-shifting framework.[60]  Initially, the burden of proof lies on the claimant; if the claimant supports

---

[55] Tr. 168: 18-22.

[56] Tr. 169:13-19.

[57] *See* D.I. 1180.

[58] At the Status Conference, the Debtors represented that for several months, including July 2015, such gas post-production overages were indeed netted against the oil royalties prior to the royalty payments being made.  The Debtors continued that the Debtors then changed their internal policies regarding netting and reimbursed the royalty owners for any gas post-production overages taken from the oil royalties.  Status Conference Tr. 5:13-8:6; 11:9-16.  Although the Debtors offered to supplement the record with evidence regarding the netting and reimbursement, the Court declined to re-open the record.  Status Conference Tr. 11:22-12:23.  Thus, the Court believes there to be a gap in the evidence as a result of these statements made at the Status Conference.  However, based on the discussion *infra*, such evidence would not change the outcome in this matter.

[59] Status Conference Tr. 9:2-11:5.

[60] *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992).

his claim with sufficient facts or documentation, the claim is deemed *prima facie* valid.[61] The burden then shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the claim.[62] "It is often said the objector must produce evidence equal in force to the *prima facie* case."[63] If the objector does so, the burden then reverts to the claimant to prove its validity by a preponderance of the evidence.[64] Here, Mr. Ness did not present any evidence in support of the amount of the netting allegation. As a result, Mr. Ness did not carry his burden in proving the amount of any netting that occurred.

53.    The Court is troubled by the evidence presented by the Debtors in their case concerning the calculation of the post-production charges as compared to the statements made by the Debtors at the Status Conference. As a result, the Court finds itself with a gap in the evidence.

54.    However, *at most*, the Debtors deducted $1,930 in post-production charges from Mr. Ness's royalties. And as post-production charges for oil and gas were correctly deducted from Mr. Ness's royalty, *at most*, any netting would be a much smaller portion of $1,930 in post-production charges.

55.    As set forth above, the burden of proof for the amount of any netting between post-production gas expenses against oil royalties lies with Mr. Ness. At no point during the Hearing did Mr. Ness present any evidence that supported the amount

---

[61] *Id.* at 173.

[62] *Id.*

[63] *Id.* at 173-174 (*citing In re Holm,* 931 F.2d 620, 623 (9th Cir. 1991)).

[64] *Id.* at 174.

of his claim as filed.  Although the Court is empathetic that this information would be at the Debtors' fingertips and gathering it would be a major undertaking by Mr. Ness, the Court cannot shift the burden of proof to the Debtors.

56.    Also, as noted above, in *Hurinenko*[65], the North Dakota wells produced both oil as well as "casinghead gas."[66]  The Eighth Circuit did not distinguish between the oil and gas royalties when determining that the post-production costs were deducted from gross sales revenues."[67]

57.    Furthermore, based on testimony at the Hearing, oil cannot be produced from the Ness Wells without also producing gas.  In addition, the Debtors are unable to destroy the gas at the well, rather than put the gas into the pipeline because the NDIC limits the amount of gas that can be flared.  As such, *even if* the amount of the netting was conclusively determined at the Hearing, which it was not, the Court hereby finds that nothing in North Dakota case law indicates that post-production gas overages cannot be netted against the oil revenues.

58.    That being said, if indeed the Debtors are not netting or accruing overages in the post-production costs of gas at the present time, the Court would find it distasteful for the Debtors to alter their practice based on this Memorandum Order.  And if the Debtors are not netting or accruing post-production gas overages at this time and

---

[65]  *Hurinenko v. Chevron, USA, Inc.*, 69 F.3d 283 (8th Cir. 1995).

[66]  *Hurinenko*, 69 F.3d at 284.

[67]  *Id.* at 285 (*citing Koch Oil Co. v. Hanson*, 536 N.W.2d 702, 707 (N.D.1995); *Amerada Hess Corp. v. Conrad*, 410 N.W.2d 124, 127 n. 3 (N.D.1987)).

determine to begin such practices during the pendency of these cases, the Court requires that the Debtors provide notice to this Court within five (5) business days.

G.  **Conclusion**

59.    For the reasons set forth above, the Court hereby disallows and expunges the Ness Claims.

60.    The Court retains jurisdiction over any and all matters arising from or related to the implementation or interpretation of this Order.


_____
Christopher S. Sontchi
United States Bankruptcy Judge

Date:  September 13, 2016