IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| SAMSON RESOURCES CORPORATION, | ) | Bankruptcy Case No. 15-11934(BLS) |
| *et al.*, | ) | |
| Reorganized Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Related Docket Nos. 2015 and 2060** |

John H. Knight
RICHARDS LAYTON & FINGER, P.A.
One Rodney Square, 920 North King Street
Wilmington, Delaware 19801

and

Ana Alfonso
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019

and

John Thompson, III
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102

Counsel for Samson Resources II, LLC,
for itself and the Reorganized Debtors

Diane S. Jones
Gary Pop
Kendi Narmer Pakey Bey
Curtis Parker
Cherrie Parker Thorton
Chris Parker
PARKER HEIRS, *Pro Se*

Joseph J. Farnan, Jr.
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801

and

Thomas E Lauria
J. Christopher Shore
WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036

Counsel for the Settlement Trust

## OPINION

## INTRODUCTION[1]

Before the Court are the (i) *Debtors' Amended Second Omnibus (Substantive) Claims Objection*[2] (the "Objection") which objects, in part, to 22 claims[3] filed by various "Parker Heirs" each seeking $100 million on account of their royalty claims and (ii) the *Joint Motion of the Debtors and the Official Committee of Unsecured Creditors for Entry of an Order Establishing the Amount of the Disputed Royalty Holder Claims Reserve*[4] (the "Claims Reserve Motion"). The Parker Heir Claims are based, in part, on an oil and gas royalty lease (as defined and described *infra*, the "Walling Lease") entered into by their grandfather. The Parker Heirs dispute whether the Walling Lease is still valid and, if it is, the amount of the royalties owed therefrom.

As discussed in detail below, the Court finds that the Walling Lease is valid and remains in effect, and that it allows for pooling of the mineral interests. As the 25-Acre Tract does not contain any wells, the only entitlement of the Parker Heirs to royalty payments is through the Walling Lease. The Court further finds that the Debtors have paid the Parker Heirs their royalty payments consistent with the provisions of the Walling Lease. As a result, the Court disallows the Parker Heir Claims in full. Furthermore, as the Parker Heir Claims are disallowed, the Court need not reach the Claims Reserve Motion as it is moot with respect to the Parker Heir Claims.

---

[1] Terms not defined in this Introduction shall have the meanings ascribed to them *infra*.

[2] D.I. 2060. *See also* D.I. 2015, which was later amended by D.I. 2060.

[3] The Parker Heirs filed 22 Claims that are identified in the Objection (Claim Nos. 1227. 1229. 1272. 1422, 1423, 1474, 1477, 1480, 1481, 1483, 1485, 2197, 2419, 2558, 2674, 2685, 2687, 2688, 2696, 2697, 3698 and 2720).

[4] D.I. 1980.

## JURISDICTION AND VENUE

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157(b)(1) and per the retention of jurisdiction provision embodied in the confirmed *Global Settlement Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and its Debtor Affiliates (with Technical Modifications)*, Art. XI.[5]  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of the Objection and the Claims Reserve Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (K).

## FACTUAL BACKGROUND

### A.  Background of Bankruptcy Case

On September 16, 2015 (the "Petition Date"), each of the Debtors filed a voluntary Chapter 11 petition in this Court.  During the pendency of their Chapter 11 cases, the Debtors operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Court entered a final order for joint administration of these Chapter 11 cases[6] and has not appointed a trustee.  The Office of the United States Trustee for the District of Delaware formed an official committee of unsecured creditors of Samson Resources Corporation (the "Committee") on September 30, 2015.[7]

On February 13, 2017, the Court entered an order[8] confirming the *Global Settlement Joint Chapter 11 Plan of Reorganization of Samson Resources Corporation and Its Affiliates*[9] (the "Plan").  The Final Effective Date (as defined in the Plan) occurred on March 1, 2017.  On

---

[5]  D.I. 2009 and 2019.

[6]  D.I. 70.

[7]  D.I. 129.

[8]  D.I. 2019.

[9]  D.I. 1822.

the Final Effective Date and pursuant to the terms of the Plan, Samson Resources II became the parent of the majority of the above-captioned reorganized debtors (collectively, the "Reorganized Debtors").

Also, on the Final Effective Date of the Plan,[10] the Second Lien Lenders (as defined in the Plan) became the new equity owners of the Reorganized Debtors and the Committee formed the Settlement Trust.  Pursuant to the terms of the Plan, the authority to object to claims was vested in the Debtors and the Reorganized Debtors (with respect to all claims that are not General Unsecured Claims, as defined in the Plan)[11] and the Settlement Trust (solely with respect to General Unsecured Claims).[12]

## B.  Debtors' Business

The Debtors were an onshore oil and gas exploration and production company that owned royalty and working interests in various oil and gas leases primarily located in Colorado, Louisiana, North Dakota, Oklahoma, Texas and Wyoming.  As of the Petition Date, the Debtors operated or had interests in approximately 8,700 oil and gas production sites, generating revenue through sales of oil and natural gas to wholesale buyers throughout the United States.

---

[10] *See* D.I. 2070.

[11] The Reorganized Debtors and the Debtors will be referred to herein as the "Debtors."

[12] Plan, Art. VII.B.

## C.  Procedural Background Related to Parker Heirs

The Parker Heirs have filed the following claims (collectively, the "Parker Heir Claims"):

| Claimant | Claim No. | Amount of Claim | Priority of Claim |
|---|---|---|---|
| Kendi Narmer Pakey Bey | 1227 | $100,000,000 | Unspecified §507(a) priority claim |
| Curtis Parker | 1228 | $100,000,000 | Unspecified §507(a) priority claim |
| William A. Parker | 1272 | $100,000,000 | Unspecified §507(a) priority claim |
| Chris Parker | 1422 | $100,000,000 | Unspecified §507(a) priority claim |
| Gary Pop | 1423 | $100,000,000 | Unspecified §507(a) priority claim |
| William A. Parker | 1474 | $100,000,000 | Unspecified §507(a) priority claim |
| Randolph Parker | 1477 | $100,000,000 | Unspecified §507(a) priority claim |
| Karen Parker | 1480 | $100,000,000 | Unspecified §507(a) priority claim |
| Diane S. Jones | 1481 | $100,000,000 | Unspecified §507(a) priority claim |
| Darrell Parker | 1483 | $100,000,000 | Unspecified §507(a) priority claim |
| Cherrie Parker Thornton | 1485 | $100,000,000 | Unspecified §507(a) priority claim |
| Karen Parker | 2197 | $100,000,000 | Unspecified §507(a) priority claim |
| Clifford Parker | 2419 | $100,000,000 | Unspecified §507(a) priority claim |
| Gary Pop | 2558 | $100,000,000 | Unspecified §507(a) priority claim |
| Gary Pop | 2674 | $100,000,000 | Unspecified §507(a) priority claim |
| Darrell Parker | 2685 | $100,000,000 | Unspecified §507(a) priority claim |
| Diane S. Jones | 2687 | $100,000,000 | Unspecified §507(a) priority claim |
| Karen Parker | 2688 | $100,000,000 | Unspecified §507(a) priority claim |
| Karen Parker | 2696 | $100,000,000 | Unspecified §507(a) priority claim |
| Chris Parker | 2697 | $100,000,000 | Unspecified §507(a) priority claim |
| William A. Parker | 2698 | $100,000,000 | Unspecified §507(a) priority claim |
| Cherrie Parker Thornton | 2720 | $100,000,000 | Unspecified §507(a) priority claim |

All in, the Parker Heirs have filed claims totaling over $2 billion in the aggregate.  The Debtors dispute any liability to the Parker Heirs, but the pendency of such large disputed claims had obvious ramifications for the Debtors' ability to file and obtain confirmation of a plan of reorganization under Bankruptcy Code § 1129.

Accordingly, on January 24, 2017, the Debtors filed the *Debtors' Motion to Reclassify for All Purposes and Estimate for Voting Purposes Certain Claims Pursuant to the Solicitation Procedures*[13] (the "Estimation Motion").  In the Estimation Motion, the Debtors contend that

---

[13]  D.I. 1923.

there were certain unresolved unsubstantiated claims asserted by holders of royalty interests (including but not limited to the Parker Heirs), asserting claims for unpaid royalties, trespass, conversion, or other theories. Many of the claims listed in the Estimation Motion were asserted as priority or secured claims and the Debtors requested that a portion of these claims would be reclassified as general unsecured claims.[14]

In order to make distributions to general unsecured claimants while the claims listed in the Estimation Motion remained unresolved, the Committee and the Debtors jointly filed the Claims Reserve Motion.[15] The Claims Reserve Motion proposes to establish a reserve for these disputed royalty claims so that the now Settlement Trust could promptly make distributions to other general unsecured claimants.

Thereafter, on February 28, 2017, the Debtors filed the *Debtors' Amended Second Omnibus (Substantive) Claims Objection*,[16] which objected, in part, to the Parker Heir Claims and sought, among other related relief, to (a) disallow each of the Parker Heir Claims in their entirety, or, in the alternative, (b) reclassify each of the Parker Heir Claims as a general unsecured claim. As reclassification of the Parker Heir Claims to general unsecured claims would affect the Settlement Trust given the amount and quantity of the claims, the Reorganized Debtors and the Settlement Trust sought to bifurcate the objection to the Parker Heir Claims. Thus, on May 1 and 2, 2017, the Court held an evidentiary trial on the threshold issue of whether

---

[14] The Estimation Motion was later withdrawn without prejudice. D.I. 2008.

[15] D.I. 1980.

[16] D.I. 2060.

the Parker Heir Claims should be disallowed in their entirety.[17]  The issue of the classification or

priority of the Parker Heir Claims was held in abeyance until the Court determines the validity

and amount, if any, of each of the Parker Heir Claims.  This is the Court's decision.

**D.  Background Related to Parker Heirs**

At the heart of the Parker Heir Claims is a gas and mineral lease (the "Walling Lease").

To understand the Walling Lease, the Court must look back to a 255-acre tract of land in Texas

originally owned by John and Anna Walling.  After John Walling's death, Anna Walling

conveyed 230 acres of land to B.F. Lewis in 1904 and retained the remaining 25 acres of land for

herself.[18]  After Anna Walling's death, the 25-Acre Tract (as defined below) was inherited by

Anna Walling's surviving children, including Pat Walling.

### i.    Walling Lease

On October 1, 1957, Pat Walling and others executed an Oil Gas and Mineral Lease to

Neal Woods, as lessee.[19]  The Walling Lease covered the 25-acre tract of land in Rusk County,

Texas (the "25-Acre Tract").  The Walling Lease stated a primary term of five (5) years, and

would remain in effect "so long as oil, gas, sulphur or other minerals or any of them is produced

from said land by Lessee or any of the obligations or conditions hereinafter specified in lieu of

production are fulfilled."[20]  The critical condition to the Walling Lease, for purposes of the

---

[17]  The Trial Transcripts shall be referred to herein as (i) May 1, 2017 Hr'g Tr. page:line or (ii) May 2, 2017 Hr'g Tr. page:line.  *See* D.I. 2351 and 2352.  After the trial, the Debtors and the Parker Heirs submitted a *Certification Regarding Trial Exhibits* (D.I. 2376) (the "Trial Certification") which lists and identifies each exhibit to be admitted related to the Trial.  On June 5, 2017, the Court entered the *Order Admitting Parker Heir Trial Exhibits* which admitted the exhibits discussed in the Trial Certification. D.I. 2410.  Trial Exhibits shall be referred to herein as "Debtors Tr. Exh. #" or "Parker Heirs Tr. Exh. #."

[18]  *See* Debtors Tr. Exh. 18 (Deed from Anna Walling to B.F. Lewis, dated November 2, 1904).

[19]  Debtors' Tr. Exh. 1.

[20]  Walling Lease at ¶ 2.

Court's analysis, is that it required that a well be drilled and production commenced within the primary 5-year term of the lease, *viz.* before September 30, 1962.[21]  The Parker Heirs contend that this did not occur, and hence that the Walling Lease terminated decades ago by its own terms.

The Walling Lease permits "pooling" with other leases:

> Lessee is hereby give the power and right, as to all or any part of the land described herein and as to any one or more of the formations thereunder and the minerals therein or produced therefrom, at its option and without Lessor's joinder or further consent, to at any time, and from time to time as a recurring power and right, either before or after production, pool and unitize the leasehold estate and the Lessor's royalty estate created by this lease with the rights of third parties, if any, in all or any part of the land described herein and with any other land, lands, lease, leases, mineral and royalty rights . . . so as to create by such pooling and unitization one or more drilling or production  units  . . .[22]

The 25-Acre Tract was pooled into two different units: (i) the Booth-Freeman Gas Unit ("Booth-Freeman Unit"), which is 702.91 acres in total and contains 19.16 acres of the 25-Acre Tract;[23] and (ii) the Sanders Gas Unit ("Sanders Unit"), which is 131.35 acres in total and contains 5.84 acres of the 25-Acre Tract.[24]  As explained by Terry Cross, Esquire, a witness at the trial with decades of experience practicing oil and gas law in Texas, pooling allows an oil and gas developer to aggregate multiple properties and treat them as one property for production

---

[21] *Id.*

[22] Walling Lease at ¶ 17.

[23] *See* Debtors Exhs. 2, 3 and 104-107.

[24] *See* Debtors Exhs. 3 and 4.

purposes.[25]  Furthermore, pooling in Texas is based on contract, whereby the parties to the lease create the authority to pool various acreages.[26]

Although only 19.16 acres of the 25-Acre Tract is included in the Booth-Freeman Unit, a well drilled and producing in *any* part of the Booth-Freeman Unit will perpetuate the lease for the lease's entire 25 acres.[27]  Further, as noted above, in order for the Walling Lease to perpetuate, a well had to be drilled within the pooled unit within the "primary term" of the lease.[28]  Significantly, there are no wells on the 25-Acre Tract, meaning that the only entitlement to royalties arises from the pooling authority in the Walling Lease and the success of wells in both the Booth-Freeman Unit and the Sanders Unit.[29]

Once acreage is pooled, a royalty interest in the minerals produced in the pooled unit will be allocated by the amount of acres a royalty owner has within that pooled unit.[30]  For example, 19.61 acres of the 25-Acre Tract are in the Booth-Freeman Unit, thus, any oil or gas produced within the Booth-Freeman Unit will be paid to *all* royalty owners whose acreage is contained in the Booth-Freeman Unit based on the amount of acres held in the Booth-Freeman Unit.  The same holds true for the portion (5.84 acres) of the 25-Acre Tract that are contained in the Sanders Unit.

---

[25]  May 1, 2017 Hr'g Tr. 39:16-22.

[26]  May 1, 2017 Hr'g Tr. 42:9-14.

[27]  May 1, 2017 Hr'g Tr. 40:23-41:3.

[28]  May 1, 2017 Hr'g Tr. 39:3-8.

[29]  May 1, 2017 Hr'g Tr. 64:5-65:2.

[30]  May 1, 2017 Hr'g Tr. 40:23-41:3.

The Parker Heirs contend that the Walling Lease terminated because no wells were drilled in the pooled tract during the primary term of the Walling Lease.  However, at trial, the Debtors produced the following evidence: (1) Permit to drill a well in the Booth-Freeman Unit (referred to herein as the "Booth-Freeman #1 Well") dated February 19, 1958,[31] (2) the completion report for the Booth-Freeman #1 Well dated March 22, 1958;[32] (3) several applications for permits to drill additional wells as well as completion reports for various wells, all noting the existence of Booth-Freeman #1 Well and referencing the 702.91 Booth-Freeman Unit;[33] (4) summaries of production reports for the wells in the Booth-Freeman Unit maintained by the Railroad Commission of Texas which indicate that the Booth-Freeman #1 Well began production in 1958 and continued production through 1965; and (5) IHS[34] production reports that show that the Booth-Freeman #1 Well continues to produce oil and gas.[35]  Furthermore, Mr. Cross testified as follows:

> A: That the production from the Booth-Freeman Number 1 [W]ell held the leases in that unit until the other wells were drilled, and all the leases in the Booth-Freeman unit have been held by this unit production.
>
> Q: As a result, is it your believing -- belief that the Walling [L]ease is valid as we sit here today?
>
> A: It did not terminate.[36]

---

[31] Debtors Tr. Exh. 6.

[32] Debtors Tr. Exh. 7.

[33] Debtors Tr. Exhs. 8, 148 and 149.

[34] IHS is a subscription service commonly used in the oil and gas industry to access public records.  May 1, 2017 Hr'g Tr. 58:11-59:3.

[35] Debtors Tr. Exhs. 9 and 10.

[36] May 1, 2017 Hr'g Tr. 59:6-12.

In support of their position that no well was drilled in the primary term of the Walling Lease, the Parker Heirs produced a map, provided to them by the Debtors, of the Booth-Freeman Unit that depicted a number of wells drilled after 1962: the Booth-Freeman #1 Well was not shown on that map.[37]

### ii.    Family Tree and Fractional Royalty Interests in 25-Acre Tract

Anna Walling had nine (9) children, 8 of whom survived Anna Walling.  Thus, the 25-Acre Tract of land in Rusk County, Texas was divided among Anna Walling's 8 remaining children.  One of Anna Walling's children, Pat Walling, received a one-eighth (1/8) interest in the 25-Acre Tract.

Upon Pat Walling's death, one-half (1/2) of his one-eighth (1/8) interest was inherited by his wife Catherine Walling (from whom Randolph Parker inherited his interest).  Randolph Parker then conveyed (i) one-half (1/2) of his interest to National Locater Service, Inc. ("National Locater"),[38] (ii) and one-half (1/2) to his heirs.  Because both of his children predeceased him, Randolph Parker's .0001065 interest passed to his 12 grandchildren, who collectively comprise the Parker Heirs (Darell D. Parker, Chris Parker (who had three children), William A. Parker (referred to herein as "William A. Parker, Senior"), Cherrie Parker Thornton, Gary Pop, Curtis L. Parker, Diane S. Jones, Kenneth E. Parker (now Kendi Narmer Pakey Bey), Karen Parker, William A. Parker (referred to herein as "William A. Parker, Junior"), Clifford O. Parker and Randolph Parker).

---

[37] Parker Heirs Tr. Exh. 41.

[38] Debtors Tr. Exh. 67.

Thus, based on the division order signed by Randolph Parker, after the transfer to National Locater, Randolph Parker owned a .0001065 royalty interest in the Booth-Freeman Unit.[39]  Based on the above, and as reflected in the division order, Randolph Parker's interest is calculated as: $\frac{1}{2}$ x $\frac{1}{2}$ x $\frac{1}{8}$ x  $\frac{1}{8}$ x $\frac{19.61}{702.91}$ = .0001065.[40]  This interest has now been divided among the Randolph Parker's 12 grandchildren.[41]  Thus, each of the Parker Heirs' fractional interest in the Booth-Freeman Unit is .00000887.[42]

### iii.    Other Mineral Owners of 25-Acre Tract

What happens if there is no valid Walling Lease?  During the trial, this became a central question.  The Debtors assert that if there is no valid Walling Lease, then the Parker Heirs would not be entitled to any royalties and even asserted that the Parker Heirs would be obliged to reimburse the Debtors for the royalty payments made to the Parker Heirs.

---

[39]  Debtors Tr. Exh. 15.

[40]  The first ½ is a result of Randolph Parker conveying one-half of his royalty interest to National Locater Service, Inc.  *See* Debtors Tr. Exh. 67.  The second ½ is included because upon Pat Walling's death, one-half of his interest was inherited by his wife Catherine Walling (from whom Randolph Parker inherited his interest).  The first 1/8 is a result of Pat Walling and his seven siblings receiving a 1/8th interest of their parents' interest.  The last 1/8th is the royalty in the Walling Lease.  The 19.16 figure is the numerator of the last fraction is the number of acres of the 25-Acre Tract included in the Booth-Freeman Unit, and 702.91 figure is the denominator of the last fraction is the total number of acres in the Booth-Freeman Unit.

[41]  Originally, William A. Parker, Senior, filed an affidavit of heirship claiming 100% of Randolph Parker's royalty interest.  As a result, William A. Parker, Senior, collected the royalty payment that would have otherwise been paid to the Parker Heirs.  Upon discovery, Diane Jones filed the *Corrected Affidavit for Randolph A. Parker and William A. Parker*.  *See* Debtors Tr. Exh. 73.  Subsequently, Diane Jones filed an *Amended and Corrected Affidavit for Randolph A. Parker, William A. Parker and Lonnie Parker* which corrected her previous affidavit to add Lonnie Parker and his child Darrell D. Parker.  *See* Debtors Tr. Exh. 84.  To further complicate the division of royalty interests, originally the Debtors divided one-half of Randolph Parker's royalty interest to Lonnie Parker and one-half to William A. Parker (i.e. on a *per stirpes* basis); however because both Lonnie Parker and William A. Parker predeceased Randolph Parker, Randolph Parker's royalty interest should have been divided equally among all twelve of the grandchildren on a *per capita* basis.  *See* Debtors Tr. Exh. 94.  Although this calculation adjustment took some time for the Debtors to complete, the adjustment was made and the royalty interest was then divided equally among the twelve grandchildren of Randolph Parker including a payment of back-royalties and interest accounting for the delay.  *See* Debtors Tr. Exh. 95; May 1, 2017 Hr'g Tr. 244:24-246:9.

[42]  Chris Parker's .00000887 interest is now owned by his children: Chris D. Parker, Crystal Sykes, and Breanna Parker.  *See* Debtors Tr. Exh. 98.

As stated above, there are no wells drilled on the 25-Acre Tract. Every royalty payment associated with the 25-Acre Tract results from the acres being pooled – whether in the Booth-Freeman Unit or the Sanders Unit. Further, the Court notes that there are *many* other holders of fractional royalty interests on that 25-Acre Tract. As noted above, Pat Walling was one of eight siblings who inherited any land or interests from Anna Walling. Although not at issue in these cases, Pat Walling's siblings also presumably conveyed their interests and now there are possibly hundreds of fractional royalty interest holders in the 25-Acre Tract claiming rights under the Walling Lease.[43]

### iv.    The 69-Acre Tract

The Booth-Freeman Unit also contains a 69.9 acre tract of land ("69-Acre Tract") which is situated to the north of the 25-Acre Tract. The 69-Acre Tract was once owned by John and Anna Walling. After John's death, the 69-Acre Tract was part of the 230 acres sold by Anna Walling to B.F. Lewis in 1904.[44] B.F. Lewis sold off portions of the 230-acre parcel, including

---

[43] Lisa Johnson testified as follows at the hearing:

> Q: Does Samson own all of the working interest created by the Walling lease?
>
> A: No.
>
> Q: Are those other working interest owners part of this bankruptcy proceeding?
>
> A: No.
>
> Q: What would the effect be if the Court were to find that this lease terminated on those other parties?
>
> A: Well, it would impact too many owners. I would speculate there's probably over 100 royalty owners to this 25 acres and more than one working interest owner.
>
> Q: And, in fact, would the Walling [L]ease still be valid with respect to these other owners that aren't in this proceeding?
>
> A: Yes.

May 2, 2017 Hr'g Tr. 157:1-15.

[44] Debtors Tr. Exh. 18.

what is now known as the 69-Acre Tract.[45]  In 1913, the 69-Acre Tract was conveyed to Pat

Waldron.[46]  This is one of the major evidentiary disputes set forth during the trial.  The Parker

Heirs assert that Pat Waldron and Pat Walling, who was also known as Pat Waldon or Walden,

are the same person.  Thus, the Parker Heirs also submit that they are royalty owners in the 69-

Acre Tract.

The Debtors submitted various documents to support their position that Pat Waldron and

Pat Walling/Waldon/Walden were different people.  The Debtors' evidence is set forth in the

below chart:

|  | Pat Walling (25-Acre Tract) | Pat Waldron (69-Acre Tract) |
|---|---|---|
| **Year of Birth** | ~December 1897 | ~1858 |
| **First Names Used** | "Pat" and "Patsy" | "Patrick" and "Pat" |
| **Last Names Used** | "Walling," "Waldon," and "Walden" | "Waldron" and "Waldon" |
| **Age in 1910 Census** | 12 | 52 |
| **Residence in 1910 Census** | Rusk County, Texas | Gregg County, Texas |
| **Number of Times Married** | 1 | 2 |
| **Spouse's Name(s)** | 1. Catherine Bradford | 1. Laura (last name unknown) 2. Katie Baker Lampkins |
| **Number of Children** | None | 8 |
| **Date of Death** | July 4, 1971 | ~1926 |
| **Residence at Death** | Wichita Falls, Texas | Rusk County, Texas |

To summarize, the Debtors acknowledge the phonetic similarities between the names but point

out that it is unlikely that Pat Walling would have engaged in significant land transactions at the

age of 15, whereas Pat Waldron was married and in his 50's in 1913.

---

[45] The 69-Acre Tract was conveyed by B.F. Lewis to J.R. Bell in 1906; J.R. Bell conveyed the property to Henry Walling, and later, Henry Walling conveyed the 69-Acre-Tract to Pat Waldron on November 5, 1913. *See* Debtors Tr. Exhs. 17, 18, 20 and 21.

[46]  Debtors Tr. Exh. 21.

Interestingly, the Parker Heirs established that Pat Walling was listed in the census as a wage earner and laborer at the age of 12,[47] which does raise a question as to whether Pat Walling could have also been a landowner at that time.  The Parker Heirs' point is well taken regarding whether teen-aged Pat Walling could also have been a landowner in that vastly different time.  However, the Parker Heirs did not produce any additional evidence showing that Pat Walling and Pat Waldron were the same man and as discussed in detail below, at this point in the proceedings, the Parker Heirs had the burden of proof to show that Pat Walling and Pat Waldron were the same person.

## ANALYSIS

### A.  Standard of Review

When a claim objection is filed in a bankruptcy case, the burden of proof as to the validity of the claim "rests on different parties at different times." *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992).  Bankruptcy Rule 3001(f) provides that a proof of claim executed and filed in accordance with the rules of procedure, i.e., includes the facts and documents necessary to support the claim, constitutes *prima facie* evidence of the validity and amount of the claim.  Fed. R. Bankr. P. 3001(f).  Pursuant to Bankruptcy Code § 502(a), a claim that is properly filed under Rule 3001 and Code § 501 is "deemed allowed" unless a party in interest objects.  11 U.S.C. § 502(a).  "The objecting party carries the burden of going forward with the evidence in support of its objection which much be of a probative force equal to that of the allegations of the creditor's proof of claim."  *In re Kincaid*, 388 B.R. 610, 614 (Bankr. E.D. Pa.

---

[47] May 2, 2017 Hr'g Tr. 65:12-21; Park Heir Exh. 84.

2008) (*citing Allegheny*, 954 F.2d at 173–74).  If the objecting party succeeds in overcoming the *prima facie* effect of the proof of claim, the ultimate burden of persuasion then rests upon the claimant to prove the validity of the claim by a preponderance of the evidence.  *Id.*

In this case, the Parker Heirs enjoy the benefit of the presumption embodied in Rule 3001 and section 502 of the Bankruptcy Code, and each of the Parker Heir Claims were deemed allowed upon filing.  The Debtors have responded with competent evidence and arguments in opposition to each of the Parker Heir Claims.  At trial, therefore, the burden lay with the Parker Heirs to prove the validity of the Parker Heir Claims by a preponderance of the evidence.

**B.  Discussion of Parties' arguments**

The Parker Heirs assert four primary (and largely independent) arguments in support of their Claims: (i) the Walling Lease terminated and, thus, there is not a valid lease for the gas interests in the 25-Acre Tract; (ii) the Debtors have underpaid the Parker Heirs on their royalty interests; (iii) the Parker Heirs own an interest in the 69-Acre Tract;[48] and (iv) the Parker Heirs believe their claim should be classified as a secured claim, priority claim, or an administrative claim.  In addition, at trial, the Parker Heirs contested the legitimacy of the transfer of one-half of

---

[48]  At the trial, Ms. Jones indicated that she was unsure regarding whether the Parker Heirs had claims to the 69-Acre Tract:

> That's why we put it together, we put it together the best way that we knew how, because we didn't know what they owed us.  So that's all we were trying to accomplish was saying you owe us something and we need to figure out what that something is.  They made the other -- and we said, why?  This is why we feel you owe us something.  They made the 75-acre tract more of an issue.  They threw it up in their defense as far as why they shouldn't even pay us anything, and I think that they did that to muddy the situation myself, but if it was up to me we would have just been dealing with the 25 acres and what they owe us pertaining to that, but -- . . . -- it just kind of evolved into more and more and more.

May 2, 2017 Hr'g Tr. 122:5-16 and 18-19.  However, as the arguments regarding 69-Acre Tract were briefed and were not formally withdrawn, the Court will discuss the claims to the 69-Acre Tract herein.

Randolph Parker's interest to National Locater and the payments from the Debtors on account of that transfer.

In response, the Debtors insist that the Walling Lease is valid as the Booth-Freeman #1 Well was drilled and has continued in production through the primary lease portion of the Walling Lease, thereby perpetuating the Walling Lease. The Debtors also claim that the Parker Heirs have received all of their royalty interests in the 25-Acre Tract. Finally, the Debtors do not believe that the Parker Heirs can prove any valid interest in the 69-Acre Tract. As a result, the Debtors do not believe that any of the Parker Heir Claims are valid and they seek to have these claims disallowed and expunged. In the alternative, the Debtors assert that if the Parker Heirs indeed have any valid claim against the Debtors, such claims are general unsecured claims and must be reclassified as such.

## C. Parker Heir Claims

### i. The Walling Lease Did Not Terminate.

As mentioned above, paragraph 17 of the Walling Lease permitted pooling with other leases. Furthermore, the lessee's authority to pool is derived directly from the terms of the lease. As explained in *Browning Oil Co., Inc. v. Luecke*, 38 S.W.3d 625, 634 (Tex. App. 2000) (citations and footnotes omitted):

> Often, if a tract is of insufficient size to satisfy the state's spacing or density requirements, lessees will "pool" acreage from different leased tracts. Pooling allows a lessee to join land from two or more leases into a single unit. Operations anywhere within the unit are treated as if they occurred on all the land within the unit, and production from a well on the pooled unit is treated as occurring on all the tracts pooled into the unit. With regard to the royalty interest owners, pooling results in "a cross-conveyance of interests in land by agreement among the participating parties, each of

17

> whom obtains an undivided joint ownership in the royalty earned
> from the land in the 'block' created by the agreement.  Royalty is
> distributed on the basis of the proportion each party's acreage
> bears to the whole block."  Effective pooling in essence abrogates
> the rule of capture by allowing owners of non-producing tracts to
> share in production from the producing tract.  A lessee's authority
> to pool is derived solely from the terms of the lease; a lessee has no
> power to pool absent express authority.

As evidenced at trial, on February 26, 1958, 19.16 acres of the 25-Acre Tract covered by the

Walling Lease were pooled with other acreage to form the Booth-Freeman Unit.  The Booth-

Freeman Unit contains 702.91 acres.[49]  On July 19, 1991, the remaining 5.84 acres of the 25-

Acre Tract covered by the Walling Lease were pooled to form the Sanders Gas Unit, which

contains a total of 131.35 acres.[50]  Thus, all 25 acres covered by the Walling Lease have been

pooled into the two units.

The original lessee in the Walling Lease was Neal Woods.  Carter Jones Drilling

Company, Inc. became a successor in interest to Neal Woods.  Pursuant to the *Declaration of*

*Gas Pooled Unit Carter-Jones Drilling Company, Inc., et al – Booth-Freeman Gas Pooled Unit*

*No. 1*[51] production on any tract constitutes production on every other tract in the Booth-Freeman

Unit, and any production is allocated based upon the percentage each owner holds in the unit.[52]

---

[49] Debtors Tr. Exh. 2.

[50] Debtors Tr. Exh. 4.

[51] Debtors Tr. Exh. 2 (the "Declaration of Unit for Booth-Freeman Unit").

[52] The Declaration of Unit for the Booth-Freeman Unit provides:

> (1)  That drilling or re-working operations on, or production from any portion of
> said pooled unit shall be considered as operations upon each separately owned
> tract of land.

> (2)  Production of gas from said unit on any tract included therein shall be
> allocated to each of the undersigned parties in the proportion that the number of
> mineral acres owned by each of the undersigned parties within the unit bears to
> the total acres so pooled.

Debtors Tr. Exh. 2 at p. 2.

The record adduced at trial conclusively demonstrates that the Booth-Freeman #1 Well was completed on March 22, 1958, and began producing oil and gas at that time.[53]  It has continued producing since its completion.[54]  By 1997, a total of seven (7) wells (Booth-Freeman #1 - #7 Wells) were drilled in the Booth-Freeman Unit, each was completed, and all of them continue to produce today.[55]  The Debtors acquired working interests in the deep rights in the Booth-Freeman Unit by two assignments in 2000 and another assignment in 2003.[56]  Between 2001 and 2007, the Debtors drilled and completed an additional nine wells in the Booth-Freeman Unit (Booth-Freeman #8 - #16 wells).  The Debtors currently operate a total of 11 of the 16 wells in the Booth-Freeman Unit.

When the Parker Heirs were originally provided by the Debtors with a map of the Booth-Freeman Unit the Booth-Freeman #1 Well was not shown on the map.[57]  This has caused much confusion for the Parker Heirs and has led them to reasonably conclude that production had not commenced in the primary term of the Walling Lease, since the Debtors' own map did not show a well dating from prior to 1962.  However, at trial, Mr. Cross explained that Booth-Freeman #1 Well was not noted on this map simply because the Debtors do not own an interest in the Booth-Freeman #1 Well.[58]  As a matter of record, Indigo Minerals operates the Booth-Freeman #1

---

[53]  *See* Debtors Tr. Exhs. 5, 6, and 7.

[54]  *See* Debtors Tr. Exh. 9.

[55]  *See* Debtors Tr. Exhs. 8 and 10.

[56]  Debtors Tr. Exhs. 53, 59, and 63.

[57]  *See* Parker Heirs Tr. Exh. 41.

[58]  Many of the factual disputes between the parties derive from miscommunications, and the Debtors' unresponsiveness to the Parker Heirs' inquiries both prior to and during these cases, including providing maps without differentiating various ownership of wells.  The Court takes the time to quote the transcript as these issues

Well.  However, due to the pooling in the Booth-Freeman Unit, it does not matter who operates

or has interest in each individual well, the wells and acreage are "pooled" to create a collective

unit.

_____

could have been avoided *in toto* via communications between the Debtors' counsel and the *pro se* Parker Heirs.  At trial, Mr. Cross testified as follows:

> Q: Mr. Thompson just referred to Exhibit 41, which is a map that the Debtors did provide to the Parker Heirs. I'll give you time to get there, sir. Are you there?

> A: I have it up.

> Q: Okay. If you look in the bottom left corner you'll see date 04/08/2016, author Samson GIS, SF -- SJF, and as Mr. Thompson stated, this is something that they provided to us and I just want to get on record that there is no Booth- Freeman number one in this map. If you look at it closely - - tell me if I'm mistaken -- do you see a Booth number one - Booth-Freeman number one in this map?

> A: No. It's not on this map.

> Q: Okay. And I would just like to point out that -- well, I'll come back to that. In the right-hand bottom corner it says, "Legend. Parker lease." So, the inference to us was that these are the wells associated with this lease – the 1957 lease.  When this was given to us, this is what we were being today, is that these are the wells and I've highlighted them.  I've highlighted them beginning with -- number two is kind of in the middle of the page, more toward the bottom than the top, and if you can just follow the highlights you'll see it begins with number two.  Now, there's some other ones that we didn't understand what their purpose in this is.  But there's Booth-Freeman one HD, HB, 2H, and those things we don't have any idea what those are about.  But there is no Booth- Freeman number one.  Would we agree that there's no Booth- Freeman number one in this description?

> A: It's not on this map.

> Q: Okay. Now, do you have an opinion as to why the oil company would tell us initially that these are the wells associated with the Parker lease as they've put in this legend repeatedly?

> A: I do. Samson does not own an interest in the Booth-Freeman number one well.

> Q: So because they don't own an interest in it they shouldn't still -- because now they're trying to say that that's what holds this lease. So, because they don't own an interest in it and this says "Parker lease," this would lead me as an average, every day person to believe that these are the wells involved with this lease if I'm reading this -- A Well, in the legend you also see the Booth-Freeman gas unit operated, this part of the legend. And whether they own an interest in the lease doesn't have a bearing on whether it holds the lease or not.

> Q: Say that last part again?

> A: Whether Samson owns an interest in the Booth-Freeman number one is not relevant to the question of does the well -- did the well hold the lease in the unit. I mean, it's just a fact Samson does not own interest in that well today.

May 1, 2017 Hr'g Tr. 147:1-148:25.

The Sanders Gas Unit contains one well, the Sanders #1 well, which was completed on July 29, 1991.  The Debtors do not operate the Sanders #1 well: Chisos operates this well.  However, it continues to produce gas.

Production from the Booth-Freeman #1 Well is sufficient to perpetuate the Booth-Freeman Unit, as well as the Walling Lease, because production anywhere in the Booth-Freeman Unit constitutes production on the Walling Lease.  *Chambers v. San Augustine Cty. Appraisal Dist.*, 514 S.W.3d 420 (Tex. App. 2017) ("Production anywhere on a pooled unit is treated as production on every tract in the unit.  Thus, all royalty interest owners in the land subject to the lease share in production no matter where the well is drilled on the leasehold.  The lessor's royalty interest under a lease providing that lessor will have a fractional portion of the minerals produced is considered an interest in real property and is taxable as such." (citations omitted)).

Based upon the evidence and testimony described above, the Court finds that the Walling Lease has not terminated because the Booth-Freeman #1 Well was drilled within the primary period of the Walling Lease, began producing and continues in production.  The Walling Lease did not terminate and remains in effect.[59]

### ii.    The Parker Heirs Do Not Own Mineral Rights in the 69-Acre Tract.

As mentioned above, the Booth-Freeman Unit contains the 69-Acre Tract situated to the north of the 25-Acre Tract.  The 69-Acre Tract was once owned by a Pat and Katie Waldron.

---

[59]  The Debtors raised an alternative argument of adverse possession if the Court found that the Walling Lease terminated.  As the Court finds that the Walling Lease has **not** terminated, the Court need not reach the issue of whether the Debtors have established a lease via adverse possession.

The Parker Heirs claim that Pat Waldron and Pat Walling are the same person, which the Debtors dispute.

One source of confusion is a May 6, 1987, affidavit by Pat Walling's niece Doretha Moore, which states that Pat Walling changed his last name to Waldon, which was sometimes spelled Walden.  Significantly, the affidavit does not mention the last name of Waldron.[60]

As summarized above, the Debtors have produced affidavits of heirship, census records, and marriage and death records, to show that Pat Walling/Waldon is not the same person as Pat Waldron.[61]  Further, the Debtors produced multiple title opinions held in the land files that the Debtors obtained when they acquired their interest in the units, which state that Randolph Parker only owned an interest in the 25-Acre Tract.[62]  Based on the title opinions, it does not appear that any interests are attributable to Randolph Parker in the 69-Acre Tract.

In addition, Randolph Parker signed a division order (as discussed in more detail below) acknowledging that he only owned a .0001065 interest in the Booth-Freeman Unit based on his interest in the 25-Acre Tract pursuant to the Walling lease.[63]  If Randolph Parker held an additional claim in the Booth-Freeman unit, his interest would have exceeded that .0001065 interest (as that figure corresponds only to the proportional interest in the 25-Acre Unit, as calculated above).

---

[60]  Debtors Tr. Exh. 37.

[61]  *See* Debtors Tr. Exhs. 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 39, and 40.

[62]  Debtors Tr. Exhs. 12, 13 and 14.

[63]  Debtors Tr. Exh. 15.

The Parker Heirs, as noted above, have proposed some plausible theories concerning whether Pat Walling/Walden could possibly be the same as Pat Waldron.  However, the Parker Heirs have the burden of proof regarding ownership of any royalty interests, and they needed to come into Court with evidence establishing their ownership interests in the 69-Acre Tract and rebutting the Debtors' evidence.  This, they did not do.  As such, the Court finds that the Parker Heirs do not possess any royalty interests in the 69-Acre Tract.

### iii.    The Debtors Do Not Owe the Parker Heirs a Larger Royalty Payment.

### a.    Division Order

A division order, as used in the oil and gas industry, is essentially a contract between the lessee and mineral interest owners (including royalty owners).  The purpose of the document is to warrant and affirm the amount of each mineral interest owner's interest.  The function of a division order is (i) to provide a procedure for distributing the proceeds from the sale of oil and gas by authorizing and directing to whom and in what proportion to distribute the sale proceeds and (ii) to protect the lessee from liability for improper payment of royalties.  *Neel v. Killam Oil Co., Ltd.*, 88 S.W.3d 334, 342 (Tex. App.—San Antonio 2002, pet. denied).  As a condition for the payment of proceeds from the sale of oil and gas production to a mineral interest owner, a lessee is entitled to receive a signed division order from the mineral interest owner containing provisions set forth in Section 91.402 of the Texas Natural Resources Code.

Division orders are binding until revoked.  *Pan Am. Petroleum Corp. v. Long*, 340 F.2d 211, 223 (5th Cir. 1964) (holding that "the law of Texas is that a division order is the operative instrument of transfer, whether called a contract or not, and until revoked is binding on the

parties, who thereunder declare their present ability and intent to transfer, sell, or otherwise dispose of the oil to the pipeline, and their entitlement to payment for this same transfer."); *Exxon Corp. v. Middleton*, 613 S.W.2d 240 (Tex. 1981); *Ohrt v. Union Gas Corp.*, 398 S.W.3d 315, 327 (Tex. App.—Corpus Christi 2012, pet. denied); *see also* TEX. NAT. RES CODE ANN. § 91.402(g).  Texas law and the Walling Lease place the burden on the mineral interest owner to notify the Operator in writing of any change in ownership of an interest.

In *Middleton*, landowners brought suit to recover alleged deficiencies in royalty payments for natural gas production from wells.  The division orders, which had been executed by the landowners, obligated the lessees to pay royalties at lesser rates than those required under the royalty clauses of the natural gas leases.  The Supreme Court reiterated that under Texas law payments made and accepted under an agreement, such as the division orders in question, were effective until the agreement was revoked.  *Middleton*, 613 S.W.2d at 250.

The *Middleton* decision solidified Texas' "binding-until-revoked rule."  Following *Middleton*, both state and federal courts have found that royalty owners who execute division orders have waived any right to subsequently claim that larger payments are owed.  *See Bailey v. Shell Western E & P, Inc.*, 555 F. Supp. 2d 767 (S.D. Tex. 2008); *Neel v. Killam Oil Co., Ltd.*, 88 S.W.3d 334, (Tex. App.—San Antonio 2002, pet. denied) (if the royalty owners "had signed the new division orders and accepted one-sixteenth royalty payments under the new division orders, they would have waived their rights to the larger amount they claimed was owed to them"); *Ohrt*, 398 S.W.3d at 327 ("appellants were bound by the division orders because they accepted

24

royalty payments based on the unit percentages under the division orders, and they did not revoke the division orders").

For example, in *Bailey*, the landowner executed 32 different division orders and accepted payments under them beginning in 1984. *Bailey*, 555 F. Supp. 2d at 773-74. Bailey first expressed discontent in a letter dated in 1990. For the next seven years, Bailey failed to make any additional complaint until after a lawsuit in 1997. The court found that the claimant consented to the treatment of which he complained and that the producers adhered to the instruments between themselves and the claimants. Based on this, the Court concluded that Bailey had waived his claim to larger royalty payments. *Id.* The same is true here.

After the transfer to National Locater, Randolph Parker signed a division order reflecting his .0001065 interest in the Booth-Freeman Unit. Later, after the Parker Heirs notified the Debtors of the change in ownership and provided evidence of such change, the Debtors sent the Parker Heirs several division orders (collectively, the "Division Orders") identifying the Parker Heirs' respective royalty interests.[64] The Parker Heirs affirmed their royalty interests by executing these Division Orders and returning them to the Debtors. Consistent with the Parker Heirs' certification of their interests, the Debtors have distributed royalty payments for years in accordance with the Division Orders and the Parker Heirs accepted those payments with no objection or other indication of inaccuracy related to the Division Orders or the payments.

The Parker Heirs assert claims seeking a larger portion of the revenues derived from production from the wells based on alleged ownership interests that are far larger than the

---

[64] Debtors Tr. Exhs. 74, 75, 76, 77, 78, 79, 80, 81 and 82 (collectively, the "Division Orders").

ownership interests identified in the relevant Division Orders.[65]  However, because the Walling

Lease has been perpetuated by production from the Booth-Freeman Unit and the Sanders Unit,

the Parker Heirs are only entitled to royalties based on their pro-rata share of unit income

determined by their ownership of net mineral acres as set forth in the respective Division Orders.

There are no wells on the 25-Acre Tract, and so the Parker Heirs' only possible entitlement to

royalty payments in either the Booth-Freeman Unit or the Sanders Unit derives from the pooling

authority in the Walling Lease.  The record reflects that the Parker Heirs executed Division

Orders clearly stating the royalty interest on which payments would be made.  The record further

reflects that the Parker Heirs in no way attempted to revoke the Division Orders until, at the

earliest, the filing of their proofs of claim.[66]  As such, the Court finds that the Parker Heirs are

bound by the Division Orders.

---

[65]  For example, Gary Pop, one of the Parker Heirs, states in the *Parker Heirs' Amended Response/Objection to Debtors' Amended Second Omnibus (Substantive) Claims Objection* (D.I. 2162), filed on March 24, 2017, that:

> The 16 Booth-Freeman wells and Sanders Gas Unit well 1 sit on land the Debtor's operate but the Callie Morrison Walling Lease does not cover these wells as it expired in 1958 due to the fact that none of these wells were producing within the first year of the lease as required.  And they did not produce during the 5 year primary term.  We add that the Debtors have not paid the Parker Heirs 100% of the royalties due us because we are not due a meager royalty as the 25 acre tract of land associated with the aforementioned wells is un-leased.  We are un-leased mineral holders and are due a full ownership in any production from any wells within the 702.91 acre pooled unit.

D.I. 2162, p. 6.

[66]  Pursuant to the Walling Lease, the Parker Heirs are obligated to inform the Debtors of any change in ownership of the royalty interests.  Walling Leas, Debtors Tr. Exh. 1, ¶ 15.  Furthermore, the division order signed by Randolph Parker provides:[66]

> No change of ownership or transfer of interest shall be binding on you until you are furnished at your office or the address shown above a certified copy of the recorded instruments evidencing such transfer and your regular form or transfer order or an amended division order is executed by all parties to such transfer and is returned to you.  You shall not be required to recognize such transfer as being effective earlier than 7:00 a.m. of the first day of the calendar month in which said written notice is received by you. You are hereby relieved of responsibility for determining when any interest herein set forth has been increased, decreased,

### b. Sale to National Locater

The Parker Heirs also dispute Randolph Parker's sale of one-half of his interest to National Locater. The Debtors claimed that they have been unable to make payments to National Locater and thus, pursuant to Texas law, have been turning funds over to the Texas Unclaimed Property fund.

On May 4, 1987, Randolph Parker executed a Royalty Deed to National Locater, conveying half of his "undivided interest, in and to all of the oil royalty, gas royalty, and royalty in casinghead gas, gasoline, and royalty in other minerals in and under" the 25-Acre Tract.[67] The Debtors presented a certificated copy of the Royalty Deed to the Court at the trial. The Parker Heirs did not dispute the legitimacy of the Royalty Deed but did dispute whether the Debtors have been paying royalties to National Locater based on such transfer.

The testimony at trial was as follows:

> Q: Did you hear Ms. Jones say earlier today that she thought why Yates French from Kirkland & Ellis had misrepresented something to her with respect to national locator [sic]?
>
> A: Yes.

---

terminated, or transferred and Owner agrees to give written notice to you of any such change and to hold you harmless for all loss or expense that may result from any incorrect payment prior to such written notice.

Debtors Tr. Exh. 15, p. 2 ("Change of Ownership") (The "you" and "your" reference in the division order refers to the operator, which in this case is the Debtors.). Furthermore, Texas statute dictates that a mineral owner must notify the lessee of any change in ownership. *See* Tex. Nat. Res. Code § 91.402(c)(1). "The division orders state that the signatures of appellants '[certify] the ownership of their decimal interest in production or proceeds as described' therein. They require lessors to notify in writing of any change in ownership, interest, or address." *Ohrt*, 398 S.W.3d at 330. Thus upon inheriting Randolph Parker's royalty interest under the Walling Lease, the Parker Heirs had the obligation to provide documentation to support the transfer of interest from Randolph Parker to the Parker Heirs.

[67] Debtors Tr. Exh. 67. This also reinforces the Court's holding that the Walling Lease had not terminated in its primary term; because in 1987, Randolph Parker believed that the Walling Lease was in full force and effect when he transferred half of his interest to National Locater.

Q: And what is this debtor's -- excuse me. What is this Parker Heirs' Exhibit 74?

A: This is the Texas unclaimed property detail listed for national locator spelled L-O-C-A-T-O-R service, S-E-R.

Q: Okay. So someone searched through National Locator spelled with the last two letters O-R in Locator, right?

A: That is correct.

. . .

Q: What is Debtors' Exhibit 67?

A: This is the royalty deed from Randolph Parker to National Locator Service Inc. [sic].

Q: How is National Locator Service Inc. [sic] spelled on Debtors' Exhibit 67?

A: National and Locator is L-O-C-A-T-E-R.

Q: Okay. And that's different than the Texas unclaimed property detail spelling that someone used to search for that name, right?

A: That is correct.

Q: Okay. Did Samson, in fact, send funds for National Locator [sic] to Texas per the (indiscernible) [unclaimed property] statute?

A: Yes, we did.

Q: Okay. Have you actually performed a search of the Texas unclaimed property details using the correct spelling of National Locator [sic] as it is in the deed that's Debtors' Exhibit 67?

A: Yes.

Q: What did you find when you performed that search on the Texas unclaimed property details?

A: Spelling it with an E-R, there are unclaimed funds under that amount from Samson.[68]

---

[68] May 2, 2017 Hr'g Tr. 154:14-156:1.

Based on the testimony and the royalty deed admitted into evidence at trial, the Court finds that Randolph Parker transferred one-half of his royalty interests to National Locater.[69] The Court further finds that the Debtors have complied with the terms of the royalty transfer to National Locater.

### c. Accounting

After the transfer to National Locater, Randolph Parker owned a .0001065 royalty interest in the Booth-Freeman Unit related to the 25-Acre Tract. As reflected in the Division Order signed by Randolph Parker,[70] this interest is calculated based on the above, and as reflected in the division order, Randolph Parker's interest is calculated as: $\frac{1}{2}$ x $\frac{1}{2}$ x $\frac{1}{8}$ x $\frac{1}{8}$ x $\frac{19.61}{702.91}$ = .0001065.[71] This interest has now been divided among the Randolph Parker's 12 grandchildren. Thus, each of the Parker Heirs' fractional interest in the Booth-Freeman Unit is .00000887.[72]

The Debtors assert that they have been properly paying each of the Parker Heirs his or her share of the royalties on production from the Booth-Freeman Unit and the Sanders Unit. The

---

[69] As mentioned above, much of this dispute could have been avoided through communication between the Debtors and the Parker Heirs. To compound the confusion, the demonstrative accession chart which was provided to the Court by the Debtors during the hearing spelled the transferee as "National **Locators**" rather than the correct spelling of "National **Locater**," as set forth in the deed. *See* Debtors Tr. Exh. 67.

[70] Debtors Tr. Exh. 15.

[71] *See*, *supra*, note 40.

[72] Chris Parker's .00000887 interest is now owned by his children: Chris D. Parker, Crystal Sykes, and Breanna Parker. *See* Debtors Tr. Exh. 98.

Parker Heirs dispute that the Debtors properly accounted for their equal proportional share of their royalty interests.[73]

At this stage of the proceedings, the Parker Heirs had the burden to establish the amount of their claims and to rebut the Debtors' records and evidence of proper, regular payments under the Walling Lease.  Prior to the trial, the Parker Heirs employed Mary Ellen Denomy, an accountant who specializes in oil and gas, to develop the record regarding any errors in calculating the Parker Heirs' royalty payments.  However, during trial, the Parker Heirs withdrew Ms. Denomy as a witness.[74]  Thus, the Parker Heirs did not put forth any evidence regarding the alleged errors in the Debtors' accounting for the Parker Heirs' royalty payments.

---

[73] At trial, Ms. Jones asserted:

> They argue that they have done that but even without Ms. Denomy's input, there are times over the 17 years that I would get a check, say, for $13.  They would get a check for 95 cents.  Someone else would get a check for, say, $40.  And if we're divided equally, we're all supposed to get the same exact amount.  So we still question -- we still say that something was not right according to even their own accounting system . . .

May 2, 2017, Hr'g Tr. 135:15-23.

[74] At trial, Ms. Jones withdrew her expert witness Ms. Mary Ellen Denomy:

> Ms. Jones: Since it's causing such a stir and such an issue we asked Ms. D[enomy] to help us to figure out the dollar amount that the debtors owed us anyway.  She wasn't crucial to our case. I mean, we feel like our case is strong anyway.  This was just to help us to figure out --
>
> The Court: The amount.
>
> Ms. Jones: -- the money out.  So since it's causing such an issue, we're just going to withdraw her as a witness and we're just going to present our case and be satisfied with that. . . . So it's not a major issue to us.
>
> The Court: Okay.
>
> Ms. Jones: We'll just present our case.
>
> The Court: All right.  I understand.
>
> Ms. Jones: And we will rely on our original proof of claim which was back to the amount of $100 million and let the Court decide what the outcome is going to be.

May 2, 2017 Hr'g Tr. 26:8-27:10.

At trial, the Debtors presented the check details to each of the Parker Heirs[75] and elicited

the following testimony from Lisa Johnson, the Debtors' Division Order and Land

Administration Manager:

> Q: Earlier today, I heard Ms. Jones question why the Parker [H]eirs received checks in different amounts. Did you hear her say that?
>
> A: Yes.
>
> Q: Is there an explanation for that?
>
> A: Yes.
>
> Q: Would you please explain that to the Court?
>
> A: Okay.  So there are factors that play into the checks, one of them being, some owners will be put into the system without a social security number.  And our system, if you do not have a social security number, we automatically withhold 28 percent to pay the taxes for the owner until they provide us with a tax -- or social security number.  So we do know some of that went on with some of their checks.  That would be one of the reasons.  Another reason would be because of all the adjustments that were made per the different affidavits that were sent, there were different adjustments that were made so different people's decimals would have been different at different times.  That'd be another reason.  Another reason would be through the course of these checks going out and being sent to the Parker [H]eirs, some would cash them, some would not. If their checks were not cashed, they continued to accrue in our system. Therefore, they would be paid different ones -- you pay different amounts at different times.  So those are a few reasons as to why their checks would have been different amounts.[76]

Thus, the *only* evidence presented at trial was that the Debtors complied with the written

instructions of the Parker Heirs regarding their inheritance of Randolph Parker's royalty interest,

---

[75]  Debtors Tr. Exh. 97.

[76]  May 2, 2017 Hr'g Tr. 150:22-151:24.

that there are coherent business explanations for the different amounts received by each of the Parker Heirs, and that the Debtors have fully and properly paid the Parker Heirs for their fractional royalty interest.

The Court finds that the Debtors have paid the Parker Heirs all royalties earned in the ordinary course of the Debtors' businesses.

## CONCLUSION

For the reasons set forth above, the Court finds that the Walling Lease has not terminated and remains in full force and effect, the Walling Lease provides for pooling, and the Parker Heirs have been paid their proportional royalties in the ordinary course of the Debtors' business.  As such, the Parker Heirs have not met their burden by a preponderance of the evidence to support the Parker Heir Claims.  The Court will **SUSTAIN** the Second Omnibus Objection, in part and as set forth herein, and disallow the Parker Heir Claims in their entirety.  The Court need not reach the Claims Reserve Motion as it is moot as it relates to the Parker Heir Claims.

An appropriate order will issue.

Dated: June 15, 2017
Wilmington, Delaware

**BY THE COURT:**

_____
Brendan Linehan Shannon
Chief United States Bankruptcy Judge